UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ADAM CARMON | : | NO.: 3:23-CV-00944 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | FEBRUARY 19, 2025 |

## MEMORANDUM OF LAW IN SUPPORT OF THE CITY OF NEW HAVEN'S MOTION FOR SUMMARY JUDGMENT

### I.    FACTUAL BACKGROUND

The Local Rule 56(a)1 Statement of Undisputed Material Facts is adopted in its entirety and incorporated herein by reference. See Local Rule Statement (hereinafter "LRS") ¶¶ 1-74.

### II.    STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 256 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party seeking summary judgment satisfies their burden of demonstrating that there exists no genuine issue of material fact in dispute where they point to the absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S.317, 323-25 (1986). "A defendant need not prove a negative when it moves for

summary judgment on an issue that the plaintiff must prove at trial. It need only to point to the absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial." <u>Parker v. Sony Pictures Entertainment, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (internal quotation marks omitted), citing Celotex, 477 U.S. at 324.

## III.    LAW AND ARGUMENT

### A. The Plaintiff's *Monell*-Based Claim against the City of New Haven in Count VI Fails as a Matter of Law

The Plaintiff, Adam Carmon (hereinafter "Carmon"), in Count VI, has asserted direct claims of municipal liability against the City of New Haven (hereinafter the "City") for civil rights liability, based on several theories:

1. the New Haven Police Department's ("NHPD") consistent and *widespread practice* of fabricating evidence against suspects in homicide and other felony cases, by coercing false confessions, feeding information to witnesses, and falsely "clarifying" unhelpful witness statements, constituting a municipal *custom or usage*. Amended Complaint [Doc. 71] ¶ 395;

2. the NHPD's consistent and *widespread practice* of destroying and/or suppressing exculpatory information in homicide and other serious felony cases, constituting a municipal *custom or usage.* Amended Complaint [Doc. 71] ¶ 396;

3. the NHPD's consistent and *widespread practice* of failing to exclude exculpatory information in arrest warrant applications, which constituted a municipal *custom or usage*. Amended Complaint [Doc. 71] ¶ 397;

4. the City and its municipal policymakers' *deliberate indifference* to NHPD officers' repeated fabrication of evidence, coercion of false confessions, feeding of details to witnesses, false "clarifying" of witness statements, suppression of exculpatory information, and/or omission of exculpatory information from warrant applications, demonstrating an *acquiescence in and tacit authorization* of those actions. Amended Complaint [Doc. 71] ¶ 398;

5. the City and its municipal policymakers' *deliberate indifference* to the constitutional rights of its citizens, including Plaintiff, who came in contact with its police officers, including Det. DiLullo, by *failing to adequately discipline and supervise* officers who engaged in such misconduct. Amended Complaint [Doc. 71] ¶¶ 399-400;

6. the City and its municipal policymakers' *deliberate indifference* to the constitutional rights of its citizens, including Plaintiff, who came into contact with its officers by failing to *adequately train* its police officers to conduct constitutionally appropriate investigations and disclose exculpatory information to prosecutors. Amended Complaint [Doc. 71] ¶ 401, et seq.

The City is entitled to judgment as a matter of law as to each of Plaintiff's theories of Monell liability, which amount to (1) a custom or usage, pattern or practice of unconstitutional techniques and disclosures to prosecutors, (2) municipal policymakers' ratification and/or deliberate indifference to officer misconduct, or (3) a failure to supervise, discipline, and train officers, and each of which are each discussed in turn below.

The United States Supreme Court first recognized a direct claim against a municipal entity itself as a "person" within the meaning of § 1983 in Monell v. Dept. of Social Services, 436 U.S. 658, 690, 98 S. Ct. 2427, 56 L. Ed. 2d 611 (1978). In so recognizing, the Court held that a municipality may be held liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690. "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." Id.; see also, Oklahoma v. Tuttle, 471 U.S. 808, 810, 105 S. Ct. 2018, 56 L. Ed. 2d 791 (1985). A municipality may not, therefore, be held liable under § 1983 on a respondent superior theory solely for injuries inflicted by its employees or agents. See Monell, 436 U.S. 691, 694. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

Consistent with the foregoing, in order to state a cognizable claim against a municipality pursuant to § 1983, a plaintiff must: (1) prove the existence of a municipal policy or custom, the exercise of which caused a deprivation of the plaintiff's constitutional rights; and (2) establish an affirmative link between the policy and the alleged constitutional violation. See Oklahoma v. Tuttle, 471 U.S. at 817, 823. Stated differently, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008).

1. **The Plaintiff Cannot Demonstrate the City and Its Municipal Policymakers Had Knowledge or Reason to Suspect Impropriety in Connection with Carmon's Arrest and Did Not Ratify Improper Conduct**

A municipality may be subject to direct liability in a § 1983 claim if it can be established that "a policymaker ordered or ratified the subordinate's actions" or "that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004). In making this assessment it is axiomatic that the only relevant events are those that both: (1) occurred prior to the alleged unconstitutional conduct, and (2) can fairly be said to be a moving force behind the constitutional violation underlying the Monell claim. See Connick v. Thompson, 563 U.S. 51, 62 (2011) (to show a supervisory authority's deliberate indifference, a plaintiff cannot point to "contemporaneous or subsequent" violations to establish a pattern of unconstitutional conduct); Collins v. City of New York, F.Supp.2d 462, 479 (2013) (finding evidence of police-misconduct was insufficient to make plausible claim for Monell liability in part because the conduct "post-date[d] [the plaintiff's] conviction"). Rodriguez v. City of New York, 607 F.Supp.3d 285, 300 (2022); see also McLennon v. City of New York, 171 F.Supp.3d 69, 99 (E.D.N.Y. 2016) (finding plaintiff alleging constitutional violations by the prosecution did

not plead municipal liability for failure to supervise when the underlying constitutional violation
preceded the cases she cited to in her complaint).

There is no evidence of any misconduct by Officers Leroy Dease, Michael Sweeney,
James Stephenson, Gilbert Burton, James Ponteau, and Peter Carusone that came to the attention
of Chief Pastore or the City's policymakers prior to the arrest of Carmon in 1994. Viewing the
undisputed facts and accepting Plaintiff's version of facts for purposes of this motion, as a matter
of law, Carmon cannot establish that the alleged unconstitutional conduct by the Officers
occurred because of the City of New Haven's prior acquiescence to unconstitutional actions sent
a message to officers that it was okay to fabricate evidence, coerce false confessions, feed
witnesses details, suppress or omit exculpatory evidence.

There is no evidence that the City condoned impropriety by a City officer. In fact, the
City had no information relating to any impropriety as to the investigation, arrest and prosecution
of Carmon.  An examination of what the City would have known in real time regarding the
investigation, arrest and prosecution of Carmon points away from any impropriety and toward
the conclusion that Carmon was properly arrested for involvement in the Taft homicide.
Specifically, as the events unfolded during the investigation in 1994, and at Carmon's criminal
trial in 1995, the City would have seen the following.

On February 3, 1994, seven-month-old infant, Danielle Taft was killed and her
grandmother, Charlene Troutman, was paralyzed when a gunman fired shots into the Troutman's
apartment located at 810 Orchard Street. LRS ¶ 1. NHPD Officers, Leroy Dease, Michael
Sweeney, James Stephenson, Gilbert Burton, James Ponteau, and Peter Carusone participated in
the Taft homicide investigation. LRS ¶ 2. The day after the shooting, February 4, 1994, the
police questioned Arthur Brantley because they had learned that Brantley had been involved in a

heated argument with Troutman and her family members at 810 Orchard Street on the afternoon of the shooting. LRS ¶ 3. Because of this, the police viewed Brantley as a suspect in the Taft homicide. LRS ¶ 4.

Brantley initially denied any involvement in the murder, before giving multiple recorded statements to the police, including a written statement on February 7, 1994, implicating Anthony Little in the Taft homicide. LRS ¶ 5. Based on Brantley's February 7th statement, the police believed that Little had participated in the shooting and obtained a search and seizure warrant regarding Little. LRS ¶ 6. Brantley recanted both his inculpatory statements on February 18, 1994, in a recorded statement to Detectives DiNello and Burton, indicating that his previous statements implicating himself and Anthony Little in the Taft homicide were fabricated because he was threatened, and wanted to protect his family. LRS ¶ 7, 27. Additionally, Brantley had an alibi at the time of the Taft homicide. LRS ¶ 8.

