# PX18

| NNH-CV19-5052879-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| COMMISSIONER OF CORRECTION | : | APRIL 25, 2022 |

| NNH-CV20-6107902-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| STATE OF CONNECTICUT | : | APRIL 25, 2022 |


TRANSCRIPT OF PROCEEDINGS


BEFORE THE HONORABLE JON M. ALANDER, JUDGE


A P P E A R A N C E S :


    Representing the Petitioner:

        ATTORNEY KENNETH ROSENTHAL - Ordering Party
        Green & Sklarz, LLC
        1 Audubon Street
        3rd Floor
        New Haven, CT 06511


    Representing the Petitioner Pro Hac Vice:

        ATTORNEY DAVID SMITH KEENAN
        152 W. 57th Street
        8th Floor
        New York, NY 10019

        ATTORNEY MAURA BARRY GRINALDS
        One Manhattan West
        Emeritus Pro Bono Program
        New York, NY 10001

        ATTORNEY DOUGLAS E. LIEB
        Kaufman, Lieb, Et Al
        10 East 40th Street - Suite 3307
        New York, NY 10016

PL0002930

**A T T O R N E Y   G L E N N   C O N W A Y**

Having first been duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION BY ATTY. CAMPBELL:**

A    Good morning.

Q    Good morning, Attorney Conway.  Attorney Conway, what do you do for work?

A    I'm a lawyer.  I'm an attorney.

Q    And where do you work?

A    I work out of my office at 7 Elm Street in New Haven.

Q    What kind of law do you practice?

A    Criminal defense primarily.  Like, 99 percent criminal defense.

Q    Have you always practiced in Connecticut?

A    Yes.

Q    Where'd you go to law school?

A    University of Connecticut.

Q    And when did you finish law school?

A    December of 1996.

Q    Did you have any internships while you were in law school?

A    I did.

Q    Where was that internship?

A    I worked for Attorney Richard Silverstein.

Q    Who's Richard Silverstein?

A    Richard Silverstein is an attorney here in New Haven.

Q    And when did you start your internship with Attorney

PL0003004

out, who was there, you know, who was present and the specifics of that so he could -- those are the two that -- that come to mind independent -- that I independently recall.

Q   Do you recall learning at trial that Miss Stanley was shown Mr. Carmon's photo?

A   Yes.

Q   And how -- how did you learn that?  Do you recall?

A   I believe that there was a detective who -- who testified that -- that she had gone through a photo array and identified -- she couldn't be positive about the identification but she said that the photo of Mr. Carmon was a look alike.  A, quote, look alike.

Q   And had you known that prior to trial?

A   We did not know that prior to trial.

Q   And prior to trial did you have any indication that Jaime Stanley was shown Adam Carmon's photo?

A   No.

Q   You said Attorney Silverstein had asked for -- for photo arrays prior to trial?

A   Yes.

Q   And he did not receive any prior to trial?

A   He was under the impression they had not been preserved is my recollection.

Q   I'd like to direct your attention to tab 31 of this binder in front of you.

THE COURT:  Just -- I -- I apologize for

PL0003041

had been made aware of the existence of this array and he felt -- you know, he wanted Attorney Silverstein to be aware of that so that he could do with it what he wanted to do or needed to do.

Q    And you -- you previously said that the trial prosecutor had represented that photos were not preserved --

A    Correct.

Q    -- that were shown to Miss Stanley?

A    Correct.

Q    How did Attorney Silverstein react when he received these photos?

A    He was angry because it was after Miss Stanley had testified.  There's -- I think there's two pictures of Mr. Carmon in here if I remember correctly.  There was -- you know, one of the photos, a picture of guy named David Myles has a notation as a look alike.  No notations on the back of Mr. Carmon's photograph.  It seemed like to Mr. -- Attorney Silverstein that this should have been disclosed before the trial or at least certainly before the start of the trial.

Q    You said there are two photos of Mr. Carmon in Exhibit 31?

A    There are.  So out of the 18 -- two of the 18 are of Mr. Carmon.

Q    And you also mentioned that one of the photos that was selected was a look alike?

A    The notation on the back is -- is David Myles, date of birth 12/30/70, picked as a look alike to the shooter at

PL0003044

810 Orchard.

Q   Does the photo of David Myles resemble --

ATTY. NOWAK:  Objection, your Honor.

ATTY. CAMPBELL:  I'll -- I'll withdraw it.

THE COURT:  Okay.

Q   So, at trial, did you -- did Attorney Silverstein and -- and the defense, did -- did you realize that Attorney -- I'm sorry, that Jaime Stanley had picked a look alike prior to trial?

A   We were -- we were led -- led to believe that she had picked Mr. Carmon as the look alike, not -- not David Myles. It was never disclosed to us that -- that she had picked David Myles as the look alike.

Q   Was it disclosed that she had picked any look alike?

A   Prior to trial or during trial?

Q   Prior to trial.

A   Prior to trial, I -- my recollection is I don't think she did.  I think it came out during the course of the trial from one of the detectives.

Q   That she had picked a look alike?

A   That she had picked a look alike.

Q   If you could turn to tab 2.  Tab 2 which is the discovery that Attorney Silverstein received.

ATTY. CAMPBELL:  But to you it's tab 1.

Q   And if you could turn to the page marked Silverstein 003.

A   Okay.  I got it.

PL0003045

testifying to.  Yes.

Q   Do you think Attorney Silverstein would have used this document at trial?

A   I think -- I believe he would have definitely questioned her about her vision.

Q   And how -- why would he have questioned her about her vision?

A   Because she had claimed to been quite close to the alleged shooter at some point in time during the incident and -- and if -- it would -- if it was true that she had poor close vision that would then go to her credibility with regard to making the identification.

Q   Do you recall testimony at trial relating to Miss Stanley's identification of Mr. Carmon as the shooter -- as the 810 Orchard Street shooter?

A   Yes.

Q   What do you recall about the circumstances of the identification or the testimony about the circumstances of the identification?

A   In terms of the sequence of events?

Q   How did it happen?

A   So she was in a car with a guy named Ray Jones.  They --

Q   I'm sorry.  I was probably confusing.

A   Oh.

Q   The -- how did she identify him?

A   I understand.

PL0003069

Q   Identify Mr. Carmon.

A   When -- how did she actually make a positive identification?

Q   Correct.

A   I understand.  So she was taken -- she was brought to what was then G.A. 6, it's now G.A. 23, and was allowed to view -- she testified that she was actually brought into the courtroom and -- and Mr. Carmon was brought up with the arraignments for the day.  There was, I don't know, 15 or 20 other individuals and he was allegedly put in this -- in amongst them and then she supposedly sees him and then he supposedly says -- looks -- makes eye contact and says, oh shit, and puts his head down and that's when -- that's when she -- and then she said that -- you know, that -- when they left the courtroom I -- she told detectives that that's -- that that's the guy, that's the shooter.

Q   If you could turn to tab 8 which is Petitioner's Exhibit 70.

A   Okay.

Q   Can you tell us what this document is?

A   70, that is the lock up list for G.A. 6.  The arraignment list -- arraignment/lock up list for G.A. 6 for February 22nd, 1994.

Q   And do you see Mr. Carmon's photo in Petitioner's Exhibit 70?

A   I do.  It's the second page.  Page number 4290.

Q   Can you tell what the significance of this document

PL0003070

Conway, are you familiar with an individual named -- an individual named Peter Carusone?

A   Yes.

Q   Who is Peter Carusone?

A   Peter Carusone today I believe is a probation officer working in this building.

Q   And do you know Mr. Carusone?

A   I do.

Q   How do you know him?

A   I know him from -- I remember when he was a detective at the New Haven Police Department.  He may have testified in a case or two that I had.  And I know him from -- I know him from the building 'cause he's part of the intensive pretrial supervision office of probation, so he's in the building and he monitors some of my clients or has monitored some of my clients who are awaiting disposition of their case and they're typically on a GPS.  They have to have weekly face-to-face contact with him.  He administers drug testing.  It's -- you know, they're -- they're -- they're at liberty, but they're -- they're -- they, you know, toe the lie so to speak and so from time-to-time issues would arise of my clients and then I would just pop in and see him. We'd talk about it.  You know, what can we do to -- you know, how bad is it, that kind of thing.  Over time, you know, I developed a -- a good rapport with him just by virtue of talking to him on a regular basis.  We had things in common.  Our sons were in the military.  So from time-to-

PL0003073

time when I was in the building I would just pop in and say hello to him, take five minutes of his time just to chat him up and see what was going on and vice versa.  Friends really.  I mean, not that we socialize, but it was a very friendly relationship.  Still is.

Q   Did you have -- in the last few years, have you had a conversation with Mr. Carusone about Jaime Stanley?

A   Yes.

Q   Was it -- can you tell us when that conversation took place?

A   It was really inadvertent.  I -- I found out or I heard from somebody within this building or the building across the street, 121 Elm Street, that he wasn't around on a particular day 'cause he had -- I think he was -- I think he was being deposed by -- by Mr. Carmon's attorneys.  So -- and that was in January of last year.  So the next time I came in and stopped in to see him, I kind of broke his stones a little bit, you know, 'cause I don't remember him from this case and I -- and I remember saying to him, you know, so, Pete, so you're all -- how'd you get caught up in this Adam Carmon business?  I don't remember you from the trial.  And then we both kind of chuckled about it and he said, no, I know, it was nothing really, I just -- the detectives asked me to bring her in and she was my -- she was my CI or my informant.  And I was, like, oh, okay, well, that explains why we didn't hear from him, you know, 'cause he really -- he was, like, a taxi driver in some respects in

PL0003074

my mind.

Q   And at the time of trial did you know that Jaime Stanley -- had anyone suggested that Miss Stanley was Mr. Carusone's CI or confidential informant?

A   No.

Q   And you said you had no awareness that he had any involvement in the case at the time?

A   Correct.

Q   So did you know Mr. Carusone in 1995?

A   No.  He was a patrol officer in 1995 as I recall.  I had learned that over time, but -- and this is one of my first interaction with the system -- the system here. There's no way I would of -- I would of known him.

Q   Just to go back to this conversation briefly, where did it take place?

A   It took place downstairs in his office just -- just beyond the -- the metal detector of the entry to the building.

Q   And you said you had heard he had been deposed?

A   I don't know.  I think I heard that he was having his deposition taken and it was -- it was close in time to that because it was fresh in my mind and -- and so when I -- when I stopped in to see him because it was fresh in my mind, I -- I -- you know, I said what I said.  Really more just to kind of be a wise guy really, you know.

