# PX102

Case 3:23-cv-00944-JCH     Document 137-12     Filed 04/11/25     Page 1 of 249

Page 1

STATE OF CONNECTICUT  :   SUPERIOR COURT

JUDICIAL DISTRICT OF NEW HAVEN

AT NEW HAVEN

---------------------------------x

ADAM CARMON,

               Petitioner,

   -versus-                        : No. NNH-CV-6107902S

STATE OF CONNECTICUT,

               Respondent.

---------------------------------x

          Deposition of JAMES STEPHENSON, taken pursuant to Section 13-26, et seq., of the Connecticut Practice Book, held remotely at the law offices of Karsten & Tallberg, LLC, 500 Enterprise Drive, Rocky Hill, Connecticut, before Patricia Saya, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on February 25, 2021, at 10:00 a.m.

PL0000409

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 2

A P P E A R A N C E S (via remote locations):

For the Petitioner:

DOUG LIEB, ESQ.
Kaufman, Lieb, Lebowitz & Frick, LLP
10 E. 40th Street, Suite 3307
New York, New York 10016
(212)660-2332
dlieb@kllflaw.com

        -and-

DAVID KEENAN, ESQ.
Law Office of David Keenan
152 W. 57th Street
New York, New York 10019
(347)457-4068
dkeenan@davidkeenanlaw.com


For the Respondent:

CRAIG NOWAK, ESQ.
Office of the Chief State's Attorney
235 Church Street
New Haven, Connecticut 06510
(203)789-7801
craig.nowak@ct.gov


For James Stephenson:

JAMES N. TALLBERG, ESQ.
Karsten & Tallberg, LLC
500 Enterprise Drive
Rocky Hill, Connecticut 06067
(860)233-5600
jtallberg@kt-lawfirm.com


A L S O   P R E S E N T:

MAURA BARRY GRINALDS, ESQ.

PL0000410

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all technicalities as to proof of the official character before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the reading and signing of the deposition by the deponent are not waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that said deposition is being conducted remotely.

                    *   *   *   *   *

Sanders, Gale & Russell
(203) 624-4157

PL0000411

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 4

I N D E X

NAME OF WITNESS:  JAMES STEPHENSON

---------------------------------------------------------

                                                      PAGE

DIRECT EXAMINATION BY MR. LIEB                          7

CROSS EXAMINATION BY MR. TALLBERG                      242

CROSS EXAMINATION BY MR. NOWAK                         244


                    PETITIONER'S EXHIBITS

NO.    DESCRIPTION                                    PAGE

25   Image of inside back cover of marble
     composition notebook                              12

26   Excerpt of FBI GRC File Manual                    32

27   Article from AFTE Journal subtitled
     "Subclass Characteristics from Origin
     to Evaluation"                                    53

28   Page 287 of the fall 2011 AFTE Journal            66

29   January 24th, 1994 typewritten police
     report from April Hines complaint                 75

30   Handwritten bench notes from
     January April Hines S&S examination               82

31   Handwritten notes from Taft homicide
     Exam on 2/5/94                                     98

32   GRC query listed as 14 hours, 59
     minutes, and 34 seconds                          119

33   GRC query run several minutes after
     Exhibit 32                                       121

34   GRC query with time stamp 150413                 124

Sanders, Gale & Russell
(203) 624-4157

PL0000412

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 5

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 35 | Police report from February 8th, 1994 | 129 |
| 36 | Handwritten notes, Case Number 11826, New Haven shooting | 136 |
| 37 | J. Stephenson's probable cause hearing testimony | 145 |
| 38 | Firearms worksheet | 158 |
| 39 | GRC query for Browning 9-millimeter .38s | 177 |
| 40 | J. Stephenson's trial testimony | 187 |
| 41 | GRC query, time stamp 150413 | 189 |
| 42 | Image copy of two facing pages of marble composition notebook | 197 |
| 43 | SWGGUN Guidelines for the Standardization of Comparison Documentation | 217 |
| 44 | Search warrant for items in Carmon vehicle | 227 |
| 45 | Handwritten steno book notes dated 2/4/94 | 230 |

*(Exhibits were retained by Attorney Lieb.)

Sanders, Gale & Russell
(203) 624-4157

PL0000413

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 6

THE REPORTER:  Any stipulations?

MR. LIEB:  We can just say all objections except as to form are reserved until the time of trial, and we stipulate to the witness being sworn in remotely. Does that work, Craig?

MR. NOWAK:  Yes.

MR. TALLBERG:  Before we get going, it is my understanding from Assistant Attorney General Finucane that Mr. Stephenson is a defendant in another case, the Jackson litigation, in which he was deposed. And I believe you may have had some conversations with him.  Is there an agreement that that case won't be the topic of inquiry here today?

MR. LIEB:  I spoke with Mr.  Finucane and alerted him to the fact this examination was taking place.  And I explained that I was not intending to question the witness about the work he performed in the Horn and Jackson cases.  I may use the transcript of his testimony to discuss certain foundational principles in the field, but I am not going to ask him about the work he performed in that case.

MR. TALLBERG:  Thank you.

J A M E S   S T E P H E N S O N ,
called as a witness, having been first duly sworn by Patricia Saya, a Notary Public in and for the State of

PL0000414

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 7

Connecticut, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LIEB:

Q.    Good morning, Mr. Stephenson.  Thank you for being here today.  My name is Doug Lieb.  I represent the petitioner in this matter, Adam Carmon.  My cocounsel, David Keenan, is also here with us today on the Zoom.  Where are you at the moment?

A.    At Attorney Tallberg's office in Rocky Hill.

Q.    Are there any documents pertaining to this matter that are with you in the room at Attorney Tallberg's office?

A.    There are.

Q.    Is there what I would call a marble composition book from my grade school days that is among the materials that you produced in response to a subpoena?

A.    There is.

Q.    Is there a manila folder that contains some police reports and other materials?

A.    There is.

Q.    Do you have any -- other than the materials that you produced in response to the subpoena in this matter, do you have any notes or other materials in front of you at the moment, sir?

PL0000415

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 8

A.   I do not.

MR. TALLBERG:  If I may interject, you sent electronically these exhibits.  So we do have a hard copy for Mr. Stephenson should the need arise.

MR. LIEB:  Thank you.

Q.   I know you have done this before.  But I just want to go over a few ground rules that will help today's proceedings run smoothly and efficiently.

Do you understand that you are testifying under oath under penalty of perjury?

A.   I do.

Q.   Do you understand that you need to give verbal answers to my questions, meaning "yes," "no," "correct," "incorrect," rather than a shake of the head or shrug of the shoulders?

A.   I do.

Q.   Do you understand that if any of my questions are unclear to you, whether because it is a bad Internet connection or because my question just doesn't make sense to you, you should please feel free to ask me to clarify, rephrase, or repeat the question?

A.   I do.

Q.   Do you understand that if you need to take a break at any time for any reason; restroom, coffee, confer with your attorney, that's fine?  You just need

PL0000416

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 9

to answer the pending question, and then let me know.

A.   Yes.

Q.   What, if anything, did you do to prepare for today's testimony?

A.   Reviewed the documents that I have.

Q.   When you say the documents that you have, could you describe what those documents are?

A.   The transcript from the probable cause hearing, the transcript from the trial transcript from the habeas trial, 2006, the file containing the notes and the reports from the Taft homicide, my case notebook that had some of the diagrams of the 810 Orchard Street in it, and the book that we spoke about -- you spoke about, being a marble notebook.

Q.   Did you confer with counsel in preparation for today's testimony at any point?

A.   I did.

Q.   When did you do that?

A.   Probably a couple weeks ago, and then again yesterday, pretrial.

Q.   How long did that first of those two meetings last, approximately?

A.   About an hour, hour and 15 minutes.

Q.   How about yesterday's?

A.   Two hours.

PL0000417

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 10

Q.   You served in the police department for 20 years.  Is that correct?

A.   That's correct.

Q.   When did you retire?

A.   June 10th -- it was either June 9th or 10th, 1994.

Q.   Approximately the last year of your tenure with the New Haven Police Department, you served as a firearms and tool mark examiner within the NHPD's Bureau of Identification.  Correct?

A.   That's correct.

Q.   Prior to that, you were a member of the New Haven Police Department, but you were in training as a firearms and tool mark examiner at the Connecticut state lab.  Is that correct?

A.   That's correct.

Q.   How long was that period of time when you were training at the Connecticut state lab while a member of the New Haven Police Department?

A.   From December of 1990 to October of 1992.

Q.   During that period of time, did you also perform other New Haven Police Department duties unrelated to your training as firearms and tool mark examiner?

A.   Only upon request if there was a need be for

Sanders, Gale & Russell
(203) 624-4157

PL0000418

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 11

someone to do some extra work in the unit itself.

Q.    There were times in that December of 1990 to October of 1992 period when you, for example, responded to crime scenes to process fingerprints, right?

A.    If I was asked to, that's correct.

Q.    When did you return from the state lab to the New Haven Police Department to begin performing firearm and tool mark examinations within the bureau of identification?

MR. TALLBERG:  Objection to form.  You can answer.  You can answer, Jim, if you understand the question.

A.    Could you repeat the question, sir?

Q.    You said that you finished your training at the state lab in October of '92, right?

A.    That's correct.

Q.    Is that the point in time at which you returned to the New Haven Police Department to perform work as a firearm and tool mark examiner within the bureau of identification?

A.    That's correct.

Q.    Could you take a look at the marble composition book in front of you and flip to the back inside cover, please?  I am going to share an exhibit with you on my screen momentarily.  Bear with me for a

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 12

moment, please.

Mr. Stephenson, can you see on the screen in front of you an image of the inside cover of the marble composition notebook?

A.    Yes.

Q.    I have marked that document as Plaintiff's Exhibit -- Petitioner Exhibit 25.

(Petitioner's Exhibit 25:  Marked for Identification - described in Index.)

Q.    I will zoom out.  Can you see the entire back cover on the screen in front of you at the moment?

A.    Interior of the back cover, yes, I can.

Q.    Does the image I am displaying on your screen as Petitioner's Exhibit 25 -- is that a true and accurate reproduction of the inside back cover of the marble composition book that is in front of you?

A.    It is.

Q.    And you see some handwriting in blue ink on the right-hand side of the back inside cover.  Yes?

A.    Yes.

Q.    It says -- the words "Completed Book 11/2/99" appear there.  See that?

A.    It does.

Q.    There is a list of the number of cases in which you performed work that are documented in the

Sanders, Gale & Russell
(203) 624-4157

PL0000420

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 13

preceding pages of this book.  Correct?

A.   That's correct.

Q.   It says there in your handwriting, "55 cases training."  Do you see that, sir?

A.   It does.

Q.   That entry or that note reflects that you served as the firearm and tool mark examiner in 55 cases while you were in training at the state lab from December of 1990 to October of 1992.  Correct?

A.   No.  Says 55 cases during the training period of time.

Q.   So during the period when you were in training from December of 1990 through October of 1992, you served as the firearm and tool mark examiner in 55 cases.  Correct?

A.   While at the state laboratory, I was working in consort with the examiners who were on staff at that time.  So during that time frame, those cases might have been cosigned by the examiner.

MR. TALLBERG:  We lost the witness.  Off the record.

(Off the record discussion.)

MR. LIEB:  I think the witness was in the middle of an answer to a pending question.  So Patricia, is it possible for you to read back the question and the

Sanders, Gale & Russell
(203) 624-4157

PL0000421

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 14

first portion of the answer, please?

                    (Question and answer read.)

Q.   Based upon what the court reporter has just read back, is there a remainder of that answer that you want to complete at this time, or should I move on to the next question, sir?

A.   You can move on to the next question.

Q.   On the 55 cases that we have been talking about, you were working as a trainee, correct?

A.   That's correct.

Q.   In association with trained examiner at the state lab who was the primary examiner on those 55 cases, right?

A.   That's correct.

Q.   When you were trained as a firearm and tool mark examiner at the state lab, were you trained on the basis of any particular manual or written protocol?

A.   We used part of the AFTE, Association of Firearm and Tool Mark Examiners, training manual.

Q.   After you retired from the New Haven Police Department, you went to work at the state lab as a firearms and tool mark examiner on a full-time basis. Right?

A.   That's correct.

Q.   When did you begin those duties?

PL0000422

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 15

A.    June 10th.  I believe it was June 10, 1994.

Q.    You served as firearm and tool mark examiner at the state lab for about 20 years.  Correct?

A.    That's correct.

Q.    When did you retire from the state lab?

A.    March 1st, 2014.

Q.    When did you first become a member of AFTE?

A.    I believe 1990.

Q.    Are you still a member?

A.    I am.

Q.    You served for a time on AFTE's scientific working group, which is otherwise known by the acronym S-W-G-G-U-N, or SWGGUN, right?

A.    That's correct.

Q.    When did you begin working on SWGGUN?

A.    I believe it was -- I think I was appointed on to SWGGUN in late 2008 and attended the first SWGGUN meeting in 2009, I believe.

Q.    How long did you serve on SWGGUN?

A.    So 2014, when I resigned from SWGGUN.

Q.    Why did you resign from SWGGUN?

A.    Because I was leaving service with the forensic laboratory.

Q.    As a member of SWGGUN, you kept up with scientific developments in the field of firearms and

Sanders, Gale & Russell
(203) 624-4157

PL0000423

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 16

tool mark examination, right?

A.    That was part of our goal.  That's correct.

Q.    Can you describe for me the role and responsibility of SWGGUN within AFTE?

A.    SWGGUN was actually separate from AFTE.  It was funded by the Federal Bureau of Investigation, if I remember correctly, and were to write protocols and procedures -- or guidelines, not protocols and procedures, but guidelines was one of the tests which we were working with.

Q.    SWGGUN is a group of respected professionals in the field who are charged with helping to develop scientific guidelines that will guide the work of examiners in the field, right?

A.    Correct.

Q.    And additionally, one of the things that SWGGUN did was respond at times to criticism of the field leveled from outside sources.  Correct?

A.    I believe if there were responses to certain articles or certain information that was being put out, that's correct.

Q.    For example, the National Academies of Sciences issued some reports in 2008 and 2009 to which SWGGUN responded on behalf of firearms and tool mark examiners as a whole, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000424

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 17

A.   At SWGGUN.

Q.   The purpose of your response being in part to defend the scientific validity of the enterprise that you have spent 24 years of your career engaged in, right?

A.   More than 24 years.  That's correct.

Q.   Am I correct that you have a consulting business that you set up largely for the purpose of being able to be compensated if you are called upon to respond to a subpoena?

A.   That's when I set it up.  Yes, that's correct.

Q.   Are you being compensated for the time that you are spending testifying today?

A.   No.

Q.   Do you anticipate being compensated for the time you are spending testifying today?

A.   No.

Q.   Are you paying Mr. Tallberg for his services out of your own pocket?

A.   No.

Q.   Who, if anyone, is paying for Mr. Tallberg's services?

MR. TALLBERG:  Object to the form and object to that line of inquiry.

MR. LIEB:  Are you instructing him not to

Sanders, Gale & Russell
(203) 624-4157

PL0000425

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 18

answer the question?

MR. TALLBERG:  Yeah, I am.

MR. LIEB:  You know that attorney compensation -- the existence of an attorney/client relationship and compensation arrangement is not privileged information.  So that is not a proper objection.  So I'd like the witness to answer the question.

MR. TALLBERG:  I'm not sure that is.  We will contemplate it, and I would suggest that you move along just to save time.  Perhaps we will reconsider.  I need to look at that.

MR. LIEB:  Okay.  We will come back to that issue.

Q.   You are familiar, Mr. Stephenson, with the terms "class characteristics," "subclass characteristics," and "individual characteristics"?  Yes?

A.   I am.

Q.   These are foundational terms in the field of firearms and tool mark examination.  Right?

A.   They are.

Q.   So class characteristics are characteristics of a particular tool that result from design factors and are determined prior to manufacture right?

PL0000426

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 19

A.   Not only a tool, but yes, or correct.

Q.   With respect to tools, when one refers to "class characteristics" in your field of firearms and tool mark examination, you are talking about characteristics that are determined prior to manufacture and result from features of the design, right?

A.   That could be a portion of it.  That's correct.

Q.   So for example, the number of lands and grooves cut into the barrel of a firearm, those are class characteristics, right?

A.   They are.

Q.   Because those result from the design process of that weapon where the manufacturer chooses a particular implement to cut the barrel that is going to create a fixed number of lands and grooves, right?

A.   Correct.

Q.   And just so we will all know what we are talking about here, the interior of a barrel of a firearm is rifled so that the projectile will spin when it goes out of the weapon.  Right?

A.   Yes.

Q.   The purpose of that is to increase the accuracy of the projectile?

A.   Imparts spin on the bullet so it is more

PL0000427

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 20

accurate, that's correct, leaving the balance on.

Q.    The way those spirals are cut into the barrel of the firearm is with a tool that is used in the manufacturing process, right?

A.    It is.

Q.    The number of lands and grooves is a class characteristic, right?

A.    Yes.

Q.    But the direction of the twist of the rifling left or right, that is a class characteristic, right?

A.    Yes.

Q.    The width of the lands and the grooves that are cut into the barrel, that is a class characteristic, right?

A.    Yes.

Q.    And the class characteristics of a firearm are fixed when that firearm is manufactured, right?

A.    The manufacturer might start with a certain dimension at which they make the tool to tool that process.  But during the tooling process, that tool can change, which would change the size of the lands and grooves.

Q.    So tools change as you use them during the manufacturing process, right?

A.    They can, yes.

PL0000428

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 21

Q.    One of the tools can change is the tool that is being used to cut the spiral rifling inside the barrel of the firearm?

A.    Yes.

Q.    So your testimony, just so I understand it, is that depending upon when in the life of that tool the tool is used to cut the rifling in the barrel, that may affect the width of the lands and grooves cut width inside the barrel.  Correct?

A.    That's correct.

Q.    Once the width of the lands and grooves are inside the firearm, they don't change, right?  They are fixed?

A.    I'd disagree with that.

Q.    The width of lands and grooves inside the barrel of the firearm can change over time?

A.    That's correct.

Q.    Why would that happen?

A.    Use, abuse, and wear of the firearm itself.

Q.    And in your experience, based on your training and experience as firearms examiner, how much can those lands and grooves change over time?  Withdrawn.

      Lands and grooves are generally measured in thousands of an inch?

A.    Right.

Sanders, Gale & Russell
(203) 624-4157

PL0000429

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 22

Q.   How much can the width of lands and grooves within the rifling of a firearm change over time due to use and abuse?

A.   I wouldn't have an accurate answer to that.

Q.   But could it be more than a few thousandths of an inch?

A.   It could.

Q.   You are familiar with something called the General Rifling Characteristics database?

A.   I am.

Q.   That is a database that used to be maintained by the FBI, now maintained by AFTE?

A.   That's correct.

Q.   That database is populated class characteristics, right?

A.   That's correct.

Q.   That's what makes it the General Rifling Characteristics database, is that it is characteristics about certain makes and models of firearms in general as opposed to specific individual firearms, right?

A.   Repeat the last part of question, please.

Q.   Let me rephrase the question.  What makes it the General Rifling Characteristics database is that it is intended to provide you as an examiner with information about certain makes and manufacturers and

PL0000430

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 23

models of firearms in general, correct?

A.   That's correct, but those aren't -- the specimens that are in there do not come from the manufacturer themselves.

Q.   The way the database is populated is by examiners around the country inputting information that they observe into the database, right?

A.   That's correct.

Q.   So one of your core functions as a firearms and tool mark examiner was to try to figure out what kind of weapon might have fired a projectile that is recovered from a crime scene when there is no weapon recovery, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Just repeat the question one more time, please.

Q.   One of your core responsibilities as a firearms and tool mark examiner was to try and help figure out what kind of weapon might have fired a projectile recovered from a crime scene when there is no weapon recovered, right?

A.   That's correct.

MR. TALLBERG:  Same objection.  You can answer.

PL0000431

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 24

MR. LIEB:  I think the witness answered but I --

THE WITNESS:  I said that's correct.

Q.   So the way the database -- the General Rifling Characteristics database is an investigative tool that firearms and tool mark examiners use to help them in this task, right?

A.   It is.

Q.   And the way the database works at a high level of generality is that the examiner inputs certain characteristics that are observed from the physical evidence that the examiner examines, and then the database gives you back a list of manufacturers and models of firearms that are consistent with those characteristics.  Right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Potential candidates for comparison.  That's correct.

Q.   It is not an exhaustive list of every firearm in the history of the world, is it?

MR. TALLBERG:  Objection to form.  You can answer.

A.   That's correct.  It is not an exhaustive list, even for manufacturers, of all the firearms that they

Sanders, Gale & Russell
(203) 624-4157

PL0000432

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 25

manufacture.

Q.    Back in 1994, there were ten of thousands of entries in the database, right?

A.    As a whole in the database, that's correct.

Q.    The database grows by accretion over time as more and more examiners enter data into it?

A.    That's correct.

Q.    To be clear, the way it works is that you as a firearms examiner first examined certain physical evidence recovered from the crime scene, such as bullets or bullet fragments?

A.    Correct.

Q.    You make certain observations from that physical evidence as to what the class characteristics of the weapon that fired those projectiles are, right?

A.    That is the goal, yes.

Q.    You see, for example, on a projectile that it has six lands and grooves with a right twist, right?

A.    Your question is --

Q.    For example, that is one of the things you might observe from a projectile recovered from a crime seen, is the number of numbers of lands and grooves and directional twist?

A.    Yes.

Q.    Another thing you might observe is the width

Sanders, Gale & Russell
(203) 624-4157

PL0000433

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 26

of the lands and grooves, correct?

A.   Yes.

Q.   You would gather observed data from the physical evidence that you are examining, and then you would input that data into the GRC database?

A.   Yes.

Q.   Then the GRC database would give back to you a list of any firearms contained within it that fit those observed characteristics, right?

A.   Letters were put in, that's correct.

Q.   And querying this database is part of your scientific process as a firearms and tool mark examiner when you are analyzing physical evidence recovered from a crime scene, correct?

A.   It is.

Q.   When bullets or bullet fragments are recovered from the scene of a crime, it is often useful to police to know what kind of weapon might have fired those projectiles, right?

A.   It is.

Q.   And the goal of querying the database is to narrow down the entire universe of firearms out there into a smaller list of firearms that could have fired the projectiles recovered from the crime scene, right?

A.   That's correct.  Who fired the evidence,

PL0000434

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 27

that's correct.

Q.   When you are querying this General Rifling
Characteristics database, sometimes you put in a range
of land widths and/or groove widths, right?

A.   Correct.

Q.   And there was at least a period of time when
mechanically the way that would work would be you would
put in an individual number for the land or groove width
and then plus or minus a certain number of thousandths
of an inch in either direction, right?

A.   That was part of the system at some point in
time.  That's correct.

Q.   If we call that plus or minus margin of error,
you will understand what I am talking about?

A.   Margin of -- I wouldn't use the word "error,"
but it is a margin of looking between those parameters.

Q.   Just to take a purely hypothetical example,
one thing you might put into the General Rifling
Characteristics database would be land width
50-thousandths of an inch plus or minus 3-thousandths of
an inch, right?  That is the kind of entry that you
could have put into the General Rifling Characteristics
database at a point in time, right?

A.   It is.

Q.   And 50-thousandths of an inch of plus or minus

Sanders, Gale & Russell
(203) 624-4157

PL0000435

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 28

three means that you are searching for 47-thousandths of an inch through 53-thousandths of an inch inclusive, correct?

A.    That would be the range of the parameters.

Q.    Land width 47-thousandths of an inch through 53-thousandths of an inch and 50-thousandths of an inch plus or minus three are two different ways of expressing the same concept.  Right?

A.    It is.

Q.    Regardless of whether you frame it as 47 to 53 or 50 plus or minus three, what the examiner is doing is querying the database for a range of land widths or groove widths as applicable, right?

A.    If you started with 50, you were looking for 53 or 47.  If you put in 47, it would be 44 and 52 or whatever.

Q.    All I am trying to get at is that there are different ways that you could express the same idea of querying the database for a defined range of land and groove widths.  Is that right?

A.    You could input 50 to 60 in your query, and your parameters would be 50 to 60.  If you put plus or minus three, it would be 47 to 63.  Right.

Q.    When you are querying the database, you as the firearms examiner choose the range of land and groove

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 29

widths that you are querying, right?

A.    I am inputting that data, that's correct.

Q.    And what data to input is a judgment call for the examiner to make based upon his judgment and his training and his experience, and the observations he has made of the physical evidence, right?

A.    All of that.  That's correct.

Q.    How narrow or wide the range your query is depends in part upon the quality and the consistency of the observations you have made of the physical evidence, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Can you repeat that?

Q.    It was a compound question.  I will break it down.

As we discussed, what you are trying to do is figure out a range of firearms that could have fired the projectiles recovered from the scene of a crime, right?

A.    Yes.

Q.    And so what you are trying to do is, using the measurements you have made from the physical evidence that you have examined, you have to use your judgment about how narrow or how wide a range of land and groove measurements you are trying to search for in the

PL0000437

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 30

database.  Right?

A.   Yes.

Q.   And that decision is going to be based in part upon the consistency of the measurements that you actually took from the physical evidence that you examined, right?

A.   That's correct.

Q.   So if you had six projectiles that all had a land width of 64-thousandths of an inch based on your measurements, you might query a narrower range of land widths than if you had six projectiles that ranged in land width from fifty-seven to sixty-six, right?

A.   Depends on the condition of the physical evidence itself, what you are looking at to try and determine the types of firearms that could be involved in that range that you are looking for.

Q.   Projectiles can be or bullets or bullet fragments and could be in good condition or very bad condition when they are recovered from a crime scene. Right?

A.   That's correct.

Q.   And that has to do with, among other things, whether they have been fired into walls or other hard objects that might alter their shape.  Correct?

A.   That's correct.

Sanders, Gale & Russell
(203) 624-4157

PL0000438

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 31

Q.   Assuming for present purposes that you have been able to gather measurements of land and groove widths from intact bullets or bullet fragments that enable you to clearly measure, the range for which you query the database is going to depend in part on how consistent or inconsistent those measurements you took were, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   The more lands and grooves that you have to measure the measurements that you have when you have bullets that are distorted, those bullets might not have enough surfaces for you to have more than one measurement on a particular bullet itself.

Q.   When it comes time to query the database, your decision about what range to query is going to be based in part on how consistent the measurements you were able to get were, correct?

A.   Or it was the best land or best groove in which to get -- to garner a measurement from on the surface of what I was examining.

Q.   Sometimes your decision about the range to query the database is going to be based upon your ability to get any measurement at all?

A.   That's correct.

Sanders, Gale & Russell
(203) 624-4157

PL0000439

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 32

Q.   In other cases, when you are able to get lots of measurements, the range that you choose is going to be based upon what those measurements actually say. Right?