On February 7, 1994, the NHPD received a complaint related to a shooting that occurred on Townsend Street near Henry Street. Anthony Stevenson and Carmon were identified as subjects of the shooting. LRS ¶ 9. Anthony Stevenson was found injured with a 9-millimeter handgun lying next to him. Carmon was uninjured and indicated he was shot at but was wearing a bulletproof vest. LRS ¶ 10. The handgun involved in this shooting was provided to a New Haven police detective, Det. Stephenson, for forensic analysis. LRS ¶ 11. Det. Stephenson examined and test fired the handgun and concluded that it was the handgun used in the Taft homicide. LRS ¶ 12. Det. Stephenson compared the handgun that Anthony Stevenson was in possession of with the shell casings found at the crime scene at 810 Orchard Street and determined that the 9-millimeter weapon found alongside Stevenson was the handgun used in the Taft homicide. LRS ¶ 13. Anthony Stevenson gave a recorded sworn statement to the NHPD on

February 10, 2025, indicating that prior to the Townsend Street shooting, Carmon aka "Twenty" was in possession of the 9-millimeter weapon that was found next to him. LRS ¶ 14. Carmon became a suspect for the Taft homicide at approximately this time. LRS ¶ 15.

Anthony Stevenson and Carmon were members of a street gang known as the Fifth Ward, which is known for selling narcotics on the corner of Henry Street and Orchard Street. LRS ¶ 16. Stevenson gave a recorded sworn statement to the NHPD on February 15, 2025, stating that he saw Carmon scraping the handgun with a screwdriver. LRS ¶ 17. Det. Stephenson also linked the handgun to a previous shooting that occurred on January 15, 1994, at the location of Dixwell Avenue, a very short distance from 810 Orchard Street and 37 Townsend Street. LRS ¶ 18. During the investigation, Timothy McDonald was found to have had possession of the handgun sometime after a house burglary in 1993. LRS ¶ 19. McDonald admitted that he was in possession of the handgun, but he sold the handgun to a man named Adam, also known to him as "Twenty." LRS ¶ 20.

On February 15, 1994, Anthony Stevenson gave another recorded sworn statement to Det. Dease, stating that on the evening of February 7, 1994, he observed Carmon use a screwdriver to clean the barrel of the handgun. LRS ¶ 21. That same day, Carmon was arrested on an escape warrant and gave a sworn statement to Detective Dease, putting himself near 810 Orchard Street, New Haven, around the time of the Taft homicide. LRS ¶ 22. Carmon admitted to being in possession of the handgun after receiving it from "Tim," corroborating Timothy McDonald's statement. LRS ¶ 23.

Early on in the investigation, Jaime Stanley and Raymond Jones were identified as two eyewitnesses to the Taft homicide. LRS ¶ 24. At the time of the Taft homicide, Stanley and Jones gave consistent statements that they were stopped at a traffic light near Troutman's apartment and

saw a man firing into the apartment. LRS ¶ 25. As the shooter ran away, both Stanley and Jones

saw his face. LRS ¶ 25. On February 16, 1994, Jones was shown a photo array at the police

station and selected a photo of Carmon as the shooter. LRS ¶ 26. On February 22, 1994, Jaime

Stanley, in the presence of Detective DiLullo and Detective DiNello, made a positive

identification of Adam Carmon. LRS ¶ 28. On February 23, 1994, Detective Dease applied for

an arrest warrant and Carmon was arrested for the Taft homicide. LRS ¶ 29.

There is no part of the above undisputed facts that supports a claim that: (1) the City or

policymakers had knowledge or reason to suspect impropriety in connection with Carmon's

arrest; (2) Chief Pastore condoned prior misconduct by Det. DiLullo or any other detective; or

(3) such hypothetical condoning caused officers to violate Plaintiff's constitutional rights in

connection with the investigation of him, his arrest, or his sentencing. As a matter of law, the

"affirmative link" requirement for Monell liability based on the City's alleged ratification or

condoning of bad behavior is not met, and the City is accordingly entitled to summary judgment.

### 2. The Plaintiff Cannot Demonstrate Municipal Liability based on the City of New Haven Police Department's Custom, Pattern or Practice of Unconstitutional Investigative Techniques

Under Monell, an "official municipal policy includes . . . practices so persistent and

widespread as to practically have the force of law." Lucente v. City. of Suffolk, 980 F.3d 284,

297 (2d Cir. 2020), quoting Connick v. Thompson, 563 U.S. 51,61, 131 S. Ct. 1350, 179 L. Ed.

2d 417 (2011). In order for liability to attach, there must be acquiescence by the municipal entity

to "a longstanding practice or custom which constitutes the 'standard operating procedure' of the

[municipality]." See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L.

Ed. 2d 598 (1989); see also, Perkins v. City of Rochester, 641 F. Supp. 2d 168 (W.D.N.Y. 2009);

Sorlucco v. New York City Police Dept., 971 F.2d 864, 871 (2d Cir. 1992) (finding that

"persistent and widespread" practices of city officials may establish municipal liability if they are "so permanent and well settled as to constitute a 'custom or usage' with the force of law"). However, "before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Id.; Littlejohn v. City of New York, 795 F.3d 297, 315 (2d Cir. 2015); Patterson v. Cnty. of Oneida, N.Y, 375 F.3d 206, 226 (2d Cir. 2004).

The Second Circuit's decision in Jones v. Town of East Haven, 691 F.3d 72 (2d Cir. 2012) is instructive. In Jones, the plaintiff attempted to demonstrate Monell liability through specific incidents of isolated conduct by non-policy-making police officers, and attribute those to a custom of the municipality. The trial court entered judgment in favor of the Town and the Court of Appeals affirmed, holding that while the evidence at issue demonstrated instances of reprehensible and unconstitutional conduct by individual officers, "such a showing is not a sufficient basis for imposing liability on the municipality." Jones, 691 F.3d at 82. Rather, in order to justify the imposition of liability upon the municipality, a plaintiff must show that the loss alleged was attributable to a custom, policy or usage of the municipality or its supervisory officials by way of evidence establishing:

> a pattern of abusive conduct (or expressions of inclination toward such abusive conduct) among officers, so widespread as to support an inference that it must have been known and tolerated by superiors. [Or] sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse. [Or] evidence that supervisors communicated to officers an attitude of indifference to abuse so as to give the officers a sense of liberty to abuse rights.

Id.

### a. The New Haven Police Department had Policies that Protected Constitutional Rights

In the instant matter, Carmon points to no official policy of the City of New Haven which provides for, or otherwise authorizes, unconstitutional investigative techniques, coercion of witnesses, fabrication of evidence, destruction of evidence, or the suppression of evidence. On the contrary, the NHPD's policies, procedures and training do not direct or condone such unconstitutional conduct. Since the 1970s, a NHPD Code of Conduct has been in place that mandated all police officers to be truthful, and prohibits fabrication of evidence, or withholding of evidence of any kind. LRS ¶ 50. The Code of Conduct specifically provided, inter alia, that:

> 15.    No employee of the Department shall make false official reports knowingly or willingly enter or cause to be entered into any department books, records or reports any inaccurate, false or improper information of material matter. …
> 23.    Employees of the Department shall not fabricate, withhold or destroy any evidence of any kind.

LRS ¶ 50. The NHPD's Code of Conduct further provided that all NHPD employees are required to observe and follow the Code of Conduct, the failure of which could result in punishment by way of reprimand, suspension, reduction in rank or by dismissal upon conviction. LRS ¶ 51.

In the late 1980s and early 1990s, New Haven police officers and detectives received training necessary for certification in the police academy and continuing "recertification" training on a yearly basis from, inter alia, Attorney Elliot Spector. LRS ¶ 52-53. Beginning in the late 1980s, as part of NHPD officers' yearly in-service training, Attorney Spector trained on the duty to disclose exculpatory evidence during his civil liability course. LRS ¶ 54. Indeed, Det. Carusone testified showing his knowledge of exculpatory information is and stating that he was trained on it. LRS ¶ 62. Moreover, it was Det. Carusone's practice to document exculpatory evidence. LRS ¶ 63. In addition to recertification training, the NHPD distributed training bulletins to its officers regarding preservation of evidence. Specifically, Training Bulletin 8-3

governs the "Preservation of 911 Tapes and Tapes of Statements" and provides that, "tapes of incoming calls by a defendant, victim (or both), an eyewitness or a non-eyewitness who may later testify at a trial should be preserved. Also, tapes of statements of such persons should be preserved as evidence even if such are transcribed." LRS ¶ 60. Training Bulletin 8-3 further provides that "[a]ll field notes of police officers should be preserved for at least three years since they may be discoverable as a statement of a witness or in the alternative, as a statement of the officer if he or she is called to testify." LRS ¶ 61. As such, prosecutors would have access to officers' notes and statements. LRS ¶ 61.