Q   Did you know -- I'm sorry.  So when Mr. Carusone told you Jaime Stanley was my CI, what was your reaction?

PL0003075

NNH-CV19-5052879-S                         :   SUPERIOR COURT

ADAM CARMON                                :   JUDICIAL DISTRICT
                                               NEW HAVEN

v.                                         :   AT NEW HAVEN, CONNECTICUT

COMMISSIONER OF CORRECTION                 :   APRIL 27, 2022


NNH-CV20-6107902-S                         :   SUPERIOR COURT

ADAM CARMON                                :   JUDICIAL DISTRICT
                                               NEW HAVEN

v.                                         :   AT NEW HAVEN, CONNECTICUT

STATE OF CONNECTICUT                       :   APRIL 27, 2022




                    C E R T I F I C A T I O N




        I hereby certify the electronic version is a true and

correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, Judicial District of

New Haven at New Haven, Connecticut, before the Honorable Jon M.

Alander, Judge, on the 27th day of April, 2022.




        Dated this 20th day of May, 2022 in New Haven,

Connecticut.


                                    _____
                                    Janis Longobardi
                                    Court Recording Monitor


PL0003578

**M I C H A E L   S W E E N E Y,**

Having been previously duly sworn, was further examined on his oath and testified as follows:

**CONTINUED DIRECT EXAMINATION BY ATTY. KEENAN:**

Q   Good afternoon, --

A   Good afternoon.

Q   -- Mr. Sweeney.  All right.  So yesterday when you testified, I asked you about your deposition in this matter, and if I recall correctly you indicated that you had reviewed the case file prior to your deposition, the police department case file?

A   Yes, I did.

Q   Okay.  And you had also reviewed specific statements during your deposition, Mr. Brantley's February 5th statement and his February 7th statement; is that also correct?

A   Yes, it is.

Q   And since your deposition, which occurred October of 2021, you had-- you had been given a copy of your deposition?

A   Yes, I was.

Q   And do you recall when that was?

A   Approximately two or three weeks after I gave it.

Q   And did you review it at that time?

A   I-- I looked through it, I didn't really read the whole thing.

Q   Okay.  But-- So that would have been in November of

A   Yes, I do.

Q   Okay.  And he had asked Diane to get in contact with Mr. Little concerning this fight that he had just had?

A   Yes.

Q   Below that is a reference to 36 Beers Street.  Do you see that?

A   Yes.

Q   What is the significance of 36 Beers Street?

A   At this point I don't-- I really don't recall.

Q   You would agree with me that these notes are at least referencing Mr. Brantley February 5th statement?

A   Yes, I do.

Q   Okay.  And-- And I think we went into yesterday how recorded statements normally were preceded by unrecorded interviews?

A   Yes.

Q   And would that have been case for-- for Mr. Brantley as well?

A   Could-- It certainly could.  I would say that's probably yes.  I don't know anyone who would sit down and just start a-- the tape-- tape recorder.

Q   Okay.  And, so, I understand you don't know now, but is it fair to infer that this information about 36 Beers Street came from Mr.-- an interview of Mr. Brantley?

A   Yes, it is safe to assume that.

Q   Next to that is-- is the word or the name Yani.  Is there anybody in the New Haven Police Department, or was

PL0003510

BY ATTY. KEENAN:

Q   So number 12 is research 36 Beers Street, re:  female calling in, the shooter just went inside, and circled next to that is the name Yani.  Do you see that?

A   I do see it.  I don't-- Actually, at this point I don't know the meaning of it.  I might've been talking about another shooting, just notes that I just wrote down.

Q   And could it also be re-- Let me back up.  Did you ever listen to the 911 calls in this case?

A   I don't believe I did.

Q   In fact, it was your practice never to listen to the 911 calls?

A   Pardon me?

Q   Your-- Your practice was not to listen to 911 calls?

A   No, it was-- it was not my practice, I-- I had too many other things to do, I would have assigned detectives to check on that.  And I probably mentioned before the civilian, I think I-- it was mentioned to him gather any information from calls coming in, --

Q   And --

A   -- the civilian.  I, myself, would never have time to go listen to it unless it was brought to my attention and something was interesting.

Q   And back then 911 system was on large reels?

A   Yes.

Q   And if you didn't specifically request that they be preserved they would be taped over after 30 days?

PL0003522

A   Not in all cases, no.  I did not make that-- that call because I-- I was not aware that anything was that important, or nothing was brought to my attention.

Q   But I-- I'm just asking for your understanding of the regular practice; the tapes were routinely erased over?

A   I believe they were.  Yes.

Q   After 30 days?

A   Yes.

Q   Unless you specifically requested, or somebody specifically requested that they be preserved?

A   Yes.

Q   You speculated this could be in regards to a different shooting, but it could also have been in-- in regards to the 810 Orchard Street shooting, sitting here today you can't tell us?

A   Certainly I have no idea.  I don't know what-- that's-- why I wrote that down.

Q   It was important enough to put on to do list in relation to Mr. Brantley's February 5th statement in which he had confessed to at least being the instigating force behind the shooting?

A   Yes.

Q   All right.  And you recall that 36 Beers Street also referenced in, Bates Stamp 45-- number four that we looked at before; is that right?

A   Yes.

Q   So, presumably, some-- something-- some information

PL0003523

Q   -- take that to mean negative results?

A   I had a check next to the number two and we-- somebody either went there or called there for me and didn't get anything that we needed, so I put down negative results.

Q   Okay.  And were-- The check marks, those were meant to designate things that you followed through on and done?

A   Yes.  I-- I would put the check down that, let's say, I told the detective to do it and would check that it was done, --

Q   All right.

A   -- or at least I-- I gave an assignment to somebody.

Q   And one of those items that you put a check next to is number three, locate Diane on-- on Ferry Street?

A   Yes.

Q   Okay.  And you learned during your investigation that Diane was Diane Sellers?

A   Yes, I did.

Q   And she, in fact, lived in Fair Haven on Chambers Street, --

A   Yes.

Q   -- which is right off of Ferry Street?

A   Yes.

Q   And she provided information here to detectives that in fact Mr. Brantley had gone to Fair Haven that afternoon, right?

A   Yes.

Q   After the fight?

PL0003525

A   Yes.

Q   Gone to her house and used her phone?

A   Yes.

Q   Before going around block to somebody named Freddy Freddy's house; do you recall that?

A   Yes, I do.

Q   Did you ever determine who Freddy Freddy was?

A   At this point I-- I can't tell you if we did or not.

Q   Okay.  Are you aware-- You've reviewed the case file, are you aware of any police report indicating that detectives in the investigation attempted to determine or determined whether Mr.-- who Freddy Freddy was?

A   No.

Q   Would've been an important person to interview, wouldn't you agree, Freddy Freddy?

A   Everybody was important.

Q   All right.  But here you somebody who has now confessed is involved in a shooting, told you he's gone to Fair Haven to get in contact with the shooter, and here you have a witness, Ms. Sellers, telling you that after they left her house then went Freddy Freddy's house?

A   Yes.

Q   And do you recall when Ms. Sellers said Mr. Brantley came to Fair Haven and was-- was at her house?

A   No, I do not.

ATTY. KEENAN:  All right.  I think-- I believe we go two pages forward.  Right there.

PL0003526

NNH-CV19-5052879-S              :  SUPERIOR COURT

ADAM CARMON                     :  JUDICIAL DISTRICT
                                   NEW HAVEN

v.                              :  AT NEW HAVEN, CONNECTICUT

COMMISSIONER OF CORRECTION      :  APRIL 28, 2022


NNH-CV20-6107902-S              :  SUPERIOR COURT

ADAM CARMON                     :  JUDICIAL DISTRICT
                                   NEW HAVEN

v.                              :  AT NEW HAVEN, CONNECTICUT

STATE OF CONNECTICUT            :  APRIL 28, 2022




                    TRANSCRIPT OF PROCEEDINGS



          BEFORE THE HONORABLE JON M. ALANDER, JUDGE




A P P E A R A N C E S :



     Representing the Petitioner:

          ATTORNEY KENNETH ROSENTHAL - Ordering Party
          Green & Sklarz, LLC
          1 Audubon Street
          3rd Floor
          New Haven, CT 06511


     Representing the Petitioner Pro Hac Vice:

          ATTORNEY DAVID SMITH KEENAN
          152 W. 57th Street
          8th Floor
          New York, NY 10019

          ATTORNEY MAURA BARRY GRINALDS
          One Manhattan West
          Emeritus Pro Bono Program
          New York, NY 10001

          ATTORNEY DOUGLAS E. LIEB
          Kaufman, Lieb, Et Al
          10 East 40th Street - Suite 3307
          New York, NY 10016

PL0003579

**M I C H A E L   S W E E N E Y,**

having been previously sworn, was further examined and

testified as follows:

THE COURT:  Welcome back, sir.  I think we're

going to finish with you today.  I'm sure you're

happy to hear that.  Have a seat.

MR. SWEENEY:  Yes, sir.

ATTY. NOWAK:  Good afternoon, Mr. Sweeney.

MR. SWEENEY:  Good afternoon.

ATTY. NOWAK:  I mean good morning.

MR. SWEENEY:  Good morning.

ATTY. KEENAN:  Your Honor, if I could just offer

three exhibits before we get started?

THE COURT:  Okay.

ATTY. KEENAN:  Yesterday, I actually referred to

Mr. Brantley's signed statement, and the one that was

in evidence was the unsigned statement.  I think both

of his February 5 and February 7 statements in

evidence were unsigned.  So I'm offering now the

signed version, which would be PX-232 and PX-233.  I

also had --

THE COURT:  Well any objection?

ATTY. NOWAK:  I think it's already --

ATTY. KEENAN:  You have the unsigned version.

ATTY. NOWAK:  Oh, okay.  These are signed?

ATTY. KEENAN:  Yes.

ATTY. NOWAK:  All right.  No objection.

PL0003592

in which you were under oath, that in fact it was unusual for a detective -- or this report to have been handwritten?

A    I don't recall saying that, but it was not unusual for any officer to -- or detective to handwrite a report.

Q    Okay.  How --

A    If there was certain circumstances that necessitated that.

Q    How -- how about for a detective to bring a suspect into the police station voluntarily, who has two active warrants, and then allowing him to leave the police station, is that unusual?

A    That's very unusual.

Q    Okay.  And that's in fact what happened in this case? You read this report?

A    Yes, I have.

Q    And in fact, Mr. Little is not brought in on warrants.  Detective Burton spoke to him on the phone, and Mr. Little came in voluntarily with Mr. Kitchens.

A    Okay.