A.   Correct.

Q.   If those measurements are all identical, you might choose a narrower range than if those measurements vary by 10-thousandths of an inch.  Correct?

A.   That's correct.

(Petitioner's Exhibit 26:  Marked for Identification - described in Index.)

Q.   Can you see a document on the screen in front of you that I have marked as Petitioner's Exhibit 26 in blue type in the upper right-hand corner, sir?

A.   Yes.

Q.   This is an excerpt of an FBI General Rifling Characteristics File Manual that was actually publicly filed on the docket by your counsel in the Horn and Jackson cases.

First of all, let me zoom out a little bit. Do you recognize this kind of document?

MR. TALLBERG:  I don't see the witness. Are you still there?

THE WITNESS:  Yes.

Q.   Do you recognize what this document is?

PL0000440

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 33

A.   General Rifling Characteristics File, Firearms Tool Mark Unit, FBI.

Q.   As far as you know, this is a document prepared by the FBI that gives examiners guidance in how to use the General Rifling Characteristics database, right?

A.   Correct.  Dated 2008.

Q.   I am going to show you some language in the database that is highlighted here in yellow on page 5. Can you see the text large enough to comfortably read it on your screen?

A.   I cannot.

MR. TALLBERG:  Are you able to get your hand on the physical copy?  Do you want assistance locating that?

THE WITNESS:  Let me see if I can find it.  Page 5 of 5?

Q.   Yes.  Do you have page 5 of 5 of Petitioner's 26 in front of you?

A.   I do.

Q.   Do you see the middle paragraph on this page beginning, "Firearms examiners must use their own judgment"?

A.   I do.

Q.   And do you see the last sentence of the

PL0000441

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 34

paragraph that says, "For typical instances, a tolerance range of .02 to .05 inches had been used by FBI examiners since the inception of the GRC file"?

A.   I do.

Q.   And you understand there that what they are describing as tolerance range of .02 to .05 inches is referring to plus or minus 2-thousandths of an inch through plus or minus five thousandths of an inch, right?

A.   I do see that.

Q.   What we are talking about here is the margin that you are using to query the database on either side of a fixed point, right?

A.   That's -- if you go up in the paragraph above that, it says -- talking about similar fashion, if only one land impression were visible, the edges indistinct, then once again an input tolerance of 7-thousandths of an inch would be reasonable.  That is also in the paragraph.

Q.   So can you just answer my question, so we are on the same page, about what the term "tolerance range" means?  What we are talking about here is a margin of a certain number of thousandths of an inch on either side of a number?

A.   Correct.

PL0000442

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                          February 25, 2021

Page 35

Q.   You see the sentence that says, "For typical instances, a tolerance range of .02 to .05 inches has been used by FBI examiners since the inception of the GRC file"?  See that?

A.   I do see that.

Q.   And as far as you know, that is true, right?

MR. TALLBERG:  Objection to form.  You can an answer.

A.   That is what's in their document.  That's correct.

Q.   It is characterizing 5-thousandths of an inch as the outer limit of a tolerance range that FBI examiners would use in a typical instance, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   That would be for a bullet other than what was described above that sentence.

Q.   For typical instances, right?

A.   That's correct.

Q.   That is consistent with the training that you received, right, is that for typical instances, the tolerance range wouldn't usually exceed .05, right?

A.   Correct.

Q.   That was not only consistent with your training but consistent with your standard practice at

PL0000443

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 36

the New Haven Police Department at the state lab, right?

A.   New Haven Police Department, that's correct.

Q.   In typical instances you would not use a tolerance range that exceeded .05, correct?

A.   Using the words "typical tolerances," that's correct.

Q.   Based on your knowledge of prevailing practices in your field, through your role in SWGGUN, would you agree that that was also not only an FBI practice and Connecticut state lab practice and James Stephenson practice, but standard practice in the field, that the tolerance range would not generally go past 5-thousandths of an inch in typical instances?

A.   Again, it is dependent upon the physical evidence which you are examining.  If it was a pristine bullet as something that you were dealing with, yes.  If it was something with damage or something, could be outside those tolerances.  So it could be outside those tolerances.

MR. TALLBERG:  Is that being marked as an exhibit so I can keep track?

MR. LIEB:  Yes, 26.

Q.   Certainly, if you had multiple intact projectiles, from each of which you were able to take multiple land and groove measurements, that would be an

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 37

instance when the tolerance range would not exceed 5-thousandths of an inch based upon your training and experience, right?

A.   Again, it is dependent upon the physical evidence that you are examining.

Q.   I am asking you to assume for purposes of this question that you have multiple intact projectiles from which you can take multiple land and groove measurements from each one.  That is not a case in which you have a scarcity of data, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   It is.  If there isn't any damage to the bullets themselves, that would hinder you in taking those measurements.

Q.   You would agree with me that in those circumstances when you can actually get multiple measurements from multiple intact projectiles, the tolerance would not exceed .05 as a matter of standard practice, right?

A.   To use your example, yes.

Q.   We have been talking about class characteristics and the General Rifling Characteristics database.  I want to talk a little bit about subclass characteristics.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 38

Subclass characteristics are characteristics that repeat themselves across items that are produced with the same tool but are not predetermined prior to manufacture, right?

A.    That's correct.

Q.    So for example, in one production run of the same firearm, the tool that is used to cut the breech face of that firearm might leave distinctive marks on all of the firearms within that production run.  Right?

A.    It may.

Q.    That is one example of what a subclass characteristic could be.  Right?

A.    That's correct.

Q.    The point of a subclass characteristic is that it repeats itself on multiple individual items within the class, right?

A.    It may.

Q.    Where it exists -- that's what it is though, right?  Where a subclass characteristic exists, it is repeated on multiple items within the larger class, right?

A.    We don't know what that multiple number is. That's correct.

Q.    Could be we don't know what the multiple number is, but it is some number, right, some number

PL0000446

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 39

greater than one?  Yes?

A.   Could be one, but some number greater than one, subclass, that's correct.

Q.   If the mark doesn't repeat itself, and it is only found on one firearm, that is an individual characteristic, right?

A.   That's correct.

Q.   A subclass characteristic is when that mark repeats itself on multiple firearms of the same make and model but not the entire class, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   It may -- depends upon the tool itself.  The tool is constantly changing during this process.  So if there is individual marks that are obtained across the surface of the area that is being tooled because of the chip formation or because of the use and abuse of the tool itself during that time, there can be individual marks put onto the surface over and above those subclass marks.

Q.   Sometimes there can be subclass characteristics and individual characteristics present in the same area of the firearm, right?

A.   Can be.  That's correct.

Q.   In fact, one of the important jobs of the

PL0000447

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 40

examiner is to distinguish between those two things, right?

A.   That's correct.

Q.   Subclass characteristics can be found in breech face marks, right?

A.   They can.

Q.   They can be found in firing pin impressions?

A.   They can.

Q.   Can be found in chamber marks?

A.   I am not aware of chamber marks.

Q.   Subclass characteristics are actually more rare in chamber marks than they are in breech face marks, right?

A.   I would -- I can't give you an estimation of whether rarity or not rarity.

Q.   Are you aware of subclass characteristics occurring in chamber marks at all?

A.   I am not familiar with it, sir.

Q.   Individual characteristics are distinctive individual marks that arise from random impressions or irregularities in the tooling process, right?

A.   That's correct.

Q.   That's the idea that you're talking about, that every time a tool is used in the manufacturing process, the tool changes a little bit, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000448

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 41

A.   That's correct.  Use or abuse of the actual firearm itself or the object that has been manufactured.

Q.   There are some individual characteristics that arise from the manufacture of the firearm, right?

A.   Correct.

Q.   According to the theory of the field, those individual characteristics are caused by the fact that the tool being used to manufacture the firearm changes a little bit each time it does its work.  Right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Or because of its use on the surface itself.  The removal of the tool and removal of material caught between the tool and the surface can add to those marks.

Q.   The theory is that in the manufacturing process, the tool used to manufacture a component of the firearm can leave unique marks on that firearm each time the tool is used, right?

A.   Yes.

Q.   And then to the extent those marks are left on the firearm, those marks, the theory goes, are reproducible and can be replicated on cartridge casings or projectiles that are used in the firearm, right?

A.   Yes.

Q.   So the tool leaves unique marks on the firearm

PL0000449

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 42

when it manufactures it, and then those marks are impressed upon metal that comes into contact with the firearm in the firing process, right?

A.   Either impressed or is striated onto the surface.

Q.   Am I correct that when you as an examiner are comparing one or more tool marks to try and figure out whether they came from the same source, there are four conclusions you can reach; identification, elimination, inconclusive, or unsuitable?

A.   Yes.

Q.   So elimination means that you determine that those two marks were not made by the same tool, right?

A.   That's correct.  Could be from class characteristics.

Q.   Sometimes you can make an elimination based on class characteristics, right?

A.   Yes.

Q.   To take a very obvious example, if one projectile shows that there was six lands and grooves, and another projectile shows there were for lands and grooves, those did not come from a common source, right?

A.   That's correct.

Q.   There are other times when you can make an -- eliminate them on the basis of individual

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 43

characteristics where the class characteristics are the same, right?

A.    If those characteristics are so unique to make that determination that they weren't fired from the same source, that's correct.

Q.    Elimination can also be based upon the absence of an individual characteristic observed on one piece of evidence from the other, right?

A.    Repeat your question one more time.

Q.    If you have two cartridge casings, and there are distinctive individual breech face marks on one that are not present on the other, that can lead you to eliminate the possibility those two came from a common source, right?

A.    Yes.

Q.    Let's talk about identification.  To make an identification that two tool marks were made by a common source, all the class characteristics have to be the same, right?

A.    Yes.

Q.    Similarly, to make an identification between two tool marks having come from a common source, you can't observe individual characteristics in one that you don't see in the other, right?

A.    That's correct.

PL0000451

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 44

Q.   And so AFTE has what is called a theory of identification, right?

A.   They do.

Q.   That theory of identification is what you put into practice during your career as firearms and tool mark examiner when you were trying to determine whether you could make an identification, right?

A.   That's right.

Q.   In other words, you followed the AFTE theory of identification in your work, right?

A.   I did.

Q.   And so the concept of the AFTE theory of identification is something called sufficient agreement, right?

A.   Yes.  That is part of it.

Q.   An examiner can make an identification that two tool marks came from a common source when there is sufficient agreement between them, right?

A.   Between the two marks.  That's correct.

Q.   What sufficient agreement means is that -- withdrawn.

Sufficient agreement exceeds the best agreement demonstrated by tool marks that are known to come from different sources, right?

MR. TALLBERG:  Objection to form.  You

PL0000452

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 45

can answer.

A.   Yes.

Q.   Similarly, sufficient agreement is consistent with the agreement demonstrated by tool marks known to have come from a common source.  Right?

A.   Yes.

Q.   If these two if these criteria are satisfied, then the idea is that it is practically impossible for the tool marks to have come from different sources, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   In all practical certainty, that's correct.

Q.   This is a process that involves subjectivity, right?

A.   Subjectivity is part of the -- objectivity comes in in knowing those parameters, but the subjectivity comes in when the examiner is experienced in examining that physical evidence itself.

Q.   Because ultimately what the examiner is doing is examining one or more marks side by side under a comparison microscope generally and applying his judgment, training, and experience to see if those two marks reach sufficient agreement, right?

MR. TALLBERG:  Objection to form.  You

PL0000453

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 46

can answer.

A.    Yes.

Q.    That is the subjective part of the process, right, is what's going on in the individual examiner's head as he is applying his background, knowledge, and experience to what he sees in a comparison microscope in front of him?

A.    Yes.

Q.    What is the best agreement demonstrated by tool marks known to have been produced by different tools?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Just repeat the last part of that one more time.

Q.    What is the best agreement demonstrated by tool marks known to have been produced by different tools?

MR. TALLBERG:  Same objection.  You can answer.

A.    An elimination based on the fact that you are looking at marks made by two different tools and there are two different tools.  It is an elimination based on the fact that you couldn't make the identification between those two.  The individual marks became the

Sanders, Gale & Russell
(203) 624-4157

PL0000454

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 47

process for the identification.

Q.   As we were discussing a moment ago, under the concept of sufficient agreement that you applied in your work as a firearms examiner, in order to reach sufficient agreement, the marks that are in front of you have to exceed the best agreement demonstrated by tool marks known to have come from two different sources, right?

A.   Yes.

Q.   What is that?  What is the best agreement known to have -- the best agreement demonstrated by tool marks known to have come from different sources?

A.   When you are making your observation upon the objects that you are examining, the agreement that you see between those two marks.  Based on all the class characteristics that you have looked at, based on all the individual marks that you are finding upon those two surfaces, you are able to make that conclusion that they were fired from the same source.

Q.   Is there a certain number or percentage of marks that need to be in agreement to exceed the best known agreement demonstrated by tools that came from different sources -- tool marks that came from different sources?

A.   There is no number attached to that.

PL0000455

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Q.   When you're sitting there and you are applying the AFTE theory of identification to try and figure out whether you have sufficient agreement, how do you know whether what is in front of you is exceeding the best agreement demonstrated by tool marks known to have come from different sources?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Based on your training, knowledge, and experience, knowing that you have looked at other items before and have come to those agreements, knowing that the source material, and then comparing those to what you are examining.

Q.   Is there any way to describe with more specificity what constitutes the best known agreement demonstrated by two tool marks that come from different sources?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I don't have a complete answer for you there. No, sir, I do not.

Q.   It is something that you know when you see it, right?

A.   That's correct.

Q.   That's one half of the sufficient agreement.

PL0000456

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 49

The other half is that sufficient agreement is consistent with the agreement demonstrated by tool marks known to have come from the same source, right?

A.    That's correct.  Sufficient agreement coming from the same source.

Q.    What is the agreement demonstrated by tool marks that are known to have come from the same source?

A.    What is the agreement?  Is that your question?

Q.    What constitutes that threshold that needs to be reached in order for there to be sufficient agreement, it has to be consistent with the agreement demonstrated by tool marks known to have come from the same source?

A.    Again, from your training, knowledge, and experience in working and going through the process of what is an identification, what isn't an identification, based on your examination process.

Q.    It is something you know when you see it?

A.    That's correct.

Q.    Because it is based on the individual examiner's training, knowledge, and experience, different examiners can have different conceptions of what sufficient agreement is, right?

A.    Yes.  I believe so.

Q.    Elimination and identification -- just for

PL0000457

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 50

completeness sake, "inconclusive" means there are some class characteristics or individual characteristics that you can observe, but there is not a way to tell one way or the other whether there is an identification or elimination.  Is that right?

A.    True.

Q.    Finally, the last category of unsuitable, that means that the physical evidence that has been gathered just doesn't have enough -- doesn't have sufficient tool marks for you to engage in the act of comparison.  Right?

A.    To come to that conclusion, that's correct, there is nothing that you can deal with.

(Recess:  11:11 to 11:22 a.m.)

MR. LIEB:  On the record, but for Jim, for Attorney Tallberg, for your benefit, Attorney Keenan is going to send you some case law on the non-privileged status of bills, invoices, and other matters relating to payment of counsel.  I'd ask you to take a look at it at some point between now and when we conclude this afternoon because we are plainly entitled to that information.

Theoretically, depending upon who was paying for your time, it would affect, among other things, the witness's potential bias.  So we are entitled to that.

Sanders, Gale & Russell
(203) 624-4157

PL0000458

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 51

I ask you to take a look at that.  We can revisit that question I hope before the examination is concluded.

MR. TALLBERG:  I am not going to press the issue.  You can ask the witness the question at this point, and he will answer.

Q.  Who, if anyone, is paying Mr. Tallberg for his time in connection with his representation of you in this matter?

A.  The City of New Haven.

Q.  Did you reach out to corporation counsel of the City of New Haven at some point in connection with this matter?

A.  I did.

Q.  When was that?

A.  Back when I received your subpoena.

Q.  Who did you speak with at New Haven Corporation Counsel?

A.  Roderick Williams.

Q.  Did you request legal representation from corporation counsel?

MR. TALLBERG:  I object.  I don't think it is permissible to inquire as to communications he may have had with legal staff.

MR. LIEB:  I will leave it there.

Q.  You are familiar with the publication called

PL0000459

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 52

the AFTE Journal?

A.   Yes, I am.

Q.   That is an official publication of the Association of Firearm and Tool Mark Examiners?

A.   It is.

Q.   It is a peer reviewed publication?

A.   Yes, it is.

Q.   Did you regularly read the AFTE Journal while you were practicing as a firearms examiner?

A.   I have.

Q.   Do you still read it now?

A.   I do.

Q.   It is an authoritative source on developments in the field of firearm and tool mark examination?

A.   It is.

Q.   Are you familiar with an examiner by the name of Ronald Nichols?

A.   I am.

Q.   Leading practitioner in the field?  Yes?

A.   Yes.

Q.   Highly regarded in the field, right?

A.   He is.

Q.   Been active in AFTE for a number of years, right?

A.   Yes.

PL0000460

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 53

Q.   And he plays a leading role in responding to critiques of the validity of firearm and tool mark examination from persons outside the field, right?

A.   Yes.

Q.   Do you know Mr. Nichols personally?

A.   I do.

Q.   Do you respect him as an authority in your field?

A.   Yes.

Q.   I am going to share with you what has been marked as Petitioner's 27.

(Petitioner's Exhibit 27:  Marked for Identification - described in Index.)

Q.   Can you see Petitioner's 27 on the screen in front of you?

A.   I can.

Q.   We will look at some of the language in the article.  If you have the ability to pull up the hard copy, that might just make it easier on your eyes.

MR. TALLBERG:  If we can pause.  Going on the physical files that you have before you, I believe that is two-thirds of the way down, right below the large rubber band of documents.

Q.   Do you have in front of you an article from the spring 2018 AFTE Journal by Ronald Nichols subtitled

PL0000461

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 54

"Subclass Characteristics from Origin to Evaluation"?

A.   I do.

Q.   This is a document we have marked as Petitioner's Exhibit 27.  Have you read this article before?

A.   If I have, I don't recall the whole article itself.

Q.   I just want to direct your attention to the first paragraph of the introduction, which begins, "Subclass characteristics as a concept."  See that paragraph?

A.   I do see that.

Q.   Could you just take a moment to read that paragraph to yourself, and let me know when you have had a chance to do so?

A.   Yes.  I read it.

Q.   And do you see where Mr. Nichols refers to subclass characteristics as a concept being highlighted in 1992 as part of the report of the AFTE Criteria For Identification Committee?  See that language?

A.   I do.

Q.   The AFTE Criteria For Identification Committee is the committee that promulgated the AFTE theory of identification that we have discussed before, right?

A.   I don't know who promulgated it personally,

Sanders, Gale & Russell
(203) 624-4157

PL0000462

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 55

but if that is where it came from, that's correct.

Q. You see in the abstract at the top of the page in bold italics the first sentence "Subclass Characteristics," which were first brought to the attention of the firearm/toolmark examiner community-at-large in 1992, have long been recognized (even prior to 1992) as a potential obstacle in making reliable common source determinations."

See that language?

A. I do.

Q. Is it consistent with your experience in the field that what Mr. Nichols is saying is true, the concept of subclass characteristics was popularly introduced at or around the time of 1992?

MR. TALLBERG: Objection to form. You can answer.

A. Per his statement, that's correct.

Q. Do you have knowledge inconsistent with that?

A. No, I don't.

Q. Turning to the next page, page 69 of the article, do you see in the left column a paragraph -- the third paragraph down beginning, "In 1992"?

A. I do.

Q. Could you just read that paragraph and the definition that follows to yourself for a minute,

PL0000463

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 56

please?  Let me know when you have had a chance to do so.

A.    I have.

Q.    Mr. Nichols is discussing the AFTE definition of what a subclass characteristic is?  Yes?

A.    Correct.

Q.    According to this article, at least AFTE defines a subclass characteristic as "Discernible surface features of an object which are more restrictive that CLASS CHARACTERISTICS in that they are:  Produced incidental to manufacture; Are significant in that they relate to a smaller group source (a subset of the class to which they belong); Can arise from a source which changes over time."

Do you see that material there?

A.    Yes.

Q.    That is consistent with your training and experience, but that is what a subclass characteristic is where it exists, right?

A.    That's correct.

Q.    As far as you know, that is how AFTE defines what a subclass characteristic is where it exists, right?

A.    To my knowledge, that's correct.

Q.    As far as you know, AFTE introduced this

PL0000464

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 57

concept into the lexicon of the field in 1992, right?

A.   If that's the date at which it was introduced, I don't see it was specifically introduced on that date in 1992.

Q.   You see the language that in 1992, the association, meaning AFTE, adopted the following definition of subclass characteristics?

A.   You are correct.

Q.   As far as you know, AFTE introduced this concept of subclass characteristics into the vocabulary of the field in 1992?  Yes?

A.   They did.

Q.   You are aware based upon your experience with SWGGUN and your role in AFTE and practice in the field that since 1992, there has been a lot more empirical research done, scientific research about subclass characteristics, right?

A.   There has been.  That's correct.

Q.   There has been scientific research about what subclass characteristics visually look like when they are present, right?

A.   Would depend, again, upon the surface or the tool that is making them.  That's correct.

Q.   To make sure, you would agree with me there has been research a fair bit of research done since 1992

PL0000465

Electronically signed by PATRICIA SAYA (501-398-304-5455)            1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 58

about what subclass characteristics look like when they are present, right?

A.    Correct.  On certain lands made by certain manufacturing processes.

Q.    There has also been research done about what kinds of manufacturing processes are or are not likely to result in the presence of subclass characteristics, right?

A.    Correct.

Q.    Also been research done since 1992 about the extent to which subclass characteristics are or are not likely to reproduce themselves over time, right?

A.    Repeat that question one more time.

Q.    I will ask it differently.  There has also been research in the field since 1992 about the extent to which subclass characteristics are or are not reproducible and repeatable.  Yes?

A.    I'd agree with that.

Q.    There has also been research done since 1992 about the prevalence of or unlikelihood of subclass characteristics with respect to particular types of firearms, right?

A.    Correct.

Q.    We now know much better than we did in the early '90s what kinds of manufacturing processes are

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 59

likely to cause subclass characteristics, right?

A.   I'd agree with that.

Q.   And examiners today have a much bigger body of knowledge about what subclass characteristics are visually such that they are able to recognize that, right?

A.   Correct.

Q.   With the accretion of knowledge over time, firearms examiners in the field have gotten more and more experience since the early '90s in distinguishing subclass characteristics from individual characteristics, right?

A.   Able to discern the difference between the two.

Q.   I'm sorry.  What was the first part?

A.   Able to discern the difference between subclass and individual marks.

Q.   Since the early '90s, firearms, the field of firearms and tool marks examination as a whole, has gotten a lot more experience in engaging in that task of discerning subclass characteristics from individual characteristics, right?

A.   It has.

Q.   Subclass characteristics are a potential source of false identifications, right?

PL0000467

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 60

A.    It could be.

Q.    And the examiner when engaging in an examination has to be careful to distinguish any subclass characteristics that may be present from any individual characteristics that may be present, right?

A.    Correct.

Q.    As a prior step, the examiner needs to be careful to figure out whether there are subclass characteristics present at all, right?

A.    That is a step.  That's correct.

Q.    First the examiner needs to carefully figure out are there subclass characteristics here, right?

A.    Correct.

Q.    And then the examiner needs to carefully assess if there are subclass characteristics, how am I distinguishing the subclass characteristics I see from what I believe to be the individual characteristics, right?

A.    Correct.

Q.    Because as we discussed, you can't make an identification based on subclass characteristics, right?

A.    Correct.

Q.    Because the whole point of subclass characteristics is that they repeat themselves on more than one individual firearm, correct?

PL0000468

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 61

A.   Or they can, that's correct.

Q.   Where present subclass characteristics repeat themselves on more than one individual firearm, correct?

A.   Yes.

Q.   Going back to the Nichols article that we have.  Can you see the Nichols article on your screen?

A.   I can.

Q.   If you are able to pull it up in front of you. This is Petitioner's 27.  I am going to go to page 85 of the article as noted by the page number on the top of the page.

Do you have page 85 of Petitioner's 27 in front of you?

A.   I do.

Q.   Do you see a paragraph in the left-hand column of the page, first full paragraph that begins, "Given the importance"?

A.   I have read that.

Q.   Mr. Nichols is saying that, "Given the importance of subclass characteristics, it is important to make a purposeful and deliberate examination of the tool working surfaces of any tool submitted in casework so that it can be determined whether or not subclass characteristics are actually present, and.  If so, how they might impact the examination."

Sanders, Gale & Russell
(203) 624-4157

PL0000469

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 62

See that language?

A.   Yes.

Q.   Do you agree with that language?

A.   That's correct.

Q.   That's an authoritative statement of the current scientific standard in the field, right?

A.   Correct.  This was published in spring of 2018.

Q.   Similarly, in the next sentence, see where it says, "Proper evaluation of the tool working surface includes a determination of how the tool was made, whether or not subclass characteristics are actually present, and what marks exist on the tool surface unrelated to any subclass characteristics that may be present."

See that sentence?

A.   I do.

Q.   Do you agree with that sentence as a scientific statement in the field today?

A.   Today that's correct.

Q.   Finally, the last sentence of that paragraph, "In addition, it is important to assess how the tool marks to be compared were made to determine if the interaction between the tool and substrate would have negated any potential subclass influence on the tool

PL0000470

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 63

working surface."

See that sentence?

A.   I just want to reread it if you don't mind.

Q.   Sure.

A.   I do.

Q.   And do you agree with that sentence as of today?

A.   I do.

Q.   That is an authoritative statement of the best -- of standard scientific practice in the field as of today?

A.   As of 2018, when the article was written.

Q.   Are you aware of any developments subsequent to 2018 that would make the three sentences we just looked at no longer the standard scientific practice of the field as of this moment?

A.   Again, it is 2021.  And keeping up with the articles that are being published quarterly by AFTE, I haven't seen the most recent one.  So I'm not sure.

Q.   You are retired, not necessarily a religious reader of everything that gets published in the AFTE Journal?

A.   Not on a daily basis.  That's correct.

Q.   Understanding that might be why you are not aware of anything that would change this as the standard

PL0000471

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 64

in the field as of today, are you aware of any reason

why these three sentences we just looked at would not be

the current scientific standard in the field as of

today?

MR. TALLBERG:  Objection to form.  You

can answer.

A.   I haven't read this entire article, but I do

know that there have been occasions where Mr. Nichols

has said that just because there is subclass marks

doesn't mean the possibility that identification can't

be made with individual marks that occur on those

surfaces.

Q.   If there are subclass characteristics, one of

the things the examiner can do is carefully understand

which of those characteristics are subclass, which are

individual, and then separate them out, right?