The undisputed facts demonstrate that the NHPD's policies, procedures and training bulletins do not direct or condone unconstitutional investigative techniques, coercion of witnesses, fabrication of evidence, destruction of evidence or the suppression of evidence. LRS ¶¶ 50-63. As a matter of law, Plaintiff cannot demonstrate an affirmative link between a policy to act in violation of constitutional rights, and the alleged unconstitutional conduct that led to Carmon's second arrest in February 1994 for the Taft homicide and his subsequent prosecution. The City is, therefore, entitled to judgment as a matter of law on this aspect of the Plaintiff's Monell claim in Count VI of the Amended Complaint.

### b. The Plaintiff Cannot Demonstrate Monell Liability based on the Existence of a Practice of Violating Constitutional Rights So Pervasive as to have the Effect of Municipal Policy

The other NHPD investigations relied upon by Carmon in his Amended Complaint as examples of prior misconduct by NHPD officers fail to establish a practice by the NHPD of violating constitutional rights so pervasive and widespread as to have the effect of municipal policy and result in Monell liability. The cited instances by Plaintiff, accepted as true for the

purposes of this motion, also do not establish an affirmative link between such policy as of the time the Taft homicides were investigated, and Plaintiff was arrested. The cited instances are as follows:

Anthony Golino

In 1984, the NHPD arrested Anthony Golino after an eleven-year investigation for a murder occurring in 1973. See Golino v. New Haven, 950 F.2d 864, 866 (2d Cir. 1991). In a civil rights suit that followed and focused on the actions of NHPD Detective DiLullo, the District Court granted summary judgment in favor of the City of New Haven and Chief Farrell on the Monell claims, finding that Detective DiLullo's alleged misconduct could not be traced to a City policy of unconstitutional conduct, to a custom of constitutional deprivations that would otherwise establish a policy of unconstitutional conduct, or to inadequate training. See Golino, 761 F.Supp. 962, 973 (D. Conn. 1991). Again, the conduct of one detective in one instance does not constitute the custom and practice of the NHPD. It was judicially determined in Golino's case that NHPD policies, customs and training were constitutionally proper, and Golino's Monell claims were dismissed as a matter of law. Id.

Leroy Harris

This case involves the September 18, 1984, arrest, subsequent prosecution and conviction of Leroy Harris on charges of robbery and sexual assault. See State v. Harris, 22 Conn. App. 329, 330, 577 A.2d 1077 (1990). The subsequent 2003 habeas ruling found that there existed no evidence proving any misconduct by the NHPD. Harris v. Warden, No. CV000439473, 2003 WL 22133419, (Conn. Super. Ct. Aug. 25, 2003).

Maceo Streater

Maceo Streater was arrested in 1990 for the murder of Terrence Gamble and was convicted in 1993. All his appeals and habeas corpus petitions were unsuccessful, and he served out his full prison sentence. Streater v. Comm'r of Correction, 143 Conn. App. 88, 68 A.3d 155, (2013).

Eric Ham

In Ham v. Greene, 248 Conn. 508, 729 A.2d 740 (1999), the Connecticut Supreme Court concluded that the trial court did not abuse its discretion in concluding "that although this was a close case, it could not decide as a matter of law that there existed no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits…." Id. at 526 (internal quotations omitted). The decision further contained a footnoted reference to the fact that the prosecution of the plaintiff was nolled after two witnesses recanted their statements implicating the plaintiff. Id. at 516 n. 4. There was no analysis or finding as to whether any improper interrogation techniques were utilized or whether the statements were coerced in any manner. Accordingly, the Ham decision provides no admissible evidence establishing that a pattern or practice of unconstitutional conduct existing as of 1992 led to and was a "moving force" in the Plaintiff's arrest. It bears emphasis that Ham's civil rights trial occurred in 1996, and the appeal was decided by the Connecticut Supreme Court in 1999, years after the Carmon arrest.

Daryl Valentine

Carmon's next cited exemplar NHPD investigation involves the prosecution of Daryl Valentine. See State v. Valentine, 255 Conn. 61, 762 A.2d 1278 (2000). In 1994, a jury

13

convicted Valentine of the murders of Andrew Paisley and Hury Poole. Id. at 63-64. No allegations of misconduct were made until at the earliest 1994, when witnesses Higgins and Coleman both recanted their statements, claiming that Detective Joseph Greene had coerced and pressured them into making the statements. Id. at 65- 66. Thereafter, at Valentine's second trial in 1998, Higgins reiterated that her statement was coerced, while Coleman testified that she did not recall saying that her statement was untrue or whether the detective had told her what to say or pressured her in any way. Id. at 66. The Valentine ruling contains no analysis or finding as to whether any improper interrogation techniques were utilized, or whether the statements were coerced in any manner, or whether Valentine's constitutional rights were violated in any way whatsoever. On the contrary, Valentine was convicted upon retrial. Accordingly, the Valentine case does not provide admissible evidence establishing that a pattern or practice of unconstitutional conduct led to the violation of Carmon's rights therein, let alone that the City was aware of and/or acquiesced to any such unconstitutional conduct.

        Scott Lewis & Stefan Morant

        The next case identified is the 1996-1997 FBI investigation of a former NHPD detective Vincent Raucci, who conducted a homicide investigation resulting in the arrest of Scott Lewis and Stefon Morant. The FBI investigation into Detective Vincent Raucci began sometime after March 1995 and ended sometime in early 1997, and involved solely an investigation into Raucci with regard to the Turner/Fields homicide. LRS ¶ 64. By the end of the FBI investigation in February 1997, Ovil Ruiz, the lead witness, met with the FBI and U.S. Attorney, with his attorney present, and told them that he had been pressured to lie to the FBI by Scott Lewis and confirmed that the statements he gave to Detective Raucci during Raucci's investigation, and the

testimony he had given at the trials of Lewis and co-defendant Stefon Morant was the truth. LRS ¶ 65.

The few incidents cited above do not, as a matter of law, constitute a pervasive practice to violate constitutional rights, so widespread as to have the effect of department policy. The events occurred in a police department staffed with 30-40 detectives who handled approximately 1,500 cases annually involving homicide, sexual assault, robbery and aggravated assault. LRS ¶ 54. The few incidents raised represent such a small percentage of the total cases being handled by the detectives at the NHPD that any misconduct claimed could not, as a matter of law, be considered to have been part of a pervasive practice to violate constitutional rights so widespread that it had the force of policy and was a moving force behind Plaintiff's arrest in 1994.

Aside from arrests of other persons, the Plaintiff points to a pervasive practice to conduct unrecorded "pre-interviews," prior to obtaining recorded statements of witnesses and suspects. Plaintiff points to no precedent mandating that officers were constitutionally required to record the entirety of their interactions with witnesses or suspects. In fact, from 1985-2006, the FBI was not recording witness interviews at all, either by way of audio tape or videotape, as it was their policy not to do so. LRS ¶ 66. Additionally, there is no requirement that interviews be recorded. State v. Johnson, 288 Conn. 236, 279, 951 A.2d 1257, 1285 (2008) (failure of investigating officers to record the entirety of their interviews with state's witness did not constitute a failure to preserve evidence in violation of due process.). State v. Lockhart, 298 Conn. 537, 540-60 (2010) (noting that the Connecticut Constitution does not require the electronic recording of confessions or statement). United States v. Feilbogen, 494 F.Supp. 806, 814 (S.D.N.Y. 1980), aff'd sub nom. United States v. Lichtman, 657 F.2d 265 (2d Cir. 1981) (finding that "the government is under no duty to create discoverable material for defendants' use.")

Accordingly, Carmon cannot demonstrate a practice of violating constitutional rights ongoing in the City that was so pervasive as to have the effect of a City policy existing in 1994-1995 to violate constitutional rights, and that such policy was the moving force behind officers' alleged misconduct in connection with the Carmon arrest. The City is entitled to judgment as a matter of law on this aspect of the <u>Monell</u> claim.

**3. The Plaintiff Cannot Demonstrate Municipal Liability based on the City of New Haven Police Department's Failure to Supervise, Discipline and Train its Officers and Detectives**

"To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 620 (2020). Supervisory liability requires that the plaintiff establish that there was a constitutional violation by the supervisor's own conduct, not by reason of the supervisor's supervision of other individuals that committed a constitutional violation. <u>Tangreti</u>, at 619. Holding a supervisor liable "based on a lesser showing of culpability than the constitutional violation requires—is 'inconsistent' with the principle that officials 'may not be held accountable for the misdeeds of their agents.'" <u>Id.</u> (quoting <u>Iqbal v. Ashcroft</u>, 556 U.S. 662, 677 (2009)).