Q    Well I'm asking you.  You've read the report?

A    I have not read it recently.

Q    Go ahead.  Take a moment.

A    Sure.  Okay.  Next page.  Okay.  I read it.

Q    So in fact, Mr. Little came into the police station despite having active warrants and was allowed to leave? Despite having active warrants, after giving the statement, Mr. Little was allowed to leave the police station?

PL0003612

THE COURT:  Yeah.  Sure.

ATTY. KEENAN:  Sure.  I'll go back to that in a second.  Any objection to admitting 164?

ATTY. NOWAK:  What's this?

ATTY. KEENAN:  It's a police report for Mr. Little.

ATTY. NOWAK:  No.  No objection.

THE COURT:  Okay.

ATTY. NOWAK:  I assume we're using this for the same purpose --

ATTY. KEENAN:  Same purpose.

ATTY. NOWAK:  -- of what they had or what they should have had.

THE COURT:  Okay.  It may be made a full exhibit.  Can we makes sure the clerk marks a copy.

ATTY. KEENAN:  Yeah.

THE CLERK:  I have --

ATTY. KEENAN:  Yeah.  He --

THE COURT:  You have one.  Okay.  Fine.  Thank you.

Q   All right.  Do you have a copy there?  Are you all set on your screen?

ATTY. KEENAN:  Nick, can you just zoom out a little bit?  Zoom out.

Q   What's the date on -- What is this document, Mr. Sweeney?

A   This is a police report, handwritten police report by

PL0003618

an Officer Chris Stable.  He's a -- not a New Haven officer. He's a Yale officer.

Q   Okay.  But this is a New Haven Police Department police report; right?

A   They use the same paperwork that we do or did.

Q   Okay.  Well you would have had access to this report at the time?

A   Yes.  It would be on computer.

Q   What's the date of the report?

A   9-12-92.

Q   Okay.  And the name of the name of complainant?

A   Anthony Little.

Q   And his date of birth?  10-27-1970, is that his date of birth on the police report?

A   Yes, it is.

Q   Okay.  And the address is listed as 175 Chestnut Street?

A   Correct.

Q   That's the same address where you served the search warrant for Mr. Little on February 7?

A   Yes.

Q   And then Tanya Gause is listed as other?

A   Yes.

Q   That's Mr. Little's girlfriend?

A   Yes.

Q   And her address is given as 973 Winchester?

A   Yes.

PL0003619

Q   And that's the same address on the notes we just looked at?

A   Yes.

Q   And can you just read the first sentence --

A   On the --

Q   -- of the report?

A   On this police report?

Q   Yes.

A   On 9-12-92, at approximately 06:53 in the morning, I observed a gray Nissan Sentra.

Q   And can you go to the next page, please, and read the top sentence?

A   The operate of the Nissan, Anthony Little, stated that the blazer --

Q   -- had taken a left onto South Frontage Road.  So Little and I attempted to follow the vehicle to obtain at least a registration.  Now can you now go down to the last sentence of the report?  Can you read that for us?

A   The damage to Little's vehicle consisted of a crooked passenger window where it cracked.

Q   The next sentence, please?

A   Tanya Gause, Little's girlfriend, in paratheses, is the owner of this Nissan Sentra.

Q   So now you have the stated accomplice of Mr. Brantley who is actually driving the car that takes the shooter to 810 Orchard Street and picks up the shooter and flees 810 Orchard Street.  And it turns out that his girlfriend owns a

PL0003620

gray Nissan Sentra?

A   Correct.

Q   And you knew that because it was in your notes?

A   Correct.

Q   It doesn't show up in any police report related to this case, does it?

A   What doesn't show up?

Q   The fact that Mr. Little's girlfriend owned a vehicle matching the description that you were given by Mr. Brantley and the concerned citizen.

A   This is two years before the homicide.

Q   Well you wrote down the note at the time of the homicide?

A   Well that -- The information on the note is I would have done a registration check showing that the car was still available.

Q   All right.  So on February -- In February of 1994, this vehicle was still registered to Mr. Little's girlfriend?

A   Yes.

Q   Did you do any further investigation to determine whether that was the vehicle involved in the shooting?

A   I'm sure we did.

Q   Well how can you say that?  Where are the reports?

A   Because I would not let something like that go.  We were searching for a gray vehicle, or not searching for a gray vehicle.  I had information that a gray vehicle was

PL0003621

right?

A    That's correct.

Q    Okay.  I want to move on.  At some point this investigation obviously turned to my client Mr. Carmon.  It seems like the defining event had to do with a firearm that was recovered on Townsend Street.  Do you recall that?

A    Yes.

Q    But the firearm didn't have Mr. Carmon's fingerprints on it, did it?

A    Not that I'm aware of.

Q    And the firearm was not found in Mr. Carmen's possession, was it?

A    No, it was not.

Q    It didn't have any of his blood on it?

A    No.

Q    It didn't have any of his DNA on it?

A    No.

Q    It was found in the possession of a man who at the time gave his name as Lorenzo Thomas, but you later found it was Anthony Stevenson; right?

A    Yes.

Q    Okay.  Mr. Stevenson had previously been convicted of several felonies; right?

A    Yes.

Q    He was found shot and almost bled to death; right?

A    Yes.

Q    Because he was attempting to rob a vehicle or people

PL0003623

in a vehicle; right?

A    Yes.

Q    And he, in fact, stole drugs from them?  Yes?

A    Yes.

Q    And then after doing that was shot by one of the occupants of the vehicle; right?

A    Yes.

Q    And Mr. Carmen was an occupant in the vehicle?  Yes?

A    Yes.

Q    But he was not the shooter?

A    Correct.

Q    In fact, Mr. Stevenson told you that Mr. Carmen was unarmed?

A    Unarmed at the time of the shooting?

Q    Yeah.  He said he was unarmed?

A    At the time of the shooting?

Q    In his statement he said when Mr. Stevenson was shot -- when Mr. Stevenson was shot -- Withdrawn.  Let's go to his statement and look at it.  So before we get there, Mr. -- Do you remember what date this occurred on, this shooting on Townsend Street?

A    I believe it was two days or so after the homicide.

Q    All right.  Well let's go to the police report so we can make sure we get the right date.

        ATTY. KEENAN:  Petitioner's Exhibit 45, tab 61.

Q    Who was Detective Christopher Grice?

A    He's a detective assigned to the Identification

PL0003624

A    I don't remember being in --

Q    All right.  That's fine.

A    -- the courtroom.  It was so long ago.

Q    We'll move on.  No problem.  We'll move on.  But in fact, Mr. Jones -- Well you learned that there were eyewitness identifications in the case; right?

A    Yes.

Q    Okay.  Let's talk about the other eyewitness then. You do recall that this woman Jaime Stanley, a 19-year-old woman named Jaime Stanley, also reported to identify Mr. Carmon as the shooter; right?

A    Yes, I do.

Q    Okay.  And she was shown many photographs by detectives and was unable to make an identification; right?

A    Correct.

Q    So eventually it was arranged that she would go to the arraignment court at 121 Elm Street and see if she could identify Mr. Carmon in person; right?

A    Yes.

Q    And that was after having seen Mr. Carmon's photograph multiple times?

A    Yes.

Q    And not identify him?  Not identify in his photograph; right?

A    Not identify in a photograph, correct.

Q    Okay.  And were you a -- You were an experienced detective at this point; right?

PL0003648

A   Not really.

Q   Well, I mean, this man has been sitting in prison now for over 28 years based on this woman's identification.  She served as the probable cause to arrest him.

A   Well I don't know what pictures she looked at.  The pictures could have been ten years old.  I don't -- I can't answer that question.

Q   Did you review the arrest warrant that Detective Dease was the affiant on for Mr. Carmon's arrest --

A   Yes, I did.

Q   -- for murder?  For the murder of Danielle Taft?

A   Yes, I did.

Q   And did you verify before Detective Dease went to a judge and swore under oath that its contents were true, that in fact its contents were true?  Did you verify that?

A   Did I verify the information on the affidavit was --

Q   Yes.

A   -- was true?

Q   Yes.

A   To the best of my knowledge I did, yes.

Q   I asked you before about Raymond Jones, and you indicated you didn't even know who he was.  Do you recall Detective Dease though in the arrest warrant affidavit -- I'm trying to locate it for you now.  Do you recall him indicating that witness number one, meaning one of the eyewitnesses, had previously testified in Superior Court?

A   Yes, I do.

PL0003657

Q    All right.  In any event, we heard her say that even though the lighting wasn't that good she could still I.D. somebody.  Well this report indicates that -- Second sentence of the second paragraph.  She indicated to Sergeant Sweeney and I that the intersection of Orchard Street and Munson Street is not very well lit.  She stated the lighting conditions are in fact poor.  Do you see that?

A    Yes, I do.

Q    And you know that that's true because you went to the crime scene that night.  The lighting conditions are poor?

A    Yes.

Q    And this is in the context of Ms. Stanley having reviewed photograph after photograph, including Mr. Carmon.  And then in the third paragraph Detective Dilullo writes, Ms. Stanley during the course of this investigation has viewed numerous photographs of black males.  Ms. Stanley informed both Detective Sergeant Sweeney and I that of all the photographs she looked at, she could not possibly state that anyone in these photographs is in fact the person she observed doing the shooting on the evening of February 3, 1994 while she was parked directly in front of 810 Orchard Street.  Do you see that?

A    Yes, I do.

Q    So again when she came down to the police station the day after Raymond Jones had identified Mr. Carmon, Ms. Stanley still could not identify Mr. Carmon?

A    According to this, yes.

PL0003661

**J A M E S   S T E P H E N S O N,**

of Madison, Connecticut, having been first duly sworn, was

examined and testified as follows:

THE COURT:  Have a seat, sir.  Attorney Lieb.

**DIRECT EXAMINATION BY ATTORNEY LIEB:**

Q    Good afternoon, Mr. Stephenson.

A    Good afternoon.

Q    Thank you for your patience with the scheduling

changes and while we completed the testimony of the last

witness.  Are you currently retired, sir?

A    I am.

Q    Were you formerly a member of the New Haven Police

Department?

A    I was.

Q    Were you at some point a detective in the

Investigative Services Unit or ISU?

A    In the Bureau of Identification.

Q    Was that within the Investigative Services Unit?

A    I was not in the Investigative Services Unit.

Q    Okay.

A    I was in the Bureau of Identification.

Q    Okay.  Approximately when did you become a detective

in the Bureau of Identification?

A    I was assigned to the unit in 1982.  Approximately

five years later I became the rank of detective while I was

there.