A.   That's correct.

Q.   Once that has been accomplished, it may be

possible, notwithstanding the presence of subclass

characteristics, to make an identification based on

individual characteristics?

A.   That's true.

Q.   Last bit here, the next paragraph after the

one we have just been discussing, that says, "It is

important for the examiner to make a record in their

PL0000472

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 65

case notes."

Could you read that paragraph to yourself?

A. I closed the document. I have read it.

Q. Where Mr. Nichols writes, "It is important for the examiner to make a record in their case notes of the basis for any determinations they develop regarding the potential presence or absence of subclass characteristics on firearm or tool mark related evidence," do you agree with that statement as of today?

A. As of today, that's correct.

Q. To your knowledge, that reflected the best standard scientific practice in the field as of 2018?

A. In his writing, that's correct.

Q. As far as you know, was Mr. Nichols's statement that it is important for the examiner to make a record in their case notes of the basis for any determinations they make about the presence or absence of subclass characteristics the prevailing scientific standard in the field as of 2018?

MR. TALLBERG: Objection to form. You can answer.

A. To whose standard? Again, this is his article that was written and was put out there. I don't know for a fact that AFTE has put out specifically that statement, nor do I know whether any of the newly formed

PL0000473

Electronically signed by PATRICIA SAYA (501-398-304-5455)    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 66

OSAC have put out that statement itself.

Q.    After you actually made some tweaks to its theory of identification, in 2011, to account for the possibility of subclass characteristics, right?

A.    I'd have to revisit that date.

Q.    I'm sorry.  Didn't hear you.

A.    I'd have to go back and look at that on that date to see what it says.

Q.    Not a memory quiz.  Let me share with you an exhibit.  Can you see another document from the AFTE Journal bearing the marking Petitioner's 28 in the upper right-hand corner on your screen, sir?

A.    I can, but I have to look at it.

MR. TALLBERG:  Is that a separate document in the pile of exhibits?

MR. LIEB:  It was 28 from Nichols, hopefully just a couple up in the file.

(Petitioner's Exhibit 28:  Marked for Identification - described in Index.)

MR. TALLBERG:  There is one very large one.  Is it buried in that very large document?

MR. LIEB:  One page, one page excerpt from the AFTE Journal.

MR. TALLBERG:  Is it also 2008?

MR. LIEB:  It's 2011.  Maybe I can just

Sanders, Gale & Russell
(203) 624-4157

PL0000474

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 67

blow it up on the screen.

THE WITNESS:  I believe I found it here. I believe I have the document.

Q.   Do you have page 287 of the fall 2011 AFTE Journal, which has as part of it a Revised Theory of Identification as it Relates to Toolmarks?

A.   Yes.  I do see that.

Q.   And do you see that under the Theory of Identification, AFTE is adding the language "agreement in individual characteristics" with regard to both prongs of the sufficient agreement standard?

See that?

A.   Whereabouts in that paragraph are you looking at?

Q.   Do you see the numbered paragraph 2 in the left-hand column?

A.   I do.

Q.   See there are two bold underlined insertions which include the words "individual characteristics"?

A.   I do.

Q.   You understand that this is a revision to AFTE theory of identification?  Yes?

MR. TALLBERG:  Objection to form.  You can answer.

A.   If I could have a moment here, please, to read

PL0000475

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 68

this.

Q.   Take as much time as you need to read the whole document to yourself, and then -- let's do it that way.  Good idea.

MR. TALLBERG:  While the witness is reviewing that, did we lose Attorney Nowak?  See him on the screen?

MR. KEENAN:  He is there.

MR. LIEB:  When there is a screen share, I think there are fewer tiles.

MR. TALLBERG:  My grid changes when you put up the exhibits.

A.   I have read this.

Q.   Having had the opportunity to read the document, do you understand that this is a revision to AFTE theory of identification that came out in 2011?

A.   I think, if I am reading this correctly, at the bottom of "committee recommends these additions be adopted by the AFTE board of directors," I am not sure they were adopted in specifically when this article was written or this was talking about what was being proposed for that adoption into the change of the wording.

Q.   This language about individual characteristics was ultimately adopted into the theory of

Sanders, Gale & Russell
(203) 624-4157

PL0000476

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 69

identification, correct?

A.    I don't know, sir.

Q.    You understand that this is a proposal from the AFTE committee in charge of the theory of identification to amend it to include reference to individual characteristics?

A.    I do based on this.

Q.    You understand that the purpose of doing so is to account for the possibility of subclass characteristics?  Yes?

A.    That's correct.

Q.    And that proposal is reflective of the growing knowledge in the field about the importance of ruling out the possibility of subclass characteristic influence before making an identification based on individual characteristics, right?

A.    Correct.

Q.    When you were in training at the state lab from 1990 to 1992, this whole idea of subclass characteristics was in its infancy, right?

A.    That's correct.

Q.    In the period when you were in training at the state lab from 1990 to 1992, and focusing only on that period of time, what training did you receive about subclass characteristics?

PL0000477

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 70

A.   I don't recall, sir.

Q.   When you were trained at the state lab from 1990 to 1992, and again focusing specifically on that period of time, what steps were you trained to take as an examiner to assess whether or not subclass characteristics were present on a tool?

A.   Again, I don't recall.

Q.   While you were at the training at the state lab from 1990 to 1992, what steps were you trained to take as an examiner to distinguish any subclass characteristics that might be present from any individual characteristics that might be present?

A.   Again, I don't recall.

Q.   While you were at the state lab from 1990 to 1992, were you ever evaluated in your proficiency at identifying subclass characteristics?

A.   I don't recall.

Q.   While you were back at the NHPD from October of 1992 until your retirement, were you ever evaluated in your proficiency at identifying subclass characteristics?

A.   No, sir.

Q.   While you were at the state lab from '90 to '92, were you ever evaluated at your proficiency in distinguishing subclass characteristics from individual

Sanders, Gale & Russell
(203) 624-4157

PL0000478

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 71

characteristics?

A.   I don't recall.

Q.   While you were back at the NHPD from October '92 until retirement, were you ever evaluated at your proficiency in distinguish subclass characteristics from individual characteristics?

A.   No, sir.

Q.   When you performed -- withdrawn.  We are going to start going into the specific work that you performed in this case.  And so I just want to make sure I have an accurate understanding of how the marks that we're going to talk about were created.  I am going to ask you some questions in that vein.

When a cartridge is fed into a weapon from the magazine, that cartridge sits in the chamber, correct?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Yes.

Q.   And at the back of the chamber is the breech block, correct?

A.   Between the cartridge -- that's correct.  The breech block comes in contact with the cartridge at the breech block.

Q.   The portion of the breech block that comes into contact with the cartridge is called the breech

Sanders, Gale & Russell
(203) 624-4157

PL0000479

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 72

face, right?

A.    Correct.

Q.    One way a breech block might be manufactured as a component of a firearm is that a manufacturer has a bigger piece of metal and then cuts it into smaller pieces of metal that become the breech blocks, right?

A.    They start with larger pieces.  That's correct.

Q.    The cutting action of cutting that larger piece of metal into a smaller one where that cut is that face is what becomes -- can be what becomes the breech face inside the weapon?

A.    No, sir.

Q.    What is the relationship between the cutting of the larger piece of metal into individual component breech blocks and the breech face?

A.    Finishing process that is done.  Once the block of metal is cut to size, then it is finished to the specifications of what their size is.

Q.    The tool that is used to finish the breech block may leave distinctive marks upon that piece of metal, correct?

A.    That's correct.

Q.    If those marks are on the portion of the breech block that becomes the breech face, those marks

Sanders, Gale & Russell
(203) 624-4157

PL0000480

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 73

will come into contact with the cartridge casing when the weapon is fired, right?

A.    That's correct.

Q.    So the portion of the cartridge -- the flat part of the cartridge that comes into contact with the breech face is called the head stamp, right?

A.    Correct.

Q.    In the head stamp, usually in the center, is the primer, right?

A.    Yes.

Q.    The primer is what -- the firearm has a firing pin that strikes the primer, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Yes.

Q.    The striking of the primer with the firing pin causes the primer to ignite?  Yes?

A.    It does.  That is the action that it takes.

Q.    That ignition of the primer produces gas which propels the projectile forward out of the firearm, right?

A.    Creates a spark which ignites the gunpowder which pushes the bullet through the barrel.  That's correct.

Q.    At the time of that ignition of the gunpowder,

PL0000481

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 74

the cartridge casing actually expands, right?

A.   It does.

Q.   And so to the extent that there are distinctive marks in the chamber area of the barrel, those marks may impress themselves on the metal of the cartridge casing as it expands, right?

A.   That's correct.

Q.   Those are what we would call chamber marks, right?

A.   Correct.

MR. TALLBERG:  Objection.  I didn't hear that correctly.

MR. LIEB:  I said, "Those are what we would call chamber marks, right?"

MR. TALLBERG:  Thank you.

A.   On the side of the cartridge case.

Q.   The chamber marks would go on the side of the cartridge case as a result of the cartridge case expanding from the explosion that occurs, right?

A.   And the removal of that cartridge case from the chamber itself.

Q.   When the projectile is fired out of the barrel, the head stamp of the cartridge casing also comes into -- also presses up against the breech face of the weapon, correct?

PL0000482

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 75

A.   Yes.

Q.   To the extent that there are distinctive markings on the breech face, those may replicate themselves on the head stamp of the cartridge casing, right?

A.   They may.

Q.   That is what we would call breech face marks, right?

A.   Correct.

Q.   The contact between the firing pin and the primer might also leave marks on the cartridge case, correct?

A.   It may.

Q.   That would be what we would call firing pin impressions?

A.   Yes.

Q.   Let's take a look at some of the work that you did in this case.  Plaintiff's 29.

(Petitioner's Exhibit 29:  Marked for Identification - described in Index.)

Q.   This is going to be the January 24th, 1994 printed -- typewritten police report from the April Hines complaint.  Let me share my screen.  Date and time of the report are 1/24/94 at 0900.

(Off the record discussion.)

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 76

A.    I have it.

Q.    On the second page of -- withdrawn.  This police report -- this is a police report prepared by you, correct?

A.    Yes.

Q.    Bears your signature in the lower right-hand corner of the first page, correct?

A.    It does.

Q.    Memorializes work that you performed as a firearm and tool mark examiner in the New Haven Police Department in January of 1994 in connection with a shooting, the complainant for which was an April Hines, correct?

A.    It does.

Q.    Do you understand from your review of the case materials in preparation for today's testimony that this was a shooting that happened at a place called the S&S Cafe in New Haven?

A.    I believe that is what it was.

Q.    If I refer to this April Hines January incident as the S&S Cafe shooting or S&S Cafe incident, will you understand what I am talking about?

A.    On this report, yes.

Q.    This report reflects a member of the police department sees a number -- 49 pieces of firearms

Sanders, Gale & Russell
(203) 624-4157

PL0000484

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                     February 25, 2021

Page 77

evidence in connection with this investigation, correct?

A.   It does.

Q.   And you ultimately analyzed the pieces of evidence, and you concluded that they had been fired from seven different firearms, correct?

A.   That's correct.

Q.   As reflected on the second page of the document, Items 5 through 12 -- well, withdrawn.

We see here on the first page Items 5 through 12 were discharged .380 auto WIN cartridge cases.  See that notation on the first page?

A.   I do.

Q.   Were Winchester manufactured .380 cartridge cases that had been discharged from a weapon that had been fired, right?

A.   "WIN" refers to marketed by Winchester.

Q.   The brand name, so to speak, was Winchester.  That doesn't necessarily mean the manufacturer is Winchester?

A.   That is correct.

Q.   Second page, you concluded that those cartridge casings were all fired from the same firearm?

A.   That is my conclusion.

Q.   Then going -- you also see that Items 13 and 14 were discharged 9-millimeter Luger FC cartridge

PL0000485

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 78

cases, correct, FC being the brand.  Is it Federal Cartridge?

A.    Yes.

Q.    "Discharged" meaning they were fired from a weapon?

A.    That's correct.

Q.    You concluded that those two cartridge casings were also fired from the same firearm?

A.    Yes.

Q.    Then -- so going up back again, items 15 through 17 are discharged 9-millimeter Norinco 90 cartridge cases.  See that?

A.    Yes.

Q.    What does 9-millimeter Norinco 90 mean?

A.    9-millimeter Luger is the caliber. 9 millimeter is the caliber.  Norinco 90 is the head stamp marking.  Norinco was the manufacturer.  90 -- I am not sure that that is a designation for that.  Could have been the year manufactured.

Q.    Similarly on Page 1, refers to Items 23 through 49 as being discharged 9-millimeter Luger Winchester brand cartridge cases, right?

A.    Correct.

Q.    You concluded that the three 9-millimeter Norinco 90s that are 15 through 17 and Items 25 through

Sanders, Gale & Russell
(203) 624-4157

PL0000486

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 79

44 of those 9-millimeter Norinco Winchesters were all fired from the same weapon, right?

A.    That's correct.

Q.    That is 23 cartridge casings that you concluded were all fired from the same firearm, correct?

A.    That's correct.

Q.    Three of which were 9-millimeter Norinco 90s?

A.    Correct.

Q.    And 20 of which were 9-millimeter Luger Winchester brand, right?

A.    Correct.

Q.    9-millimeter Luger is a designation of a size of the cartridge, correct?

A.    Correct.

Q.    What is the difference between 9-millimeter and 9-millimeter Luger?

A.    The same.  It is the caliber designation. Luger was the original designer of the cartridge itself.

Q.    Fair to say that whoever fired those 23 cartridge casings from a single firearm was at some point using two different brands of ammunition, right?

A.    By this report, that's correct.

Q.    And they were also either using an extended magazine or they reloaded, right?

A.    That's correct.

PL0000487

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 80

Q.   Going back up to Page 1, Items 18 and 19 are fired, 9-millimeter Luger cartridge cases, Federal Cartridge brand, right?

A.   Yes.

Q.   The fourth line on page 2, you conclude that there are four 9 millimeter cartridges fired from the same firearm, two of which were Federal Cartridge brand 18 and 19, and two of which were Winchester brand, right?

A.   That's correct.

Q.   That person either would have had a manufacturer of a different brand in the magazine or I guess potentially reload the firearm?

A.   I don't know the action of their firing, but I do know that these were matched to each other based on those individual pieces of evidence.  Whatever person or persons was operating that weapon was using a different brand of ammunition.

Q.   Was Winchester a common brand of ammunition at the time?

A.   I'd say yes.

Q.   When you reached these and conclusions about this S&S Cafe, shooting we have got seven different firearms that were discharged, one of which fired 23 rounds, right?

PL0000488

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 81

A.    Yes.

Q.    And then we have another firearm, the .380 that fired eight rounds, correct?

A.    Yes.

Q.    Then the five remaining firearms each discharged five rounds or fewer?

A.    Correct.

Q.    As you were performing this work, did you theorize at all how these events might have unfolded in the real world?

MR. TALLBERG:  Objection to form.

A.    I don't understand the question.

Q.    Did you think about what might -- the events that might have actually been happening that might have led seven firearms to be discharged, one 23 times and the others a significantly lower number of times?

MR. TALLBERG:  Objection to form.  You can answer.

A.    I don't recall.

Q.    As an examiner, that is something that you might do from time to time, right?  As you are inspecting the visual evidence and matching physical evidence, matching cartridge casings to each other and projectiles to each other, you might think about gee, what might have actually happened here, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000489

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 82

MR. TALLBERG:  Objection to form.  You can answer.

A.  My job is to examine the physical evidence.  I am not there to make a determination as to what took place.

Q.  It is not your job to make a determination?  It is something you might think about, right?

A.  I don't recall, sir.

MR. LIEB:  This will be Exhibit 30, handwritten bench notes from this January April Hines S&S examination.

(Petitioner's Exhibit 30:  Marked for Identification - described in Index.)

THE WITNESS:  Still attempting to locate it here.

MR. TALLBERG:  Give me a second.  I have a copy I can walk down the hall.

(Off the record discussion.)

MR. TALLBERG:  The witness has a hard copy.  I will follow along on the screen.

Q.  You have in front of you a document that has certain identification numbers at the top left, New Haven shots fired in the center, and Complainant April Hines underneath that?

A.  It does.

Sanders, Gale & Russell
(203) 624-4157

PL0000490

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 83

Q.    These are handwritten notes made by you, correct?

A.    They are.

Q.    While you were a firearms examiner for the New Haven Police Department, was your regular practice to make handwritten notes about the evidence that you were examining at or around the time you were examining it?

A.    It was.

Q.    Did you make those notes in the regular course of your duties as a firearms and tool mark examiner for the New Haven Police Department?

A.    I did.

Q.    Was it your regular practice to make such notes as or around the time you were doing the examination?

A.    It was.

Q.    You recognize it to be -- this document Plaintiff's Exhibit 30 to be your handwritten notes associated with the April Hines/S&S Cafe we just looked at the typewritten report for?

A.    That's correct.

Q.    The original version of these notes was among the documents that you produced through counsel in response to the subpoena that we caused to be served on

PL0000491

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 84

you in this case, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   It was.

Q.   The originals are actually looseleaf paper in pencil?

A.   They are.  I believe so.

Q.   You have the original notes relating to this S&S Cafe shooting and other work that you performed in the Taft homicide case in a manila folder labeled as pertaining to the Taft homicide, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Yes.

Q.   Before you provided it to counsel in response to a subpoena, where did you maintain those documents?

A.   After my last time testifying in this case, which was in 2015, they were in my residence.

Q.   While you were at the New Haven Police Department, you maintained the originals of these notes in a detective file?

A.   Yes.

MR. TALLBERG:  Objection to form.  You can answer.

A.   In the firearms section of the laboratory.

PL0000492

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 85

Q.   That was a file that you kept for your own personal -- withdrawn.

That was a file that you kept that related to the work that you individually were performing as a member of the New Haven Police Department?

A.   Correct.

Q.   When you prepared a typewritten police report that reflected the work you performed in connection with the firearms examination, you would file a copy of that police report with the New Haven Police Department records room, right?

A.   That is where it eventually ended up.  That's correct.

Q.   You'd also keep a copy of that police report in your own file in the detective bureau?

MR. TALLBERG:  Objection to form.  You can answer.

A.   In the identification unit firearms section.

Q.   When you retired from the New Haven Police Department, what did you do with the files that you kept in the identification unit at the New Haven Police Department?

MR. TALLBERG:  Objection to form.  You can answer.

MR. LIEB:  What is the objection?

Sanders, Gale & Russell
(203) 624-4157

PL0000493

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 86

MR. TALLBERG:  It is a compound question. It's not clear what you mean when you say "files."  So there are multiple objections to the form of the question.

Q.  Go ahead and answer the question.

A.  They were with the firearms section of the laboratory.

Q.  How did these notes first come to be in your house?

MR. TALLBERG:  Objection to form.  You can answer.

A.  Again, I testified in two habeas cases back in 2006 and 2015.

Q.  Before your 2006 testimony, were the handwritten notes that we are looking at, a copy of which we are looking at, Plaintiff's Exhibit 30, in your personal possession?

A.  I don't recall, sir.

Q.  Did they come into your personal possession at some point after your testimony in 2006?

A.  I think I just said that I had them in my possession during that time frame.

Q.  My question is, when did they first come into your personal possession after you left the New Haven Police Department in 1994?

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 87

MR. TALLBERG:  Objection to form.  You can answer.

A.   Probably for trial in 1995.

Q.   What did you do with your handwritten notes after trial?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I don't recall, sir.

Q.   Do you have any specificity as to when the first time after your retirement from the -- withdrawn.

After retirement from the New Haven Police Department in 1994, what is the first time you personally came into possession of handwritten notes relating to the Taft homicide?

A.   Probably for the habeas in 2006.

Q.   Do you know or are you guessing?

A.   I don't recall, sir.

Q.   When you retired from the New Haven Police Department in 1994, did you take any files with you?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I don't recall, sir.

Q.   Where in the identification bureau did you keep files containing the handwritten notes such as the ones that are depicted in Plaintiff's 30?

Sanders, Gale & Russell
(203) 624-4157

PL0000495

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 88

A.    In the firearms section of the bureau of identification.

Q.    More specifically, where?

A.    It was an office.  It was the firearms section bureau of identification.

Q.    Was there a filing cabinet in that office?

A.    At least one or two.

Q.    Where within the office did you keep handwritten notes such as those depicted in Plaintiff's 30?

A.    In that office somewhere.

Q.    How were they stored?

A.    I'd imagine in a binder.

Q.    Was that a binder that you organized?

A.    Yes.  I'd imagine so as the cases -- yes.

Q.    When you do an examination, and you look at the physical evidence under the microscope and you make handwritten notes such as the ones depicted in Plaintiff's Exhibit 30, what was your practice to then physically do with those notes?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Place them on a copy of the report and maintain them there.

Q.    They would be maintained in your individual

Sanders, Gale & Russell
(203) 624-4157

PL0000496

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 89

file within with your own identification?

A.    In the firearms section of the bureau of identification.  That's correct.

Q.    Anywhere else?

MR. TALLBERG:  Objection to form.

A.    No, sir.

Q.    What about printouts from the General Rifling Characteristics database?  Would you also maintain those in the same file within the firearms section of the bureau of identification while you were at the New Haven Police Department?

A.    As part of the case, that's correct.  If they were generated, they were kept with the case.

Q.    When you say, "They were kept with the case," if you generated printouts from the General Rifling Characteristics database in the course of your duties performing a firearms examination with the New Haven Police Department, it was your practice to store those printouts in your individual file in the firearms section of the bureau of identification, correct?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Yes.

Q.    Anywhere else?

MR. TALLBERG:  Objection to form.  You

Sanders, Gale & Russell
(203) 624-4157

PL0000497

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

February 25, 2021

Page 90

can answer.

A.   No.

Q.   Who, to your knowledge, was responsible for the maintenance of those individual files in the firearms section of the bureau of identification at the NHPD after you retired?

A.   I don't know, sir.

Q.   Looking at Petitioner's 30, on the second page you see a diagram -- do you see where it is Item Number 4 toward the top of the page?

A.   I do.

Q.   Underneath that is a diagram of a bullet recovered from this particular crime scene, correct?

A.   That's correct.

Q.   You drew that diagram?

A.   Yes, I did.

Q.   Was it your practice to make diagrams of bullets or bullet fragments that had been recovered from a crime scene in the notes of your examinations of those events?

A.   It was a process that I did.  That's correct.

Q.   Why did you do that?

A.   To record for visual -- for the notes, so if I ever had to go back, I could get an idea of what the object looked like.

PL0000498

Electronically signed by PATRICIA SAYA (501-398-304-5455)            1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 91

Q.   The purpose of the diagrams was in part to help you refresh your own recollection should you have need to testify about the matter in court later?

A.   Correct.

Q.   That would help you understand the basis for any conclusions that you might have drawn about those bullets or bullet fragments?

A.   That's correct.

Q.   You see here to the right of the bullet diagram "LIMPS" and "GIMPS" underlined?

A.   I do.

Q.   Those stand for land impressions and groove impressions, respectively?  Yes?

A.   Yes, it does.

Q.   Listed there are physical measurements, physical measurements of the land and groove impressions that you took from Item 4 in the S&S Cafe shooting?

A.   That's correct, from that object.

Q.   What kind of tool was it your practice to use to take land impression measurements and groove impression measurements in 1994?

A.   It was a micrometer, which was used in consort with a comparison microscope.

Q.   Describe how you take measurements on a micrometer using a comparison microscope.

PL0000499

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 92

A.   A piece of physical evidence is mounted on one stage.  The micrometer is mounted on the other stage. By using the micrometer and by using the comparison microscope, you are able to see both objects at the same time.  So it is used to measure the distance of the land and groove impressions.

Q.   Looking at -- withdrawn.  What did you do to make sure the micrometer was in good working order?

A.   It was maintained in the forensic laboratory, in the firearms section of the laboratory itself. Wasn't used for any other purpose.

Q.   Who was in charge of its maintenance?

A.   I guess you could say I was.  It was in my office, and that is where it was being used.

Q.   Were there any other firearm and tool mark examiners in the New Haven Police Department in January and February of 1994?

A.   No, there were not.

Q.   Who was in charge of the bureau of identification at that time?

A.   Sergeant Willis.

Q.   What is Sergeant Willis's first name?

A.   Robert.

Q.   Did Sergeant Willis report to the chief of detectives?

Sanders, Gale & Russell
(203) 624-4157

PL0000500

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 93

A.    I guess in the chain of command that's correct.

Q.    Drawing your attention back to the same page of Petitioner's 30, Items 5 through 12 are discharged .380 Winchester brand cartridge cases that there is a diagram of here.  See that?

A.    I do.

Q.    Again, it was your practice to make diagrams of relevant information to help -- in part to help refresh your memory should you need to testify later on and refresh yourself as to the basis for your conclusions?

A.    Correct.

Q.    Here there is an asterisk that says, "All fired in the same firearm pos.," meaning positive match, right?

A.    It does.

Q.    Then it says, "BFMs-extractor," right?

A.    Correct.

Q.    "BFMs" meaning breech face marks?

A.    Correct.

Q.    So does the wording "BFMs extractor" reflect you based your identification on both breech face marks and extractor marks?

A.    I believe that is the case.  I believe that to

PL0000501

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 94

be the case.

Q.   I wanted to be sure you furnished your answer.

A.   I was just looking at a notation there.  Just trying to figure out --

Q.   Which notation were you looking at?

A.   Above the rim of the cartridge, under the letter "f" in "firearm."

Q.   Were you able to figure out what that notation is?

A.   I can't presently, no.

Q.   Do you see underneath the little diagram, it says "extractor good"?  See that?

A.   Correct.

Q.   Does that reflect that the -- withdrawn.  What does "extractor good" mean?

A.   There was a good extractor mark found.

Q.   When you say "good extractor mark," you mean of a quality that was readily discernible and conducive to comparison to other extractor marks?

A.   I believe that to be the notation.  That's correct.

Q.   Going down to the next page of the document bearing "page 3" in handwriting in the top right-hand corner, see the notation for Items 18 and 19?

A.   I do.

PL0000502

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 95

Q.   These were discharged 9-millimeter Luger cartridge cases, Federal Cartridge brand, right?

A.   That is what it says, that's correct.

Q.   Here you again reached the conclusion that these two cartridge cases were fired from the same firearm, right?

A.   I did.

Q.   You made notations of PBFMPS and FPIMPS.  See that?

A.   That's correct.

Q.   What does PBFMPS refer to?

A.   I think it refers to the breech face marks.  I am not sure of the PS at the end of that, firing pin impressions one after that.

Q.   This notation reflects that your identification of Cartridge Cases 18 and 19 as being fired from the same firearm was based on both breech face marks and firing pin impressions?