Supervisory liability is individual liability, and only elevates to municipal entity liability if the supervisory misconduct is committed by a final policymaker for the entity, such as the Chief of Police, under circumstances where it can fairly be said that the actions of the policymaker are indeed the actions of the entity. The City has previously explained how the undisputed evidence shows that Chief Pastore did not condone the actions of Detective DiLullo, or any other New Haven police officer, in a way that could fairly be said to be a ratification by the City of unconstitutional conduct. <u>Oklahoma v. Tuttle</u>, 471 U.S. 808, 821 (1985)

(stating that Monell's "policy or custom" requirement "was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers"); see also Walker v. City of N.Y., 974 F.2d 293, 296 (1992); Pembaur v. Cincinatti, 475 U.S. 469, 106 (1986).

Aside from supervisory liability, a municipality's decision not to train employees may rise to the level of an official government policy for purposes of Monell liability if the failure to train amounts to a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). When "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights…the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. (stating the failure to provide proper training under these circumstances may represent a municipal policy "for which the city may be held liable if it actually causes injury"). In order to establish Monell liability in this regard, the Plaintiff must "submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiff['s] rights." Reynolds v. Guiliani, 506 F.3d 182, 192 (2d Cir. 2007) (citing Walker v. City of N.Y., 974 F.2d 293, 297-298 (2d Cir. 1992)) (holding a municipality could be liable for constitutional violations resulting from a complete failure to train Assistant District Attorneys on their Brady obligations).

In the instant matter, there are undisputed facts demonstrating that the NHPD provided training regarding the constitutional obligations of its officers, both at the Police Academy and in-service training. LRS ¶¶ 52-53. As mentioned, the duty to disclose exculpatory evidence was

17

covered by Attorney Elliot Spector in recruit training at the Police Academy beginning in the late 1980s and throughout in-service training. LRS ¶¶ 52-53. NHPD officers and detectives received in-service training yearly on civil liability and adhering to Brady and Giglio requirements. LRS ¶ 56. This training also covered the duty to disclose exculpatory evidence in police reports, warrants and to the prosecutor. LRS ¶ 57. NHPD also trained officers in detective roles that they are not to withhold or fabricate evidence. LRS ¶ 58. Clearly, the disclosure of exculpatory and impeachment evidence was part of the NHPD's training curriculum throughout an officer's career. LRS ¶¶ 52-63.

The NHPD had adequate training, and it is undisputed that there was no deliberate indifference to the need for more or different training that was "so obvious" to the City or its policymakers as characterized by City of Canton, that was a moving force behind misconduct in the Taft homicide investigation.  The Taft homicide investigators included exculpatory evidence in police reports, document notes and warrant applications, and it was *the state prosecutor*, not the NHPD officers, who did not properly disclose Brady material. In its Memorandum of Decision granting Carmon's petition, the trial court determined that the State prosecutor withheld exculpatory evidence and impeachment evidence in the form of police reports, witness statements, photo arrays, photo identifications and expert witness bench notes, all of which had been provided to the State prosecutor by the NHPD. LRS ¶ 67-74. It is evident that the officers, being trained by the City knew to include important material information in police reports, notes and warrant applications. Nothing in the documents suppressed by the state show that the NHPD failed to include exculpatory information into reports or witness statements.

Ultimately, it is undisputed that the NHPD officers had a Code of Conduct that prohibited fabrication of evidence, coercing witnesses or withholding of evidence of any kind, and that the

officers received training on these obligations at the Police Academy and during recertification training sessions. The City of New Haven is entitled to summary judgment on Count VI alleging Monell liability.

### 4. The City of New Haven can have no § 1983 Liability Absent Proof of an Underlying Constitutional Violation by a City Employee

The Supreme Court has held, "[n]either [Monell], nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (finding that departmental regulations that might have authorized the use of excessive force is "beside the point" when there is no underlying constitutional harm committed by the individual officer). In the event this Court rules as a matter of law that an individual defendant has not committed a constitutional violation, the City is entitled to judgment in its favor as well, under the Heller doctrine, and seeks an order of judgment enter in its favor, accordingly.

### B. The Plaintiff's State Law Claims in Count IX for Assumption of Liability by the City of New Haven Pursuant to C.G.S. § 7-465 and in Count X for Negligence Pursuant to C.G.S. § 52-557n Fail as a Matter of Law

In Count VII and VIII, Carmon alleges a variety of claims sounding in negligence against the individual defendants. In Count IX, Carmon seeks the statutory assumption of the individual defendants' negligence liability by the City, pursuant to C.G.S. § 7-465. In Count X, Carmon pleads a direct claim against the City pursuant to C.G.S. § 52-557n. The claims in Counts IX and X incorporate by reference all prior paragraphs. As more fully set forth below, the claims against the City in Counts IX and X are barred by the statutes of limitations and repose set forth in

C.G.S. §§ 52-584, 52-577, 52-557n and 7-465, they fail as a matter of law and are subject to governmental immunity.

The City of New Haven is not required to indemnify or assume liability for underlying claims that fail, be it whether they fail due to substantive or procedural time bars imposed by the applicable statutes of limitations and statutes of repose set forth in C.G.S. § 7-465, for failure to state a claim, and/or for governmental immunity. These claims are derivative of claims against co-defendants, which are barred by the doctrine of governmental immunity as the conduct alleged involves discretionary acts as a matter of law. Additionally, as more fully set forth below, Carmon's state law negligence claims against the co-defendants are barred by the applicable statute of limitations. Furthermore, any civil rights claim, whether under the state or federal constitution, must be grounded on a mental state greater than negligence, so to the extent Plaintiff is claiming in Counts VII-III that the individual defendants negligently violated federal constitutional rights and negligently caused emotional distress, such claim must fail. See Daniels v. Williams, 474 U.S. 327, 328-31(1986). Because the claims of negligent violation of federal and state civil rights are not legally cognizable under Daniels v. Williams, supra, the derivative claim for assumption of liability by the City in Count IX fails as well. In addition, Daniels bars liability on the part of the City in the direct action in Count X for negligence under C.G.S. § 52-557n to the extent it is grounded on a negligent violation of civil rights protected by the state or federal constitution. See Daniels v. Williams, 474 U.S. 327, 328-31 (1986).

1. **State Law Claims are Subject to State Law; Accrual and Tolling under Heck does not Apply**

As a preliminary matter, in Counts IX and X, Plaintiff's state law claims re-allege and incorporate all previous Counts, including individual and municipal liability under § 1983. See

Amended Complaint [Doc. 71] ¶¶ 413, 419. Because Plaintiff also makes allegations under our *Federal Constitution*, in these counts, as well as state law negligence and indemnification claims, it is necessary to be clear: state law claims are subjected to state law. Accrual and tolling mechanisms pursuant to <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994) do not apply.

The mechanism of accrual established by the Supreme Court in <u>Heck</u> are inapplicable to state law claims of negligence. Time limitations on these claims are determined by state law. As such, Carmon's state law negligence claims and his claim for assumption of liability by the City of New Haven for said alleged negligence are subject to the statute of limitations set forth in C.G.S. §§ 52-584 and 52-557 and 7-465, all of which bar the Plaintiff's state-law claims in this matter.

Though inapplicable to state law claims in Counts IX and X, even if § 1983 federal law controlled when the state claim accrued, the statute of limitations period for a § 1983 claims is determined by reference to state law personal injury torts. <u>See</u> <u>Wallace v. Kato</u>, 549 U.S. 384, 388 (2007). Notwithstanding the foregoing, in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), the Supreme Court expressly acknowledged that certain claims do not necessarily imply that a plaintiff's conviction was unlawful, and provided the following example:

> a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful.

<u>Id.</u> at 487 n.7 (emphasis in original) (internal citations omitted). The Second Circuit has expressly acknowledged the import of this very footnote in <u>Heck</u>, noting that it underscored the fact that Heck "does not bar a § 1983 action that, at most, increases the *likelihood* that a plaintiff

will eventually be able to overturn a still-outstanding conviction, but which does not go so far as to *necessarily* demonstrate the conviction's invalidity." <u>McKithen v. Brown</u>, 481 F.3d 89, 102 (2d Cir. 2007) (emphasis in original), <u>citing</u> <u>Nelson v. Campbell</u>, 541 U.S. 637, 647, 124 S. Ct. 2117, 158 L. Ed. 2d 924 (2004) ("[W]e were careful in Heck to stress the importance of the term 'necessarily.'").