Q    While you were employed as a New Haven Police

PL0003714

Q    And then you went to work as a firearm and toolmark examiner at the state lab; right?

A    That's correct.

Q    And then you retired from there in 2014; right?

A    That's correct.

Q    Okay.  So while you were the firearm examiner for the New Haven Police Department from October of 1992 through June of 1994, were there any other firearm and toolmark examiners employed by the department?

A    No, sir.

Q    So if the need arose to examine firearm evidence from a crime scene in New Haven during that time period, would you be the person to do it?

A    That's correct.

Q    During this period, did you also hold the rank of detective within the Bureau of Identification?

A    I did.

Q    In addition to your duties as a firearms examiner, did you also perform other duties of a New Haven police detective in the B of I?

A    When -- when called upon during that timeframe. That's correct.

Q    Did that include from time to time responding to scenes to process fingerprints, for example?

A    That's correct.

Q    Throughout your career as a firearm examiner, have you been a member of the Association of Firearm and Toolmark

PL0003716

ATTY. LIEB:  Okay.  Nick, can you pull up Petitioner's 101, please?  Can you zoom in on the text?

THE COURT:  I'm sorry.  This is Exhibit 1?

ATTY. LIEB:  101.

THE COURT:  101.

ATTY. LIEB:  I'm sorry.  By the way, these are all in evidence.  This was the small handful that was marked as full for the --

THE COURT:  All right.  As part of the discovery packet or no?

ATTY. LIEB:  No.  Actually, it was -- it was not in the discovery folder.

THE COURT:  Oh, okay.

ATTY. LIEB:  It didn't even make it there.

Q   Okay.  So on the screen in front of you, Mr. Stephenson, is the first page of Petitioner's 101 in evidence.  Do you recognize this to be a query of the GRC Database that you ran in connection with your work on this case?

A   From what I can see on here, yes.

ATTY. LIEB:  For the benefit of the record, it was established at Mr. Stephenson's deposition that the date on this is not accurate for whatever reason.

THE COURT:  The date being February 3, 1994?

ATTY. LIEB:  Yeah.  He did not run the evidence through the database before the homicide occurred.

PL0003738

that you ran a few minutes later; is that correct, Mr. Stephenson?

A    Correct.

Q    And on this one the land width is exactly 64 and the groove width is exactly 112; is that correct?

A    That's correct.

Q    And am I right, that those are the most frequent measurements that you got from the land impressions and the groove impressions on the projectiles from this scene?

A    That's correct.

Q    Okay.  And Brownings on this?  Was any results -- Withdrawn.  Were there any Brownings among the results for this query?

A    No, there were not.

Q    Okay.  So several days later there was a Browning Hi-Power .9 millimeter pistol recovered by the New Haven Police Department; is that correct?

A    Yes, there was.

Q    Okay.  And do you recall that that firearm was given the evidentiary mark designation or it was called K-1?  Do you remember that?

A    That's correct.

Q    Okay.  So if we just call that K-1 for purposes of our discussion today, that gun, you'll understand what I'm talking about?

A    I will.

Q    Okay.  Did you test fire K-1?

PL0003746

A    I did.

Q    Did you examine the test fire cartridge cases?

A    From K-1?

Q    From K-1.

A    Yes, I did.

Q    Did you examine the projectiles test fired from K-1?

A    I did.

Q    Okay.  And you ultimately reached the conclusion that K-1 was the source of the cartridge casings recovered from the scene of the homicide of Danielle Taft at 810 Orchard Street; right?

A    I did.

Q    Okay.  So we'll talk about how you did that in a moment.

        ATTY. LIEB:  But, first, Petitioner's 104, please.

Q    At or around the time you -- that K-1 was recovered, you ran a fourth query of the General Rifling Characteristics Database; right?

A    I did.

Q    Okay.  And that's what's marked here -- or what's in evidence rather as Petitioner's 104; right?

A    It is.

Q    Okay.  And what was your purpose in running this fourth query of the General Rifling Characteristics Database?

A    To see what the general rifling characteristics would

PL0003747

come up for a Browning .9 millimeter.

Q   Right.  And specifically to see whether those characteristics were consistent with the projectiles from the Taft homicide scene; right?

A   Again, yes.

Q   Okay.  And so to be clear, what you're doing here is you're asking the database to give me the results for all of the Browning .9 millimeters; right?

A   That's correct.

Q   Okay.  And in response, you got a long list of Browning .9 millimeter firearms; right?

A   That's correct.

Q   Okay.  The vast majority of those were Browning -- .9 millimeter Browning Hi-Powers; right?

A   Correct.

Q   That -- That's what K-1 was; right?

A   That's correct.

Q   Okay.  Were any of the general rifling characteristics results for any of those Browning Hi-Powers in this database close to the characteristics you observed on the projectiles from the Taft homicide?

A   There was one.

Q   There was one?  Can you --

A   At least on the first page.

Q   Okay.  Can you -- can you tell us which is the one that you're -- that you're talking about?

A   It's the very last entry on the first page.  It's

PL0003748

Q   Right.  And the -- And that second query that you ran was 64 to 112; right?

A   Right.

Q   And that first query that you had run had one thousand of an -- one thousandth of an inch on either side of 112; right?

A   It was 111 and --

Q   111 and 113; right?

A   Correct.

Q   So that's 112 plus or minus one; right?

A   Per that.

Q   Right.  So you would agree with me that these results are more than five thousandths of an inch from the most frequent land impression and groove impression from the Taft homicide scene; right?

A   Referring to this 66, 68.  I had some 65's, some 63's in there.  If you only had one land or one groove to work with, and you had an impression of 63 or 65, again the 66, 68 would fall within that.

Q   Right.  Just to be clear, the groove impressions are outside that plus or minus five range recommended by the FBI; right?

A   Well it's not recommended by the FBI.  That's what was put in by someone into that -- into the database.  In other words, the FBI doesn't recommend that.  The FBI only puts in entries and brings back those entries that are being searched.  So there's no recommendations specifically by the

FBI, the feds.

Q    The reason that result didn't come up in the first place was because it was outside of the plus or minus five margin of error that the FBI considers the maximum for a typical instance; right?

A    And had I only run a land width of 65 thousandths this might have come up.

Q    What was my question, Mr. Stephenson?

A    Could you repeat the question then?

Q    The reason this did not come up in response to the previous queries was that it was outside that plus or minus five range that the FBI recommends as the -- for the typical instance; right?

A    Five thousandths.  When you have -- When it was being searched with both those maximum and minimum land and groove widths.

THE COURT:  Can I ask it a different way?  So your testimony is 13469, that entry had land and groove impressions that were within the parameters of what you found at 810 Orchard Street; is that -- is that correct?

MR. STEPHENSON:  The 66 and the 68 thousandths would have been within the parameters of the 65 thousandths that I had.

THE COURT:  So the land parameters were --

MR. STEPHENSON:  That would have fallen --

THE COURT:  -- but not the groove?

PL0003751

MR. STEPHENSON:  The groove would have been under that.  The highest I had was 113.  So 113 plus five would be 118.

THE COURT:  So why didn't this come up when you ran what -- your previous queries?

MR. STEPHENSON:  Algorithms or algorithms.  I can't -- That's -- that's -- You don't know what they are -- what they are going to bring back to you all the time, and that's why searches were done the way that I did.  That's why I searched .9 millimeter and .38 caliber.  Then I searched again when I had the specific firearm, and it didn't show it up there, I searched just the specific firearm itself to see what -- what rifling characteristics were coming up for that.  Granted, there's not many that fall within that parameter.  There's a couple down on the next page that are -- that fall close to that.  But again, that's what was in the database itself fitting those parameters.

Q   The overwhelming majority are not close; right?

A   I agree with you there.

Q   Okay.  And there's -- 13469 is a little close but didn't come up as a result for the parameters that you put in based on your judgment, training, and experience; right?

A   Correct.  And I don't know why it didn't come up. That's correct.

Q   All right.  Let's move on to talk about the

PL0003752

Q   Well is there a chance or is that what you would expect?

A   Again, it's relative to the condition of the firearm during those circumstances in which you're trying to make that comparison to.

Q   Assuming the chamber was in the same condition and the same kind of ammunition was used, would you expect those heavy chamber marks to be replicated on other cartridge casings fired from the same gun?

A   There is that possibility.

Q   Would -- would you expect it to happen?

A   Well there is that -- well there is that possibility. You don't know until you've examined the physical evidence itself.

Q   Okay.  Isn't the whole premise of what you do as a firearm and toolmark examiner is that these marks are repeatable and reproducible if the same gun is fired under the same conditions at future times?

A   They are.

Q   Yeah.  So wouldn't you expect those chamber marks to be there if you fired the same gun again and it was in the same condition with the same kind of ammunition?

A   You would expect that.

Q   Okay.  Did you assess whether sufficient agreement existed in the chamber marks to make an identification?

A   No, I don't recall doing that.

Q   Okay.  Because once you had made the identification

PL0003781

based on the breech face marks, you didn't think it was necessary; right?

A   Because I had located enough marks for that first -- for that process to determine that they were fired in that particular firearm.

Q   Okay.  Now so at the time you were doing this examination in the Taft case, you knew that there had been this other big shootout at the S and S Café a few weeks earlier; right?

A   I did.

Q   Okay.  That was something you had in the back of your mind; right?

A   All the cases came through my -- through my section. So yes.

Q   All right.  And you were aware -- Well withdrawn.  So something you saw while you were doing this Taft examination led you to go back and look at Items Number 13 and 14 from S and S; right?

A   That's correct.

Q   And that was before the gun, before K-1 ever was recovered; right?

A   I don't recall the exact date, but yes.

Q   Okay.  Did you go back and look at all 48 of those cartridge casings from the S and S Café?

A   I don't recall.  But the marks that were consistent with those two were consistent with the ones which were found on -- the ones from the -- this Taft case.

PL0003782

ATTY. LIEB:  Can you pull up Petitioner's 70, please?

THE COURT:  I'm sorry.  I was talking to the clerk.

ATTY. LIEB:  Oh, I was --

THE COURT:  Oh, you were just asking --

ATTY. LIEB:  I was talking to Nick.  So we're okay.

THE COURT:  Okay.  Sure.  That's all right.

ATTY. LIEB:  Oh, no.  That's the wrong document.  Sorry.  Take it down.  All right.

Q   But you went back and looked at 13 and 14 from S and S; right?

A   Correct.

Q   And you concluded that those two had been fired from the same gun as all 15 from the Taft homicide; right?

A   Correct.

Q   How did you do that?

A   Comparative microscope.