A.   That's correct.

Q.   Going back to that same page, you see at the bottom there is a note about your conclusion that Cartridge Casing Number 23 was fired in the typewritten police report, same firearm as Items Numbers 18 and 19. See that?

A.   Correct.

Sanders, Gale & Russell
(203) 624-4157

PL0000503

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 96

Q.   Given that your identification of 18 and 19 was based on both breech face marks and firing and pin impressions, your identification of 23 also had to be based on both of those things, right?

A.   I don't see a notation there.  So I don't know.  I can't recall.

Q.   Logically it follows that if the firing pin impressions found on 18 and 19 were not on 23, there would be no identification, right?

A.   No.  That could be referring to the quality of the marks themselves.  In other words, I found quality on 18 and 19 but not have found the same quality on 23.

Q.   If there was a distinctive firing pin impression that you find on two cartridge casings, but you do not find that same distinctive firing pin impression on the third, that would rule out an identification, wouldn't it?

A.   Not necessarily.

Q.   Why not?

A.   Because the quality of the mark might not have been as good as the quality of the marks in the other cartridge cases, for example.

Q.   If there were a mark -- if you found a firing pin impression that could have been similar but just wasn't of a sufficient quality for you to actually tell,

PL0000504

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 97

it could be inconclusive as to that characteristic, right?

A.   That's correct.

Q.   If it was totally absent, you'd agree with me that that would rule out an identification?

A.   No, because the identification was on the breech face marks.

Q.   What would be the explanation for why -- withdrawn.  We will get back to it.

You see here that your notes indicate at the bottom of page 3 that 23 came from the same firearm as 18 and 19, and 24 to 44 came from the same firearm as 15, 16, and 17.  See that?

A.   I do.

Q.   Keep that page in front of you.  Going back to the previous exhibit, Plaintiff's 29, the report, this indicates 23 and 24 were both fired from the same firearm as 18 and 19.  See that?

A.   I do.

Q.   Just to be clear, the notes reflect that three cartridge casings were fired from one firearm and 24 from another, but the report has one of those 24 with the other three, and it is four and 23 right?

MR. TALLBERG:  Objection to form.  You can answer.

PL0000505

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 98

A.   That is what the note says here.

Q.   Which one is right, the note or report?

MR. TALLBERG:  Objection to form.  You can answer.

A.   The report that -- my notes say if there was a mistake, it wasn't picked up at that present time.

Q.   Sitting here today, you don't know which of the two accurately reflects your conclusions, correct?

A.   Based on notes, if I had the physical evidence, that would certainly clear that up.

MR. LIEB:  Why don't we take our lunch break now.  I am about to go to a new document that we will be with for longer than 10 minutes probably.

(Recess:  12:50 to 1:23 p.m.)

Q.   If at any point you need to take a break to eat something, just let us know.

A.   Thank you.

Q.   So the next exhibit is going to be the handwritten notes from the Taft homicide exam on 2/5/94. I am pulling it up on the screen now.

(Petitioner's Exhibit 31:  Marked for Identification - described in Index.)

Q.   Have you located the document?

A.   I have.

Q.   Do you see FA940052 and Case Number 10607 in

Sanders, Gale & Russell
(203) 624-4157

PL0000506

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 99

the top left-hand corner?

A.   Yes.

Q.   Victim, Danielle Taft's name below that?

A.   Yes.

Q.   This document marked as Petitioner's 31 is your handwritten notes from your examination of physical evidence in connection with -- your examination of physical evidence recovered from the crime scene of the Taft homicide, correct?

A.   Yes.

Q.   As with the previous set of notes, you made these notes at or around the time of your examination in the course of your regular duties as a firearm and tool mark examiner in the New Haven Police Department?  Yes?

A.   Yes.

Q.   The homicide, as indicated in the top right, occurred on February 3rd of 1994, right?

A.   Yes.

Q.   You responded to the scene the next morning, and you processed certain physical evidence at the crime scene, correct?

A.   I did.

Q.   That was part -- one of the responsibilities of the bureau of identification in the NHPD at the time?

A.   Yes.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 100

Q.   You took some latent print impressions from the window through which the perpetrator of this crime had actually fired the bullets, correct?

A.   I did.

Q.   And you also located the tray of an ammunition box in the street from the crime scene, correct?

A.   I did.

Q.   You knew from going to the scene and speaking to your colleagues and gathering information that this was a crime in which Danielle Taft, an infant child, had been killed in her home, correct?

A.   Yes.

Q.   And you also knew that her grandmother, Charlene Troutman, had been seriously injured in the crime as well?

A.   Yes.

Q.   Looking at the substance of this document, it indicates that there was -- the physical evidence that you examined included a bullet recovered from Danielle Taft's autopsy from her body, correct?

A.   Yes.

Q.   And then 15 shell casings or cartridge casings recovered from the crime scene, correct?

A.   Yes.

Q.   As well as five bullets recovered from the

PL0000508

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 101

crime scene?

A.    Yes.

Q.    And the cartridge casings that were recovered from the crime scene were designated Number 1 through 15?

A.    Yes.

Q.    They were 9-millimeter Luger in size, and Winchester brand, correct?

A.    That's fair.

Q.    Do you see toward the middle of the page, where it says Items Number 1 to 15, there is language that says "Rd FPimps"?

A.    I do.

Q.    FPimps are firing impressions?

A.    Round firing pin impressions.

Q.    Does that note reflect that there were round firing pin impressions found on all of Items Number 1 through 15?

A.    I believe that is what the note says.  That's correct.

Q.    Have you heard the term "circular firing pin impressions"?

A.    I have.

Q.    Based on your usage of the terms, are round firing pin impressions and circular firing pin

PL0000509

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 102

impressions the same thing?

A.    I guess it depends on your nomenclature, what you are using, round firing pin impressions.

Q.    Your observation of the firing pin impressions on these 15 cartridge casings were that they were round?

A.    Yes.  That's correct.

Q.    Then you go on to say, "Positive match All By PBFM's (Very Good)"?

A.    Yes.

Q.    That reflects based on the primer breech face marks you were able to determine that all of these cartridge casings were discharged from the same firearm, correct?

A.    That is my notification.  Correct.

Q.    That was also your conclusion, right?

A.    Yes.  It was.

Q.    And the parentheses, "very good" refers to the quality of the primer breech face marks that you observed on Cartridge Casings 1 through 15, correct?

A.    I believe that is what the notation would stand for, yes.

Q.    Meaning that the markings were of a quality that you could gain sufficient -- gain a lot of information from them and use them effectively as a basis for comparison?

PL0000510

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 103

A.   That's correct.

Q.   What are some of the factors that might determine whether a primer breech face mark is very good, as you use that term here in these notes?

A.   Just the quantity and quality of the marks was good.

Q.   Wasn't a very clear question.  What are some of the reasons why primer breech face marks might be very good, as you use that term in these notes?

A.   Again, the quality and quantity of the marks found upon the cartridge cases which I was examining.

Q.   What physical aspect of the cartridge cases or firearms might lead there to be very good primer breech face marks on a particular cartridge case?

A.   The breech face itself.

Q.   What about the breech face?

A.   The actual contours of the breech face itself and the marks found upon that breech face.

Q.   If the contours of the breech face have more definition, that might lead there to be very good marks on the cartridge case that is impressed upon that breech face?  Is that right?

A.   That's correct.

Q.   So if you are observing very good breech face marks on a cartridge casing, that would suggest then to

Sanders, Gale & Russell
(203) 624-4157

PL0000511

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 104

you that the breech face of the firearm that produced those marks had well-defined contours in the marks, right?

A.    There was sufficient striking of the cartridge against the breech to leave those marks.  That's correct.

Q.    That is a slightly different point.  I guess I am trying to clear up whether -- does the presence of very good primer breech face marks lead you to draw any conclusions about the physical attributes of the breech face that produced those marks?

A.    Until you are able to make your examination of the physical evidence, to make this determination we are dealing with cartridge cases.  So the cartridge in this case we are dealing with, the cartridge cases -- the cartridge case has had very good marks left upon the surface for me to make a positive statement to say that they were all fired from the same firearm.

Q.    Those very good primer breech face marks were found on all 15 of the casings recovered from the Taft scene, correct?

A.    Correct.

Q.    You would expect that if the same kind of ammunition were fired from whatever firearm produced those breech face marks, shortly thereafter, those very

PL0000512

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 105

good primer breech face marks would be reproduced and replicated on other cartridge cases, right?

A.   You could draw that conclusion.  That's correct.

Q.   You also indicated at the -- I am going back to the exhibit.  You indicated at the bottom of the same page of the document that all had heavy chamber marks. See those words?

A.   I do.

Q.   That is a conclusion that you drew from your examination of Cartridge Casings 1 through 15, correct?

A.   Correct.

Q.   Again -- withdrawn.  What does "heavy chamber marks" mean?

A.   Very distinctive, very heavy markings left upon the side of the cartridge case itself from the chamber area.

Q.   Were the chamber marks -- were they striated or impressed?

A.   They would be a combination of expansion within the chamber and then the pulling, the striated marks as they are extracted from the chamber itself.  So you have a combination of the same type of mark.  You have a combination of marks that occurred during that dynamic firing within the chamber.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 106

Q.   Similar to the breech face marks, you'd expect that if the same kind of ammunition were fired from whatever weapon produced these heavy chamber marks within a short period of time afterwards, that those heavy chamber marks would be replicated and reproduced on those cartridge casings, right?

A.   If all conditions were consistent, that's correct.

Q.   When you say, "If all conditions were consistent," it wouldn't require the weather to be consistent, would it?

A.   No.

Q.   The chamber would have to be in the same condition, right?

A.   That's correct.

Q.   You noted the presence of the chamber marks here in your notes because that was relevant to your identification of Items 1 through 15 as having been fired by the same firearm, correct?

A.   No.  The identification was based on the prior breech face marks.  I just made the notation there were heavy chamber marks.

Q.   Why did you make that notation?

A.   Because I noticed them during my examination of the physical evidence.

Sanders, Gale & Russell
(203) 624-4157

PL0000514

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 107

Q.    Were the chamber marks the same?

MR. TALLBERG:  Objection to form.  You can answer.

A.    I didn't draw a conclusion to any identifications based on chamber marks.

Q.    Did you examine the chamber marks beyond noting that they were there and that they were heavy to determine whether those chamber marks were produced by the same firearm?

A.    I don't recall, sir.

Q.    You would agree with me that if the chamber marks -- if there were not sufficient agreement between the chamber marks that you observed on all 15 of these cartridge casings, then that might call into question whether these cartridge casings were all fired from the same weapon, right?

A.    Repeat the last portion of your question.

Q.    If there were not sufficient agreement among the chamber marks found on all 15 of these cartridge casings, that might call into question whether all 15 were fired from the same weapon, correct?

A.    Again, it concerns the condition of the ammunition, concerns the condition of the chamber itself.  If there is a lubrication that makes it easier for those chamber -- for the cartridges to be removed

PL0000515

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 108

from the chamber, the marks might not be as prevalent as some that I have noted here.

Q.   In this case, you noted that all 15 of the discharged cartridge casings from the Taft homicide scene had heavy, meaning prevalent, chamber marks, right?

A.   I did.

Q.   So the conditions of firing were sufficient to produce prevalent chamber marks, correct?

A.   It was.

Q.   Taking that as given there were prevalent chamber marks on 1 through 15, what, if anything, did you do to evaluate whether there was sufficient agreement between those chamber marks to conclude whether or not the chamber marks were produced by the same firearm?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I didn't make a conclusion based on chamber marks.  It wasn't necessary based on the primer breech face marks I found on the surface of the base head stamp area of the cartridges.

Q.   You had made an identification based on the primer breech face marks, right?

A.   I did.

Sanders, Gale & Russell
(203) 624-4157

PL0000516

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 109

Q.   There is this additional piece of data out there, right, that is found on all 15 of the cartridge casings, which are the chamber marks, right?

A.   Correct.

Q.   It would strengthen your identification to compare the chamber marks and see whether they have sufficient agreement as well, right?

A.   That is your conclusion.

Q.   Do you disagree with that?

A.   It wasn't necessary to make the identification with the chamber marks.

Q.   My question is not whether it is necessary. My question is whether it would strengthen the identification to compare not just one common data point among all 15 but two?

A.   I don't think that that was necessary to do at that point.  Once I have made the identification, there was no sense to continue on looking for more and more points to cumulatively add up to the breech face marks that I was already able to identify.

Q.   You would agree with me that if you looked at those chamber marks and they were inconsistent with having been made by the same tool, that would call into question the identification that you made on the basis of the primer breech face marks?

Sanders, Gale & Russell
(203) 624-4157

PL0000517

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 110

MR. TALLBERG:  Objection to form.  You can answer.

A.   No.

Q.   Why not?

A.   Because you can cycle a cartridge through a chamber, and put it in another gun and fire it in another gun, and have overlapping or extra chamber marks upon the surface of the cartridge itself.

Q.   You can do that with breech face marks too?

A.   No.  Once it is fired in the gun, the marks that occur on -- the breech face marks that occur on the head stamp area occurred during the firing process itself against the marking of the primer and the head stamp area to the breech.

Q.   As we discussed, chamber marks occur when the chamber both expands and is pushed backwards by the force of the explosion from the ignition of the gunpowder, right?

A.   That is one source.  The other source could be the extraction in the chamber of the cartridge without firing.

Q.   Would you expect the extraction in the chamber of a cartridge without firing to produce heavy chamber marks?

MR. TALLBERG:  Objection to form.  You

Sanders, Gale & Russell
(203) 624-4157

PL0000518

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 111

can answer.

A.   If you could repeat the first part of your question.

Q.   Would you expect the extraction of a chambered round without firing to produce heavy chamber marks?

A.   Depended upon the firearm itself, the condition of which the chamber is.

Q.   When you observed these heavy chamber marks on Items 1 through 15 from the Taft homicide, you thought they were there from the firing that occurred in connection with the Taft homicide, right?

A.   I believe that to be, yes.

Q.   That is what you thought produced marks, not extraction without firing, is it?

A.   No.

Q.   Wouldn't -- given that you have 15 items that have heavy marks on them that you believe to have been produced by the act of firing into Danielle Taft's apartment, why wouldn't it have strengthened your identification to compare those marks as well?

A.   I didn't say it would strengthen it.  I didn't look at the chamber for the purpose of identification.

Q.   Wasn't necessary, according to your testimony, but it would strengthen it, wouldn't it?

MR. TALLBERG:  Objection to form.  You

PL0000519

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 112

can answer.

A.    If need be, to look at chamber marks in conjunction with breech face marks because I didn't have sufficient enough marks in other areas to make an identification, yes.  It would help for purposes of making an identification stronger.

Q.    But all else equal, if you have two sets of marks that are in agreement, sufficient agreement, that is a stronger evidentiary basis for an identification than if you just have one set of marks that is in sufficient agreement, right?

A.    The way you stated it, yes.

Q.    Going on to page 2 of Plaintiff's 31, Item 16 at the top there.  See that?

A.    I do.

Q.    There is a bullet which you diagramed on this piece of paper.  There are three land impressions and two groove impression measurements recorded here.  Correct?

A.    That's correct.

Q.    Those are measurements of individual lands and grooves on bullet Number 16?

A.    Correct.

Q.    Do you see immediately to the left of -- sorry.  Immediately to the right of the diagram, it says

PL0000520

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 113

"back side heavy secondary striae"?

A.    Correct.

Q.    What does "heavy secondary striae" mean?

A.    Struck another object, causing damage to the other side of the bullet itself.

Q.    Secondary striae are striae caused by contact between the bullet and a second object other than the firearm?

A.    It struck something harder than itself.

Q.    What does the word "secondary" mean in particular as used there?

A.    It wasn't from the travel through the barrel itself.  The secondary marks weren't from the travel through the barrel.  I wasn't able to do anything with those marks because they were secondary marks.  They were marks put there after it struck something else.

Q.    Similarly, with regard to the -- sorry.  Just to be clear, the measurements of .64, .62, and .64 in the middle of the page, those are individual lands on Bullet Number 16?

A.    Correct.

Q.    And then .113 and .112 are individual grooves on Bullet 16?

A.    Yes.

Q.    And .64 and .63 are individual lands on

Sanders, Gale & Russell
(203) 624-4157

PL0000521

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 114

Bullet 17?

A.   Yes.

Q.   And then similarly, on Number 18 on page 3, .65 is a measurement of an individual land on Bullet Number 18, right?

A.   Correct.

Q.   And .112 is a measurement of an individual groove on Bullet 18?

A.   Yes.

Q.   The same goes for Item 19 here?  We have individual land and groove measurements of .064 and .111 respectively for an individual land and individual groove on Bullet Number 19?

A.   Yes.

Q.   And the same goes for Number 20?  Again, you measured an individual land and individual groove there?

A.   Yes.

Q.   This is a situation where there were five bullets that were sufficiently intact for you to make measurements of individual lands or grooves on each of them, right?

A.   Correct.

Q.   You took multiple land measurements from at least two of the bullets, right?

A.   Yes.

PL0000522

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 115

Q.    Remember we were having a discussion this morning about what constitutes ordinary circumstances with respect to the margin of error or tolerance range in the General Rifling Characteristics database? Remember that discussion?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Yes.

Q.    You'd agree with me that there is a sufficient amount of data that you were able to get here from these lands and grooves on these five bullets that would put this in the ordinary circumstances, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.    There was enough information that I was able to measure those landing groove impressions and come up with roughly those measurements.  That's correct.

Q.    When you say "roughly," what do you mean?

A.    Again, the bullets did have -- some of them did have distortion.  Some of them did have marks.  So that is the measurements that I took from those particular bullets.

Q.    Just going back to -- I will pull it up on my screen.  You don't need to look for it.  Going back to Plaintiff's 26, 2008 General Rifling Characteristics

Sanders, Gale & Russell
(203) 624-4157

PL0000523

Electronically signed by PATRICIA SAYA (501-398-304-5455)    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 116

Manual that I was just alluding to, we discussed the language that says, "For typical instances, a tolerance range of .02 to .05 inches has been used by FBI examiners since the inception of the GRC file."

Remember our discussion about that?

A.  I do.

Q.  The measurements that you took from the five bullets at the Taft homicide scene, that was enough data to put this within typical instances, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.  I'm sorry.  Did you ask a question?  I can't hear you.

Q.  I am formulating the question.

A.  I'm sorry.

Q.  The multiple land and groove measurements that you took from the five projectiles at the Danielle Taft homicide scene, was that an unusually limited amount of data in terms of measuring land and grooves from a crime scene?

MR. TALLBERG:  Objection to form.  You can answer.

A.  Depends on the condition of the bullet. Sometimes if you have a full bullet, you might measure all of them.

PL0000524

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 117

Q.   But the conditions here were sufficient for you to get at least one measurement from all of the five bullets, right?

A.   That's correct.

Q.   You got multiple measurements from multiple bullets, right?

A.   Yes.

Q.   That is a typical instance within the meaning of this document as you understand it, right?

A.   I think it is referring to the range of the parameters for typical instances of tolerance range, range at which you would use the GRC.

Q.   Specifying, as we discussed earlier, a standard tolerance range that you would use in typical instances, right?

A.   Correct.

Q.   The Danielle Taft homicide scene, based upon five bullets that were recovered, was one such typical instance?

          MR. TALLBERG:  Objection to form.  You can answer.

A.   Yes.

Q.   Going back to the bench notes from the Taft homicide, Plaintiff's 31.  Do you have that in front of you?

PL0000525

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 118

A.   I do.

Q.   At the bottom of page 5, last page, there is a paragraph, a long handwritten note that begins, "Item 16 through 21 are all 9-millimeter caliber bullets."  See that?

A.   Yes, I do.

Q.   Then it goes on to say that those bullets may have been fired from but not limited to a self-loading pistol.  And then there is a list of manufacturers? Yes?

A.   That's correct.

Q.   That list there comes from your searching or querying of the GRC database?

A.   It was.

Q.   When you took individual land and groove measurements of projectiles, it was your practice to record that in your notes?

A.   It was.

Q.   Now I am going to go to the General Rifling Characteristics query.  This is the General Rifling Characteristics query that is listed as 14 hours, 59 minutes, and 34 seconds.  Do you have it?

A.   Yes.

            MR. LIEB:  I am marking this as Petitioner's 32.

PL0000526

Electronically signed by PATRICIA SAYA (501-398-304-5455)      1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 119

(Petitioner's Exhibit 32:  Marked for Identification - described in Index.)

Q.   You actually performed your work in this case on February 4th, right?

MR. TALLBERG:  Objection to form.  You can answer.

Q.   You performed your examination of the physical evidence from the Taft homicide scene on February 4th. Is that correct?

A.   That's correct.

Q.   Am I correct to infer that the date on the general rifling characteristics database here is just off for whatever reason?

A.   Could very well have been.

Q.   This is a query that you ran of the General Rifling Characteristics File at or around the time you were performing your examination of the physical evidence recovered from the Taft homicide scene, correct?

A.   Correct.

Q.   You put in a minimum land width of 62 and maximum land width of 65?

A.   I did.

Q.   That was the minimum individual land measurement and maximum individual land measurement you

Sanders, Gale & Russell
(203) 624-4157

PL0000527

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 120

gleaned from the physical evidence, correct?

A.   That's correct.

Q.   Similarly, for the groove width you put in 111 to 113, which was the minimum physical measurement you took and the maximum physical measurement you took from the Taft homicide projectiles?

A.   Correct.

Q.   I'm sorry?

A.   Correct.

Q.   It produced a list of results which are reflected on page 2 of Plaintiff's 32?

A.   Yes.

Q.   This is the list of results that you used to make that entry in your notes that we just discussed that came from the general rifling characteristics database?

A.   I believe so.

Q.   Do you still have Plaintiff's 31 notes in front of you?

A.   I do.

Q.   Just put that note on page 5 of Plaintiff's 31 and this query results, Petitioner Exhibit 32, next to each other, and take a moment to look at it.  I will re-ask the question.

A.   I have looked at it.

Sanders, Gale & Russell
(203) 624-4157

PL0000528

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 121

Q.    Having looked at that, does it appear to you that this is the query from which the results reflected at the bottom of page 5 of your handwritten notes is based?

A.    Yes.

Q.    Looking at the first page of Plaintiff's 32, we have six lands and grooves, right, 62 to 65, 111 to 113 for the groove width, 9-millimeter cartridge .38-caliber?  That is all information that you put in?

A.    That's correct.

Q.    Now to the next General Rifling Characteristics query from 150225.

A.    What was the time stamp?

Q.    It is 150225?

A.    I have it.

            MR. LIEB:  We will mark this 33, which I will share with you on your screen.

            (Petitioner's Exhibit 33:  Marked for Identification - described in Index.)

Q.    Petitioner's 33.  This is another query of the General Rifling Characteristics database that you ran several minutes after the preceding one, correct?

A.    Whatever the time differential was.

Q.    It reflects parameters that you put in and a search that you performed, a query that you performed?

Sanders, Gale & Russell
(203) 624-4157

PL0000529

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 122

A.   It does.

Q.   All of the parameters are the same except removing 9-millimeter as the cartridge, correct?

A.   Correct.

Q.   Why did you run this second query?

A.   Why did I run that?

Q.   Yes.

A.   Just to see -- because .38-caliber runs everything that would come up.  As you can see on here, there is other .38-caliber classifier arms to put into this list at that point as well as -- bear with me -- 9 millimeters.

Q.   It is possible under some circumstances to fire a 9-millimeter cartridge from a different .38 caliber weapon, correct?

A.   Depending on the firing arm itself, that's correct.

Q.   That is one reason why you wanted to look at a list of firearms that might be consistent with the lands and grooves and the twists that you observed, but not limited to 9-millimeter cartridges, right?

A.   I don't think that was my reason.

Q.   Why did you want to see a list of firearms that matched the twist and the number of lands and grooves and the land width and the groove width but not

Sanders, Gale & Russell
(203) 624-4157

PL0000530

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 123

limited to a 9-millimeter cartridge?

A.   I think probably because there were no other firearms listed other than 9-millimeter on the original one.  I just wanted to double-check and look at the .38-caliber again, see if it promulgated the other 9 millimeter with the other firearms that were there.

Q.   Promulgate what?

A.   See if there was any differences between the list.

Q.   You thought there might be firearms that were in the database that could be consistent with the results that you examined that weren't reflected on your first query?

A.   I don't know whether that is the case or not.

Q.   That is the point of running a second query, to double-check to see whether there is another possible result that isn't captured on the first one?

A.   Again, I wasn't looking for a specific firearm at that time.  I was just looking to see what firearms were brought up during the GRC search.

Q.   Not suggesting that you were looking for any particular one.  But you thought that there might be some universe of additional firearm or firearms not reflected in your first query that could have produced the physical characteristics that you observed from the

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 124

bullets recovered from the Taft homicide scene, right?

A.   Again, the same General Rifling Characteristics were run in both searches.  The only thing that was changed was the fact that the cartridge was dropped from one.  They were both 9-millimeter and .38.

Q.   Now to the last of the sequence of GRC queries, which has the time stamp 150413.

A.   I have that.

(Petitioner's Exhibit 34:  Marked for Identification - described in Index.)

Q.   I am showing Exhibit 34.  This reflects a third General Rifling Characteristics database query made by you a few minutes later with different parameters input by you?

A.   That's correct.

Q.   Here you have restored the parameter that the cartridge be 9-millimeter and you changed the land and groove widths to exactly 64 and exactly 112, correct?

A.   Yes.

Q.   Going back to your handwritten bench notes from the Taft homicide again, that is -- my exhibit numbering seems to have -- sorry.  Plaintiff's 31, the handwritten notes.  Do you have that Mr. Stephenson?

A.   Yes.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 125

Q.   This is going to be a little bit cumbersome, but it is important.  Bear with me.  So on the top of the second page I am going to run through all of the land impressions that you measured, and I am actually going to write it down as we do this.

On Item 16, you had 64, 62, and 64-thousandths of an inch.  See that?

A.   Bear with me one second.

Q.   Take your time.

A.   I do.

Q.   64, 62, and 64.  Then on Item 17, you have 64 and 63?

A.   Yes.

Q.   Then on Item 18, you have 65, right?

A.   I do.

Q.   On Item 19, you have 64?

A.   I do.

Q.   On Item 20, you have 65?

A.   I do.

Q.   By my tally, that is -- sorry.  Item 21, you have 64.  See that?

A.   I do.

Q.   By my tally, which I didn't show you, we have got nine land impressions measured, five of which are 64.  Right?

Sanders, Gale & Russell
(203) 624-4157

PL0000533

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 126

A.   Yes.  Looking at my notes, I can't see your --

Q.   That's fine.  Skip the show and tell.  So 64 would be in statistical terms what you would call the model land impression of this set, right?