Therefore, operating within the hypothetical that <u>Heck</u> would apply, even under <u>Heck</u>, police negligence in investigation and even arrest, such as that contemplated by the Supreme Court in the above example, akin to the negligence alleged in Counts VII-VIII, places Counts IX-X in this matter outside of <u>Heck</u>'s mechanism of accrual and tolling. And if these parallels could not be drawn and the allegedly negligent actions by the City's co-defendants were to fall under <u>Heck</u>, case law is clear even still, that the statute of limitations period for tortious conduct under <u>Heck</u> is determined by state law. <u>See</u> <u>Kato</u>, <u>supra</u>. More simply put, Carmon's state law claims are subjected to and governed by state law.

## 2. The Statutes of Limitations and Repose Contained in C.G.S. § 52-584 Bar the Plaintiff's Negligence Claims
### a. Two-Year Negligence Statute of Limitations

Plaintiff's state law negligence-based claims are subject to the statute of limitations set forth in C.G.S. § 52-584, which bars the state-law negligence claims in this matter. C.G.S. § 52-584, by its very language is "applicable to actions to recover damages to real or personal property, caused by negligence." <u>Sinotte v. Waterbury</u>, 121 Conn. App. 420, 429, 995 A.2d 131 (2010) (internal quotations omitted). Connecticut General Statutes § 52-584 provides, in pertinent part, that:

> No action to recover damages for injury . . . to real or personal property, caused by negligence . . . shall be brought but within *two years* from the date when the injury is first sustained or discovered or in the exercise of reasonable care should

22

> have been discovered, and except that no such action may be brought more than
> *three years* from the date of the act or omission complained of . . .

[emphasis added.] The statute imposes two distinct time restrictions upon prospective plaintiffs bringing causes of action sounding in negligence. The first-time restriction, known as the discovery portion, requires that a plaintiff bring an action within two years from the date on which the injury alleged is first sustained, discovered or, in the exercise of reasonable care, should have been discovered. See Johnson v. North Branford, 64 Conn. App. 643, 648, (2001); Rosato v. Mascardo, 82 Conn. App. 396, 401 (2004).

In ascertaining whether a cause of action has been timely commenced in accordance with § 52-584, Connecticut Appellate Courts have consistently held that,

> an injury occurs when a party suffers some form of actionable harm…. Actionable harm occurs when the plaintiff discovers … that he or she has been injured and that the defendant's conduct caused such injury…. The statute begins to run when the plaintiff discovers some form of actionable harm, not the fullest manifestation thereof…. The focus is on the plaintiff's knowledge of facts rather than on discovery of applicable legal theories.

Rosato, at 404-05 (alteration in original), quoting Mountaindale Condominium Assoc. v. Zappone, 59 Conn. App. 311, 323 (2000).

Under the discovery portion of C.G.S. § 52–584, Carmon should have known of facts sufficient to bring a negligence claim when gave statement to police on February 15, 1994 that he knew to be false, and then again on February 23, 1994 when he was arrested for the Taft murder that he alleges he did not commit. LRS ¶¶ 22, 29. Alternatively, Carmon was required to bring this claim on or before March 15, 1995, when he was first tried. LRS ¶ 30.  At the latest, consistent with well-established Connecticut precedent, the statute of limitations on Carmon's state law negligence claims began to run on April 7, 1995, when he was found guilty, making his deadline to bring negligence claims April 7, 1997. LRS ¶¶ 39. But Carmon did not file the instant negligence

claims until July 17, 2023, more than twenty-six (26) years beyond the expiration of the statute

of limitations for bringing such claims. See Complaint [Doc. 1]. Carmon's state law negligence

claims are, thus, barred by the two-year statute of limitations set forth in C.G.S. § 52-584 and the

City of New Haven is entitled to summary judgment as a matter of law.

### b. Three-Year Negligence Statute of Repose

Notwithstanding the foregoing, Carmon's action is barred by the second time restriction

set forth in C.G.S. § 52-584, known as the statute of repose. The statute of repose provides an

absolute bar to any cause of action brought more than three years from the date of the act or

omission complained of. Id.; McDonald v. Haynes Medical Laboratory, Inc., 192 Conn. 327,

334, 471 A.2d 646 (1984). The determination of whether a plaintiff's claim is barred is a question

of law for the Court. See Lindsay v. Pierre, 90 Conn. App. 696, 699 (2005). As to C.G.S. § 52-

584. "The statutory clock on this three year time limit **begins to run when the negligent**

**conduct** of the defendant **occurs**." Johnson v. North Branford, 64 Conn. App. at 648 (emphasis

added). A cause of action may, therefore, *be time barred even where no injury occurs within the*

**three year***s following defendant's alleged negligent act or omission*. See Id.

While some rely on common law precedent, states are within their right to define how

they handle negligence in their statutes or codes. In Connecticut, the legislature has determined

in C.G.S. § 52-584 that no one can sue for negligence more than three years after the negligent

conduct occurred, regardless of when the person has knowledge that the conduct occurred. See

Vilcinskas v. Sears, Roebuck & Co., 144 Conn. 170, 174, 127 A.2d 814, 816 (Conn. 1956)

("There is no reason, constitutional or otherwise, which prevents the legislature from enacting a

statute…which starts the limitation on actions for negligence"); see also Sanborn v. Greenwald,

39 Conn. App. 289, 306, 664 A.2d 803, 812 (1995) (discussing the Connecticut legislature's right

to enact the three-year procedural time-bars to negligence claims, soon after said bar was reduced from six to three years). The fact that Carmon may not have been aware of the fullest manifestations of the harms allegedly suffered does not alter the analysis. See Rosato, 82 Conn. App. at 405; Mountaindale Condominium Assoc., 59 Conn. App. at 323.

As set forth above, the City's alleged negligence in their investigation and eventual arrest of Carmon for the Taft homicide occurred on or before his date of arrest, February 23, 1994. LRS ¶ 29. Pursuant to the statute of repose set forth in Conn. Gen. Stat. § 52-584, the latest Carmon could have brought his negligence claims would be three years from the date of his sentencing, April 7, 1995, but, again, Carmon did not file the instant negligence claims until July 17, 2023. See Complaint [Doc. 1]. Carmon's negligence claims in Counts VII and VIII related to his arrest, prosecution and conviction are, therefore, absolutely barred by the three-year statute of repose set forth in Conn. Gen. Stat. § 52-584. As such, derivative claims for the City's assumption for said liability must fail as well.

**3. The Continuing Course of Conduct Doctrine does Not Apply to the Plaintiff's Claims**

The continuing course of conduct doctrine may be used to toll the statute of limitations in certain circumstances. See Blanchette v. Barrett, 229 Conn. 256, 275 (1994). In order for the continuing course of conduct doctrine to apply to toll the statute of limitations in a matter, "there must be evidence of the breach of a duty that remained in existence after the commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." Id. A finding that a duty continued to exist after the act or omission relied upon may be made only where "there has been evidence

of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." Id.

Connecticut Appellate Courts have consistently refused to apply the continuing course of conduct doctrine after a plaintiff has discovered the harm. See Rosato, 82 Conn. App. at 405; Connell v. Colwell, 214 Conn. 242, 255 (1990). In this regard, any purported continuing duty by a defendant terminates when the plaintiff's cause of action accrues, i.e., when the plaintiff discovers that he or she has been injured and that the defendant's conduct caused such injury. Id. Consistent with the foregoing, the Court in Rosato expressly held that "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm." Rosato, 82 Conn. App. at 405. In so holding, the Rosato Court cited, with approval, the reasoning set forth in Rivera v. Fairbank Management Properties, Inc., 45 Conn. Supp. 154, 160 (1997), that "[u]pon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force." Id.

In the instant matter, it is undisputed that well more than three years have lapsed since Carmon was charged and convicted in this matter. Carmon undoubtedly had knowledge of the harm done onto him at the moment of his incriminating, allegedly false, statement on February 15, 1994, when he was arrested and charged for the Taft murder later on February 23, 1994, during his March 1995 trial, and again on his conviction and sentencing in April 1995. LRS ¶¶ 22, 29, 39-40. The continuing course of conduct doctrine, therefore, is inapplicable to toll Carmon's state law claims in this matter. See generally, Rosato; see also Connell.