Q   What marks was it based on?

A   Pardon me?

Q   What marks was it based on?

A   The primer breech face marks.

Q   Did you look for those chamber marks that you would have expected to be replicated with the same ammunition and the cartridge -- and the cartridge -- the chamber in the same condition?  Did you look for those on Items 13 and 14

PL0003783

Q   Okay.  And at the bottom of the page --

ATTY. LIEB:  Can you scroll down a little bit?

Q   It says here Item Number K-1, a Browning Semiautomatic Hi-Power submitted with a magazine and nine full metal case .9 millimeter Luger Winchester cartridges. Do you see that?

A   I do.

Q   .9 millimeter Luger is a common caliber of ammunition; correct?

A   It is.

Q   And Winchester was a common brand of ammunition at the time?

A   It is.

Q   Okay.  And this was same kind of ammunition that was used in the Taft homicide; right?

A   The same specific .9 millimeter Luger Winchester full metal case cartridges were found.  That's correct.

Q   So when you examined K-1, what did you notice about the condition of the barrel?

A   The barrel itself had been altered in the interior surface up from the muzzle into the interior surface of the muzzle of the barrel.

Q   Did you think that someone had stuck something into the barrel for the purpose of altering it?

A   I did.

Q   Okay.  And am I correct, that the damage went about an inch into the muzzle end?

PL0003785

NNH-CV19-5052879-S                 :  SUPERIOR COURT

ADAM CARMON                        :  JUDICIAL DISTRICT
                                      NEW HAVEN

v.                                 :  AT NEW HAVEN, CONNECTICUT

COMMISSIONER OF CORRECTION         :  APRIL 29, 2022


NNH-CV20-6107902-S                 :  SUPERIOR COURT

ADAM CARMON                        :  JUDICIAL DISTRICT
                                      NEW HAVEN

v.                                 :  AT NEW HAVEN, CONNECTICUT

STATE OF CONNECTICUT               :  APRIL 29, 2022




                    TRANSCRIPT OF PROCEEDINGS



          BEFORE THE HONORABLE JON M. ALANDER, JUDGE




A P P E A R A N C E S :



    Representing the Petitioner:

        ATTORNEY KENNETH ROSENTHAL - Ordering Party
        Green & Sklarz, LLC
        1 Audubon Street
        3rd Floor
        New Haven, CT 06511


    Representing the Petitioner Pro Hac Vice:

        ATTORNEY DAVID SMITH KEENAN
        152 W. 57th Street
        8th Floor
        New York, NY 10019

        ATTORNEY MAURA BARRY GRINALDS
        One Manhattan West
        Emeritus Pro Bono Program
        New York, NY 10001

        ATTORNEY DOUGLAS E. LIEB
        Kaufman, Lieb, Et Al
        10 East 40th Street - Suite 3307
        New York, NY 10016

PL0003793

**J A M E S   S T E P H E N S O N**

Having previously been duly sworn, was examined and testified as follows:

**CONTINUED DIRECT EXAMINATION BY ATTY. LIEB:**

Q   Are you ready, Mr. Stephenson?

A   Yes, sir.

Q   Okay.  Thank you.  Good morning.  Do you recall yesterday that we were discussing the heavy chamber marks that you observed on the cartridge cases recovered from the Taft homicide scene which were designated items 1 through 15?

A   I do.

Q   Were those chamber marks very heavy?

A   If that was my comment on -- on the notes they -- they were heavy.

Q   Do -- do you recall whether they were very heavy?

A   Not as I sit here today without my notes and without thinking back on it.

Q   All right.

ATTY. LIEB:  Well, why don't we just pull up Petitioner's 99 for one moment please.  Scroll -- let's see.  All right.  Scroll down to the bottom of the first page please.

Q   Your notation here to refresh your recollection was that all had very -- sorry.  Withdrawn.

All had heavy chamber marks.  Do you see them?

A   I do.

PL0003796

Q   Okay.  Do you recall perceiving them to be very heavy?

A   I -- I don't recall, sir.

Q   Would it refresh your recollection to take a look at your deposition testimony on this particular subject?

A   If it would, yeah.

Q   Okay.  So I'm -- I'm just gonna show you page 105, lines 10 through 17.  If you -- don't -- don't read it aloud.  Just take a look at it and see if that jogs your memory about how you understood or perceived those chamber marks.

A   (Witness complies.)

Q   Do you recall, sir, that you regarded the chamber marks as very heavy?

A   Very distinctive.

Q   Very heavy and very distinctive, in fact.  Is that correct?

A   I believe so.

Q   Okay.  Thank you.

        ATTY. LIEB:  You can take down 99.

Q   So you -- you ultimately made an identification of the Taft homicide cartridge casings to the cartridge casings test fired from K1, the Browning Hi-Power .9-millimeter. Correct?

A   Yes.

Q   Okay.  Before making that identification, what, if anything, did you do to determine whether subclass

PL0003797

Q   But as -- as we discussed yesterday, if you used the same kind of ammunition and the chamber was in the same condition, you would have expected those very heavy very distinctive chamber marks to be replicated on the test fires.  Right?

A   If all things are the same, that's correct.

Q   Right.  And -- and you did, in fact, use the very same kind of ammunition for -- for the K1 test fires as was recovered at the Taft homicide scene.  Right?

A   Plus four other cartridges.

Q   Right.  Well, for four of them it was the -- the same kind of ammunition.  Right?

A   That's correct.

Q   Okay.  And, as we discussed yesterday, this -- this bore damage that you talked about, you didn't identify any damage to the chamber, did you?

A   Excuse me?

Q   As -- as far as you knew, the chamber of K1 was in the same condition on February 3rd of 1994 as it was when you examined it about a week later.  Right?

A   That I'm not sure of.  And when I examined it, I don't know the actual condition of that bore at the time of the Taft homicide.

Q   Okay.  As we established yesterday though, did you observe any damage to the chamber at the time you -- of K1 at the time you examined K1?

A   I didn't see any external damage from an outside

PL0003803

at the Taft homicide.

Q   Right.  But that was your conclusion and that was what you told your colleagues.  Right?  Was that this damage to the bore had to have happened between February 3rd when Danielle Taft was shot and killed and February 7th when the New Haven Police Department recovered the K1.  Right?

A   I'm -- in an inclusive -- inconclusive result as I'm not able to make that determination that they were fired through the same barrel.

Q   Right.

A   So that the damage that I'm seeing on the bullets from the second incident apparently was caused by either addition or -- or just damage to the bore at that time.

Q   Right.  But I just want to be really clear.  It was your conclusion that this damage to the bore of K1 post-dated, occurred after, the 810 Orchard Street homicide.  Right?

A   I can't attribute it all to being then.

Q   Well, is that what you thought?  That -- 'cause what -- what's the other explanation for the fact that the riffling striations on the two projectiles were different?

A   There was a damage to the bore when I examined the bore.  I hadn't seen a -- I hadn't seen a firearm prior to that in the Taft case.  I hadn't seen the firearm that discharged the Taft bullets prior to it being fired in that location.

Q   Let me try asking it this way.

PL0003817

THE COURT:  Well, let me ask this.  The bullets that you found at the 810 Orchard Street shooting did not have the striations that you subsequently found when you tested fired K1.  Is -- is that correct?

THE WITNESS:  That's correct.

THE COURT:  Okay.  So the question, as I understand it, is then the damage to the bore of K1, if that's the weapon that fired the bullets at 810 Orchard Street, had to have occurred subsequent to the 810 Orchard Street shooting.  Right?

THE WITNESS:  Correct.

THE COURT:  Okay.

ATTY. LIEB:  Thank you, your Honor.

THE COURT:  Sometimes it's --

ATTY. LIEB:  That was the point I was going for.

THE COURT:  -- sometimes it's the robe.  Go ahead.

ATTY. LIEB:  Okay.  Can you pull up Petitioner's 234 please?

And I'm -- I'm gonna hand the witness a paper copy.  This is marked for identification only at this point.  I'll just hand you a paper copy.

Would your Honor like a paper copy?

THE COURT:  Yes please.  Thank you.  I'm sorry.  This has been marked for ID at this point?

ATTY. LIEB:  Yeah.  It's still --

THE COURT:  Okay.

PL0003818

ATTY. LIEB:  -- it's still for identification.

THE COURT:  Okay.

ATTY. LIEB:  And counsel.

**BY ATTY. LIEB:**

Q   Mr. Stephenson, do you recognize --

A   Excuse me.  Excuse me.  Excuse me one sec.

Q   Oh.  Sorry.

(Whereupon the witness takes a sip of water.)

A   I'm sorry.

Q   Mr. Stephenson, do you recognize Petitioner's Exhibit 234?

A   I do.

Q   What is this document?

A   It was a composition book that I kept for myself of -- of cases that I was examining at the laboratory in the New Haven Police Department for my purposes because we were not in the computer stage.  This gave me a quick reference to go back if somebody said did you do a case on a certain date, I was able to go back and take a quick look and see.

Q   Now, was it your practice to make entries in this document at or around the time you examined physical evidence in the cases listed herein?

A   Yes.

Q   Okay.  And -- and did you make those entries in the regular course of your business as a firearm and toolmark examiner for the New Haven Police Department?

A   Again, these were my notes that I kept.

PL0003819

Q    You made them in the regular course of your job duties.  Right?

A    For my own personal -- they weren't an NHPD record. They were -- they were mine.  That's correct.

ATTY. LIEB:  I offer Petitioner's 234.

THE COURT:  Any objection?

ATTY. NOWAK:  No, your Honor.

THE COURT:  Okay.  It may be made a full exhibit.

Q    Okay.  So tell the Court what -- so there are a couple of case numbers on the left-hand side.  Is -- is -- withdrawn.

What are the two left most columns?

A    The one that says lab number, those was the laboratory -- firearms laboratory number I had assigned to the case as it came through my door.  And the CN number was the New Haven Police Department case number.

Q    Okay.  And the -- you see the following two columns are DOI and DOR.  Do you know what that means?

A    Date of incident.  Date of -- date of request.

Q    All right.  And then next to it there is type of incident and below that is a description of the relevant incident.  Is that right?

A    Yes.  There's notations there.

Q    Okay.  And then the next column is labeled evidence. Right?

A    It does.

PL0003820

A    I do.

Q    Okay.  And then next to it it has Browning and a serial number.  Do you see that?

A    I do.

Q    Okay.  Do you recall that Anthony Stevenson was the person in whose possession this K1 was originally found?  Right?

A    I don't recall that, but.

Q    Okay.  That -- that -- you know that's the serial number of K1.  Right?

A    I do.