A.   If you say so, yes.

Q.   Most frequently occurring one?

A.   It was, yes.

Q.   If you were to average these, you've got 5, 64, and then 62 and 63 below, and two 65's above.  The average of that is going to come out to be just a tick below 64?

MR. TALLBERG:  Objection to form.  You can answer.

A.   That's correct.

Q.   Then for the groove impressions.  Not to belabor the point, but you have got -- going back up to Number 16, you have got 113 and 112 for the groove impressions, right?

A.   I do.

Q.   I'm sorry.  Was that yes?

A.   Yes.

Q.   None from 17, 18 you have got a 112, correct?

A.   Yes.

Q.   And 19, you have got 111?

A.   Yes.

PL0000534

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 127

Q.   And then 20, you have got another 112?

A.   All 111.  My mistake you are correct, 112.  I was looking above it.

Q.   Then 21 is also 112, right?

A.   Yes.

Q.   You have got six measurements, four of which are 112?

A.   Yes.

Q.   Also got 111 and 113, right?

A.   Yes.

Q.   Average of that is going to be 112?

A.   That is what you said that the average was, yes.

Q.   If you have four 112s, 111, and 113, the difference in the 111 and 113 is going to cancel themselves out.  The average is going to be 112?

A.   Yes.

Q.   Going back to the rifling characteristics query, this document reflects 64 and 112 as the specific parameters you put in.  It reflects both the most common and the average land and groove measurements that you took from the bullets recovered from the Taft homicide, right?

A.   That is what we have just come up with, yes.

Q.   Why did you run this third query?

Sanders, Gale & Russell
(203) 624-4157

PL0000535

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 128

A.   No reason other than the fact it was 64, 112.

Q.   What were you trying to learn by doing it?

A.   It was -- I don't recall actually why specifically I ran that.

Q.   Were there any Browning Firearms that came back as results for any of the three queries that we have marked as Petitioner's Exhibits 32, 33, or 34?

A.   No.

Q.   I didn't hear.

A.   No.

Q.   These specific general rifling characteristic database queries that you -- that we have looked at as Petitioner's 32, 33, and 34, you printed them out from a printer and put them in your individual file in the firearms office in the bureau of identification, right?

A.   Yes.

Q.   Did you put any copies of them anywhere else at that time?

A.   No.

Q.   Did you give copies of them to any other detectives working on the case?

MR. TALLBERG:  Objection to form.  You can answer.

A.   No.

Q.   Did you give copies of them to the state's

PL0000536

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 129

attorney's office?

MR. TALLBERG:  Objection to form.  You can answer.

A.    I don't recall.

Q.    I am now going to go to a 2/8/94, 0900 hours police report that again references Complainant April Hines at the top.  It is a typewritten report.  Let me pull it up.  One-page document.  Do you have it?

A.    I have one, but I am trying to see your page.

Q.    I can zoom in if it would be helpful.

A.    Good.

Q.    2894, 0900 hours, Complainant, April Hines, one-page document.

(Petitioner's Exhibit 35:  Marked for Identification - described in Index.)

Q.    This is Petitioner's 35.  This is a police report signed by you from February 8th of 1994, correct?

A.    February 8, 1994, correct.

Q.    It reflects the results of comparison that you did between two of the shell casings recovered from the S&S Cafe and the 15 shell casings recovered from the Taft homicide scene?

A.    It does.

Q.    You typed up this report at or around the time that you performed that comparison, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000537

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 130

A.   That's correct.

Q.   You prepared the report in the course of your official -- in the regular course of your business as a firearm and tool mark examiner for the NHPD?

A.   Yes.

Q.   It was your practice, as we have seen here, today to prepare such reports memorializing the examinations that you performed?

A.   Yes.

Q.   When did you actually compare the S&S Shell Casings 13 and 14 with the Taft homicide Shell Casings 1 through 15?

A.   I don't recall, sir, not by this document.

Q.   This document reflects that no firearm has been submitted as yet for comparison to this evidence. See that?

A.   I do.

Q.   That is, as far as you know, a statement that was true at the time you made it, right?

A.   That's correct.

Q.   As you know, there was later a firearm that was recovered that you came to conclude had fired these shell casings that we are talking about in Petitioner's 35?

A.   Yes.

PL0000538

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 131

Q.    At this time there was no gun, when you made this report?

A.    Yes.  Says there was no firearm at that time.

Q.    What led you to perform this comparison between the S&S Cafe Shell Casings 13 and 14 and the Taft shell casings?

A.    Because I was the firearms examiner and I saw every case that was coming through.  I must have seen some similarity between the marks which led me to make that comparison.

Q.    You were the one and only firearms examiner for the New Haven Police Department at the time, right?

A.    That's correct.

Q.    There was, unfortunately, a fair amount of -- a large amount of gun crime in New Haven in or around the time of 1994, right?

A.    There was.

Q.    Whenever there was physical firearms evidence recovered from a crime scene, you were the person to examine it?

A.    If it came through our office, that's correct.

Q.    You would have had in your mind as you were doing the Taft examination of the 9 millimeter shell casings the fact there was this other case shooting a few weeks ago a couple blocks away, right?

PL0000539

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 132

A.   Yes.

Q.   And as you were doing the Taft examination, it might have occurred to you that there was some -- you thought visual similarity in the evidence that you were examining?  Is that right?

A.   That's correct.

Q.   Do you have any bench notes that relate to this comparison that you made between the S&S Shell Casings 13 and 14 and the Taft shell casings?

A.   Excuse me.  I don't recall, sir.

MR. LIEB:  Off the record.

(Off the record discussion.)

Q.   As we covered earlier, there were -- you concluded that there were seven firearms discharged in the S&S incident, five of which fired 9-millimeter ammunition, right?

A.   Yes.

Q.   And when you made the comparison between the Taft cartridge casings and the S&S cartridge casings we were looking at marked as Exhibit 35, you looked at two specific 9-millimeter cartridge casings from the S&S, right?

A.   Yes.

Q.   And you had previously concluded that those two had been fired from one of the five firearms that

Sanders, Gale & Russell
(203) 624-4157

PL0000540

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 133

discharged 9-millimeter ammunition at that scene?

    A.    Yes.

    Q.    Did you compare the Taft cartridge casings with cartridge casings from any of the other 49 millimeters that discharged at S&S?

    A.    I don't recall.

    Q.    Was there something in particular that stood out to you about these two 9 millimeter cartridge casings from the S&S?

    A.    Probably breech face marks.

    Q.    When you say "probably breech face marks," what is that based on?

    A.    That's where the identification was made, to the breech face marks.

    Q.    When you say, "That's where the identification was made," you ultimately identified the Taft --

    A.    Correct.

    Q.    Let me finish.  You ultimately identified the Taft cartridge casings to a recovered firearm based upon breech face marks?

    A.    Right.

    Q.    Do you recall what specifically you compared when you performed the S&S Taft comparison, what marks you compared specifically when you performed the S&S Taft comparison reflected in Petitioner's 35?

Sanders, Gale & Russell
(203) 624-4157

PL0000541

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 134

A.   It was breech face marks.

Q.   Do you know that or are you inferring that you made other identifications based on the breech face marks?

A.   I'd guess that was where the identification was made, on the breech face marks.

Q.   You are guessing, right?

A.   Then I guess I don't recall.  I don't recall.

Q.   I think I asked you before whether you had any notes of the Taft S&S comparison reflected in Petitioner's 35.  Did you make any notes of that comparison at the time?

A.   I don't recall.

Q.   It was generally your practice to make notes when you were engaged in a comparison of physical evidence using the comparison microscope?

A.   That's correct.

Q.   Do you have any particular reason to think you deviated from that practice in this instance?

A.   Recovery of the firearm is what date?

Q.   I'm sorry.  I didn't hear you.

A.   The recovery of the firearm is what date?

Q.   We have established that Petitioner's 35 reflects there was no firearm recovered at the time you performed the Taft S&S comparison.  Right?

Sanders, Gale & Russell
(203) 624-4157

PL0000542

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 135

A.    That is what it says, that's correct, from the bottom of the report.

Q.    I want to get your best answer based upon your recollection and your knowledge of these documents to this question, which is, do you have any particular reason to believe that in the case of this S&S Taft comparison reflected in Petitioner's 35, you deviated from your usual practice of making notes while engaged in comparison with the comparison microscope?

A.    I don't recall.  I have no notes specifically for this document.

Q.    There came a point in time at which a breech Nationale Browning Hi-Power 9-millimeter was recovered from another crime scene in the same neighborhood, right?

A.    Yes.

Q.    That weapon was given the designation of K1?  Yes?

A.    I'd have to refer to my report, but I think it is.  Do you have the report?

Q.    We can skip it for now.  We will get there.  I withdraw the question.

I am going to go to the bench notes from the February incident, which are one of the items that I would like you to actually look at the original.  I had

PL0000543

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 136

flagged in the manila folder -- I put two green stickie notes on two police reports that I indicated I would use the original during this examination.

MR. TALLBERG:  Are there copies in this package as well.  The originals are -- once you marked them with the witness --

MR. LIEB:  More or less.

MR. TALLBERG:  I am sure I can follow along.

MR. LIEB:  The notes were broken up into two parts.  First I need to confirm they actually belong together.

THE WITNESS:  I have the two documents that have stickie notes.

Q.   Are both of those documents police reports paper clipped to handwritten pencil notes behind them?

A.    There are.

Q.   Do you see -- hang on.  Let me mark -- of all the depositions, this would be the best one to have had in person.  But this is safer.

(Petitioner's Exhibit 36:  Marked for Identification - described in Index.)

Q.   Sharing with you what I have marked as Plaintiff's Exhibit 36.  Do you see an image of handwritten notes on the screen in front of you?

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 137

A.   No.

Q.   See it now?

A.   I do.

Q.   We are looking at handwritten notes that have "Case Number 11826, New Haven shooting, arrested Anthony Stevenson, a/k/a Lorenzo Thomas."  See that on the screen?

A.   I do.

Q.   Can you find that page in the physical originals in front of you?

A.   I've got it.

Q.   I believe within the set of documents where you just found the first page, there are pages 1 through 5 of these handwritten notes.  See that?  Is that consistent --

A.   You just showed us 6 up there.

Q.   Sorry.  Ignoring what is on the screen, are pages 1 through 5 paper clipped together behind a police report in front of you now, or were they before you opened the paper clip?

A.   They are.

Q.   Looking at the other document that I put a stickie note on, do you see pages 6 and 7 there?

A.   I do.

Q.   Notwithstanding that they were maintained

PL0000545

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 138

separately by you in the folder that you produced

through counsel in response to our subpoena, am I

correct that pages 1 through 7 consecutively numbered

together constitute your handwritten notes in connection

with the examinations and comparisons you performed of

this Browning 9-millimeter that was recovered on

February 7th?

A.   A continuation, yes.

Q.   Is it fair for us to put pages 1 through 7

consecutively numbered together as one exhibit for

purposes of today's examination?

A.   I can do that if you wish.

Q.   These are notes that you made in the regular

course of your duties as a firearms and tool mark

examiner in the NHPD at or around the time you performed

these examinations, right?

A.   Correct.

Q.   Looking at the first page of Plaintiff's 36,

which I am now going to share on the screen, see where

it says, "Date of incident, 2/7/94" in the upper

right-hand corner?

A.   Yes.

Q.   "Date of receipt," it has two lines with two

dates.  See that?

A.   It does.

Sanders, Gale & Russell
(203) 624-4157

PL0000546

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 139

Q.    What are the words on each or letters on each of those two lines preceding the dates?

A.    "CWD" stands for Chris Grice.  "EDI" stands for Edward Ingraham.

Q.    You performed your examinations of physical evidence in the firearms office of the bureau of identification, right?

A.    Yes.

Q.    Am I correct that you got the evidence by going down to the property room of the New Haven Police Department and signing it out?

A.    I may have.  May have just been transferred to me because we worked in the same unit.

Q.    But the evidence would be logged into evidence in the property room before you examined it, right?

A.    I don't recall.

Q.    Evidence at the NHPD at this time was maintained in envelopes that had inventory forms attached to them, right?

A.    It has been 27 years.  Yes, I guess.

Q.    Generally there was something on the outside of the envelope that enabled you to know what was inside it without opening it?

A.    Yes.  Usually there was writing on the envelope itself which would have what was contained in

Sanders, Gale & Russell
(203) 624-4157

PL0000547

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 140

it.

Q.   This document, Petitioner's 36, your notes from the examination of this Browning Hi-Power, reflects that there is the name of an arrestee with an alias and complainant with an alias.  See that?

A.   I do.

Q.   That is information you knew at the time you performed this examination?

A.   It was information that was on the evidence itself.

Q.   Information that was affixed to whatever folder envelope it was that you got the physical evidence from, right?

A.   Yes.

Q.   You knew at the time you were doing this examination that persons named Anthony Stevenson, a/k/a Lorenzo Thomas, and Adam Carmon, a/k/a Mark Jones, were involved in this incident involving this firearm in some way?

A.   Yes.

Q.   You knew that the owner of the firearm was this Harry Gilbert?

A.   Somewhere along the line -- I don't recall how I knew that was the owner, but the name does ring a bell.

Sanders, Gale & Russell
(203) 624-4157

PL0000548

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 141

Q.   It says, "PD evidence Item K1."  See that?

A.   I see it now.

Q.   Does that refresh your recollection that this particular firearm was designated as Item K1?

A.   Yes.

Q.   If I call this specific Browning Hi-Power 9 millimeter K1, you will understand I am talking about this specific gun?

A.   Yes.

Q.   Two lines below it says, "Harry Gilbert, owner"?

A.   Yes.

Q.   K1 was recovered with 9 live rounds of ammunition.  Correct?

A.   Yes.

Q.   There were also five discharged .45-caliber cartridge casings recovered from the scene at which K1 was recovered, right?

A.   Yes.

Q.   You concluded that those were all discharged from the same firearm, correct?

A.   I believe that is the answer.  I haven't gone back to look at it.

Q.   There were .45 caliber projectiles and casings recovered from the scene which could not have been fired

PL0000549

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 142

from a K1, right?

A.   That's correct.

Q.   That is because K1 was a 9-millimeter, and you can't fire .45 caliber ammunition from a 9-millimeter?

A.   Correct.

Q.   You ultimately decided to -- withdrawn.  You performed a test fire of K1?  Yes?

A.   Correct.

Q.   There was no reason to test fire the K1 to figure out anything about the shooting that had occurred at the scene where the K1 was recovered, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   There was no recovered physical evidence of fire evidence at that scene for a 9-millimeter.

Q.   There was no recovered evidence that was consistent with having been fired from a K1 at the scene where this K1 was recovered?

A.   Correct.

Q.   The purpose of test firing K1 was not to try and solve anything about this February 7th incident during which K1 was recovered?

A.   That's correct.  There was no physical evidence for comparison to it.

Q.   The purpose of test firing K1 was to examine

PL0000550

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 143

the test fires in connection with the Taft homicide, right?

A.   No.   The purpose of examining the firearm that was submitted relative to this case.  So being that it was submitted under this case, the procedure would be to test fire for corrobability and to examine the firearm itself.

Q.   When you say, "It was submitted under this case," what do you mean by that?

A.   Seized as evidence under this Case 11826, physical evidence in that case.

Q.   Going back to Petitioner's 31, bench notes from the Taft homicide.  See those on the screen in front of you?

A.   I do.  There is a block in the middle of it. I don't know what that is.

Q.   See it better now?

A.   Yes.

Q.   Different case number, right?

A.   That's correct.

Q.   The Taft homicide and the K1 incident are separate cases at this point, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   They are.

Sanders, Gale & Russell
(203) 624-4157

PL0000551

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 144

Q.    Going back to the K1 incident, as we discussed, there was no 9-millimeter projectile or cartridge casings recovered from the scene of K1?

A.    That's correct.

Q.    There is no reason to fire K1 to solve anything about that incident, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.    The incident that it was recovered in, no. There was no physical evidence for comparison in that case.

Q.    The purpose of firing K1 was to figure out whether it was the murder weapon at the Taft scene, right?  That is what you were trying to do?

A.    No.  The reason for test firing the gun was for the purpose of examining the gun relative to this case of which it was submitted under to determine whether it was an operable firearm.

Q.    What, according to you, was the purpose of figuring out whether K1 --  when you shouldn't fire anything at the scene which wasn't recovered -- was operable?

A.    Could you restate your question?

Q.    What was -- your testimony is that the reason you tested K1 was to figure out whether it was operable

PL0000552

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 145

in connection with the shooting at the scene where it was recovered, right?

A.   That's correct.

Q.   What is the point of that?

A.   Because it is physical evidence.  In that particular case it is a firearm.  Your determination is to determine whether it was operable.

Q.   You indicated earlier that you reviewed your testimony at the probable cause hearing in this case as part of your preparation for this testimony, right?

A.   I did.

Q.   Having had the chance to review it, was your testimony at the probable cause hearing accurate, to the best of your knowledge and best of your recollection?

A.   It was.

Q.   Can you pull up your probable cause hearing testimony?  I am sharing it on the screen.  We will mark this as Plaintiff's 37.

(Petitioner's Exhibit 37:  Marked for Identification - described in Index.)

Q.   Keep these --

A.   Keep them out or put them away?

Q.   Please keep them out.  We are going to go back to them.

A.   Can I take a break?

PL0000553

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 146

Q.   Sure.

(Recess:   2:58 to 3:02 p.m.)

Q.   I have marked Petitioner's 37.  Do you recognize the document beginning with Page Number 129 in the upper right-hand corner to be your testimony at the probable cause hearing in this matter?

A.   I do.

Q.   Just for the purposes of orienting you, on the page marked 131 in the upper right-hand corner, starting at about the middle of the page, Attorney Dearington asks you if you recognize what has been marked as State's Exhibit 2 and then goes on to ask you a series of questions.  Do you see that?

A.   I do.

Q.   You understand what he is showing you at this to orient you is the K1 recovered firearm?

A.   Yes.

Q.   So going on to Page 132, as marked in the upper right-hand corner -- confusingly, there are two sets of pages numbers.  Toward the bottom -- middle of the page, see Attorney Dearington asking if you came into possession of materials received from Detective Bennie Smith and seized by him at 810 Orchard Street about February 3rd, 1994?  See that?

A.   I do.

Sanders, Gale & Russell
(203) 624-4157

PL0000554

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 147

Q.   You understand that that is a reference to projectiles and shell casings from the Taft homicide, right?

A.   Yes.

Q.   And at the bottom of Page 132, or middle bottom, Attorney Dearington asks, "Did you perform certain tests to ascertain whether the shell casings found in 810 Orchard Street had both been ejected from that particular weapon, as well as having been part of a full bullet that was fired from that weapon?"

"Answer:  Yes sir, I did."

See that question and answer?

A.   Yes.

Q.   That was truthful and accurate testimony?

A.   Yes.

Q.   Next question and answer, "What tests did you perform, generally speaking, as far as the shell casings?"

"Answer:  For the purpose of comparing those cartridge cases which were found at the scene at 810 Orchard Street it was necessary to have test fires taken from this particular firearm, which I did test fires at the New Haven Department of Police Services."

See that?

A.   I do.

PL0000555

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 148

Q.    In that answer, what you are explaining is that for the purpose of comparing the cartridge casings recovered at 810 Orchard Street and projectiles recovered at 810 Orchard Street with K1, you have to test fire K1?

A.    That's correct.

Q.    The purpose of test firing K1 was to figure out whether K1 was the source of the physical evidence recovered from the Taft homicide, right?

A.    At the time I test fired the firearm, I didn't know that it was related to the Taft homicide.

Q.    You didn't know, but you were trying to figure it out, right?

A.    After I test fired the firearm, in looking at the test fires, they were consistent by what I saw on the breech face marks for the purpose of comparison.

Q.    You'd agree with me the testimony we just looked at though states that the purpose of the test fire was to compare the test fired cartridge casings and projectiles with the Taft cartridge casings and projectiles, right?

            MR. TALLBERG:  Objection to form.  You can answer.

A.    If that is what his statement is saying.  He asked that particular question.

Sanders, Gale & Russell
(203) 624-4157

PL0000556

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 149

Q.   Let's go back to the probable cause hearing testimony, page 132 at the bottom.  You see Dearington's question, "What tests did you perform, generally speaking, as far as the shell casings?"

See that question?

A.   Correct.

Q.   That is not a question about your purpose.  It is a question about what you did?  Yes?

A.   Yes.

Q.   Your answer is, "For the purpose of comparing those cartridge casings which were found at the scene at 810 Orchard Street it was necessary to have test fires taken from this particular firearm, which I did."

It goes on.  See that?

A.   It does go on.  Can you go further up in there?

Q.   I'm with you.  Let me know where you'd like to go.

A.   "And that company is located where"?

"In Belgium."

"Similarly, did you come into possession of certain casings as well as copper jacketed bullets, received from Detective Bennie Smith and seized by him at 810 Orchard Street on February 3rd?"

The answer to that was "Yes."

Sanders, Gale & Russell
(203) 624-4157

PL0000557

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 150

Q.   As we have established, several days before you got -- at least 3 days before K1 was found, you examined bullets and cartridge casings from 810 Orchard Street?

A.   Right.

Q.   Your testimony at the probable cause hearing is that the purpose of test firing K1 was to compare the test fires to the projectiles and the cartridge casings recovered from 810 Orchard Street, right?

MR. TALLBERG:  Objection to form.  The transcript says what it says.  You can answer.

A.   I am reading the transcript.  It is not clear to me as to the questioning as far as what was the firearm that had been tested and then the comparison made to the Taft homicide, because of the fact that I knew that the unique marks found on those cartridge casings were similar to the Taft homicide.

Q.   Was it your practice at the time to test fire every weapon at the New Haven Police Department recovered in the field?

A.   I believe so.

Q.   Going back to your -- sorry -- bench notes from the K1 homicide, Plaintiff's 36.  That is the seven pages of notes.  Let me know when you are there.

A.   Okay.

PL0000558

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 151

Q.   At the top right it says, "Date of Exam, 2/9/94," right?

A.   It does.

Q.   That means you performed your examination in this matter on February 9th of 1994, right?

A.   That is the notation.

Q.   As we previously established, at no later than February 8th of 1994, you had already concluded that the Taft shell casings matched those two 9 millimeter shell casings from the S&S Cafe, right?

A.   That is the date on the top of that report. That's correct.

Q.   By the time you are doing your examination of K1, you have in your mind that you have two unsolved 9 millimeter shootings very close to each other in New Haven that you have already concluded use the same firearm, right?

A.   I drew no conclusion at that point.

Q.   You had previously concluded that the two cartridge casings from the S&S and 15 from Taft came from the same firearm, right?

A.   That is what the report states.  That's correct.

Q.   So that is in -- that is work that you did the day before you examined K1, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000559

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 152

A.   If that is the date that is on there, unless it was a mis-transcription of the date.  It says 2/8.

Q.   When you sit down with K1, you have knowledge that there are two unsolved 9-millimeter shootings that you have already concluded are already linked to each other, right?

A.   By the fact that that report says that they were fired from the same gun, yes.

Q.   One of those two is, of course, the murder of an infant child in her home, right?

A.   It is.

Q.   Did you perform the test fire of K1 of your own accord or were you instructed to do it by someone?

A.   I don't recall.

Q.   At the time you performed the test fire of K1, did you have any knowledge of potential suspects in the Taft homicide?

A.   No.

Q.   When you test fired K1, you used some of the live 9-millimeter rounds that were recovered with K1 at the scene where K1 was found?

A.   I did.

Q.   You also used some ammunition belonging to the laboratory, right?

A.   I did.

Sanders, Gale & Russell
(203) 624-4157

PL0000560

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 153

Q.   You did -- for reasons that we will get into in some detail later, you found that you were unable to make an identification as to the projectiles themselves because, according to you, of an alteration in the barrel of K1?

MR. TALLBERG:  Objection to form.  You can answer.

A.   That's correct.  From the test fires that I took, that's correct.

Q.   But you did make an identification between the cartridge casings, test fired cartridge casings from K1 and the cartridge casings from Taft, right?

A.   That's correct.

Q.   Which in turn, based on your prior work, would also be an identification as to those two cartridge casings from S&S, right?

A.   Correct.

Q.   Going back to your probable cause hearing testimony, if I could direct your attention to page -- see it on the screen?

A.   I do.

Q.   If I could direct your attention to page 133, using the number at the top right, do you see where -- about the middle of the page, see where Attorney -- the questioning attorney asks, "And when you received that

Sanders, Gale & Russell
(203) 624-4157

PL0000561

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 154

weapon from Detective Grice, was there a magazine with it?"

See that question?

A.   I do.

Q.   That question and the next question, you understand that we are talking about K1 here, right?

A.   Yes.

Q.   Then you were then asked whether you compared those what are called hearing bullets but really cartridges from the magazine of K1 with the casings from the Taft homicide, right?

A.   That is what it says here, yes.

Q.   At the top of 134, it is your testimony that the head stamp area on the cartridge casings from the scene were all 9-millimeter Luger Winchester cartridge casings and the cartridge casings which were submitted with the firearm were 9-millimeter Luger Winchester cartridge casings.  See that?

A.   That's correct.  The nine cartridges -- the nine cartridges were submitted with the firearm were all 9 millimeter Luger.  That's correct.

Q.   This is all truthful and accurate testimony? Yes?

A.   Yes.

Q.   But what this testimony is saying is that the

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 155

nine live rounds recovered from the magazine in K1, like the cartridge casings recovered from the Taft scene, were 9-millimeter Luger size Winchester brand, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Yes.

Q.   Sorry.  Didn't hear.

A.   Yes.

Q.   That is a common brand of ammunition, as we discussed, right?

A.   Yes.  It was.

Q.   And 9-millimeter Luger is not unusual either, right?

A.   That's correct.  It is not.

Q.   Was there any significance to the fact that there were 9-millimeter Luger Winchester rounds in K1 and also at the Taft scene?

A.   I was answering the question that was asked to me by the state's attorney.

Q.   There was nothing remarkable about the cartridge casings recovered from the Taft scene or from the magazine of K1?  They were just regular 9-millimeter Luger Winchester rounds?

MR. TALLBERG:  Objection to form.  You can answer.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 156

A.   That is what I recall.  That's correct.

Q.   Continuing on to Page 135 of your probable cause hearing testimony, you see at the top of the page you were being asked if you received bullets from Detective Smith.  And you responded you received five.  See that?

A.   Yes, I do.

Q.   You understand that these are the five bullets recovered from the Taft homicide scene?

A.   Yes.

Q.   Then you were asked if you did a comparison between those and the bullets test fired from K1, right?

A.   Yes.

Q.   Further down the page, you were asked, "What was your conclusion?"  See that question?

A.   I do.

Q.   Your answer is, "My result was inconclusive.  The general rifling characteristics of the bullets were similar and the fact that they had six lines" -- meaning lands -- "and grooves, with a right hand twist."
     See that testimony?