Furthermore, the continuing course of conduct doctrine is inapplicable to Carmon's claims as no special relationship exists between Carmon and the City. The Connecticut Appellate

26

Court's ruling in <u>Sinotte v. Waterbury,</u> 121 Conn. App. 420, 429, 995 A.2d 131 (2010) is instructive in this regard. In <u>Sinotte</u>, the plaintiffs brought a cause of action against the City of Waterbury alleging, in part, a nuisance claim as a result of a sewage backup in their residence. The Court held that the trial court properly found that the continuing course of conduct doctrine was inapplicable to their claim. In so finding, the Court expressly held that "there was no special relationship between the plaintiff and the defendant such as exists between an attorney and his client or a doctor and her patient." <u>Sinotte</u>, 121 Conn. App. at 440-41 (emphasis added). Explicit in the Court's ruling is that the "special relationship" contemplated by the continuing course of action doctrine is one which is either fiduciary in nature, such as that of an attorney and client or that of a doctor and patient. <u>Id.</u>; <u>see also</u> <u>Saint Bernard Sch. of Montville, Inc. v. Bank of Am.,</u> 312 Conn. 811, 835, 95 A.3d 1063, 1077 (2014) ("Usually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation.").

In the instant matter, there was no relationship between the parties, beyond a relationship between the NHPD and the Plaintiff as a suspect it investigated and charged. This relationship terminated once Carmon was subject to prosecution by the State of Connecticut State's Attorney's Office, and thereafter convicted and sentenced, bringing him within the jurisdiction of the State of Connecticut Department of Corrections. The continuing course of action doctrine is, thus, inapplicable pursuant to the special relationship prong of the doctrine, and the City is entitled to summary judgment on Plaintiff's claim for assumption of liability for violation of Carmon's rights by the individual defendants.

### 4. Equitable Tolling does Not Apply to the Plaintiff's Claims

Equitable tolling is a doctrine grounded in federal law to allow plaintiffs to bring claims despite the expiration of the statute of limitations when, despite diligent efforts, injury was not

discovered until after the limitations period had expired. <u>Richardson v. Hierholzer</u>, Docket No.

CV 17 6072031S, 2018 WL 2709425, at *4 (Conn. Super. Ct. May 17, 2018). It applies in

certain situations to excuse untimeliness in filing a complaint. <u>Gager v. Sanger</u>, 95 Conn. App.

632, 638, 897 A.2d 704 (2006). Indeed,

> [e]quitable tolling permits a plaintiff to avoid the bar of the statute of limitations *if*
> *despite all due diligence* he is unable to obtain vital information bearing on the
> existence of his claim . . . This doctrine embraces . . . what is sometimes called
> the 'discovery rule,' which holds that the statute begins to run only after discovery
> of the facts constituting the violation . . . and the related rule that the statute does
> not begin to run when the plaintiff knows that he has been injured but he cannot
> obtain information necessary to decide whether the injury is due to wrongdoing
> and, if so, wrongdoing by the defendant.

<u>Richardson</u> at *4 (Conn. Super. Ct. May 17, 2018)(emphasis in the original); <u>Connecticut Ins.</u>

<u>Guar. Ass'n v. Yocum</u>, Docket No. CV 94 0539691S, 1996 WL 367726, at *4-5 (Conn. Super.

Ct. June 6, 1996).

Connecticut courts have recognized that equitable tolling <u>does not</u> apply to C.G.S. §§ 52-

584 or 52-577. More specifically, Connecticut courts have held that "the equitable tolling

doctrine is inapplicable to § 52–584 because this statute incorporates the 'discovery rule' on

which the equitable tolling doctrine is based . . .. Because the equitable tolling doctrine does not

apply to statutes of repose, the doctrine is also inapplicable to § 52–577." <u>Lopez v. Travelers</u>

<u>Companies, Inc.</u>, Docket No. AAN CV 15  6019474S, 2016 WL 2890477, at *6 (Conn. Super.

Ct. Apr. 26, 2016); <u>see also</u> <u>Saperstein v. Danbury Hosp.</u>, Docket No. X06 CV 07 5007185S,

2010 WL 760402, at *13 (Conn. Super. Ct. Jan. 27, 2010) ("Because the equitable tolling

doctrine is based on a "discovery rule," this doctrine would appear to be inapplicable to a statute

such as C.G.S. § 52- 584 which itself incorporates a discovery rule as part of the statutory

limitation. Additionally, the law is well established that equitable tolling does not apply to statutes of repose.").

As noted above, Carmon's state law claims against the City are governed by C.G.S. § 52-584 and/or § 52-577. Both statutes function as statutes of repose. Accordingly, the doctrine of equitable tolling is inapplicable to the Plaintiff's claims.

### 5. The Plaintiff's Claims Pursuant to C.G.S. § 7-465 are Substantively Barred for Failure to Comply with the Statute's Requirements to Provide Six-Month Notice and to File Suit within Two Years of the Date of Injury

A statute of limitations is generally considered procedural where it contains merely a limitation as to the time within which to commence a cause of action and does not itself create a cause of action. See Ecker v. West Hartford, 205 Conn. 219, 231-32, 530 A.2d 1056 (1987). "Where, however, a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then *the remedy exists only during the prescribed period and not thereafter*." Id. at 232 (emphasis added); Ambroise v. William Raveis Real Estate, Inc., 226 Conn. 757, 766–67, 628 A.2d 1303 (1993). Accordingly,

> [i]n such cases, the time limitation is not to be treated as an ordinary statute of limitation, but rather is a limitation on the liability itself, and not of the remedy alone . . . . The courts of Connecticut have repeatedly held that, under such circumstances, *the time limitation is a substantive and jurisdictional prerequisite*, which may be raised at any time, even by the court sua sponte, and may not be waived.

Ecker, 205 Conn. at 232 (internal citations omitted; emphasis added); Ambroise, 226 Conn. at 766-67; see also Moore v. McNamara, 201 Conn. 16, 22-23, 513 A.2d 660 (1986); Orticelli v. Powers, 197 Conn. 9, 15, 495 A.2d 1023 (1985); L.G. DeFelice & Son, Inc. v. Wethersfield, 167 Conn. 509, 511, 356 A.2d 144 (1975); Hillier v. East Hartford, 167 Conn. 100, 106, 355 A.2d 1 (1974); Diamond National Corporation v. Dwelle, 164 Conn. 540, 547, 325 A.2d 259 (1973);

Vecchio v. Sewer Authority, 176 Conn. 497, 504-505, 408 A.2d 254 (1979); Wilburn v. Mount Sinai Medical Center, 3 Conn. App. 284, 288, 487 A.2d 568 (1985).

Pursuant to Connecticut's common law, a municipality is immune from liability for negligence in the absence of a statute abrogating such immunity." Grady v. Town of Somers, 294 Conn. 324, 334, 984 A.2d 684 (2009), quoting Williams v. New Haven, 243 Conn. 763, 766–67, 707 A.2d 1251 (1998). Connecticut General Statute § 7-465 abrogates a municipality's common law immunity and provides for indemnification of municipal officers, agents, or employees under certain prescribed circumstances. See Williams, 243 Conn. at 768. Accordingly, C.G.S. § 7-465 creates a right of action that did not exist at common law, the remedy for which exists only during the statutorily prescribed time period, and not thereafter. See Ambroise, 226 Conn. at 766–67; Ecker, 205 Conn. at 232.

Carmon's assumption of liability claim against the City of New Haven, brought pursuant to C.G.S. § 7-465, is governed by the express limitations period and notice requirements set forth therein. Specifically, C.G.S. § 7-465 provides, in pertinent part, as follows:

> No action for personal physical injuries or damages to real or personal property shall be maintained against such municipality and employee jointly **unless such action is commenced within two years after the cause of action therefor arose and written notice of the intention to commence such action** and of the time when and the place where the damages were incurred or sustained **has been filed with the clerk of such municipality within six months after such cause of action has accrued** . . . .

C.G.S. § 7-465(a) (emphasis added).

In the instant matter, the City is not in receipt of notice of this suit from the Plaintiff. LRS ¶ 75. In the Amended Complaint, the Plaintiff does not allege when he filed notice with the Clerk for the City of New Haven, instead merely asserting that notice was filed "within six months of the foregoing causes of action accrued." Amended Complaint at [Doc. 71] ¶ 418. Therein, the

Plaintiff also acknowledges that the accrual date is at issue in this matter. "[A]pplied to a cause of action, the term to accrue means to arrive; to commence; to come into existence; to become a present enforceable demand.... The true test is to establish the time when the plaintiff first could have successfully maintained an action." (Internal quotation marks omitted.) O'Brien v. New Haven, 178 Conn. App. 469, 480, 175 A.3d 589 (2017), appeal dismissed, 330 Conn. 791, 201 A.3d 1021 (2019). Plaintiff's claims arise out of the alleged wrongful investigation of him in 1994, his imprisonment in 1995, and subsequent conviction for the same. Certainly, the Plaintiff cannot cure a notice deficiency now, long after the six-month window from the accrual date of his cause of action back in 1995 verdict in the Taft murder.