Q    Okay.  And then it says one six-inch regular screwdriver, one three-inch Phillips screwdriver.  Do you see that?

A    I do.

Q    Those were two evidentiary items that the New Haven Police Department had apparently seized that you were asked to examine.  Is that right?

A    Or look at.  Yes.  That's correct.

Q    Where did those screwdrivers come from?

A    I have no idea, sir.

Q    Do you know whose screwdrivers they were?

A    I have no idea.

Q    Do you know whether they were seized from Anthony Stevenson?

A    I have no idea, sir.

Q    What did you do with those screwdrivers in relation

PL0003822

to K1?

A   I don't recall, sir.

Q   Okay.  But you did something with them in connection with this firearm that you concluded was used to murder Danielle Taft.  Right?

A   Could you repeat your question, sir?

Q   You -- you did something with those screwdrivers in relation to K1, the firearm that you concluded was used in this homicide.  Right?

A   I don't recall exactly what was done.

Q   Okay.  But you did do -- just to be clear, even if you don't recall the specifics, it's fair to infer from the fact that the serial number of K1 and those screwdrivers are in the same line entry that you used the screwdrivers in connection with K1 in some fashion.  Right?

A   That's correct.

Q   Okay.  But you -- do you have any recollection at all of what you did?

A   No, sir, I do not.

Q   Did you write it up in a report of any kind?

A   Not that I recall.

Q   If you had concluded that those screwdrivers had been used to damage the bore of K1, would you have put that in the report?

A   If there was that determination, yes, sir.

Q   All right.  So is it fair to conclude from the absence of a report that you did not make that

PL0003823

determination?

A   I mean, I've stated that I've never made a determination as to what damaged the bore of the firearm.

Q   Right.  But you tried to figure it out with these two screwdrivers that were somehow in evidence at the New Haven Police Department.  Right?

A   And, again, I don't recall to the extent of -- of why those came to me relative to -- to the firearm itself except for maybe to look to determine whether they damaged the bore.

ATTY. LIEB:  Nothing further.

THE COURT:  Attorney Nowak.

ATTY. NOWAK:  Thank you.

**CROSS-EXAMINATION BY ATTY. NOWAK:**

Q   Good morning, Mr. Stephenson.  How are you today?

A   Good morning.

Q   Good.  Can you tell me in 1994 where were you currently -- where were you employed?

A   At the beginning part of the year with the New Haven Department of Police Services.

Q   And what did you do there?

A   I was the firearm and toolmark examiner with the Bureau of Identification.

Q   And briefly describe what your duties were as a firearms toolmark examiner for the State -- for the Department -- New Haven Police Department.

A   To examine physical evidence whether it be cartridge

PL0003824

Q    Okay.  Now, the Hi -- the Browning Hi-Power .9 millimeter-millimeter's not listed on there?

A    It is not.

Q    All right.

THE COURT:  And what's your explanation for that?  Do you have one?  As to why when you initially queried the GRC it -- it did not come back indicating a Browning Hi-Powered firearm?

THE WITNESS:  That initial run of the GRC at that time or the runs of the GRC didn't include a Browning within those -- in the parameters that were searched.

THE COURT:  No, but I'm trying to understand why that is.  Why -- why was it that what you submitted to the GRC -- what -- what parameters were different so that it didn't give you back the Browning Hi-Powered which is what you ultimately concluded was the -- the murder weapon.  Right?

THE WITNESS:  Correct.

THE COURT:  So I'm trying to figure out why that's so.  Why you didn't get that back.

THE WITNESS:  Again, when I ran -- we talked the other day about when it didn't show up in that list and then -- then a Browning came in and I noticed the -- the -- the distinctive marks on the breech face, I said to myself, why didn't a Browning come up within that search.

PL0003836

| NNH-CV19-5052879-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| COMMISSIONER OF CORRECTION | : | MAY 2, 2022 |

| NNH-CV20-6107902-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| STATE OF CONNECTICUT | : | MAY 2, 2022 |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JON M. ALANDER, JUDGE

A P P E A R A N C E S :

Representing the Petitioner:

    ATTORNEY KENNETH ROSENTHAL - Ordering Party
    Green & Sklarz, LLC
    1 Audubon Street
    3rd Floor
    New Haven, CT 06511

Representing the Petitioner Pro Hac Vice:

    ATTORNEY DAVID SMITH KEENAN
    152 W. 57th Street
    8th Floor
    New York, NY 10019

    ATTORNEY MAURA BARRY GRINALDS
    One Manhattan West
    Emeritus Pro Bono Program
    New York, NY 10001

    ATTORNEY DOUGLAS E. LIEB
    Kaufman, Lieb, Et Al
    10 East 40th Street - Suite 3307
    New York, NY 10016

PL0004022

A R T H U R   B R A N T L E Y ,

Having been previously sworn, testified upon his oath as follows:

CONTINUED DIRECT EXAMINATION BY ATTY. KEENAN:

Q   Good morning, Mr. Brantley.

A   Hmm.

Q   Welcome back.  If you can keep your voice up this time, I would appreciate it; okay?  Do you understand?

A   Yeah.

Q   So I can hear you and the court reporter can take down your testimony.  Okay?

You're friends with Holbert Brown?

A   Right.

Q   And you were friends with Mr. Brown on February 3rd, 1994?

A   Correct.

Q   And he was the friend of yours that was assaulted at 810 Orchard Street?

A   Correct.

Q   Did you and Mr. Brown sell drugs together?

A   No.

Q   Did Mr. Brown sell drugs?

A   I don't know.

Q   How about Damian Thomas; do you know him?

A   Yes.

Q   Who is Damian Thomas?

A   He was a friend of ours.

PL0004056

Q    And where do you know Damian Thomas from?

A    From the neighborhood, from school.

Q    What neighborhood?

A    He lived on Beers Street, I believe.

Q    Okay.  Beers Ave?

A    Beers Street.

Q    Beers Street.  What part of Beers Street did he live on?

A    Down towards Chapel Street.

Q    Okay.  So Beers Street is two blocks long?

A    Right.

Q    And he lived on the side toward St. Raphael's Hospital?

A    Correct.

ATTY. NOWAK:  I'm going to object as to leading.

THE COURT:  It's preliminary; I'll allow it.

BY ATTY. KEENAN:

Q    And which side of the street did he live on, the side towards Sherman Avenue?

A    I believe so; I don't remember.

Q    Well, let me make it easier for you.  If you're walking towards Chapel Street, Chapel Street straight ahead, is his house on the right or the left?

A    I don't remember.

Q    Well, you were close friends with Mr. Thomas, were you not?

A    Correct, yeah.

PL0004057

Q   I'm sorry?

A   Yes.

Q   But you can no longer remember where he lived?

A   I told you, he lived on Beers Street.  I don't remember the exact address or whatever.

Q   Okay.  How about Mr. Brown; where did Mr. Brown live on February 3rd, 1994?

A   I believe he lived on Platt Street.

Q   And I think -- did you just answer you don't know whether Mr. Brown sold drugs?

A   Yes, that's what I said.  I don't remember.

Q   Okay.

        THE COURT:  So Mr. Brantley, you've got to keep -- I want you to move closer to that mic.  It amplifies a little; it's not great at amplifying. This is going to go a lot quicker if you keep your voice loud enough that everybody can hear you, okay?

        THE WITNESS:  All right.

        THE COURT:  Okay.

BY ATTY. KEENAN:

Q   Do you recall giving different testimony at your deposition in December of last year, Mr. Brantley?

A   I don't recall.

        ATTY. KEENAN:  Nick, could you pull up Mr. Brantley's deposition?  Page 36, please.  Mr. Brantley's December 3rd, 2021 deposition, page 36.

BY ATTY. KEENAN:

PL0004058

you were having problems with any of the people involved in the fight over there.

A    Right.

Q    At the time, were you having problems at Hillhouse High School with people from the ville?

A    I think I maybe got into an argument or -- I don't remember.  It was high school.

Q    Well, did you feel outnumbered at Hillhouse High School in terms of the ville/Dwight Kensington rivalry?

A    Maybe, I don't know.  That was high school, man. That's just like 27, 28 years ago.

Q    Well, do you remember bringing a gun to high school for protection?

A    No, I don't.

Q    Do you remember telling the police at the time you were questioned on February 5th, 1994 that you were having a beef with people from the ville in high school?

A    No, I don't.

Q    Hillhouse High School, by the way, is a couple blocks from 810 Orchard Street; is that right?

A    Yeah.

Q    And specifically, you indicated we was already beefing in school with the ville.  Who's we?

A    Me -- I don't know.

Q    Well, who were your friends at Hillhouse High School?

A    I can't remember.

Q    Was Damian Thomas one of them?

PL0004110

A    Yeah.

Q    And Mr. Thomas in fact, a few months after this, brought a firearm to Hillhouse High School?

A    I don't know.

Q    Well, don't you know he was expelled from Hillhouse High School for bringing a firearm?

A    Oh, I don't know.

Q    And then you indicated, I wanted to have some protection because there's only a few of us and a lot of them.

Do you remember telling the police that on February 5th, 1994?

A    No, I don't.

Q    Mr. Kelley attended Hillhouse High School with you?

A    I believe so.

Q    All right; and he was from the ville?

ATTY. KEENAN:  We can go to the next page, please.  Keep going.  Yeah, 25.  Go down, please. Next page.

BY ATTY. KEENAN:

Q    So do you recall telling police that after having a conversation with Mr. Little that evening, you knew that Mr. Little was going to go to 810 Orchard Street and shoot the house up?

A    No.

ATTY. KEENAN:  Can you just pull up 23:22?

(Whereupon the audio was played for the Court).

PL0004111

NNH-CV19-5052879-S                    :  SUPERIOR COURT

ADAM CARMON                           :  JUDICIAL DISTRICT
                                         NEW HAVEN

v.                                    :  AT NEW HAVEN, CONNECTICUT

COMMISSIONER OF CORRECTION            :  MAY 3, 2022


NNH-CV20-6107902-S                    :  SUPERIOR COURT

ADAM CARMON                           :  JUDICIAL DISTRICT
                                         NEW HAVEN

v.                                    :  AT NEW HAVEN, CONNECTICUT

STATE OF CONNECTICUT                  :  MAY 3, 2022




                    TRANSCRIPT OF PROCEEDINGS



        BEFORE THE HONORABLE JON M. ALANDER, JUDGE




A P P E A R A N C E S :



    Representing the Petitioner:

        ATTORNEY KENNETH ROSENTHAL
        Green & Sklarz, LLC
        1 Audubon Street
        3rd Floor
        New Haven, CT 06511


    Representing the Petitioner Pro Hac Vice:

        ATTORNEY DAVID SMITH KEENAN
        152 W. 57th Street
        8th Floor
        New York, NY 10019

        ATTORNEY MAURA BARRY GRINALDS
        One Manhattan West
        Emeritus Pro Bono Program
        New York, NY 10001

        ATTORNEY DOUGLAS E. LIEB
        Kaufman, Lieb, Et Al
        10 East 40th Street - Suite 3307
        New York, NY 10016

PL0004226

**P E T E R   C A R U S O N E,** of 235 Church Street, New Haven, Connecticut, having been duly sworn by the Clerk, was examined on his oath and testified as follows:

THE COURT:  Thank you, sir,  If you'd just remove your mask while you're testifying.  Thank you.