A.   I do.

Q.   That is truthful and accurate testimony?

A.   Yes.

Q.   You'd expect the General Rifling

PL0000564

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 157

Characteristics of a built fired from the same firearm to be the same, wouldn't you?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Yes.

Q.    Then you continue on by saying, "And the lines and groove measurements were somewhat similar in their size although the, and the fact that structure of the bullets were also full metal case and 9-millimeter caliber."  See that testimony?

A.    I do.

Q.    This is truthful and accurate testimony?

A.    It is.

Q.    What you are saying here is that the land and groove measurements of the five Taft bullets were somewhat similar to the land and groove measurements of the K1 test fire bullets?

A.    I believe.

Q.    You would expect the land and groove measurements of the same kind of ammunition fired from the same gun a week later to be the same, right?

A.    Yes.

Q.    What was the basis of your testimony that they were somewhat similar?

A.    These particular bullets -- this is talking

PL0000565

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 158

about the examination of those bullets themselves being consistent to each other, but I was unable to make an identification -- excuse me one second.

I was unable to make an identification to the test fires based on the difference -- what I saw to be a difference between the land and groove impressions.

Q.    This question is asking you about any conclusions that you drew from your comparison between the test fired K1 bullets and the Taft bullets, right?

A.    May I have a moment?  I will go back and read that one more time.

The question above there, did you make a comparison with the bullets -- these bullets and the test fires from the gun for the purpose of determining whether the bullets at the scene -- whether you could make or draw a conclusion that the bullets at the scene were fired from that gun.

I said yes, I did, and my results were inconclusive.

Q.    This answer here, you say the results were inconclusive.  You go on to explain why?

A.    Yes, I do.

Q.    So going back to your bench notes from K1. This is Plaintiff's 36.

(Petitioner's Exhibit 38:  Marked for

Sanders, Gale & Russell
(203) 624-4157

PL0000566

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 159

Identification - described in Index.)

Q.   Going to page 5.  See the note here on page 5?

A.   I do.

Q.   This says it is a cross comparison, right?

A.   Correct.

Q.   Here you are indicating that the 15 shell casings from the Taft scene were fired from K1, right?

A.   Yes.

Q.   That the two -- those two 9 millimeter shell casings from the S&S Cafe scene we have been discussing were also fired from K1?

A.   That's correct.

Q.   When you test fired the K1, you didn't actually make any measurements of the lands and grooves of the test fires, did you?

A.   It is marked on the test fire worksheet.

Q.   We will get there in a second.  You fired nine rounds from K1, right?

A.   Four.

Q.   You used five of the --

A.   No.  Used four from the submitted firearm and for from laboratory ammunition.  Total of eight.

Q.   You fired those into a water tank that is used for this purpose, right?

A.   Yes.

PL0000567

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 160

Q.   And the point of the firing into the tank is that there are no -- there is no damage or alterations caused to the bullet from hitting another object, like a wall or person, right?

A.   That's correct.

Q.   There is nothing preventing you from measuring -- withdrawn.

There was no damage to any of the eight test fired results from K1, was there?

A.   Not that was noted.  No.

Q.   Were you able to measure the lands and grooves on each of them?

A.   I didn't measure all the test fires.  Just have two measurements down, 63-thousandths for land and --

Q.   You are taking that from a document titled "Firearms Worksheet," right?

A.   Yes.

Q.   We will get there in a moment.  How many test fired bullets did you measure the lands and grooves of?

A.   I don't recall.

Q.   Let's go to the firearms worksheet.  I am going to share with everyone what I have marked as Plaintiff's 38.

(Petitioner's Exhibit 38:  Marked for

Sanders, Gale & Russell
(203) 624-4157

PL0000568

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 161

Identification - described in Index.)

Q.   Do you have this document in front of you?

A.   Yes.

Q.   Looking at the firearms worksheet, you made reference to land width 63, groove width 113, which are marked here on this worksheet?

A.   Yes.

Q.   Were those an individual land and individual groove that you measured, an average of measurements that you took, or something else?

A.   I don't recall, sir.

Q.   Where it says "method used" to the right, that means you used a micrometer?

A.   Yes.  Micrometer.

Q.   You measured the barrel of K1?

A.   Yes, I did.

Q.   How did you do that?

A.   I don't recall.

Q.   When you conducted an examination of this nature, you would disassemble the firearm?

A.   Correct.

Q.   Sorry.  Didn't hear.

A.   Correct.

Q.   You would take the barrel off?

A.   Yes.

PL0000569

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 162

Q.   Irrespective of what tool you used to make the measurement, am I correct that that length there goes from the muzzle to the breech face?

A.   Correct.

Q.   Did you see where it says, "Cylinder magazine capacity, 13 damaged on floor plate"?  See that?

A.   I do.

Q.   Why did you note -- what was the nature -- what is the floor plate?

A.   The base of the magazine.

Q.   What was the nature of the damage you observed?

A.   I don't recall.

Q.   Why did you note the damage to the floor plate?

A.   Because there was some damage there.

Q.   What, if anything, was the potential significance of that?

A.   Could you repeat that?

Q.   What, if anything, was the potential significance of the damage to the floor plate?

A.   Depending upon how severe the floor plate is damaged, whether it would function properly or not.

Q.   Going down toward the bottom of the page, toward the very bottom you indicate that the K1 will not

PL0000570

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 163

fire without magazine inserted.  See that?

          A.   I do.

          Q.   What was the potential significance of that?

          A.   Has a magazine safety.  Has to have a magazine submitted before it can fire.

          Q.   That something that is your practice to test on every weapon you test fire?

          A.   In this case, if that particular firearm in testing it didn't function without a magazine in it, you would check to see if it would fire with a magazine. And in this case it does fire with a magazine.  Had a magazine safety disconnect.

          Q.   You noted here that 14 cartridges can be placed in the magazine?

          A.   Yes.

          Q.   The reason that you noted that was that you knew that there had been 15 cartridge casings recovered from the Taft homicide?

          A.   There were.  Yes.

          Q.   You knew that different witnesses to that homicide had claimed that the firing was uninterrupted?

          A.   I don't know what the witnesses -- nothing about the witnesses.

          Q.   You knew that whether the magazine could hold 14 cartridges was significant to whether K1 could have

Sanders, Gale & Russell
(203) 624-4157

PL0000571

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 164

been used at the Taft homicide scene?

A.   Yes, the reason being if there are 15 cartridge casings, then if you can't fit 14 in the magazine, that would mean that this person would have had to have reloaded.

MR. TALLBERG:  Objection to form.  You can answer.

A.   There is that possibility.  That's correct.

Q.   When you were trying to figure out whether 14 cartridge casings -- cartridges could fit in the magazine, you were doing that for the purpose of evaluating whether K1 would have been the 810 Orchard Street murder weapon?

A.   That might have been a thought.  That's correct.

Q.   Why didn't you test fire the weapon with 14 cartridges in the magazine?

A.   There would be no need to test fire the 14 cartridges.

Q.   You actually went and pulled the part of the manufacturer's manual or handbook for this particular model of weapon?

A.   Right.

Q.   What you were looking for there was what the manufacturer's recommendation was as to how many

Sanders, Gale & Russell
(203) 624-4157

PL0000572

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 165

cartridges could loaded in the magazine at one time, right?

A.   Yes.

Q.   The manufacturer's manual indicated that 13 is what was recommended?  Under some circumstances might be able to fire 14?

A.   That's correct.

Q.   You knew that this distinction was significant to the reality of the events at the Taft homicide where there were 15 cartridges discharged?

A.   Yes.

Q.   Why not test whether this particular firearm could effectively fire with 14 cartridges in the magazine?

A.   I test fired for the purpose of testing the cartridges.  The eight cartridges that I did test, the firearm fired and functioned properly.  I loaded the magazine and tested it for being able to load 14 cartridges in it, which I did.  It wasn't necessary for me to fire it with the fully loaded magazine.

Q.   Why?

A.   Wasn't necessary for the examinations that I was doing.

Q.   You knew that 14 was one more than the manufacturer's recommendation, right?

PL0000573

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 166

A.   There is that possibility by the manufacturer specifications.

Q.   You were testing to see whether this specific magazine would hold 14?

A.   I did do that.

Q.   The reason you were testing that was to see whether this specific magazine plus one in the chamber would have been enough to discharge the 15 rounds that were recovered from the Taft homicide scene?

A.   It was capable of holding 14 cartridges in the magazine.

Q.   Whoever went to the Taft homicide scene and fired those shots didn't just hold the cartridges and the magazine?  They fired them, right?

A.   A person did fire the cartridges.  That's correct.  Someone fired that gun.

Q.   Why not test whether this firearm and this magazine was capable of firing 15 rounds as were discharged at the Taft homicide?

A.   I have no answer for that other than the fact that I loaded the magazine with 14 cartridges.

Q.   Did you consider whether to test fire with the 14 in the magazine?

A.   I don't recall.

Q.   The identification that you ultimately made

Sanders, Gale & Russell
(203) 624-4157

PL0000574

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 167

between the test fired cartridges from K1 and the 15

cartridges recovered from the Taft homicide was based on

the primer breech face marks, correct?

    A.   Yes.

    Q.   Which are what you have often referred to as

"PFBMs" in your notes that we have looked at today?

    A.   Yes.

    Q.   What did the primer breech face marks that you

saw on the test fired cartridges from K1 look like?

    A.   I don't recall, but I believe they were

parallel marks.  I don't recall.  I don't have any

independent recollection at the present time.

    Q.   You don't have any notes describing those

breech face marks in any way, do you?

    A.   Just the notes from the comparison.

    Q.   But the notes from the comparisons don't say

anything about what the breech face marks look like?

    A.   No.  It does not describe it.

    Q.   Doesn't say they are parallel, circular, or

otherwise?

    A.   No.  It doesn't.

    Q.   Were they continuous right across the surface?

Were there breaks?

    A.   I don't recall.

    Q.   Do you know what the number of breech face

PL0000575

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 168

marks that you observed on each cartridge was?

A. There was sufficient agreement between the individual marks that I did find on there. We don't put a number assigned to it.

Q. I am not talking about the degree of agreement. Just talking about did you have any sense of how many marks there were, what number, ballpark?

A. No, sir. I do not.

Q. Do you know whether they were symmetrical or asymmetrical?

A. No, I don't.

Q. Do you know whether there was any evidence of after-mark defects from rust corrosion or anything like that?

A. I don't recall, sir.

Q. Before you made your identification between the K1 test fired cartridges and the Taft cartridges, what, if anything, did you do to determine whether subclass characteristics were present?

A. I don't recall.

Q. As we discussed earlier, we now know certain kinds of manufacturing processes are more likely than others to produce subclass marks?

A. That's correct.

MR. TALLBERG: Objection to form. You

PL0000576

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 169

can answer.

Q.   You didn't know that at the time, did you?

A.   At the time of my examination?

Q.   Yes.

A.   No, sir.

Q.   "No, sir" meaning I'm wrong, or "no, sir" meaning "I did not know that"?

A.   I did not know meaning -- you should restate your question.  Maybe I am answering the wrong one.

Q.   Did you know at the time you performed your examination of K1 in February of 1994 which kinds of manufacturing processes were more likely to produce subclass characteristics than others?

A.   I don't recall.

Q.   Did you have any training in that at any point prior to February 9th of 1994?

A.   I don't recall, sir.

Q.   At the time you test fired K1, you had no knowledge of the manufacturing process that was used to create the breech face of a Browning Hi-Power 9 millimeter correct?

A.   That's correct.

Q.   Therefore, it follows that you had no knowledge of whether that manufacturing process was or was not likely to produce subclass marks?

Sanders, Gale & Russell
(203) 624-4157

PL0000577

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 170

A.    That's correct.

Q.    Did you observe heavy chamber marks on the test fires from K1?

A.    I don't recall.  I don't recall.

Q.    Given there were heavy chamber marks on the Taft cartridge casings, you would have expected there to be heavy chamber marks on the K1 test fires if K1 had fired the cartridges found at the Taft scene, right?

A.    That's a fair statement to make.  That's fair.

Q.    Did you compare firing pin impressions between the K1 test fires and the Taft cartridges?

A.    No, sir.  I have no notations of that.

Q.    Did you compare extractor marks between the K1 test fires and the Taft cartridge casings?

A.    I don't recall, sir.

Q.    Were there subclass characteristics present on the cartridge casings test fired from K1?

A.    I don't recall.

Q.    There is nothing in any of the notes you made of that examination or the reports that you completed of that examination that would tell you there weren't, is there?

A.    No.  There is not.

         MR. LIEB:  Let's take a break.

         (Recess:  3:47 to 3:57 p.m.)

Sanders, Gale & Russell
(203) 624-4157

PL0000578

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 171

Q.   Sitting here today, you have no specific recollection of any steps that you took to rule out the -- off the record.

(Off the record discussion.)

Q.   Restarting that question.  Sitting here today, you have no specific recollection of any steps that you took to rule out the presence of subclass characteristics in K1, correct?

A.   That's correct.

Q.   I didn't hear that.

A.   Just repeat the question.

(Off the record discussion.)

Q.   Sitting here today, you have no specific recollection of any steps that you took to rule out the presence of subclass characteristics in K1, correct?

A.   That is correct.

Q.   As we discussed earlier, by the prevailing scientific standards governing the field today, if you are going to make an identification, first you have to ascertain whether or not subclass characteristics are present, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   That is the recommended steps as of today. That's correct.

Sanders, Gale & Russell
(203) 624-4157

PL0000579

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 172

Q.   If it is true that you did not do anything to rule out the presence of subclass characteristics in K1, then this identification that you made would not be a valid identification under today's standards right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I disagree with that.

Q.   Why?

A.   Because you don't have -- there can be individual marks that have existed over the subclass that makes them still available to make an identification based on the breech face.

Q.   It is possible to have individual markings that can form the basis for an identification even where subclass characteristics are present, right?

A.   That's correct.

Q.   But in order to make an identification under those circumstances, you have to know which of the markings are the individual characteristics and which are the subclass characteristics, right?

A.   That's the recommendation today.  That's correct.

Q.   If you didn't do anything to ascertain whether there were subclass characteristics present, it would not be possible under the prevailing standards today to

PL0000580

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 173

make any identification, right?

MR. TALLBERG:  Objection to form.

A.    I disagree with that statement.

Q.    How can you differentiate the individual characteristics from the subclass characteristics if you don't even know whether any subclass characteristics are there?

A.    If none exist, then the identification is based on those individual marks that are found there. If they do exist and there is individual marks that occur along with those subclass characteristics, identification can still be made.

Q.    In order to proceed down either of those paths, you have to know in the first instance whether subclass characteristics do or do not exist on what you are examining, right?

A.    That's the recommendation as it stands now.

Q.    Do you disagree with that recommendation?

A.    We have come 27 years past the time at which this case took place.

Q.    If you were doing this examination today, in order to make an identification, you would have to first decide whether there were subclass characteristics present or not?

A.    That would be suggested.  That's correct.

PL0000581

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 174

Q.   That is not what you did back in 1994, right?

A.   Not that I recall.  That's correct.

Q.   That's because the state of the science was different at the time, right?

A.   It was.  That's correct.

Q.   There have been no scientific developments in this field we have learned since 1994 that would cause an examiner to do this examination that you did differently today, right?

A.   Potentially, that's correct.

Q.   Did you make any notes about any of the marks you observed on the test fired -- test fired cartridge casings from K1?

A.   I see them here.

Q.   Separate and apart from looking at what is in front of you, do you have any awareness of having done that?

A.   No, sir.  I don't recall.

Q.   Why not?

A.   I don't recall, sir.

Q.   I want to go back to something we did earlier briefly.  Pulling back up what is -- I am not going to ask you to look at it any detail.  I don't think you need to retrieve the document in paper, although you are certainly free to if you want.

PL0000582

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 175

Pulling back up for a second, to orient you, Petitioner's 33, which is the second GRC query that you ran for the Taft examination where you took out the 9 millimeter cartridge parameter. Remember discussing that earlier?

A.   I do.

Q.   That got you a more expansive list of results that were not limited to 9 millimeters but also included .357 Magnums and .38 automatics?

A.   It did.

Q.   Could the cartridge casings discharged at the Taft homicide scene have come from a .380 automatic?

A.   No.

Q.   Why not?

A.   The length of the cartridge case is different than that of a .380.

Q.   Could they have come from a .380 Smith & Wesson?

A.   Different bullet diameter, different size, different cartridge case length. Not meant to be fired in a 9-millimeter.

Q.   It is under some circumstances actually possible to fire a 9-millimeter from a .38 Smith & Wesson, isn't it?

A.   That -- I am not familiar with it.

Sanders, Gale & Russell
(203) 624-4157

PL0000583

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 176

Q.   What about a .357 Magnum?  Could the cartridge casings found at the Taft homicide scene have come from a .357 Magnum?

A.   Cartridge casings, no, sir.  Different cartridge casings.

Q.   Could the projectiles found at the Taft homicide scene have come from a .380 automatic?

A.   Different bullet weight.  .380s are lighter in weight than that of a 9-millimeter.  Same caliber, but different weight, bullet weight.

Q.   Is it possible under some circumstances to fire the projectiles fired at the Taft homicide scene from a .380 automatic?

A.   No, sir.  The cartridge case is too long to fit into a .380 automatic.

Q.   Is it possible under some circumstances to fire the projectiles found at the Taft homicide scene from a .38 Smith & Wesson?

A.   I believe I answered that.  I'm not sure.  I'm not familiar with that.  That's a revolver.

Q.   How does the damage to the floor plate or how can the damage to the floor plate affect the functioning of the firearm?

A.   Could affect the spring within the magazine itself.

Sanders, Gale & Russell
(203) 624-4157

PL0000584

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 177

Q.    What does the floor plate do?

A.    Retains the spring that is in the magazine itself that is used to rise the cartridges up through the magazine.

(Petitioner's Exhibit 39:  Marked for Identification - described in Index.)

Q.    This is going to be the GRC query for Browning 9-millimeter .38s from 12/12/53.  That is a time stamp.

A.    Yes, sir.  I see it.

Q.    Sharing what has been marked as Plaintiff's 39.  Earlier we discussed the fact that the GRC database had a date of 2/3/94 for an examination that you performed on February 4th.  Do you recall that?

A.    Correct.

Q.    Would you infer from the fact that this date says February 8th that you actually did this query on February 9th when you were examining K1?

A.    If the date stamp is off, that's fair.

Q.    You ran a general rifling characteristics query for Browning 9-millimeter cartridge 38-caliber at or around the time that you examined K1?  Is that right?

A.    Yes.

Q.    In doing that you were trying to figure out whether a Browning was consistent with the measurement that you had taken from the Taft homicide, right?

PL0000585

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 178

A.   Yes.

Q.   And when you ran this query, what, if any, conclusion did you draw from the results?

A.   There were numerous Browning semiautomatic pistols and 9-millimeter Luger calibers.  There was only one that was close to being considered by the General Rifling Characteristics.

Q.   When you say "numerous," dozens, right?  There are dozens of results that come up here on this -- for this query?

A.   However many pages there are, that's correct.

Q.   What, if any, significance did you attach to the fact that there were numerous results but only one that was close to the physical measurements that you observed from the Taft projectiles?

A.   I made no significance from it.

Q.   Presumably there was something you wanted to learn by making this query, right?

A.   Correct.

Q.   The fact that there was only one result that was even close to the Taft measurements could be understood as suggesting that maybe the Taft homicide weapon wasn't a Browning, right?

A.   The reason for running a GRC was to determine whether there were any Brownings that had those similar

PL0000586

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 179

consistent markings, similar class characteristics that I had been examining. And I found one in that list of all those particular firearms. And it is on page 1 toward the bottom.

Q.   Which one is that?

A.   The one that is 66118.

Q.   There is one entry that has a minimum land within 66 and a maximum of 68, and a minimum of 118 and maximum of 120, correct?

A.   Correct.

Q.   Those two lines are all one entry?

A.   That is what appears to be there, yes.

Q.   The sequence there is -- just so I know we are talking about the same entry -- Sequence Number 13469. Is that right?

A.   Yes.

Q.   That is the one single entry you found that listed dozens of Brownings that had General Rifling Characteristics close to the observed characteristics from the Taft projectiles, right?

A.   That's correct.

Q.   There is a column at the top that is labeled "EJR." See that?

A.   That's correct.

Q.   That refers to the ejector marks?

PL0000587

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 180

A.    Correct.

Q.    There is a -- some of the entries in that column are populated with a number, right?

A.    There are.

Q.    And that number refers to the location of the ejector as if you were reading a clock, right?

A.    That's correct.

Q.    In that entry that we were just referring to, Sequence Number 13469, that indicates that the ejector from that firearm is located at 7 o'clock, right?

A.    That is what it is indicated here.

Q.    Such that the ejector marks from a cartridge casing discharged from that firearm would also be replicated on the cartridge at 7 o'clock, right?

A.    If it had been properly entered, that's correct.

Q.    The ejector from K1 is at 9 o'clock, right?

A.    That's correct.  That is what I noted.  That's correct.

Q.    The one entry on this GRC search that you did for Brownings that comes close to the General Rifling Characteristics from the Taft projectiles does not match the General Rifling Characteristics of K1, right?

A.    The rifling characteristics that I had here were 63-thousandths and 113-thousandths.  If we used the

Sanders, Gale & Russell
(203) 624-4157

PL0000588

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 181

GRC plus or minus three or five, that brings it up to 69 and 118, plus or minus five.

Q.   Land width and groove width are not the only kind of General Rifling Characteristics, right?

A.   That's correct.

Q.   General Rifling Characteristics also include the location of the extractor on the ejector?

A.   That's correct.

Q.   That is why there are entries for those things in the General Rifling Characteristics database, right?

A.   If they are properly inputted into the system, that is correct.

Q.   You'd agree with me that this one entry that you found that was close to the General Rifling Characteristics of the Taft projectiles is inconsistent with the General Rifling Characteristics of K1, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I think they are close.

Q.   The ejector being at seven and the ejector being at nine are different, right?

A.   The location as to what the person has determined what that location was in the firearm itself. Again, it is what the person has interpreted it as being what seven is and what nine is.

Sanders, Gale & Russell
(203) 624-4157

PL0000589

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 182

Q.   The whole premise of this database depends upon the idea people are entering things accurately, right?

A.   You are correct.

Q.   We never know whether whoever made any of these entries did it right?  There is also always the possibility of data entry error in any of the entries in the GRC database?

A.   That's correct.

Q.   You'd agree with me if one firearm has the ejector located at 7 o'clock and another firearm has the ejector located at 9 o'clock, those two firearms do not have the same General Rifling Characteristics, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   The rifling characteristics -- the size of the lands and grooves are what the predominant examiner is looking at.  Those are put in there so that people put in the extractor and ejector.  That is why you probably don't see a lot of extractor and ejector marks in there. People aren't making those notations when they are making entries in the GRC database.

Q.   I understand you to be saying that extractor and ejector locations may be less important or less widely noted or less salient General Rifling

Sanders, Gale & Russell
(203) 624-4157

PL0000590

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 183

Characteristics.  But I'd like you to answer the question, which is, if one firearm has an ejector located at 7 o'clock and another firearm has an ejector located at 9 o'clock, do those firearms have the same General Rifling Characteristics?

MR. TALLBERG:  Objection to form.  You can answer.

A.  In part they do.

Q.  But not in whole, right?

A.  That's correct.

Q.  The location of an ejector is a class characteristic, right?

A.  Characteristic of the firearm, that's correct.

Q.  A class characteristic that is determined prior to the manufacture by the designer of the weapon?

A.  That's correct.

Q.  As we have discussed, if two firearms do not have the same class characteristics, you cannot make an identification between the two, right?

A.  We are dealing with extractor cartridge casings.  The bullets are on the lands and grooves. Ejector and extractor are on the cartridge casings.

Q.  If you know that either of the bullets or the cartridge casings produced by one firearm have different class characteristics -- withdrawn.

Sanders, Gale & Russell
(203) 624-4157

PL0000591

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 184

When you ran the query from -- you just indicated a moment ago that 66 to 68 and 118 to 120 are within plus or minus five of the measurement that you said you took from K1, right?

A.   Correct, which were 63 and 113.

Q.   They are not within plus or minus five of 64 and 112, right?

A.   69 would put it up to one above the 68 and two above the 66.  And the 113 is under the 112.  118 is correct.  It is under the 112.

Q.   Just to make sure I get a clean answer, this entry here -- hang on a second.  You'd agree with me that sequence Number 13469 is not within plus or minus five of 64 and 112, right?

A.   It is plus or minus five of that.  In other words, if the rifling characteristics were 66, plus or minus five would either be 61 or --

Q.   No.  You ran a query in connection with the Taft homicide where you put -- as we discussed, the most common measurement that you got from the Taft was 64 and 112, right?

A.   Correct.

Q.   So if you add five to 112, you get 117?

A.   Correct, which is one-thousandth off.

Q.   You'd agree with me if you are putting a plus

Sanders, Gale & Russell
(203) 624-4157

PL0000592

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 185

or five margin of error around 64 and 112, you are not going to get this result found in Sequence 13469, right?

A.   One-thousandth difference -- one-thousandth of an inch difference.

Q.   I am correct?  It is not going to come up, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   You are correct.

Q.   When you saw this sequence Number 13469 here that you say was similar, what did that make you think?

A.   That there was at least one firearm on the GRC database that was consistent by GRC.

Q.   Did you document that anywhere?

A.   No, sir.

Q.   You thought that the results of this Browning query here were helpful to your analysis that you were performing as a firearms examiner, right?

A.   That's correct.

Q.   You thought they were reinforcing your conclusion that the Taft homicide projectiles came from K1, right?

A.   I didn't need the GRC database to tell me after the examination of the cartridge casing -- to make a determination that that was the particular

PL0000593

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 186

firearm, nor on the bullets, the bullets themselves. The bullets were damaged from the test firing because the actual barrel was damaged itself.

Q.   Irrespective of whether you needed it, you thought these results, because there was this one similar entry, were supportive of your conclusion, right?

A.   Just showed there was one in the general rifling characteristics.

Q.   Showed this was possible at all in your view, right?

A.   That's correct.

Q.   If K1 was actually the murder weapon at 810 Orchard Street in the Taft homicide, you'd expect there to be some entry of these dozens and dozens of Brownings that was close, right?

A.   Not necessarily.

Q.   Why did you do it?

A.   Because I wanted to see what the rifling characteristics, the General Rifling Characteristics, put out.  We didn't have a list, as you suggested before.  There was no Browning on any of the other lists.  So the list was run to see if there was anything there.

Q.   The fact that there was no Brownings on any of

PL0000594

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 187

those other lists was an open question in your mind,
right?