A notice deficiency under § 7-645 (a) deprives the court of subject matter jurisdiction over this claim. Additionally, the Plaintiff filed the instant suit well beyond the two-year statute of repose period contained in C.G.S. § 7-465. Carmon's claims against the City of New Haven pursuant to C.G.S. § 7-465 are, therefore, barred as a matter of law and accordingly, the City of New Haven is entitled to judgment as to Carmon's claims in Count IX as a matter of law.

### 6. The City of New Haven has No Obligation to Assume Liability for the Conduct of the Individual Defendants Alleged to have Occurred

Even if not barred by statutes of limitations and repose, there is no liability under C.G.S. § 7-465 as brought in Count IX, for the willful misconduct alleged to have occurred in the other counts of the Complaint, incorporated by reference, by the individual officers. See Amended Complaint [Doc. 71]. A municipality can act only through natural persons as its agents or employees. See Shay v. Rossi, 253 Conn. 134, 168, 749 A.2d 1147 (2000); Miller v. Eagan, 265 Conn. 301, 325, 828 A.2d 549 (2003). A municipality may not, however, be held vicariously

31

liable for the intentional torts of its employees. See Sanzone v. Bd. Of Police Commissioners, 219 Conn. 179, 193, 592 A.2d 912 (1991).

Consistent with the foregoing, C.G.S. § 7-465 expressly precludes indemnification liability for intentional misconduct. Section 7-465 provides, in relevant part:

> Any town, city or borough ... shall pay on behalf of any employee of such municipality ...all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any    person's civil rights or for physical damages to person or property ... if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty.

See C.G.S. § 7-465 (emphasis added).

Under C.G.S. § 7-465, Connecticut municipalities are liable in civil judgments against its employees so long as the employee acted in the performance of his duties, within the scope of his employment, and provided his actions were not willful or wanton. See City of Hartford v. Edwards, 946 F.3d 631 (2020); see also Martyn v. Donlin, 148 Conn. 27, 32 (1961); Gillespie v. Ancona, No. 3:97-CV-2045 (EBB), 1999 WL 66538, at *6 (D. Conn. Feb. 4, 1999). "The plain and unambiguous language of § 7-465 provides that a municipality is not obligated to pay damages if the employee was acting in a willful or wanton manner." City of West Haven v. Hartford Ins. Co., 221 Conn. 149, 156, 602 A.2d 988 (1992).

Claims of willful, intentional and malicious misconduct are indistinguishable and evaluated under the same standard. See Elliott v. City of Waterbury, 245 Conn. 385, 415, 715 A.2d 27, 42 (1998). Willful misconduct may either be "intentional or committed under circumstances exhibiting a reckless disregard for the safety of others." See BLACKS LAW DICTIONARY, Fifth Edition (1979). The terms willful, wanton and reckless have been treated as

interchangeable with one another. See Pane v. Danbury, 267 Conn. 669, 685, 841 A.2d 684 (2004), (overruled on other grounds by Grady v. Town of Somers, 294 Conn. 324 (2009); Bauer v. Waste Management of Connecticut, Inc., 239 Conn. 515, 527 (1996); Dubay v. Irish, 207 Conn. 518, 533, 542 A.2d 711 (1988); West Haven v. Hartford Insur. Co., 221 Conn. 149, 161 n.3, 2 A.2d 988 (1992). "A willful act is one done intentionally or with reckless disregard of the consequences of one's conduct." Bauer, 239 Conn. at 527. Additionally, gross negligence is interchangeable with deliberate indifference, and often equated with recklessness. See Poe v. Leonard, 282 F.3d 123 at 140 n. 14. (2nd Cir. 2002).

The Plaintiff pleads again and again that co-defendants acted "with malice," acted "knowingly," acted "intentionally," with "deliberate disregard," and the like. See Amended Complaint [Doc. 71] ¶¶ 371, 374, 379, 382, 387, 392, 395-401, 410. All of these assertions of intentional, willful, wanton or malicious conduct are incorporated by reference as the foundation for Plaintiff's state law claims against the City. As such, the City has no obligation to assume liability or indemnify for any of the conduct alleged against the individual defendants.

Carmon cannot transform the intentional conduct he expressly alleges the City's co-defendants engaged in by merely labeling the same conduct as negligent. As the Connecticut Supreme Court has observed:

> the same conduct [cannot] reasonably be determined to have been both intentionally and negligently tortious. . . . Intentional conduct and negligent conduct, although differing only by a matter of degree . . . are separate and mutually exclusive.... Although in a given case there may be doubt about whether one acted intentionally or negligently, the difference in meaning is clear. As [Oliver Wendell] Holmes observed, even a dog knows the difference between being tripped over and being kicked.

DaCruz v. State Farm Fire and Cas. Co., 268 Conn. 675, 693, 846 A.2d 849 (2004) (alteration in original); see also, American National Fire Ins. Co. v. Schuss, 221 Conn. 768, 775-76, 607 A.2d 418 (1992).

As noted above, in the instant matter, Carmon explicitly incorporates and alleges that the individual defendants acted intentionally and willfully, causing him harm. Carmon does not claim that the individual defendants violated his constitutional rights, threatened and coerced witnesses, fabricated evidence or withheld exculpatory evidence by way of accident. Rather, he expressly alleges that the co-defendants acted unlawfully, acted with malice, and acted with the specific intent to deprive him of his constitutional rights.

The language of C.G.S. § 7-465 is unequivocal, a municipality is not required to assume liability for the criminal, intentional, willful, wanton or malicious acts of its employees. Accordingly, the City of New Haven is entitled to judgment as a matter of law as to Count IX of the Complaint.

**C. The Plaintiff's Direct Claims against the City in Count X for Negligence Pursuant to C.G.S. § 52-557n Fail as there was No Duty on behalf of the City to Act, Claims Pursuant to C.G.S. § 52-557n are Barred by Governmental Immunity and the Applicable Statutes of Limitations and Repose, and the City has No Liability for the Conduct of Individual Defendants Alleged to have Occurred**

**1. The City of New Haven had No Duty to Act; Claims Pursuant to C.G.S. § 52-557n are barred by Governmental Immunity**

The Connecticut Supreme Court established more than 35 years ago that the operation of a police department, including deployment of officers involves judgment and discretion:

> "[I]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality.... [T]he failure to provide, or the inadequacy of, police protection usually does not give rise to a cause of action in tort against a city." 18 E. McQuillin, Municipal Corporations (3d Ed.) § 53.51. The deployment of officers is particularly a

> governmental function. "Considerable latitude must be allowed to [a police chief] in the deployment of his officers, or in enforcing discipline. Indeed, because a police chief's authority to assign his officers to particular duties is deemed a matter that concerns the public safety, he may not be deprived of his power to 'exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time'...." 16A E. McQuillin, supra, § 45.08. We conclude that the general deployment of police officers is a discretionary governmental action as a matter of law."

Gordon v. Bridgeport, 208 Conn. 161, 180 (1988). The immunity doctrine would not apply in the factual setting where a failure to take action would subject an identifiable person to imminent harm. Sometimes described as a duty of care arising when an identifiable person is subject to imminent harm, and other times as an exception to immunity doctrine, the application to specific lawsuits is the same—there is no municipal liability unless it is apparent to a City employee that if he or she does not take specific immediate action an identifiable person will suffer a specific harm imminent harm. Id. See Brooks v. Powers, 328 Conn 256, 269-277 (2018). The undisputed facts set forth below establish as a matter of law that there was no mandatory duty on the part of the City to look into the Carmon conviction and it was not apparent to any City employee that if he or she did not act immediately Carmon would suffer a specific imminent harm. What was apparent is as follows.

In addition to investigation of the Taft homicide (LRS ¶ 1-29), during Carmon's criminal trial, Stanley and Jones again identified Carmon as the person who had fired the shots through the window of Troutman's apartment. LRS ¶ 31. At trial, Brantley testified that he soon thereafter recanted both his February 5th and February 7th statements. LRS ¶ 32. Therefore, the jury was presented with evidence of Brantley's tendency to make inconsistent statements. LRS ¶ 33. McDonald was consistent in testifying that he sold the handgun to Carmon months prior to the Taft homicide, and Carmon's own statement corroborated this. LRS ¶ 34. Carmon, after

consistent denial, finally admitted that the tape on February 15, 1994, was his voice. LRS ¶ 35.