MR. CARUSONE:  Well, I'm-- I just want to let you know that I'm sick.

THE COURT:  Are you sick with COVID?

MR. CARUSONE:  It was negative this morning.

THE COURT:  But you're not feeling well?

MR. CARUSONE:  I was-- I was booked off sick today.

THE COURT:  Okay.  Any-- Anybody have an objection to keeping his mask on?

ATTY. NOWAK:  I don't.

ATTY. KEENAN:  No, it's fine, your Honor.

THE COURT:  Okay.

ATTY. LIEB:  To the contrary, your Honor.

THE COURT:  Okay, fine.  You can leave your mask on.  Thank you for letting me know.  Attorney Nowak.

**DIRECT EXAMINATION BY ATTY. NOWAK:**

Q   Mr. Carusone, where are you currently employed?

A   State of Connecticut, Department of Adult Probation.

Q   In February 3rd, 1994, where were you employed?

A   City of New Haven, New Haven Police Department.

Q   Were you a police officer?

PL0004344

you on notice that you're expected in Meriden at 2:00 to handle the cases you have there.

MR. SILVERSTEIN:  Okay.

THE COURT:  Okay.  Anything else before we continue?

ATTY. LIEB:  There was one issue that I think the parties determined would be appropriate to put on the record with respect to the Timothy McDonald issue that was raised yesterday.  I-- I believe the State's Attorney's Officed obtained some records that I think resolve the facts of what-- of Mr. McDonald's arrest, and so I was hoping we could put those on the record.

THE COURT:  Attorney Nowak.

ATTY. NOWAK:  That's fine.  But maybe perhaps we should finish Mr. Silverstein so we can --

THE COURT:  Okay.  Fine.

ATTY. KEENAN:  Your Honor, --

ATTY. LIEB:  Well, no.

ATTY. KEENAN:  -- I'm sorry, it's relevant to his testimony.

THE COURT:  Oh, is it relevant to examination?

ATTY. LIEB:  Yes.

ATTY. KEENAN:  Yes.

THE COURT:  Oh, okay.  So what is it?

ATTY. NOWAK:  Well, apparently, Inspector Rachael Cain spoke to I think it's Sergeant Rosedale at the New Haven Police Department, it looks like

PL0004229

Timothy McDonald was arrested for conspiracy to sell narcotics, and this was on May 18th, 1994, and that case was nolled on June 2nd, 1994.  That's all I got.  I don't know what the facts of the case were.  I don't know-- That's-- These were from computer printouts from the New Haven Police Department, I'm hearing this third and fourth hand.  So that's --

THE COURT:  So-- So he was arrested on May 18th and-- and the charges were nolled when?

ATTY. NOWAK:  June 2nd, 1994.

THE COURT:  Okay.

ATTY. NOWAK:  And this is according to printouts from the New Haven Police Department computer records and what was told to me --

THE COURT:  Okay.

ATTY. NOWAK:  -- through Inspector Cain.

THE COURT:  Okay.  Fine.

ATTY. NOWAK:  Other than that, that's all I know.

THE COURT:  Okay.  So are we ready to continue with Attorney Silverstein?

ATTY. KEENAN:  Yes.  Just one --

THE COURT:  Attorney Keenan.

ATTY. KEENAN:  -- One moment as I explain to Attorney Lieb how to operate this software.

ATTY. SILVERSTEIN:  Hey, Judge, can I get some water?

PL0004230

A    Yes.

Q    Okay.  Do you know a Jaime Stanley?

A    Yes.

Q    How do you know her?

A    Rel-- Close neighbor and I grew up with her.

Q    Okay.  On the night of February 3rd, 1994, were you dispatched to 810 Orchard Street?

A    Yes.

Q    Okay.  Do you remember receiving a call from dispatch?

A    Yes.

Q    And-- And what did do in response to that call?

A    I went and called Ms. Stanley.

Q    Okay.  And did Ms. Stanley give you information, I don't what to know what it is, but did she give you any information regarding what happened at 810 Orchard Street?

A    Yeah.  She said she believed she witnessed a crime.

Q    So what did you do with that?

A    She wanted to-- I-- What-- What I did with --

Q    Yeah.  What did you do, you had this information?

A    Yep.  I-- I connected her with the investigators in the New Haven Police Department.

THE COURT:  So did she call you, is that what happened?  How did-- How did --

WITNESS:  Your Honor, --

THE COURT:  -- your connection with her come about?

PL0004345

A   I believe so.

Q   In fact, you didn't-- when-- when you talked to Jaime Stanley, supposedly that night, you didn't take a description from her at all?

A   I don't recall.

Q   Do you have any notes that show this description or-- that show a description from Jaime Stanley, any notes at all?

A   No.

Q   Did you complete a police report?

A   I don't recall.

Q   Well, if you had taken a description of the shooter from if took statement from Jaime Stanley wouldn't you have completed a police report about that?

A   I don't recall.  I believe so.

Q   Okay.  I'm asking you as a police officer-- as a sworn police officer didn't you have an obligation to memorialize any suspect descriptions in a police report?

A   Yes.

Q   Okay.  And, according to your testimony, if I understand it correctly, you were at the scene of a shooting in which a six month old child had just been murdered; correct?

A   Yes.

Q   As police officer, wouldn't you want to catch the person who did the shooting?

A   You always want to catch the perpetrator.

PL0004351

Q   And if you were at the scene within any proximity to the time the shooting actually happened and you learned that there was an eyewitness to the shooting, wouldn't you want to obtain a suspect description from that eyewitness?

A   Would I have given a --

Q   Wouldn't you have wanted to obtain a suspect description from a person who told you they were an eyewitness?

A   If they-- If they gave me information, I would relay it.  Yes.

Q   Well, if learned there was a witness to a shooting, wouldn't you ask?

A   Sure.

Q   Okay.  But you didn't do that here?

A   I-- I was taken off of that scene and went to go make a phone call.

Q   Okay.  Who'd you call?

A   I called first upstairs at the police department, the dispatch, whoever it was I don't recall, and then I called Ms. Stanley.

Q   And what did you and Ms. Stanley discuss?

A   She said that she believed she witnessed a crime and I-- I connected her with the investigators.

Q   Who?  Who'd you connect her with?

A   I don't know who was working at the time.

Q   So sitting here today you can't tell us the name of the detective that you put Ms. Stanley in contact with?

PL0004352

A   I don't recall that.  No.

Q   All right.  When Ms.-- And you-- And did- Do you know where Ms. Stanley was when she contacted you?

A   Did I know who she was?

Q   No.  Did you know where she was?  Where did she make this-- Where-- How-- First of all,--  Withdrawn.

At the time of the-- that the shooting happened and conversation that you claim happened with Ms. Stanley that night, did you have a police department issued pager?

A   Taser?

Q   Pager, --

A   Pager.

Q   -- a beeper?

A   I don't-- I don't recall.

Q   You were a patrol officer in in Newhallville, right?

A   Yes.

Q   You don't recall having business cards that you would hand out to people with your pager number on it?

A   I don't recall offhand.

Q   Well, did you ever have a pager that was issued by the New Haven Police Department?

A   I believe I did.

Q   Did you ever have business cards issued by the New Haven Police Department with a pager number on it?

A   I don't recall to be honest.

Q   Well, did Ms. Stanley have your business card?

A   Would she have my business card?

PL0004353

A    -- and I said that I was just there.

Q    Okay.  And you have no recollection of asking her to describe the shooter for you so you could make a radio broadcast?

A    No, I connected her with the investigators.

Q    Okay.  Well, how long were you on shift that night?

A    I don't recall.

Q    Well, what did you see at the crime scene?

A    What did I see?

Q    Yeah, what'd you see?

A    Pulling up I saw a paramedic running to the ambulance with a -- with an infant in his arms.

Q    And what did you?

A    We --

Q    You, --

A    We --

Q    -- what did you do at the crime scene?

A    Protected it for integrity, any integrity in the area.

Q    Abd what did that involve?

A    Making sure no one went into the crime scene and-- and protected that crime scene.

Q    Okay.  Did you speak to any witnesses who were there?

A    I don't-- I don't recall.  No.

Q    Okay.  Why didn't you write report that-- about your activities that night?

A    Because it was moments later I was-- I left that

scene.

Q   I don't think that answers my question.  Why didn't you write a report about your activities in responding to the crime scene?

A   Because at-- at the time I don't think I did too much.

Q   Except receive a call from an eyewitness, you didn't think that was important?

A   Yeah, that's why I hooked her up with-- I connected her with the detectives.

Q   All right.  And then you-- But-- did that that end your involvement in-- in the investigation?

A   I didn't work on the investigation.

Q   You didn't work on the investigation, but you accompanied Ms. Stanley to her interviews with the police department?

A   Some of them.

Q   And what do you recall about those?

A   Moral support.  Neighbor support.

Q   I didn't ask you why you went, I asked you recall about Ms. Stanley's interviews with the police.

A   I-- I don't think I took part in them.  I don't think I was there, I was just a bystander.

Q   Well, if you're a bystander that would mean you were there.

A   Correct.  But I don't believe I was in the interviews.

PL0004359

department for the first time on February 5th, 1994?

A   I don't recall.

Q   Well, on the night of the homicide you-- all you did was put in touch with the detectives?

A   That's correct.

Q   How'd you do that exactly?  Did you call-- I thought you said you called the detectives.

A   No, I don't recall what-- I don't recall how I-- how she got there, but I did get her connected with the detectives.

Q   But you didn't go pick her up and take her to the police station?

A   I don't recall.

Q   Well, certainly, if you had transported an eyewitness you would have written a police report about that?

A   I don't recall.

Q   All right.  Do you recall receiving a subpoena to testify at Mr. Carmon's trial?

A   No.

Q   Right.  You didn't testify at Mr. Carmon's trial, right?