A.    That goes to the caveat may have been fired
from but not limited to.

Q.    But you wanted to know, right?  Because now
you have a Browning, and you think this is the Taft
homicide murder weapon.  You want to know, do the
general rifling characteristics say this really could be
a Browning or not?  That is what you are trying to
figure out?

A.    There could be others out there too.  They
just weren't inputted into the system.

Q.    Let's talk about the alteration of the barrel
of K1.  You concluded that the barrel of K1 had been
altered by the insertion of an implement of some kind
into the muzzle end, correct?

A.    That's correct.

                 (Petitioner's Exhibit 40:  Marked for
Identification - described in Index.)

Q.    It is the trial testimony.  If you could pull
up the trial testimony, please.

                 MR. TALLBERG:  This would be the
transcript that starts at page 641?

                 MR. LIEB:  Yes.

A.    I have it.

Sanders, Gale & Russell
(203) 624-4157

PL0000595

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 188

Q. I am going to go to page 672 please. Starting at the bottom of 671. Can you let me know when you are there?

A. Okay.

Q. Do you see that there is a question at the very bottom of 671, "Now can you tell us how far down the end of the barrel those markings appeared?"

Do you see that?

A. I do.

Q. At the top of page 672 you answer, "Some of the marks start right at the muzzle of the barrel itself. The majority of all the markings which were found on the barrel are three-quarters of an inch to an inch into the barrel."

See that answer?

A. I do.

Q. That was truthful and accurate testimony?

A. It was.

Q. The majority of the marks inside the barrel of K1 were found three-quarters of an inch to an inch into the barrel, right?

A. Yes.

Q. All of the marks were concentrated toward the muzzle end?

A. That's correct.

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 189

Q.   There was no damage to the chamber or breech face?

A.   I found none.

Q.   There are a couple of pages of photographs of barrels, which I am going to turn to right now.  If you can look for those.

A.   I have it.

(Petitioner's Exhibit 41:  Marked for Identification - described in Index.)

Q.   Let me pull up the photograph I want to show you on the screen.  Can you see on your screen what has been marked as Plaintiff's 41, which is basically a piece of paper with two Polaroid photos on it?

A.   Yes.

Q.   I am going to try and zoom in on the top photo so you can see it adequately on your screen.  Can you see the top photo of this on your screen?

A.   Yes.

Q.   A photo of the barrel of K1?

A.   It is.

Q.   Depicts some of the damage to the bore you concluded was caused by the insertion of an implement?

A.   That's correct.

Q.   The marks are circumferential, meaning they go around the barrel?

Sanders, Gale & Russell
(203) 624-4157

PL0000597

Electronically signed by PATRICIA SAYA (501-398-304-5455)            1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 190

A.   In both directions.

Q.   There were also some linear marks?

A.   There were.

Q.   You made a Mikrosil cast of the barrel, correct?

A.   I did.

Q.   That was for the purpose of preserving or examining these marks?

A.   That's correct.  Show the condition of the bore.

Q.   How did you -- how do you make a Mikrosil cast of the barrel?

A.   Mixture of two polymers together, and then it is pushed into the barrel itself.  And then once it is hardened, those can be pulled out, and gives you an idea of what the interior of the barrel looks like.  In this case I did both the chamber and the barrel.

Q.   There is no way for you to tell as a tool mark examiner just by looking at these marks on the bore when they were made, right?

A.   That's correct.

Q.   You have no scientific way of determining the age of these marks on the bore, right?

A.   No.  That's correct.

Q.   As we have discussed, you concluded that this

Sanders, Gale & Russell
(203) 624-4157

PL0000598

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 191

marking of the bore of K1 affected the rifling impressions that were left on the test fired bullets, right?

A.    The test fire bullets were marked during the test firing process itself.  I was able to test fire bullets through the firearm itself through the obliterations.

Q.    You were unable to make an identification between the Taft bullets and the test fired bullets, right?

A.    That's right.

Q.    You attributed that inability that to do so to the damage that was made to the bore, right?

A.    That's correct.

Q.    For that reason, you postulated that the damage to the bore occurred between the Taft homicide and the recovery of K1 by the New Haven Police, right?

A.    Yes.

Q.    You'd agree with me that if this damage to the bore of K1 was made before February 3rd of 1994, then K1 cannot have discharged the bullets found at the Taft homicide, right?

A.    Just repeat that last part again.

Q.    If this damage to the bore of K1 occurred before the Taft homicide on the night of February 3rd,

PL0000599

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 192

1994, then K1 didn't fire the bullets found at the Taft homicide scene, right?

A.    We don't know when this damage occurred to the particular firearm, before or after.

Q.    You observed differences between the Taft bullets and the K1 bullets that you attributed to this bore damage, right?

A.    That's correct.

Q.    But if the bore damage had been there before the Taft homicide, you would have seen those same issues on the Taft bullets too, right?

A.    But it would also -- at that point what I would be examining are those bullets fired from that particular firearm at that particular time for the purpose of examination against those bullets, if we had had the gun at that particular moment, at that particular time.

Q.    But if it is true that if K1 was damaged in 1993, bore damage occurred in 1993, and K1 actually had been fired at 810 Orchard Street, resulting in the death of Danielle Taft, then the bullets recovered from 810 Orchard Street would have whatever rifling disruption you observed in the test fires of them, right?

A.    If fired at the time of that homicide.

Q.    It follows then that in order for K1 to be the

PL0000600

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 193

Taft murder weapon, these alterations to the bore have to have been made after the Taft homicide, right?

A.    That's correct.

Q.    If these alterations to the bore were made before the Taft homicide, this is not your murder weapon, right?

A.    If I was able to make the comparison to the bullets, that's correct.

Q.    You concluded these alterations were made for the purpose of making it harder for firearms examiners to do their job basically, right?

A.    The alterations of the barrel itself would interrupt the normal land and groove impressions that are there.

Q.    Did you think these alterations to the barrel were an accident?

A.    No.

Q.    You thought someone deliberately put something in there to try and alter the firearm to prevent it from being identified for some reason, right?

A.    With the amount of marks that were in there, yes.

Q.    Which is something that sometimes people who are using firearms for unlawful purposes will do to try and avoid detection, right?

PL0000601

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 194

A.   In my entire career, I'd only seen two guns that had altered barrels in this fashion.

Q.   If it is true that someone was altering this barrel for the purpose of avoiding detection, they would have done a much better job if they had damaged the breech face, right?

A.   If they had gone that far, that's correct.

Q.   And they would also would have done a better job if they had damaged the chamber potentially?

A.   You are correct.

Q.   Whatever or whoever did this, whatever they stuck in the barrel, it didn't go very far down, right?

A.   Three-quarters from the muzzle end to three-quarters of an inch to an inch in the barrel is quite a distance into the barrel itself of the muzzle into the barrel.

Q.   It is about an inch into the muzzle end of the barrel, right?

A.   That's correct.  An inch barrel length was four and three-quarters inches.

Q.   Between 20 and 25 percent of the way into the barrel?

A.   That's correct.

Q.   Are you familiar with what a squib round is?

A.   I am.

PL0000602

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 195

Q.   What is a squib round?

A.   Round that doesn't have enough force to make the bullet travel through the barrel.

Q.   Gets stuck in the barrel, right?

A.   That's correct.

Q.   What is the proper technique for removing a squib round from a barrel?

A.   As a firearms examiner, you'd use a wooden dowel for the purpose of removing it from the barrel itself.

Q.   Stick something in the barrel to try and get it out?

A.   That's correct.

Q.   If you are doing it properly, you would use something that is softer than the barrel, such as wood, to avoid any potential damage, right?

A.   That's correct.

Q.   If you didn't know what you were doing and you were trying to remove a squib round, you might stick something metal in there that could damage the barrel, right?

A.   I can't determine what someone else would do.

Q.   What about cleaning out gunpowder residue or lead?  How do you go about doing that if you need to do that to clean your weapon?

PL0000603

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 196

A.    Soft brass brush.

Q.    Sometimes a brass brush can leave marks in the bore, right?

A.    That is why they recommend a brass brush, because it is softer than the metal on the interior on the barrel itself.

Q.    If you don't use a brass brush, you use another wire brush, you can damage the bore, right?

A.    You could.

Q.    Going back to your trial testimony for just a minute. I want to go to page 672, please. This is just after the question and answer we discussed earlier, where you explained that the markings were three-quarters of an inch to an inch into the barrel.

Do you see the next question, line 5, page 672, "Are you able to determine what type of implement would cause those markings?"

See that question?

A.    I do.

Q.    You answered, "I drew no conclusions as to the type of implement." See that testimony?

A.    I do.

Q.    That is truthful and accurate testimony, that you did not draw any conclusions as to the type of implement that marked the bore of K1, right?

Sanders, Gale & Russell
(203) 624-4157

PL0000604

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 197

A.   That's correct.

Q.   You tried to figure that out, right?

A.   I don't recall doing that, sir.

Q.   This is something else we are going to use the original for.  Can you take your marble composition book and open it to what I believe should be the second of two pages flagged with a paper clip?  The first entry on the top left-hand corner of the page would be for FA930124.  Is that what you have?

A.   Yes.

MR. LIEB:  Are we up to Petitioner's 42?

(Petitioner's Exhibit 42:  Marked for Identification - described in Index.)

Q.   Can you see on your screen a photograph of the page of the marble composition book to which I have asked you to open?

A.   I do.

Q.   Is this photograph a true and accurate copy of the two facing pages of your marble notebook?

A.   It is.

Q.   This marble notebook was a log that you kept of physical evidence that you inspected or examined in the course of your duties as a firearms examiner, right?

A.   That's correct.

Q.   And you made the entries here in the course of

Sanders, Gale & Russell
(203) 624-4157

PL0000605

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 198

performing your regular duties as a firearms examiner
for the NHPD, right?

A.   That's correct.

Q.   You made them at or around the time you
examined the evidence, right?

A.   That's correct.

Q.   It was your regular practice every time you
examined physical evidence to make an entry in this
book, right?

A.   Correct.

Q.   About two-thirds-ish of the way down the page,
there is in the left hand column there is "FA940057."
Let me know when you are at that line.

A.   I have it.

Q.   If you go over two columns, there is a column
that says "DOI."  See that?

A.   Yes.

Q.   Here for this entry it is February 16th of
'94.  Right?

A.   Correct.

Q.   What is DOI?

A.   Date of incident.

Q.   There is another column immediately to the
right that says "DOR."  What is that?

A.   Probably date of receipt or date received.

PL0000606

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 199

Q.   The purpose of your making these entries was to keep a chain of custody of the physical evidence that you received so that you knew when it came into and out of your possession and what you did with it?

MR. TALLBERG:  Objection to form.  You can answer.

A.   It was just a quick reference so if someone asked me a question, that I was able to go in here and try to find the information, basic information.

Q.   Next column after the dates is, "Shooting, Anthony Stevenson," right?

A.   That's correct.

Q.   Then in the next column, where there is the evidence, there are entries -- there is writing on two levels within that one line, right?

A.   Yes, there is.

Q.   The first thing there is "Browning" with a serial number?

A.   Yes.

Q.   That is K1, right?

A.   It is.

Q.   Then the next entry is, "One 6-inch regular screwdriver and one 3-inch Phillips screwdriver"?

A.   That's correct.

Q.   Those were items that the New Haven Police

PL0000607

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 200

Department had seized and had taken into evidence as having evidentiary value in connection with this K1 incident, right?

A.   That's correct.

Q.   You got those for the purpose of trying to figure out whether those two screwdrivers made the marks in the bore of K1, right?

A.   They were presented to me for that purpose, that's correct.

Q.   Who presented them to you for that purpose?

A.   I can't tell you that.  I don't have who submitted the physical evidence in there.

Q.   What did you do with the screwdrivers?

A.   They were returned to the property room.

Q.   While they were in your possession, what did you do with the screwdrivers to conduct the examination that you were tasked to perform?

A.   I don't recall.

Q.   You did something to compare these two screwdrivers to the bore of K1?

A.   I don't recall.

Q.   You concluded that these weren't the screwdrivers that made those marks, right?

A.   I don't think I ever made that assertion.

Q.   What did you conclude?

PL0000608

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 201

A.   I don't recall.

Q.   Certainly if you concluded that you thought these screwdrivers did make those marks, you would have testified to that at the trial, right?

A.   If that were the case, yes.

Q.   There was something about these screwdrivers that you found was not consistent with their having made the marks in the bore of K1, right?

A.   It is possible to test the interior of the bore without further destroying the interior of the bore, so it would be impossible to actually test those particular marks against those particular items.

Q.   You had the cast.  That is why you had the Mikrosil cast, was so that you could examine the damage to the bore, look at it and play around with it without damaging the bore?

MR. TALLBERG:  Objection to form.  You can answer.

A.   It was to demonstrate the alterations on the interior of the bore itself.

Q.   And it was entirely possible to take the screwdriver and see if the markings made in the Mikrosil cast were consistent with the head of these two screwdrivers that you examined?

A.   A test could be done to do that, but you run

Sanders, Gale & Russell
(203) 624-4157

PL0000609

Electronically signed by PATRICIA SAYA (501-398-304-5455)                  1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 202

the risk of damaging the tool itself and trying to make tests with the tool itself.  So I did not conduct -- as far as I know, I did not conduct any physical examination to determine those two -- those two particular items made the marks in the barrel.

Q.   You understood that it was a question of potential significance to someone at the New Haven Police Department whether these screwdrivers made those marks, right?

A.   Again, I don't know who brought them forward to me.

Q.   Irrespective of who it was, you understood that it was a matter of interest to that person whether these screwdrivers made those marks, right?

A.   Could have been as much of a question of could marks have been made from these types, two types of screwdrivers.

Q.   A 6-inch screwdriver would reach all the way to the breech face of K1, right?

A.   The breech face was at 7 and three-quarters inches.  The barrel was 7 and three-quarters inches. Yes, a 6-inch screwdriver -- if it was able to fit through the barrel and chamber, there was a possibility it could touch the breech.

Q.   The barrel was 4 and three-quarter inches?

PL0000610

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 203

A.   That's correct.

Q.   The 3-inch screwdriver wouldn't make it all the way to the breech face but would make it well past an inch into the bore, right?

A.   That's correct.

(Recess:  4:54 to 5:01 p.m.)

Q.   Going back briefly to Plaintiff's 39, Petitioner's 39, the Browning GRC query results, I think you can probably -- I am just going to ask one thing that requires you to look.  I suspect you can probably see it on the screen.

Do you see at the right-hand side next to the sequence number column, there is a column labeled "BOB"?

A.   I do.

Q.   And that is where the kind of breech face mark that the examiner observes is listed in this database, right?

A.   I am not familiar with that marking. Something that I wasn't used to looking at.

Q.   Have you heard the term "smooth breech face mark"?

A.   I have.

Q.   You have used earlier today the term "parallel breech face mark," right?

A.   I have.

PL0000611

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 204

Q.   And your testimony was that you believed that the breech face marks that form the basis of your identification in this case were parallel, right?

A.   And I think I retracted that and said I wasn't sure.  I didn't recall.

Q.   What is a smooth breech face mark?  What are smooth breech face marks?

A.   Breech that had been completely -- the surface of the breech itself was so smooth it didn't leave much marking behind itself.

Q.   Smooth breech face marks and parallel breech face marks are mutually exclusive?  If you have parallel breech face marks, it is not smooth?

A.   Again, unless something has happened to the breech to cause it to have parallel marks, abuse or wear of the firearm itself.

Q.   Irrespective of whether one firearm can produce parallel and smooth breech face marks at different points in its life span because of damage or what have you, just looking at -- if you are just looking at a particular set of marks on the head stamp of one cartridge casing, is it possible for those markings to be both parallel and smooth?

A.   Yes.  You could have some smooth -- could have some of those parallel marks across the area again.  I'm

Sanders, Gale & Russell
(203) 624-4157

PL0000612

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 205

sorry.

Q.  Did you take any photographs of the test fired cartridge casings from K1?

A.  No, I did not.

Q.  Did you take any photographs of the test fired projectiles from K1?

A.  No, I did not.

Q.  Why not?

A.  Because it wasn't asked of us that we did or I did.

Q.  Did you have access to equipment that could take a photographic image of what you were looking at through a microscope of the New Haven Police Department around 1994?

A.  No, I did not.

Q.  Are you familiar with the term "cognitive bias"?

A.  I have heard of it.  Heard talk about it.

Q.  You understand it to refer to the fact that as imperfect humans, our perception is sometimes altered without our realizing it by irrelevant factors that don't actually pertain to the situation at hand?

MR. TALLBERG:  Objection to form.  You can answer.

A.  I am not familiar enough with the term to

Sanders, Gale & Russell
(203) 624-4157

PL0000613

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 206

understand the whole "cognitive bias" meaning.  That's correct.

Q.   Have you heard the term "confirmation bias"?

A.   I have.

Q.   Do you have an understanding of what that means?

A.   If you told someone that a particular cartridge casing was fired from a particular firearm during their examination, before their examination process, they could walk in with that thought process. That would raise an identification bias based on that information they received prior to examining it.

Q.   It refers to, without realizing it, distorting our reasoning to emphasize factors that are consistent with an idea we already have in our head and de-emphasizing information that is inconsistent with it, right?

A.   That's different than what I heard of confirmation bias.

Q.   Sort of going with your example, the example that you gave is you would not want to tell an examiner before he is performing as an examination that someone came to the conclusion that this particular projectile was fired from this particular weapon, right?

A.   That's correct.

PL0000614

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 207

Q.   That is because you would not want the examiner to consciously or unconsciously get -- have his conclusions affected by this information, right?

A.   Yes.

Q.   You don't want to expose the examiner to information that he doesn't need to know that might bias him toward a particular conclusion one way or the other, right?

A.   That's correct.

Q.   And as a result of that, it is the standard practice, for example, in the state lab when you retired to minimize the amount of information that examiners have about the underlying facts of the crime when they perform an examination, right?

A.   I can't talk to anything about what took place at the Connecticut state lab.  I think that you were advised of that before, what examination processes took place at the Connecticut State Forensic Laboratory while I was an employee there.

Q.   I think I represented that I was not going to ask about the facts of the examination in the Horn and Jackson cases.  But my question is, when you retired from the state laboratory in 2014, was it the practice of the laboratory to minimize the amount of information that examiners had about the underlying facts of the

Sanders, Gale & Russell
(203) 624-4157

PL0000615

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 208

cases associated with the evidence they were examining?

MR. TALLBERG:  I need to interpose an objection.  It was my understanding from Attorney Finucane that because Mr. Stephenson is a defendant in his capacity as a state employee firearms examiner, that those were questions that should be addressed in that other litigation, not this one.

MR. LIEB:  That is not the representation I made to Mr. Finucane.  Number two, that is not a proper basis not to answer the question.  Number three, that case occurred in 1999, and I am asking -- this literally has nothing to do with any of the facts of that case.  Are you instructing him not to answer the question?

MR. TALLBERG:  Why don't you reserve your right?  It was my understanding he wouldn't be questioned about his state employment because of that separate litigation.

MR. LIEB:  That is not an accurate representation.  Just so we have a clear statement on the record, are you instructing the witness not to answer?

MR. TALLBERG:  Yes.  My understanding from the State Assistant Attorney General Finucane is because of the pending Horn and Jackson litigation where

PL0000616

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 209

Mr. Stephenson is a defendant, those questions would be addressed in that case and would not be raised here today.

MR. KEENAN:  Is that based on an email you received from Mr.  Finucane or phone conversation?

MR. TALLBERG:  Had a telephone conversation.  He instructed the witness that he ought not answer questions about that based on our understanding that you all had an agreement.

Maybe there is some misunderstanding.  We can agree to disagree, but given that we have short time, maybe that is something you could reserve on.

MR. KEENAN:  Attorney Lieb's statement, which I have in front of me, to Mr. Finucane is, "I do not intend to ask Mr. Stephenson about the work he performed in the Horn Jackson homicide investigation," period.  Full stop.

So that's not -- to the extent Attorney Finucane made that representation to you, he did not do so on the basis of anything that we communicated to him. I don't want to have to come back here or litigate this, but we will if we have to.

I mean, the idea we can't ask him -- this case pertains to changes in firearms identification practices.  The idea that we can't touch any topic of

Sanders, Gale & Russell
(203) 624-4157

PL0000617

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 210

his career as a state firearms examiner having testified in 333 cases is absurd.

THE WITNESS:  I have a letter sent to me by Attorney Finucane and Attorney O'Neil, AG --

MR. KEENAN:  Don't talk about it.  I think your attorney would instruct you not to.

MR. LIEB:  Hang on.  Don't disclose any communications that attorneys Finucane or O'Neil sent to you, written or otherwise.  They are privileged, and I don't think your attorneys would want you to disclose that.

MR. TALLBERG:  We have been going since 10:00 this morning.  The court reporter has indicated you have about 45 minutes left.  All I am suggesting is why don't you discuss -- you still have a stack of exhibits pertinent to this case, as opposed to his state employment.

BY MR. LIEB:

Q.   Is it your understanding, based upon the prevailing scientific standards in the field, that it is the best practice to avoid exposing firearms examiners to unnecessary information that they don't need about the underlying facts of the case?

A.   To that question, yes.

Q.   What are some examples of such information?

PL0000618

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 211

A.   There could be plenty of examples.  I am at a loss for the type of examples you are looking for. There are examples that --

Q.   Who the suspects were, for example?

A.   That could be one.

Q.   Whether there was any fingerprint evidence connecting a particular person to the crime?

A.   That could be one.

Q.   Information about who the victim was and the circumstances under which he or she was harmed or killed?

A.   That could be.

Q.   Information about how eyewitnesss described the shooting occurring?

A.   That could be.

Q.   Ordinarily, this is information that, according to prevailing scientific standards in the field, you'd generally want an examiner not to have because the examiner doesn't need to reach his scientific conclusions, and it might inadvertently or otherwise bias his thinking, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Has that possibility.

Q.   Here, before you did your test fire of K1, you

Sanders, Gale & Russell
(203) 624-4157

PL0000619

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 212

had information that Anthony Stevenson and Adam Carmon were associated with that event in some way, right?

A.   They were probably listed on the envelopes and documents that came in.

Q.   You had actually gone to the Taft homicide scene and seen the window through which all 15 of these shots were fired, right?

A.   I did.

Q.   You had learned about the fact that there was a 7-month-old infant killed in her home, right?

A.   I did.

Q.   And you had learned about the fact that her grandmother was paralyzed, right?

A.   That she was injured, that's correct.

Q.   You had recovered a Winchester ammunition tray just down the block from the scene of the homicide, right?

A.   Just a few doors away.

Q.   You had -- you had lifted latent fingerprint impressions from that ammunition box tray?

A.   I did.

Q.   At the time you fired K1, you had independently concluded that one of the S&S perpetrators -- withdrawn.

You had concluded one of the people who fired

Sanders, Gale & Russell
(203) 624-4157

PL0000620

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 213

at the S&S Cafe -- whoever fired at 810 Orchard Street used the same weapon?

A.   The firearm.  I don't know about individuals, but the firearm.

Q.   You concluded that the same firearm was used at the S&S and 810 Orchard Street?

A.   That's correct.

Q.   You also knew that these three incidents had happened -- by which I mean S&S Cafe, 810 Orchard Street, and K1 -- within several blocks of each other in New Haven, right?

A.   By their locations, yes.

Q.   In fact, according to you, it was after you saw the test fires from K1 that you recalled seeing similar breech face marks on the 810 Orchard Street cartridge casings?

A.   That's correct.

Q.   You are sitting there testifying about K1, and without the basis of any comparison evidence in front of you, your mind goes back to this other 9-millimeter shooting in same area several days before?

A.   Correct.

Q.   Based upon your knowledge of prevailing scientific standards in the field, it is standard practice to have a second examiner review the work of an

PL0000621

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 214

examiner who performs a firearm examination, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.    That is the trend today, that's correct.

Q.    That is how did that at the state lab, right?

MR. TALLBERG:  Again, I object to the form.  It is an open-ended question that is not limited in time or duration.

Q.    When you retired from the state lab, it was standard practice to have a second examiner review the work that the first examiner did, right?

A.    That is correct.

Q.    And that is -- the point of that is for the second examiner to make an independent assessment of whether the first examiner's conclusions are accurate?

MR. TALLBERG:  Objection to form.  You can answer.

A.    It is.

Q.    And the way that process is supposed to be performed is that the second examiner exercises his or her own independent judgment, right?

A.    The second examiner?

Q.    Yes.

A.    Well, that's correct.  Depended upon the laboratory and whatever they did.

PL0000622

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 215

Q.   Have there been times in your career anywhere where someone else has disagreed with the conclusions of an examination that you have performed?

A.   Again, I am referring to the direction that was given by --

MR. TALLBERG:  This is not what had been described to me.  He was not talking about his state employment is what was described to me by his counsel. You have to take that up with his counsel, Attorney Finucane.

MR. LIEB:  I'm not sure that is really the case.

MR. TALLBERG:  We can agree to disagree on that.

MR. LIEB:  We can come back, and Attorney Finucane can sit here.  I mean, that is going to be the remedy.  We are plainly entitled to ask the witness these questions in the context of this case.  And so like to the extent that he feels he needs his counsel present in that case to protect his interests, that's legitimate.  But that is the solution, right?

MR. TALLBERG:  You should reserve on those questions and take them to Attorney Finucane.

MR. LIEB:  I will move on.

Q.   It is recommended by SWGGUN to have a second

Sanders, Gale & Russell
(203) 624-4157

PL0000623

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 216

examiner review the conclusions of a first examiner?

MR. TALLBERG:  Objection to form.  To the extent you are not talking about your state employment, you can answer.

Q.   Has nothing to do with state employment?

A.   Correct.  I haven't looked at the -- haven't updated the SWGGUN protocols and procedures for a long period of time because of the new process they are going through.  I am not familiar with that.

Q.   No one reviewed -- no one else reviewed your examinations in this case, right?

A.   I believe they did.

Q.   Who did?

A.   I believe an outside expert was hired to review the physical evidence.

Q.   To your knowledge, defense counsel at the trial level hired an independent forensic examiner, right?

A.   That is my understanding.  That's correct.

Q.   But no other examiner reviewed your conclusions before you wrote them up and documented them as your conclusions in the police file as it concerned this homicide investigation?

A.   That's correct.

Q.   Other than fact that an independent examiner

Sanders, Gale & Russell
(203) 624-4157

PL0000624

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 217

was retained by my client's trial counsel, do you know anything about what that examiner did?

A.   Not to the extent of the examination no, sir. I do not know the findings.

Q.   You never talked to him about it?

A.   No, not the findings.  No, sir.

Q.   Not about anything he did, right?

A.   No.

(Petitioner's Exhibit 43:  Marked for Identification - described in Index.)