Stevenson testified at Carmon's criminal trial that he received a gun from Carmon on February

7, 1994, and that Carmon had scrapped the barrel of the gun with a screwdriver. LRS ¶ 36. Det.

Stephenson testified that he used a comparison microscope to determine that the handgun that

was in Carmon's possession was the same handgun used at the Taft homicide**.** LRS ¶ 37.

Carmon raised Arthur Brantley as a red herring. LRS ¶ 38. Following trial, on April 7, 1995,

Carmon was found guilty of murder, assault in the first degree and carrying a pistol without a

permit upon a jury finding the State had proved the essential elements of all three charges

beyond a reasonable doubt. LRS ¶ 39. On May 26, 1995, the trial court, Hadden, J., sentenced

the petitioner to a total effective sentence of eighty-five years to serve. LRS ¶ 40. Thereafter,

Carmon appealed his conviction, but it was upheld by the appellate court.  LRS ¶ 41. Carmon

would then go on to file five habeas court petitions, all of which were denied. LRS ¶ 42-46. Over

20 years after the Taft homicide, Carmon's sixth habeas petition was granted by Alander, J. and

he was released in 2022. LRS ¶ 47, 49. In the decision, Alander, J. stated "Carmon has not

shown by clear and convincing evidence that he is actually innocent of the crimes of which he

has been convicted.…" LRS ¶ 48.

 Connecticut law is clear that any decision to reopen an investigation would be

discretionary and subject to the protection of governmental immunity, to which no exception

applies. See <u>Borelli v. Renaldi</u>, 336 Conn. 1, 12 (2020) (passenger in vehicle being pursued by

police not identifiable as being at risk of imminent harm.) <u>Edgerton v. Town of Clinton</u>, 311

Conn. 217, 220, (2014) (vehicle occupants involved in high speed operation not identifiable to

police dispatcher as being at risk of imminent harm). As such, Carmon is not an identifiable

person at risk of imminent harm to whom the governmental immunity exception applies.

**2. The Plaintiff's Statutory Claim in Count X against the City of New Haven pursuant to C.G.S. § 52-557n is Barred by the Applicable Statute of Limitations and Statute of Repose contained in § 52-557**

Plaintiff's statutory claim in Count X against the City of New Haven pursuant to C.G.S. § 52-557n fails as a matter of law, as it is substantively time-barred by the applicable statute of limitations and statute of repose contained in C.G.S. § 52-584. As aforementioned, "Where, however, a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then *the remedy exists only during the prescribed period and not thereafter*." Id. at 232 (emphasis added); Ambroise v. William Raveis Real Estate, Inc., 226 Conn. 757, 766–67, 628 A.2d 1303 (1993). Accordingly,

> [i]n such cases, the time limitation is not to be treated as an ordinary statute of limitation, but rather is a limitation on the liability itself, and not of the remedy alone . . . . The courts of Connecticut have repeatedly held that, under such circumstances, ***the time limitation is a substantive and jurisdictional prerequisite***, which may be raised at any time, even by the court sua sponte, and may not be waived.

Ecker, 205 Conn. at 232 (internal citations omitted; emphasis added); Amborise, 226 Conn. at 766-67; see also Moore v. McNamara, 201 Conn. 16, 22-23, 513 A.2d 660 (1986); Orticelli v. Powers, 197 Conn. 9, 15, 495 A.2d 1023 (1985); L.G. DeFelice & Son, Inc. v. Wethersfield, 167 Conn. 509, 511, 356 A.2d 144 (1975); Hillier v. East Hartford, 167 Conn. 100, 106, 355 A.2d 1 (1974); Diamond National Corporation v. Dwelle, 164 Conn. 540, 547, 325 A.2d 259 (1973); Vecchio v. Sewer Authority, 176 Conn. 497, 504-505, 408 A.2d 254 (1979); Wilburn v. Mount Sinai Medical Center, 3 Conn. App. 284, 288, 487 A.2d 568 (1985).

Pursuant to Connecticut's common law, a municipality is immune from liability for negligence in the absence of a statute abrogating such immunity." Grady v. Town of Somers, 294 Conn. 324, 334, 984 A.2d 684 (2009), quoting Williams v. New Haven, 243 Conn. 763, 766–67,

707 A.2d 1251 (1998). Connecticut General Statutes § 52-557n abrogates Connecticut's

traditional common-law doctrine that a municipality is immune from suit for torts committed by

their employees and agents. See Spears v. Garcia, 263 Conn. 22, 29, 818 A.2d 37 (2003).

Accordingly, C.G.S. § 52-557n creates a right of action that did not exist at common law, the

remedy for which exists only during the statutorily prescribed time period and not thereafter. See

Ambroise, 226 Conn. at 766–67; Ecker, 205 Conn. at 232.

      Carmon's statutory negligence claim pursuant to C.G.S. § 52-557n against the City of

New Haven is governed by the limitations period set forth in C.G.S. § 52-584. See Brusby v.

Metro. Dist., 160 Conn. App. 638, 661–62, 127 A.3d 257 (2015) (applying Conn. Gen. Stat. §

52-584 statute of limitations to the § 52-557n claim at issue therein); DeWolf v. Town of

Newington, Docket No. CV 12 6014544S, 2014 WL 1013334, at *4 (Conn. Super. Ct. Feb. 11,

2014) (noting that Connecticut courts have found that "the statute of limitations for actions

brought pursuant to § 52–557n is set out in General Statutes § 52–584 and is two years.");

Tagliaferi, 2014 WL 129223, at *9, 10-11.

      As set forth previously, the limitations period under C.G.S. § 52-584 begins to run upon a

plaintiff's knowledge of the facts giving rise to the injuries claimed. See Rosato, 82 Conn. App.

at 404-05; Mountaindale Condo. Assoc, 59 Conn. App. at 323. The limitations period

commences regardless of whether a plaintiff's claimed injuries have reached their fullest

manifestation, and regardless of whether a plaintiff has discovered all applicable legal theories.

Id. Consistent with the foregoing well established precedent, the limitations period applicable to

Carmon's claims pursuant to C.G.S. § 52-557n began to run in or around 1994-1995 around the

time of he was investigated to the time he was convicted and sentenced for the Taft homicide.

LRS ¶ 40. Carmon was, therefore, required to bring his C.G.S. § 52-557n claim against the City

of New Haven on or before April of 1997, at the latest. However, Morant did not file his C.G.S. § 52-557n claims until July 17, 2023, twenty-six (26) years beyond the statute of limitations for bringing said claim. See Complaint [Doc. 1]. Morant's claim against the City of New Haven pursuant to C.G.S. § 52-557n is, therefore, barred as a matter of law. In addition, as set forth herein, the statute of repose contained in C.G.S. § 52-584 is an absolute bar to Morant's cause of action brought under C.G.S. § 52-557n.

### 3. The City of New Haven has No Liability for the Conduct of the Individual Defendants Alleged to have Occurred

The City has no liability for the acts of the individual defendants, which the Plaintiff has alleged were conducted with malice and knowing, deliberate indifference, and with intention. See generally Amended Complaint [Doc. 71], specifically, ¶¶ 371, 374, 379, 382, 387, 392, 395-401, 410. The Connecticut legislature, which is the gatekeeper as to all suits against a Connecticut municipality has exempted from liability claims of injury caused by "acts or **omissions** of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct." See C.G.S. § 52-557n(a)(2)(A) (emphasis added). Count X therefore contains by reference foundational allegations from prior Counts that co-defendants were guilty of willful, wanton, malicious conduct, and therefore the City of New Haven will have no liability for such conduct under C.G.S. § 52-557n and is entitled to judgment a matter of law.

### CONCLUSION

For the reasons set forth above, the City of New Haven is entitled to judgment as a matter of law as to all claims against it.

DEFENDANT,
CITY OF NEW HAVEN


By */s/ Thomas R. Gerarde*
 Thomas R. Gerarde (ct05640)
 Alan R. Dembiczak (ct25755)
 Amanda E. Stone (ct31531)
 Lidia M. Michols (ct31789)
 Howd & Ludorf, LLC
 100 Great Meadow Road
 Suite 201
 Wethersfield, CT  06109
 Ph:  (860) 249-1361
 Fax:  (860) 249-7665
 E-mail: tgerarde@hl-law.com
 E-mail: adembiczak@hl-law.com
 E-mail:  astone@hl-law.com
 E-mail: lmichols@hl-law.com

## CERTIFICATION

This is to certify that on February 19, 2025, a copy of the foregoing Memorandum of Law in Support of Motion for Summary Judgment, on behalf of the City of New Haven, was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ Thomas R. Gerarde*
Thomas R. Gerarde