A   No.

Q   You transported Ms. Stanley from her home to this courthouse where she --

A   I don't recall that.

Q   -- testified?  Oh, you don't recall that?

A   Don't recall-- I don't recall.

PL0004363

Q   So that wasn't one of the times that you transported Ms. Stanley?

A   I don't recall.

Q   Okay.  Well, why were you subpoenaed in connection with Mr. Carmon's trial?

A   For this subpoena?

Q   No.  I'm talking about Mr. Carmon's trial in 1995.

A   So I could be there, I guess, for moral support.

Q   Is that an appropriate use of a subpoena?

A   I don't know.

Q   Well, did-- did-- how-- Did you tell State's Attorney Michael Dearington that you needed to be there when Ms. Stanley testified because she needed moral support?

A   Did I tell Mr. Dearington that?

Q   Yeah.

A   I don't believe so.

Q   Do you have any knowledge about-- Did Ms. Stanley ever tell you that she told State's Attorney Dearington that she needed you for moral support?

A   I don't know for sure.

Q   You're still in contact with Ms. Stanley?

A   When?

Q   Are you in-- How about prior to-- How about in 2020, were you in contact with Ms. Stanley?

A   I don't believe I've been in contact with her for quite a while, but if I was it was general texts.

Q   Well, you received a subpoenaed to testify at a

PL0004364

because Jaime Stanley is a cooperating witness, CW, --

Q   Um-Hm.

A   -- C, as in Charlie, W as in Whiskey.

Q   So you never told Attorney Conway that Jaime Stanley, was your confidential informant?

A   No, that would be false.

Q   Oh, okay.  So-- And yet you were present when three weeks later Ms. Stanley, on February 22nd, 1994, purportedly identified Mr. Carmon over in the G.A., at 121 Elm Street; is that right?

A   I was at the G.A. with --

Q   Okay.

A   -- Ms. Stanley.  Yes.

Q   So you went to the G.A. with her, right?

A   Yes.

Q   And Ms. Stanley looked through a window into Courtroom A; correct?

A   I believe so.

Q   All right.  And that is the-- through the door on the side of Courtroom A leading to the Prosecutor's Office, right?

A   Yes.

Q   It's in-- It's in the hallway?

A   Yes.

Q   And she looked through the door and there was a detective standing next to her?

A   I bel-- I don't know.  I don't recall who was

PL0004373

standing next to her.

Q   Did detectives also accompany her to the G.A. for this identification procedure?

A   Yes.

Q   All right.  And following the-- her looking through this window, did you then accompany her out of the courthouse?

A   I believe I may have.  I don't recall.

Q   All right.  Just to be clear, you were not standing directly next to her as she looked through this window?

A   No.

Q   The detectives --

A   I believe so.  Yes.

Q   Okay.  The detectives were.  And after this-- after looking through the window Ms. Stanley did not appear upset in any way?

A   I don't recall.

Q   You-- You don't-- Well, she wasn't crying?

A   I don't recall.

Q   You would recall if she was crying, wouldn't you?

A   Possibly.

Q   All right.  In any event, did that, and then you took her back home, do you remember?

A   I don't recall.

Q   All right.  But-- But you left the courthouse with her; correct?

A   Yes.

PL0004374

| NNH-CV19-5052879-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT<br>NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| COMMISSIONER OF CORRECTION | : | MAY 4, 2022 |
| | | |
| NNH-CV20-6107902-S | : | SUPERIOR COURT |
| ADAM CARMON | : | JUDICIAL DISTRICT<br>NEW HAVEN |
| v. | : | AT NEW HAVEN, CONNECTICUT |
| STATE OF CONNECTICUT | : | MAY 4, 2022 |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JON M. ALANDER, JUDGE

A P P E A R A N C E S :

Representing the Petitioner:

ATTORNEY KENNETH ROSENTHAL - Ordering Party
Green & Sklarz, LLC
1 Audubon Street
3rd Floor
New Haven, CT 06511

Representing the Petitioner Pro Hac Vice:

ATTORNEY DAVID SMITH KEENAN
152 W. 57th Street
8th Floor
New York, NY 10019

ATTORNEY MAURA BARRY GRINALDS
One Manhattan West
Emeritus Pro Bono Program
New York, NY 10001

ATTORNEY DOUGLAS E. LIEB
Kaufman, Lieb, Et Al
10 East 40th Street - Suite 3307
New York, NY 10016

PL0004457

**C E C I L I A   B R A T T E N,**

of Branford, Connecticut, having been first duly sworn, was examined and testified as follows:

THE COURT:  Thank you.  Please have a seat.

**DIRECT EXAMINATION BY ATTORNEY KEENAN:**

Q   Good morning, Ms. Bratten.

A   Good morning.

Q   Are you currently employed?

A   I'm not.

Q   What did you formerly do for work?

A   I worked as a prosecutor for about 15 years, and then after that I worked in justice sector reform programs overseas.

Q   What year did you retire?

A   Let's see.  In 2000 -- From the prosecutor's office or from --

Q   Sure.  When did you leave the prosecutor's office?

A   In 2004.

Q   All right.  In February of 1994, were you employed as an Assistant State's Attorney in New Haven Superior Court, Part A?

A   Yes.

Q   That's in this building?

A   Yes.

Q   Was one of your duties as a prosecutor to prepare arrest warrant applications?

A   Not to prepare but to -- So the process for an arrest

PL0004462

Q   How would the warrant actually get presented to the judge?

A   The police bring it to the judge.

Q   And are the officers sworn or they -- to -- that everything -- Well tell me what happens, as you understand it?

A   So after the prosecutor reviews it and agrees that there's probable cause on the face of the warrant, then it's presented to the judge for his review or her review, and the judge signs it.  And the officers are swearing to the accuracy of the affidavit.

Q   And was it your expectation at the time that officers understood their obligations under the law to only include information or to not intentionally include information in the arrest warrant affidavit that was false?

A   Yes.

Q   And was it your understanding or did you operate on the belief that officers understood that they were not to omit material information from an affidavit in support of a search warrant application?

A   The affidavit can't be misleading in any way.  It has to be accurate enough for the judge to make a determination. So it would put any information in that was relevant to that standard.

Q   Well let me ask you it this way.  Prior to signing this warrant, did you review the New Haven Police Department's investigation case file for the Taft homicide?

PL0004465

Q   So would you agree with me that to the extent this identification procedure occurred at 121 Elm Street, it would have been extremely uncommon?

A   Yes.

ATTY. KEENAN:  No further questions, your Honor.

THE COURT:  Okay.  Attorney Nowak.

ATTY. NOWAK:  Yes.  Briefly.

**CROSS-EXAMINATION BY ATTORNEY NOWAK:**

Q   Good morning.  Nice to see you again.

A   Good morning.

Q   When did you leave Iraq?

A   In 2000 -- The end of 2005.

Q   2005.

A   Yes.  Two years.

Q   Yeah.  Just -- just so we know, over at the GA, when individuals are brought in for their cases on a mittimus, you could -- those -- those cases may -- may be called in Courtroom A that day; right?

A   I mean they could be.  You know, they could be --

Q   Sometimes those cases, they're going to be called in Courtroom A, but that day they may be transferred to Courtroom B and the case may be called in Courtroom B?

A   That could happen.  I mean there's three courtrooms there and, you know, depending on what's going on with the individual defendant there could -- there could be movement between the courtrooms.

Q   Right.  And as a prosecutor, you would just tell the

PL0004481

Honor.

THE COURT:  The objection is sustained.

ATTY. NOWAK:  I don't think there's a foundation.

THE COURT:  The objection is sustained.

ATTY. KEENAN:  That's fine.

Q   I don't recall if I asked you this.  If I did, I'll probably get an asked and answered objection.

ATTY. KEENAN:  Can we just pull up the Petitioner's Exhibit 178 again?  Can you go to -- back to witness number one?  I think it's on page 9.

I'm sorry.  Witness number two, page 9.

Q   So we reviewed this paragraph before I asked a few questions, and one of them had to do with Ms. Stanley viewing photographs, and obviously, Ms. Stanley did not make a positive identification prior to the arraignment proceeding.  My question is, should the -- the fact that she had -- that she looked at multiple photographs without making a positive identification been included in the arrest warrant affidavit?

A   I would say yes, because it's relevant to the credibility and the context of the identification.

Q   And the fact that she had viewed Mr. Carmon's photograph and did not identify it, did not make a positive identification, should that have been included in the arrest warrant affidavit?

A   Sorry?

PL0004491

Q   The fact that she had seen Mr. Carmon's photograph prior to the arraignment identification and had not positively identified him as the shooter, should that have been included in the arrest warrant affidavit?

A   I would say, yes.

Q   And the fact that she -- when she ultimately -- Well you -- Have you seen the photographs of the individuals that Detective Dilullo -- Dilullo indicated were seated next to Mr. Carmon at this arraignment identification procedure?

A   I've -- I've seen the photographs that are labeled.

Q   Okay.

A   The one -- You know, the people that were there during this identification.

Q   And so you're aware that some of those individuals were white?

A   Yes.

Q   And you're -- And as prosecutor, was that appropriate?

ATTY. NOWAK:  I'm going to object, your Honor. Again --

THE COURT:  Yeah.  Mr. Keenan, I think -- Yeah. And I know I've said this before.  But aren't we way beyond whether there was probable cause for Mr. Carmon's arrest?  There was a hearing in probable cause.  There was a trial.  I mean, I'm not quite sure of the relevance of this.  I just -- It's --

ATTY. KEENAN:  No.  I --

PL0004492

Do you remember the question?  No?

MS. BRATTEN:  It's not clear to me.

THE COURT:  Okay.  Fine.

MS. BRATTEN:  So maybe we could just --

THE COURT:  Okay.

Q   The fact -- The facts and circumstances of this particular identification, as they pertain to the arraignment identification in particular were exculpatory and should have been included in this arrest warrant affidavit?

A   As the prosecutor signing it, I think it should have been, because it would have triggered me to inquire further, to ask the police to clarify further the circumstances. Because other -- This is a pretty direct statement regarding her identification.

ATTY. KEENAN:  All right.  Thank you.  Nothing further, your Honor.

ATTY. NOWAK:  Nothing further, your Honor.

THE COURT:  Okay.  Thank you.  You may step down.

MS. BRATTEN:  Thank you so much, Judge.  It's nice to see you.

THE COURT:  Yeah.  Same.  Attorney Keenan, do you have additional witnesses?

ATTY. KEENAN:  We do not.

THE COURT:  Okay.  Do you have any additional evidence you want to present?

PL0004496