Q.   This document is the SWGGUN Guidelines for the Standardization of Comparison Documentation.

A.   I have it.

Q.   Have you seen this document before?

A.   May have.

Q.   You will note at the bottom of the page it indicates that it was adopted October 23rd of 2008.  See that?

A.   I do.

Q.   Were you a part of SWGGUN then?

A.   Had just been taken in as member into the organization, but hadn't been to any meetings until the spring of '09.

Q.   These are guidelines issued by SWGGUN for what firearm and tool mark examiners should do to document

PL0000625

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 218

tool mark comparisons they perform?

A.   Yes.  It is for comparison documentation.

Q.   You see in the first paragraph labeled "1.0 Objective," it says, "The purpose of this document is to set forth a scientifically acceptable standard for documenting, in a case record, the observations that support the reported conclusion."

See that?

A.   I do.

Q.   Part of the scientific method is documenting the steps that you took to reach a certain conclusion so that someone else can come and either verify or falsify or simply understand those conclusions?

A.   That's correct.

Q.   So would you agree with me that these guidelines issued by SWGGUN of which you were a part reflect the scientific standards in the field as of the time they were issued in 2008?

A.   Yes.  In 2008.

Q.   This was not the standard in the field as of 1994, was it?

A.   I don't believe -- of course, SWGGUN wasn't formulated at that time.

Q.   Irrespective of whether SWGGUN had issued a piece of paper like this as of 1994, based upon your

PL0000626

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 219

training as of that time, were these the prevailing scientific standards in the field as of 1994?

A.   If I can read the document just to make sure.

Q.   Sure.

A.   I have read the document.

Q.   Based upon your training you received prior to 1994, was this the prevailing scientific standard in the field as of 1994, irrespective of whether SWGGUN had issued it?

A.   It is referring to AFTE criteria of identification in AFTE Journal Supplement Volume 3, August of 2005, and the ASCLD LAB-International Supplemental Requirement for Accreditation, Forensic Science Testing, January 24, 2006.

Q.   Looking at the substance of what it says, 2.1, "The case record must contain documentation of observations that support a reported conclusion."

See that language?

A.   I do.

Q.   That's the scientific standard as of October 2008, right?

A.   That's correct.

Q.   Then 2.2, "At a minimum the documentation must include depictions or descriptions of the agreement or disagreement of individual and/or class characteristics

Sanders, Gale & Russell
(203) 624-4157

PL0000627

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 220

to the extent that another qualified examiner, without the benefit of the evidence itself, can review the case record, understand what was compared and evaluate why the examiner arrived at the reported conclusion."

See that language?

A.   I do.

Q.   Then 2.5 indicates that methods of documentation includes imaging, narrative description, sketches, diagrams, charts, worksheets, et cetera.  See that?

A.   I do.

Q.   The point of this is if you make an identification, the written case record is supposed to contain documentation that would help an outside observer understand what the basis for that identification was?  Yes?

MR. TALLBERG:  Objection to form. Objection to the compound question.  And let's be clear we are talking about 2008, not 1994, correct?

MR. LIEB:  Yes.

MR. TALLBERG:  You can answer the question if you understand it.

MR. LIEB:  I will rephrase.

Q.   The prevailing scientific standard as of 2008 is that an examiner needs to document the basis for an

Sanders, Gale & Russell
(203) 624-4157

PL0000628

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 221

identification so that someone who picks up the written case file and is trained in firearm and tool mark examination can understand how the identification was made.  Right?

A.    Correct.  And this document says that they are guidelines -- these aren't written in stone.  They are guidelines for individual examiners to follow.

Q.    You would agree with me that the examination and analysis that you performed in this case, the identification you made between K1 and Taft and S&S, does not meet this standard developed later, correct?

MR. TALLBERG:  Objection to form.  You can answer.

A.    Not to the actual individual letter of each individual piece of this document, that a person of competent qualified expertise could come in and review the notes and come up with the same results looking at the physical evidence.

Q.    There is nothing in your written materials about the Taft case or K1 or S&S that would tell a qualified firearm and tool mark examiner what it was about those breech face marks that led you to make an identification, right?

MR. TALLBERG:  Objection to form.  You can answer.

PL0000629

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 222

A.   That would direct them to the area of which the identification was made.

Q.   They could always go look at the physical evidence, right?

A.   That's correct.

Q.   But there are no diagrams, no photos, no description of the breech face marks?

A.   That's correct.

Q.   The way you did it in 1994 without that documentation was consistent with the training that you had received as of 1994, right?

A.   That's correct.

Q.   So you have no recollection of any training in identification subclass characteristics that you received before 1994, right?

A.   That's correct.

Q.   You have no recollection of any steps that you took to identify potential subclass characteristics in K1, right?

A.   That's correct.

Q.   You had no knowledge of the manufacturing process of K1, correct?

A.   That's correct.

Q.   No knowledge of whether that manufacturing process was or was not likely to create -- to lead to

PL0000630

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 223

subclass characteristics, right?

A.    That's correct.

Q.    And you did not look for chamber marks that you observed on the Taft cartridges on the K1 test fired cartridges?

A.    Not that I recall.

Q.    Nor did you cross-check firing pin impressions or any other marks to see whether there was agreement in them between Taft and K1?

A.    Not that I recall.

Q.    There were no photos of the breech face marks that form the basis of your identification, correct?

A.    There are none.

Q.    There are no notes about the breech face marks that form the basis of your identification, correct?

A.    Just the notation that the breech face marks were the area for the identification.

Q.    Other than the fact that the identification was based on breech face marks, no other notes, correct?

A.    That's correct.

Q.    There was no review by another examiner before your conclusions became part of the official police record?

A.    That's correct.

Q.    You were exposed to information about the

Sanders, Gale & Russell
(203) 624-4157

PL0000631

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 224

crime scene ranging from the identity of the victim, to the recovery of an ammunition box, to the window through which the bullets were fired, to potential identities of perpetrators who had the weapon K1?

MR. TALLBERG:  Objection to form.  You can answer.

A.   I have some knowledge of each part of that what you just mentioned.

Q.   All of these are ways in which this work that you did in 1994 was consistent with the standards of 1994 but is not consistent with the scientific standards of today, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   No.  It is not the standard of what is being done today.

Q.   You would agree with me each of these things that I just ran through are examples of the way the prevailing science in the field has changed since 1994 and in which your examination done then isn't consistent with the standard of today, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   The way it was documented and the way it is being documented today is completely different than it

Sanders, Gale & Russell
(203) 624-4157

PL0000632

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 225

was in 1994.  That's correct.

Q.   But it is not just the documentation.  It is the examination itself starting with subclass characteristics, right?

A.   That would be part of it.  That's correct.

Q.   After you test fired K1, what did you do with the test fired shell casings and projectiles?

A.   This were kept with the forensic style laboratory, the identification unit.

Q.   They were kept in the bureau of identification in the New Haven Police Department.  Is that right?

A.   That's correct.

Q.   Physically where in the firearms unit in relation to the individual files, paper files that we were talking about earlier?

A.   There was -- a filing cabinet just inside the door had several large drawers in the bottom of it.

Q.   To the best of your knowledge, were the test fires, test fired projectiles and shell casings in that filing cabinet when you walked out of the New Haven Police Department on your last day on the force?

A.   Yes, sir.

Q.   Were they brought to court at the time of trial in this matter?

A.   They were at the time of the hearing of

PL0000633

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 226

probable cause.

Q.   When the probable cause hearing happened, you were still on the police department, right?

A.   Yes.

Q.   I guess you brought them with you to court from the police department when you went to testify at the probable cause hearing?

A.   And my documents, all documents that I have in the case.

Q.   Then you brought those back to the firearms unit at the police department?

A.   That's correct.

Q.   At the time of trial, did you retrieve the test fired shell casings or projectiles from the New Haven Police Department?

A.   I don't recall.

Q.   At the time of trial, to your knowledge, did anyone else retrieve the test fired projectiles or shell casings from the New Haven Police Department?

A.   I don't recall, sir.

Q.   Where, as far as you know, are the test fired K1 shell casings and projectiles today?

A.   I don't know, sir.

Q.   We are going to go to a search warrant application.  It is the only search warrant application

PL0000634

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 227

that is probably the best clue.  Starts with fingerprint

evidence on the items to be seized.

A.    Can you show me what the document looks like?

Q.    I am marking it.

MR. TALLBERG:  I don't know if you can

see it.

(Petitioner's Exhibit 44:  Marked for

Identification - described in Index.)

Q.    Do you have it in front of you?

A.    Page 1 of 6.

Q.    This is what has been marked as Exhibit 44.  I

will represent to you that it is a search warrant for

certain items in a vehicle belonging to my client.

I'm going to go to page 3 of the document.  Do

you see that there is a -- the first full paragraph on

page 3 of 6 begins with "Detective James Stevenson"

spelled wrong?

A.    What page are you on?

Q.    Three of six.

A.    This is another document that is different

than the one you have up there apparently.

Q.    You can just --

A.    The next page also says "3 of 6."

MR. TALLBERG:  First page, 3 of 6 I

think.

Sanders, Gale & Russell
(203) 624-4157

PL0000635

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 228

Q.   Third line, "Detective James Stevenson" spelled wrong?

A.   Do you have a particular question?

Q.   I was waiting for you to tell me -- see that it says, "Detective James Stevenson, a member of the New Haven Police Bureau of Identification, did in fact process the 9 millimeter weapon that was located near the body of Anthony Stevenson"?

See that language?

A.   Yes.

Q.   You understand that is referring to K1 that is the 9-millimeter weapon in question?

A.   Yes.

Q.   Then it says, "Upon examining the weapon, Detective Stevenson, a ballistics expert, stated that it appeared to him that some type of metal probe had been utilized to damage the lands and grooves in the barrel."

See that?

A.   I do.

Q.   I am going to skip to the last sentence, where it says, "Detective James Stevenson also informed investigators that it" -- missing word -- "his expert opinion that the weapon was fired but that the weapon jammed during the firing process."

See that language?

PL0000636

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 229

A.   Yes, I do.

Q.   Did you at some point in time express to colleagues at the New Haven Police Department the opinion that K1 had been fired but jammed during the firing process?

A.   No.  Never did.

Q.   Did you express the opinion that some other weapon associated with the K1 incident, the Taft homicide, or the S&S Cafe incident jammed during the firing process?

A.   No, sir.

Q.   Do you have any idea what this language in that sentence about the weapon jamming is referring to?

A.   I think if you go up to the top portion of that first part, it says the bureau of identification did in fact process the 9-millimeter weapon that was located near the body of Anthony Stevenson.

I didn't process the firearm.  The process would refer to the latent processing of the firearm itself.  But unless they are referring to that as somebody else, I never made that statement.

Q.   Would their process, as you understand it, refer to processing for fingerprints?

A.   That's correct.

MR. LIEB:  I am going to mark as 45

PL0000637

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 230

handwritten steno book notes from the scene of the

homicide, three-page handwritten document dated 2/4/94.

(Petitioner's Exhibit 45:  Marked for

Identification - described in Index.)

Q.   Do you have the document?

A.   Not as of yet.  I do now.

Q.   This document contains notes that you made at

or around the time you responded to the Taft homicide

scene on the morning of February 4th to process the

crime scene, right?

A.   It was.

Q.   So I want to just draw your attention to

the -- you understand that the first page of this

document is referring -- is describing the circumstances

under which you found the ammunition box tray a couple

doors down from the homicide scene, right?

A.   Yes.

Q.   I want to look at the second paragraph on the

page that begins, "Styrofoam was separated."  See that?

A.   Correct.

Q.   Can you just read what this paragraph says,

please?

A.   "Styrofoam was separated from the box holder -

The holder was broken on the top side - On bottom marked

for Winchester Oling 20 Center Fire Cartridges -

PL0000638

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 231

CFFTC" -- and I believe it is "E11513 Black in Color - They were photographed and seized."

Center fire was like a line of ammunition within the Winchester brand.  Is that correct?

A.    "Center fire" refers to ammunition that has a primer as opposed to rim fire.

Q.    As opposed to what?

A.    Rim fire.

Q.    The cartridge casings that were recovered from the Taft homicide scene all had a primer, right?

A.    Correct.

Q.    The primer is in the center of the head stand?

A.    Yes.

Q.    And they were manufactured by Olin Winchester Model -- is that what Winchester Olin means?

A.    I think Winchester was a subsidiary of Olin at the time.

Q.    20 refers to the fact that it held -- the tray held 20 cartridges, right?

A.    It does.

Q.    And what is CFFTC-E115133, a serial number?

A.    They were markings on the bottom of the box itself.

Q.    What, if anything, did you come to learn those markings meant?

PL0000639

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 232

A.    In preparation for the 2015 habeas trial or habeas hearing, Attorney Tsimbidaros asked if I could clarify those numbers, and I contacted Winchester relative to those numbers.

Q.    What did you learn?

A.    Contacted the representative of Olin Winchester, who is an AFTE representative, and he was able to track down the types of manufacturers and the types of ammunition that would be loaded in that particular type of box.  But it is not an inclusive list of all cartridges that were put into that style of box.

Q.    A 9-millimeter would fit in the tray that you recovered?

A.    Appears as though it could.

Q.    So you processed the box in the tray for latent fingerprints on February 4th, right?

A.    Yes.

Q.    How many detectives worked in the bureau of identification at the time?

A.    I don't recall the exact number.

Q.    Less than 10?

A.    I'd say so.

Q.    It was a relatively small group of people, right?

A.    It was.

Sanders, Gale & Russell
(203) 624-4157

PL0000640

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 233

Q.   And you found latent fingerprints on the tray in the box when you processed them, right?

A.   I did.

Q.   You knew once you processed that piece of evidence that there were latent print impressions that you were able to recover, correct?

A.   I lifted latent impressions from the box itself.

Q.   You knew that someone was going to run those prints through the database and see if they came back with a match?

A.   There was no database.

Q.   You knew someone was going to pull fingerprints and compare them to see if they found a match, right?

A.   That's correct.

Q.   That was your expectation?

A.   That's correct.

Q.   Obviously, this was a tragic case, even by the standard of a difficult time in the city, and it was a matter of Hyper Harry, right?

MR. TALLBERG:  Objection to form.  You can answer.

A.   Yes, as any case was in the state.

Q.   This was an infant child who was murdered

Sanders, Gale & Russell
(203) 624-4157

PL0000641

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 234

through the window of her own residence, right, so it was especially serious?  Yes?

A.   It was a serious crime that took place in the City of New Haven.

Q.   If you got a fingerprint match opt latent prints you lifted from an ammunition box and ammunition box tray down the street from the scene of the homicide, someone would tell you, right?

A.   I don't recall at this time.

Q.   You were part of the team of detectives that responded to the scene in processing the crime and trying to solve this murder?

A.   They may have.  I don't have recollection right now.

Q.   Wouldn't be surprising if whoever ran these prints -- if they came back with a hint, they would probably say, "Hey, Detective Stephenson, we ran those prints that you got from the ammunition box tray"?  "We got a match," right?  That would be something that you would want to know, right?

A.   With somebody from within the unit, I am sure the information would come out, but I don't recall that.

MR. LIEB:  Off the record.

(Off the record discussion.)

Q.   Did you make an assessment as to whether the

Sanders, Gale & Russell
(203) 624-4157

PL0000642

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 235

9-millimeter Luger Winchester rounds that were recovered with K1 could fit in the ammunition box tray recovered from Orchard Street?

A.   No.  I did not.

Q.   But are you aware of any reason to believe that they couldn't fit in the tray?

A.   If 9-millimeter cartridges would fit that box, there is no reason why they couldn't fit it in.

Q.   When you contacted the Olin Corporation in or around 2015, you said that they gave you a list, a nonexclusive list of what kind of ammunition could have been sold in that box, right?

A.   That's correct.

Q.   Was that list relayed to you verbally or in writing?

A.   An email that he had sent.

Q.   Someone from the Olin Corporation who sent you sent that list in an email?

A.   Yes.  That's correct.

Q.   Do you still have -- withdrawn.  Was that your personal email address?

A.   I don't recall.

Q.   Do you still have access to the email that you received from the Olin corporation?

A.   I have a copy with the file from Tsimbidaros

PL0000643

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 236

from the habeas hearing.

MR. LIEB:  I think, Jim, we are going to need that document, because that strikes me as responsive to the subpoena for all documents concerning these cases.

Q.   Not late today, but when you're home -- I assume that you don't have a copy of that email with you here.  Is that correct?

MR. TALLBERG:  We can talk off the record about that.

Q.   You will give it to counsel.  Do you have folders like the one you have for the Taft case that has the manila folder with your police reports, copies of your police reports, and then the originals of your handwritten notes?  Do you have such folders pertaining to other New Haven Police Department cases that you did the firearms and tool mark examinations for at your home?

MR. TALLBERG:  Objection to form.  You can answer.

A.   No, sir.  I do not.

Q.   At or around the time of the trial in this matter in 1995, did you go to the New Haven Police Department to get that folder?

A.   I don't recall, sir.

PL0000644

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 237

Q.  After the trial was over, did you go back to the New Haven Police Department -- withdrawn.

After the trial was over, did you go to the New Haven Police Department to put that folder back?

A.  I don't recall, sir.

Q.  Do you know for sure one way or the other whether that folder was in your possession between the 1995 trial and the 2006 habeas?

A.  I do not know.  I don't recall.  I do know that I had it in 2006 and 2015.

Q.  What other forensic scientific disciplines or areas did you work in when you were with the police department, New Haven Police Department Bureau of Identification?

A.  I was a latent print examiner.

Q.  Did you ever perform any hair analysis?

A.  No.

Q.  Fiber analysis?

A.  No.

Q.  Shoe print analysis?

A.  No.

Q.  Comparative bullet lead analysis?

A.  No.

Q.  Did you ever perform any comparative bullet lead analysis at the state lab?

Sanders, Gale & Russell
(203) 624-4157

PL0000645

Electronically signed by PATRICIA SAYA (501-398-304-5455)                1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                February 25, 2021

Page 238

A.   Never to my knowledge.

MR. TALLBERG:  You are going to have to talk to Attorney Finucane about that.

Q.   When did you start working in the bureau of identification in the New Haven Police Department?

A.   I think it was 1982, '83, '82 or '83.

Q.   Who was the chief of detectives in January, February, 1994?

A.   I don't remember.

Q.   Going back to the issue of the damaged floor plate, am I correct to understand that the floor plate affects the spring mechanism in the magazine that feeds or pushes the cartridges upwards so they can be fed into the weapon?

A.    It is the base of the magazine, and the spring goes to the base itself.

Q.   The damage to the floor plate can impede the ability of the spring to perform its function of pushing the cartridges upwards?

A.   I'd say dependent upon the amount of damage.

Q.   The more ammunition you have in a magazine, the more work that spring needs to do because the more weight is bearing down on it, right?

A.   That's correct.

Q.   So depending upon the extent of the damage to

PL0000646

Electronically signed by PATRICIA SAYA (501-398-304-5455)        1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 239

the floor plate, it is possible that that damage could affect firing if the magazine is very full, but not if the magazine has only a couple rounds in it, right?

A.    There could be that possibility.

Q.    When you performed the test firing of K1 using the four cartridges recovered from the K1 and the four cartridges from the lab, how many did you put in the magazine at a time?

A.    I don't remember, sir.

Q.    I'm sorry?

A.    I don't remember, sir.

Q.    You never tested the weapon with a full magazine, correct?

A.    No, sir.

Q.    We established you also did not test fire the weapon with an overloaded cartridge magazine?

A.    That's correct.

Q.    You have no way of knowing that the damage you observed to the floor plate would have affected the weapon's ability to fire under those circumstances, correct?

A.    Because I did not fire it under those circumstances, that's correct.

Q.    You testified earlier that you had only observed two firearms in the course of your career that

Sanders, Gale & Russell
(203) 624-4157

PL0000647

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 240

had bore damage of the nature that K1 had sustained, right?

A.    Not to the extent as K1 had.  There was a bore that was damaged, and I think it was because of an electrical contact that had occurred to the bore when it was misplaced in an automobile.

Q.    When did you see that other firearm?

A.    I don't remember.

Q.    Was it during the course of performing your duties as a firearm and tool mark examiner during your career?

A.    At some point during the career, that's correct.

Q.    To your knowledge, has a court ever precluded or excluded your testimony concerning firearm and tool mark examination on the basis that it was not sufficiently reliable?

A.    Not to my knowledge, sir.

Q.    Have you ever testified on behalf of a defendant in a criminal case in Connecticut?

A.    I have.

Q.    How many occasions?

A.    I don't know, sir.

Q.    More than ten?

A.    I really don't have a number, sir.

PL0000648

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 241

Q.   When you have done so, has it been in your capacity as either a member of the police department or the state lab or has it been in a private capacity?

A.   The two laboratories.

Q.   To your knowledge, has it ever been determined that an identification you made was subsequently found to have been wrong?

A.   No, sir.  Not to my knowledge.

Q.   I should have been clear on that question.  An identification of tool marks in the firearm context?  You understood that is what I was asking?

A.   That's correct.

MR. LIEB:  One second.

(Off the record discussion.)

Q.   Just a few more questions.  So with regard to the handwritten bench notes that you made in your other NHPD cases, other than the ones that -- the notes that we have looked at today, do you know where those notes are today?

A.   No, sir, I do not.

Q.   Do you know where the general rifling characteristic database printouts that you made in cases other than that one from your time in the New Haven Police Department are today?

A.   No, sir, I do not.

Sanders, Gale & Russell
(203) 624-4157

PL0000649

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 242

Q.   With regard to all of the original documents that you brought to Attorney Tallberg that had been in your personal possession, you understand that you have an obligation to continue to preserve those documents at least through the time of any trial in this matter that we are here about today?

A.   Yes, sir.

Q.   So if you take those documents back from Attorney Tallberg's office, you are going to put them somewhere safe and going to make sure that someone else knows where they are in case they ever need to be accessed?

A.   Yes.

MR. LIEB:  With the significant caveat that to the extent there are questions that we have been precluded from asking about his time in the state lab we need to take up with Attorney Finucane, I have no further questions at this time.  And obviously, we are leaving this open and we are reserving our right to complete the examination, but that's it for today.

MR. TALLBERG:  That's fine.  I just have two questions, maybe three.  Take less than 5 minutes, if I may.

CROSS EXAMINATION

BY MR. TALLBERG:

Sanders, Gale & Russell
(203) 624-4157

PL0000650

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 243

Q.   Do you recall you were asked questions about a probable cause hearing in the matter of Carmon versus State in 1994?

A.   I do.

Q.   Do you remember in fact the transcript of that proceeding was marked for identification here today as Petitioner's 37?  You were shown that transcript today? Do you recall that?

A.   I do.

Q.   You were asked at the probable cause hearing about the test fires, and I think your answer was that -- it is at page 143 of the transcript, but when you were asked where they were, your answer was they are here in the building.  What did you mean by that?

A.   They were in the state's attorney's office along with the documents that I had brought to that case that day.

Q.   What other documents regarding this matter did you share with the state's attorney's office other than the test fires and your reports?

A.   The reports and the photographs that I had with me at that time.

Q.   Did you share with the state's attorney's office everything that you had regarding this homicide?

            MR. LIEB:  Objection to form.

Sanders, Gale & Russell
(203) 624-4157

PL0000651

Electronically signed by PATRICIA SAYA (501-398-304-5455)          1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 244

A.   To the best of my knowledge, yes.

Q.   When you say "photographs," one of the photographs you took of the firearm K1 was admitted as an Exhibit QQ at the criminal trial.  Is that right?

A.   It was.

Q.   And did you share with the state's attorney's office all of the photographs that you took relating to this matter.  Including the negatives of those photographs, Polaroids, everything?

A.   I did.

MR. TALLBERG:  Thank you.  Those are all my questions.

CROSS EXAMINATION

BY MR. NOWAK:

Q.   I have a couple follow-up if that's okay.  Mr. Stephenson, the GRC database is now maintained by AFSCME.  Was that your testimony today?

A.   AFTE, AFTE, Association of Firearm and Tool Mark Examiners.

Q.   In 1994, who had access to that database?  Do you know?

A.   FBI was the one controlling the database at that time.  Any examiner in the laboratory that was able to -- there as a firearms examiner was able to get access to the GRC database.

Sanders, Gale & Russell
(203) 624-4157

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 245

Q.   If you were a member of AFTE back in 1994, could you get access to that database?

A.   You were probably a member of a laboratory. So if you were a laboratory member, you could get access to the database.

Q.   Do you recall what you turned over to Attorney Tsimbidaros for that habeas?

A.   Again, it is the information relative to the cartridge box, the markings on the base of the box, looking to further determine what the markings were on the box.

Q.   You didn't turn over any of your notes concerning the firearms examination?

A.   I don't recall sir.

Q.   And do you recall what you turned over -- you talked about a second habeas trial.  Do you recall what you turned over, if anything, to any of the attorneys in that case?

A.   In the 2006 case?  I don't recall at this time.  That's correct.

Q.   Would it be fair to say you don't recall what you turned over for those habeas cases?

A.   That's correct.

Q.   The GRC database.  In 1994, did that contain every single weapon ever manufactured?

Sanders, Gale & Russell
(203) 624-4157

PL0000653

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 246

A.    No, sir.

Q.    So it was incomplete in that there may have been weapons that were manufactured that may not be listed on there?

A.    That is correct.  And again, these were test fires which were sent to the laboratory for inclusion into the database by other examiners that were working in the field.

Q.    Obviously, that database is more complete today?

A.    There are more entries, more than there were in 1994.  But again, it is not manufacturers. Manufacturers don't submit anything to the GRC.

Q.    And just one last question.  When a firearm was seized, when you were working for the City of New Haven in the police department, you talked about test firing it to show operability.  Why would you have to do that?

A.    To determine what it was a functional firearm.

Q.    Was that standard practice with every firearm that came in when you were working there?

A.    It was.

         MR. NOWAK:  Nothing further.  Thank you.

         MR. LIEB:  Nothing further.

         (Deposition adjourned:  6:22 p.m.)

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

Page 247

I, JAMES STEPHENSON, have read the foregoing transcript of the testimony given at my deposition on February 25, 2021, and it is true and accurate to the best of my knowledge and belief as originally transcribed and/or with the changes as noted on the attached Correction Sheet.


_____

JAMES STEPHENSON


Subscribed and sworn to before me this ____ day of _____, 2021.


_____

NOTARY PUBLIC


My Commission Expires:   _____

PL0000655

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62

CARMON v. STATE OF CONNECTICUT                    February 25, 2021

Page 248

CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn via remote location and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 2nd day of March  2021.

*Patricia Saya*

Notary Public

Patricia Saya

My Commission Expires:

June/2025

Sanders, Gale & Russell
(203) 624-4157

PL0000656

Electronically signed by PATRICIA SAYA (501-398-304-5455)                    1c87f3fb-0ac7-4672-b247-8c1529a5eb62