## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ADAM CARMON, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:23-CV-00944 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL. | : | SEPTEMBER 18, 2025 |
| Defendants. | : | |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 119, 121, 122)

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 1

II.    BACKGROUND ......................................................................................... 2

    A.    Shooting and Investigation Overview ............................................. 2

    B.    Detective Carusone's Involvement in the Investigation ............................ 6

    C.    Detective Stephenson's Involvement in the Investigation .......................... 8

        1.    Professional Background and Training ................................. 8

        2.    Role in the Investigation ..................................... 9

    D.    Mr. Carmon's Arrest ......................................................... 12

    E.    Criminal Trial 12

        1.    Detective Stephenson's Trial Preparation.......................... 12

        2.    Trial Testimony ........................................... 13

    F.    Post Conviction Proceedings ..................................... 14

    G.    Practices of the New Haven Police Department ...................... 15

III.    LEGAL STANDARD ......................................................... 15

IV.    DISCUSSION ..................................................................... 16

    A.    Detective Carusone's Motion for Summary Judgment .................... 16

        1.    Section 1983 Claims Against Detective Carusone ................... 16

            a.    Suppression of Evidence................................. 17

            b.    Fabrication of Evidence ....................................... 18

            c.    Qualified Immunity................................. 21

        2.    Negligence Claims Against Detective Carusone .................... 23

            a.    Statute of Limitations and Period Repose ................... 23

            b.    Sufficiency of Evidence ....................................... 26

    B.    Detective Stephenson's Motion for Summary Judgment .................... 27

        1.    Section 1983 Claim Against Detective Stephenson.................... 27

            a.    Statute of Limitations ................................. 28

            b.    Sufficiency of Evidence ....................................... 29

                i.    Withheld Evidence ..................................... 29

                ii.    Intent to Withold Evidence ......................... 31

            c.    Witness Immunity ................................. 33

|   |   | d. | Prosecutorial Immunity | 35 |
|   |   | e. | Qualified Immunity | 36 |
|   | 2. | | Negligence Claims Against Detective Stephenson | 40 |
|   |   | a. | Statute of Limitations | 40 |
|   |   | b. | Discretionary Act Immunity | 41 |
| C. | | | The City's Motion for Summary Judgment | 45 |
|   | 1. | | Monell Claim | 46 |
|   | 2. | | Common Law Claims | 50 |
|   |   | a. | Statute of Limitations | 50 |
|   |   | b. | Section 7-465 Notice | 51 |
|   |   | c. | Common Law Claims and Willful Misconduct | 53 |
|   |   | d. | Section 52-557n and Immunity | 55 |
| V. | | | CONCLUSION | 56 |

## I.    INTRODUCTION

On February 3, 1994, a shooting left an infant dead and a woman paralyzed. The plaintiff, Adam Carmon ("Mr. Carmon"), was convicted of these crimes and sentenced to eighty-five years in prison.  After serving twenty-nine years of his prison sentence, a Connecticut Superior Court ruled that both suppressed and newly discovered evidence undermined the validity of the jury's verdict and ordered Mr. Carmon released from prison.  All charges against Mr. Carmon have subsequently been dismissed with prejudice.

Mr. Carmon brings the instant lawsuit against the City of New Haven, Lee Dease, Administrator of the Estate of Leroy Dease, Michael Sweeney, James Stephenson, Gilbert Burton, James Ponteau, and Peter Carusone, alleging that the defendants' handling of the February 3 murder investigation violated federal and state law.  In his Amended Complaint, Mr. Carmon asserts constitutional violations under section 1983 of title 42 of the U.S. Code, negligence, and negligent infliction of emotional distress and, further, seeks indemnification from the City of New Haven under section 7−465 of the General Statutes of Connecticut.  See Amended Complaint ("Am. Compl.") (Doc. No. 71).

Before the court are Motions for Summary Judgment filed by Peter Carusone ("Detective Carusone"), James Stephenson ("Detective Stephenson"), and the City of New Haven ("the City").  See Carusone Memorandum of Law in Support of Motion for Summary Judgment ("Carusone Mem.") (Doc. No. 119-1); Stephenson Memorandum of Law in Support of Motion for Summary Judgment ("Stephenson Mem.") (Doc. No. 121−1); City of New Haven Memorandum of Law in Support of Motion for Summary Judgment ("City Mem.") (Doc. No. 122-1); Carusone Reply to Plaintiff's Memorandum of

Law in Opposition to Motion for Summary Judgment ("Carusone Reply") (Doc. No. 142);

Stephenson Reply in Support of Motion for Summary Judgment ("Stephenson Reply")

(Doc. No. 144); City of New Haven Reply to Plaintiff's Memorandum of Law in

Opposition to Motion for Summary Judgment ("City Reply") (Doc. No. 141).  Mr. Carmon

opposes these Motions.  Plaintiff's Memorandum of Law in Opposition to the Summary

Judgment Motions of Defendants City of New Haven, Carusone, and Stephenson

("Opp'n") (Doc. No. 132).

For the reasons that follow, the court denies Detective Carusone's Motion (Doc.

No. 119) and Detective Stephenson's Motion (Doc. No. 121).  The court grants in part

and denies in part the City's Motion (Doc. No. 122).

## II.    BACKGROUND[1]

### A.    Shooting and Investigation Overview[2]

On February 3, 1994, gunshots pierced through an apartment on 810 Orchard

Street in New Haven, Connecticut.  See Plaintiff's Response to City of New Haven's

Local Rule 56(a)(1) Statement ("Pl.'s 56(a)(2) to City") (Doc. No. 132-4) at ¶ 1.  Bullets

fired by the shooter, or shooters, struck and killed an infant child, Danielle Taft.  Id.

Charlene Troutman ("Ms. Troutman"), the child's grandmother and a resident of the

apartment, was also shot and became paralyzed as a result.  Id.

---

[1] The facts presented in this part of the court's Ruling are drawn from the parties' undisputed statements of fact, as presented in their Rule 56 statements.

The court draws primarily from the parties' Local Rule 56(a) Statements in summarizing the undisputed material facts.  In addition, for ease of reference, the court cites to the plaintiff's Local Rule 56(a)(2) Statements where the parties agree because, in accordance with Local Rule 56(a)(2), they contain a reproduction of each numbered paragraph from the moving party's Local Rule 56(a)(1) Statement, as well as the nonmoving party's admissions and denials.

[2] In this sub-part, the court primarily draws from the Local Rule 56(a) Statements filed in connection with the City's Motion for Summary Judgment.

On February 4, 1994, members of the New Haven Police Department ("NHPD") questioned Arthur Brantley, whom the NHPD viewed as a suspect, about the shooting. Id. at ¶ 3-4.  Police had learned that Mr. Brantley ("Mr. Brantley") was involved in an argument with Ms. Troutman, and other members of her family, at her apartment the afternoon of the shooting.  Id. at ¶ 3.

On February 7, 1994, while being interviewed by NHPD detectives, Mr. Brantley implicated himself and Arthur Little in the February 3 shooting.  See id. at ¶¶ 6-7; City Ex. 14 at 13.  This same day, the NHPD responded to the scene of a separate shooting that occurred on Townsend Street in New Haven, Connecticut.  Pl.'s 56(a)(2) to City at ¶ 9.  There, NHPD officers found Anthony Stevenson ("Mr. Stevenson"), who had been shot, and Mr. Carmon, who had also been shot but was uninjured as a result of wearing a bullet-proof vest.  City 56(a)(1) Stmt. at ¶¶ 9-10.[3, 4]  Next to Mr. Stevenson, NHDP officers also found a Browning Hi-Power 9mm handgun.  Pl.'s 56(a)(2) to City at ¶ 10; see City Ex. 20 (describing the firearm as a Browning 9mm).  Three days later, Mr. Stevenson told NHPD detectives that the firearm recovered at the shooting on February 7 belonged to Mr. Carmon.  Id. at ¶ 14.  In Mr. Carmon's Local Rule 56(a)(2) Statement, he does not dispute that Mr. Stevenson made this statement; however, he asserts that

---

[3] Mr. Carmon admits only that Mr. Stevenson and Mr. Carmon were found near the shooting as was a handgun. Pl.'s 56(a)(2) to City at ¶ 10.  However, the evidence cited by the City shows that both Mr. Stevenson and Mr. Carmon were shot.  See City Exs. 20-21.  Because Mr. Carmon cites no evidence to call into question the City's cited evidence, the court deems admitted that both Mr. Stevenson and Mr. Carmon were shot.

[4] Mr. Carmon objects to this assertion, claiming the City's 56(a)(1) statement violates the Local Rules because the statement presents multiple factual assertions in one paragraph. Because the City asserts related facts in the same short sentence, the court does not view the City's Local Rule 56(a)(1) Statement as improper.  The court overrules Mr. Carmon's objection wherever he asserts it as to the City's Local Rule 56(a)(1) Statement.

the statement was coerced by the defendants, NHPD Detectives Leroy Dease ("Detective Dease") and James Ponteau ("Detective Ponteau").  Pl.'s 56(a)(2) to City at ¶ 14.

On February 14, 1994, NHPD Detectives again interviewed Mr. Stevenson.  Id. at ¶ 17.  This time, Mr. Stevenson informed detectives that he witnessed Mr. Carmon scraping the barrel of the Browning 9mm with a screwdriver.  Id.  While Mr. Carmon does not contest that Mr. Stevenson gave this statement, he asserts that the statement was made under duress.  Id.  Indeed, Mr. Carmon asserts that NHPD detectives wished to connect the Browning 9mm to the February 3 murder and, to do so, they pressured Mr. Stevenson to fabricate a story about Mr. Carmon altering the barrel of the gun.  Id.; see also, infra, part II.C (discussing Detective Stephenson's examination of the Browning 9mm).

On an unspecified date, Timothy McDonald ("Mr. McDonald') told NHPD officers that he had previously possessed the Browning 9mm, and that he had sold the gun to Mr. Carmon.  Pl.'s 56(a)(2) to City at ¶¶ 19-20.  Mr. Carmon does not dispute that Mr. McDonald made these statements to the police, but he asserts that the statements were made under duress.  See id.

On February 15, 1994, Mr. Carmon, who was arrested on an unrelated warrant, was questioned by NHPD detectives about the February 3 shooting.  Id. at ¶ 22.[5] During questioning, Mr. Carmon admitted that the Browning 9mm was his firearm and gave statements suggesting he was near 810 Orchard Street around the time of the

---

[5] While Mr. Carmon disputes other assertions made within paragraph 22 of the City's Local Rule 56(a)(1) Statement, he does not dispute that Mr. Carmon was arrested.  The court deems that portion of the statement admitted.

February 3 shooting.  Id. at ¶¶ 22-23.  Mr. Carmon does not deny that he made these statements; however, he asserts that he was coerced into making these statements by NHPD officers and that the statements are false.  Id.

On February 16, 1994, NHPD officers met with Raymond Jones ("Mr. Jones"), who was thought to have witnessed the February 3 shooting.  Id. at ¶¶ 24-26.  Mr. Jones told police that he saw the shooter's face.  Id. at 25.  The evidence cited by the City supports the statement that Mr. Jones told police on February 16 that he was a few feet from the shooter and saw the shooter's face clearly.  See City Ex. 38 at 3.  During this February 16 meeting with the NHPD, Mr. Jones was shown a photo array, from which he identified Mr. Carmon as the February 3 shooter.  Pl.'s 56(a)(2) to City at ¶ 26.

On February 18, 1994, Mr. Brantley was interviewed by NHPD Detectives Gilbert Burton ("Detective Burton"), a defendant in this matter, and Ralph DiNello ("Detective DiNello").  City Ex. 15 at 2. During the interview, Mr. Brantley recanted his prior statement to NHPD officers that he had been involved in the February 3, 1994 shooting. Defendant City of New Haven Local Rule 56(a)(1) Statement ("City 56(a)(1)") (Doc. No. 122-2) at ¶ 7; City Ex. 15.[6]

On February 22, 1994, NHPD officers met with another witness to the February 3 shooting, Jaime Stanley ("Ms. Stanley"), who was with Mr. Jones at the time of the shooting.  Pl.'s 56(a)(2) to City at ¶¶ 25, 28.  Upon meeting with officers, Ms. Stanley identified Mr. Carmon as the February 3 shooter.  Id. at ¶ 28.  Though Mr. Carmon does

---

[6] Mr. Carmon disputes this assertion, arguing that the evidence cited by the City, City Exhibit 15, shows only that Mr. Brantley responded to a series of leading questions posed by the NHPD detectives. Pl.'s 56(a)(2) to City at Defendant City of New Haven Local Rule 56(a)(1) Statement ("City 56(a)(1)") (Doc. No. 122-2) at ¶ 7.  The court agrees that City Exhibit 15 reflects a series of leading questions posed to Mr. Brantley.  However, this does not change the fact that the Exhibit also reflects Mr. Brantley recanted his prior confession.  See City Ex. 15.  For this reason, the court deems this assertion admitted.

not dispute that Ms. Stanley identified him as the shooter, id. at ¶ 28, he notes that Ms.

Stanley and Mr. Jones gave conflicting answers about the manner in which the shooter

left the scene: Mr. Jones reported that the shooter walked away from the scene after he

finished shooting, while Ms. Stanley reported that the shooter looked at her, turned back

to shoot once more, and ran from the scene thereafter.  Id.[7]

B.    Detective Carusone's Involvement in the Investigation [8]

On February 3, 1994, a defendant in the instant matter, Detective Peter

Carusone ("Detective Carusone"), was dispatched to the scene of the shooting on 810

Orchard Street.  Plaintiff's Response to Defendant Peter Carusone's Local Rule

56(a)(1) Statement ("Pl.'s 56(a)(2) to Carusone") (Doc. No. 132-6) at ¶ 4.  While at the

crime scene, Detective Carusone was told to call the NHPD Dispatch Supervisor.  See

id. at ¶ 5.[9]  It is unclear whether the Supervisor told Detective Carusone to contact

Jaimie Stanley by name or told him to call a phone number without providing Detective

Carusone with Ms. Stanley's name.  See id. at ¶ 5; Carusone Ex. A at 45:2-11.  Either

way, Ms. Stanley answered Detective Carusone's phone call.  See Pl.'s 56(a)(2) to

Carusone at ¶ 6.  Detective Carusone had grown up with Ms. Stanley and considered

her to be a family friend.  Id. at ¶ 2-3.[10]  Ms. Stanley told Detective Carusone that she

---

[7] Mr. Carmon also asserts that Ms. Stanley told the NHPD that the lighting was "not that good." Pl.'s 56(a)(2) to City at ¶ 25.  However, Mr. Carmon provides no pincite to support this assertion.

[8] In this sub-part, the court primarily draws from the Local Rule 56(a) Statements filed in connection Detective Carusone's Motion for Summary Judgment.

[9] According to Detective Carusone, he called an "unknown person."  Pl.'s 56(a)(2) to Carusone at ¶ 5.  However, the evidence he cites in support shows that he called the Dispatch Supervisor.  See Carusone Ex. A at 45:2-11.  Mr. Carmon disputes that the dispatcher was unknown or that the person who he was instructed to call was an "unknown person". Pl.'s 56(a)(2) to Carusone at ¶ 5.

[10] While Mr. Carmon does not dispute this, he asserts that Detective Carusone also considered Ms. Stanley to be a confidential informant. Pl.'s 56(a)(2) to Carusone at ¶ 11.

had witnessed a crime.  Id. at ¶ 6.  Thereafter, Detective Carusone picked up Ms. Stanley and brought her to NHPD investigators.  Id. at ¶ 7.  Sometime later, Detective Carusone accompanied Ms. Stanley to the New Haven courthouse to meet with investigators.  Id. at ¶ 8.

The parties dispute whether Detective Carusone investigated the February 3 shooting; they agree, however, that Detective Carusone did not write any reports connected thereto.  Id. at ¶ 12.  The parties also dispute whether Detective Carusone was present during Ms. Stanley's conversations with other NHPD officers.  Id. at ¶¶ 15-17.  Detective Stanley contests that he was not present, Carusone 56(a)(1) Stmt. at ¶¶ 15-17, while Mr. Carmon concedes only that reports prepared in connection with the conversations at issue do not reflect that Detective Carmone was there.  Pl.'s 56(a)(2) to Carusone at ¶¶ 15-17.

Years after the investigation into Mr. Carmon had concluded, Detective Carusone and Ms. Stanley exchanged text messages.  Id. at ¶¶ 13-14.[11]  Some of these messages discuss Mr. Stanley.  Id. at ¶ 14.  The parties offer differing characterizations of the messages in question.  Mr. Carmon characterizes the messages depicting the parties' anger at Mr. Carmon, Pl.'s 56(a)(2) to Carusone at ¶ 14, while Detective Stanley describes the messages sent by Ms. Stanley as reflecting frustration and the messages sent by Detective Carusone as reflecting his support for Ms. Stanley.  Carusone 56(a)(1) Stmt. at ¶ 14.

---

[11] Detective Carusone describes these messages as "emails," Carusone 56(a)(1) Stmt. at ¶ 14, but they are more accurately described as text messages.  See Carusone Ex. D.

C.    Detective Stephenson's Involvement in the Investigation[12]

1.    Professional Background and Training

Detective Stephenson was formerly a sworn member of the NHPD from 1974 to June 1994.  Plaintiff's Response to Defendant Stephenson's Local Rule 56(a)(1) Statement ("Pl.'s 56(a)(2) to Stephenson") (Doc. No. 132-5) at ¶¶ 2, 10.  After June 1994, Detective Stephenson retired from the NHPD and worked as a firearm and toolmark examiner for the Connecticut State Lab until his retirement in 2014.  Id. at ¶¶ 1, 10.

From 1990 to 1992, Detective James Stephenson, a defendant in the instant matter, maintained his position in the NHPD and studied as a firearm and toolmark examiner at the Connecticut State Police Lab.  Id. at ¶ 3.  During this time, Detective Stephenson worked on fifty-five cases in his capacity as a trainee examiner.  Id. at ¶ 4.  Detective Stephenson's training was conducted in accordance with the methods promulgated by the Association of Firearm and Toolmark Examiners ("AFTE"), of which Detective Stephenson was a member who periodically published articles in the AFTE's journal.  Id. at ¶¶ 5, 7-8.[13]

---

[12] In this sub-part, the court primarily draws from the Local Rule 56(a) Statements filed in connection with Detective Stephenson's Motion for Summary Judgment.

[13] Mr. Carmon objects to the assertion that Detective Stephenson was trained following AFTE's methods to the extent it suggests Detective Stephenson acted in conformity with his training.  The court does not read Detective Stephenson's assertion to stand for this proposition, and thus, Mr. Carmon's objection is overruled.

2.      Role in the Investigation

Following the February 3, 1994 shooting, discussed <u>supra</u> at part II.A, NHPD officers recovered fifteen shell casings from the scene, in addition to six copper jacketed 9mm bullets.  <u>Id</u>. at ¶ 13.[14]

On February 4, 1994, Detective Stephenson conducted a daytime search of the crime scene and found an empty ammunition box marked "Winchester" laying outside in the snow.  <u>Id</u>. at ¶ 14.  The next day, after conducting test-fires, Detective Stephenson concluded that the fifteen shell casings were fired from the same gun.  <u>Id</u>. at ¶ 15.  He also drafted and signed two reports, both dated February 5, 1994.  <u>See id</u>. at ¶ 16.  One of these reports, Stephenson Ex. B (Doc. No. 121-5), amounts to two typed pages describing Detective Stephenson's recovery of evidence from the crime scene.  <u>Id</u>. at ¶ 17.  The other report, Stephenson Ex. C (Doc. No. 121-6), is a one-page typed report, which memorializes a request made to Detective Stephenson to examine the fifteen 9mm cartridge casings and six bullet fragments recovered from the scene.  <u>Id</u>. at ¶ 18.  This second report shows Detective Stephenson's conclusion that the 15 cartridge cases were fired from the same firearm.  <u>Id</u>. at ¶ 19.[15]  This second report also states that the shooter may have used a self-loading pistol made by Astra, Beretta, Glock,

---

[14] Mr. Carmon also asserts that certain of the bullets recovered from the scene were damaged or fragmented.  Pl.'s 56(a)(2) to Stephenson at ¶ 13.

[15] Detective Stephenson asserts that this conclusion appeared on the two-page report.  Stephenson 56(a)(1) Stmt. at ¶ 20.  Mr. Carmon correctly notes, however, that this conclusion appeared on the one-page report.  Pl.'s 56(a)(2) to Stephenson at ¶ 20.

Maverick, Smith and Wesson, Walther, or Wilkson.  Id. at ¶ 20.[16]  In reaching the conclusions contained in this second report, Stephenson Ex. C, Detective Stephenson used a comparison microscope and relied on the theory of firearm and toolmark examination propounded by the AFTE.  Id. at ¶ 21.[17]

Sometime during the investigation, Detective Stephenson searched the General Rifling Characteristics ("GRC") database, which was maintained by the Federal Bureau of Investigation ("FBI") and used in connection with firearm examinations.  See id. at ¶¶ 22, 25.  Upon entering information about projectiles recovered from a crime scene, the GRC database presented the user with a list of firearms capable of firing projectiles fitting the description entered by the user.  Id. at ¶ 26-28.  Detective Stephenson's first queries revealed that the projectiles from the crime scene could have been fired by a firearm produced by Astra, Beretta, Glock, Maverick, Smtih and Wesson, Walther, or Wilkson.  Id. at ¶ 29.

Following a February 7, 1994 shooting, discussed, supra, part II.A, NHPD police recovered a Browning Hi-Power 9mm pistol, which the NHPD labeled "K1," loaded with 9mm bullets bearing the brand Luger Winchester.  Id. at ¶ 33.  Detective Stephenson examined K1 to determine whether the fifteen shell casings recovered from the scene of the February 3 shooting were fired from K1.  Id. at ¶ 34.  In so doing, he used the GRC database once again.  Id. at ¶ 35.  While Detective Stephenson and Mr. Carmon do not

---

[16] Detective Stephenson asserts that this conclusion appeared on the two-page report. Stephenson 56(a)(1) Stmt. at ¶ 20.  Mr. Carmon correctly notes, however, that this conclusion appeared on the one-page report.  Pl.'s 56(a)(2) to Stephenson at ¶ 20.

[17] Detective Stephenson asserts that this conclusion appeared on the two-page report. Stephenson 56(a)(1) Stmt. at ¶ 21.  Mr. Carmon correctly notes, however, that this conclusion appeared on the one-page report.  Pl.'s 56(a)(2) to Stephenson at ¶ 21.

dispute that Detective Stephenson used the GRC database once more, they dispute whether the database shows that the bullets recovered at the February 3 crime scene suggested they could have been fired from K1.  See id. at ¶ 35.  Thus, the court will not rely on that "fact" in deciding the Motion for Summary Judgement filed by Detective Stephenson.  The parties agree, however, that Detective Stephenson selected GRC database search criteria in good faith and that his conduct in using the database complied with standard practices at the time.  Id. at ¶¶ 93-95.

Detective Stephenson documented his observations using handwritten notes and reports.  See id. at ¶¶ 38, 36.  On February 14, 1994, Detective Stephenson prepared a 2-page typed report, Stephenson Ex. D (Doc. No. 121-7), in which he concluded that the 15 bullet casings recovered at the February 3 crime scene were fired from K1.  Id. at ¶ 36.  He reached this conclusion on the basis of primer breech face marks present on the casings.  Id. at ¶ 37.  In this February 14 report, Detective Stephenson noted that he was not able to determine whether the six bullets recovered from the February 3 shooting were fired from K1.  Id. at ¶ 40.  This same report also notes that the interior of the barrel of K1 contained gauge marks caused by an implement being maneuvered around the circumference of the barrel.  Id. at ¶ 41.  Detective Stephenson photographed these markings, and the photograph was introduced at Mr. Carmon's trial.  Id. at ¶ 42-43.  Mr. Stephenson does not contest that the report reflects his conclusion that K1 fired the casings recovered at the February 3 crime scene; however, Mr. Stephenson does contest that this conclusion is accurate or reliable.  See id. at ¶ 37.

D.    Mr. Carmon's Arrest[18]

On February 23, 1994, Detective Dease applied for a warrant to arrest Mr.

Carmon in connection with the February 3 shooting.  Pl.'s 56(a)(2) to City at ¶ 29.  Mr.

Carmon was arrested soon thereafter and was tried for the shooting on March 15, 1995.

Id. at ¶ 30.

E.    Criminal Trial[19]

1.    Detective Stephenson's Trial Preparation

Detective Stephenson met with State's Attorney Michael Dearington ("Attorney

Dearington") at Attorney Dearington's office on the second floor of the New Haven

Superior Courthouse in preparation for the trial of Mr. Carmon.  Pl.'s 56(a)(2) to

Stephenson at ¶ 44.  During his meetings with Attorney Dearington, and during his

testimony at Mr. Carmon's trial, Detective Stephenson brought at least certain of his

files with him and left them in Mr. Dearington's office.  Id. at ¶¶ 45, 62–63.  The parties

dispute whether Detective Stephenson brought all of his files with him when he visited

the courthouse.  See id.  Attorney Dearington selected from Detective Stephenson's

files a photograph of the barrel of K1, which was introduced as an exhibit at Mr.

Carmon's criminal trial.  Id. at ¶ 46.

While the parties dispute whether Detective Stephenson was required to share

all of the contents of his files with Mr. Carmon in advance of trial, see, e.g., id. at ¶¶ 48–

64, they agree that Mr. Carmon had access to at least certain of the documents

_____

[18] In this sub-part, the court primarily draws from the Local Rule 56(a) Statements filed in
connection with the City's Motion for Summary Judgment.

[19] In this sub-part, the court primarily draws from the Local Rule 56(a) Statements filed in
connection with Detective Stephenson's Motion for Summary Judgment.  The trial is discussed infra, at
part II.D.

prepared by Detective Stephenson, including a report that lists several possible firearms manufacturers as having made the gun fired on February 3, but excluding Browning Hi-Power from the list.  Id. at ¶ 82.

        2.     Trial Testimony

During the trial, Mr. Jones and Ms. Stanley identified Mr. Carmon as the shooter, and Mr. McDonald testified that he sold the Browning handgun to Mr. Carmon sometime before the February 3 shooting.  Pl.'s 56(a)(2) to City at ¶¶ 31, 34.[20]  Detectives DiLullo and DiNello testified at trial about photographs that had been shown to Ms. Stanley.  Id. at ¶ 71.   Mr. Brantley also testified at trial and the defense elicited testimony from Mr. Brantley suggesting that he had made inconstant statements to NHPD officers about the February 3 shooting.  City's 56(a)(1) Stmt. at ¶ 33.[21]

On March 28, 1995, Detective Stephenson testified at Mr. Carmon's criminal trial. Pl.'s 56(a)(2) to Stephenson at ¶ 96. Mr. Stevenson testified at trial that he had received a firearm from Mr. Carmon on February 7, and that Mr. Carmon had scrapped the barrel of the gun.  Pl.'s 56(a)(2) to City at ¶ 36.  Detective Stephenson testified at trial that he had determined, through use of a microscope, that the same handgun was used in the February 3 shooting.  Id. at ¶ 37.  The jury found Mr. Carmon guilty of murder, assault in

---

[20] While Mr. Carmon does not dispute these assertions, he notes that Mr. McDonald told police that he sold the handgun to Mr. Carmon only after he was offered immunity and that police had indicated to him that they already believed Mr. McDonald had sold the handgun to Mr. Carmon.  Pl.'s 56(a)(2) to City at ¶ 34.

[21] Mr. Carmon objects to this assertion claiming it is an argument not a statement of fact.  City 56(a)(1) Stmt. at ¶ 333.  The court disagrees and deems the assertion admitted.  However, the City claims Mr. Carmon raised Mr. Brantley as a "red herring," City 56(a)(1) Stmt. at ¶ 38, and Mr. Carmon objects that this statement is argumentative.  Pl.'s 56(a)(2) to City at ¶ 38.  The court agrees with Mr. Carmon that this statement is argumentative and, therefore, it is not deemed admitted.

the first degree, and possession of a firearm without a permit.  Id. at ¶ 39.  The court

sentenced Mr. Carmon to eighty-five years imprisonment.  Id. at ¶ 40.

Mr. Carmon retained his own firearms expert, Robert Hathaway ("Mr. Hathaway")

in connection with his criminal trial.  Pl.'s 56(a)(2) to Stephenson at ¶ 83.  Mr. Hathaway

examined K1 himself and testified at trial.  Id. at ¶¶ 84, 88.

F.    Post Conviction Proceedings

Mr. Carmon challenged his conviction multiple times.  See City 56(a)(1) Stmt. at

¶¶ 41–46.[22]  In a Ruling dated November 30, 2022, Judge Jon Alander of the

Connecticut Superior Court found that Mr. Carmon has established evidence had been

suppressed and new evidence called into serious question the reliability of the jury's

verdict.  Carmon v. State, No. NNH CV19-5052879, 2022 WL 17423683, at *26 (Conn.

Super. Ct. Nov. 30, 2022); see also Pl.'s 56(a)(2) to City at ¶¶ 47–48.  The Court

granted Mr. Carmon's petition for a new trial.  Id.  Among the evidence that the

Connecticut Superior Court found had been suppressed by the State was a report

describing an interview conducted by Detective DiNello on February 6, 1994, with Mr.

Brantley's mother.  Id. at ¶ 69.  This interview contradicted Mr. Brantley's trial testimony.

Id.  That court also concluded that the State had suppressed witness statements

concerning Anthony Little, who had at one point been implicated in the February 3

shooting.  See id. at ¶ 70.  Mr. Carmon does not dispute that witness statements

concerning Mr. Little had been suppressed, but he does dispute the City's assertion to

the extent it suggests NHPD officers did not themselves suppress information.  Id.

---

[22] Mr. Carmon objects to this assertion as being immaterial.  Pl.'s 56(a)(2) to City at ¶¶ 41-46.
The court disagrees and deems it admitted.

14

G.    Practices of the New Haven Police Department[23]

The NHPD's Code of Conduct in place at the time of the February 3 shooting prohibited employees from entering false reports and fabricating, or withholding, evidence. Id. at ¶ 50. The Code of Conduct further specified that employees who failed to comply with the Code could be subject to punishment, including dismissal. Id. at ¶ 51. While the facts just summarized in this paragraph are undisputed, Mr. Carmon asserts that the NHPD did not in fact punish the officers who had violated the Code. Id.

A bulletin, titled Training Bulletin 8-3, effective February 1989, provides that interview tapes are to be preserved, as are field notes taken in the course of an investigation. Id. at ¶¶ 60–61; see also City's Ex. 65 at 1. While Mr. Carmon does not challenge that the Training Bulletin 8-3 so requires, he asserts that NHPD officers did not comply with this requirement during the time of the February 3 shooting and subsequent investigation. Id. at ¶ 61.

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016). If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[23] The court primarily draws from the Local Rule 56(a) Statements filed in connection with the City's Motion for Summary Judgment.

party." Cross Com. Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Unsupported allegations do not create a material issue of fact and cannot overcome a

properly supported motion for summary judgment. See Weinstock v. Columbia Univ.,

224 F.3d 33, 41 (2d Cir. 2000). In assessing the record to determine whether there are

disputed issues of material fact, the trial court must "resolve all ambiguities and draw all

inferences in favor of the party against whom summary judgment is sought." LaFond v.

Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.    DISCUSSION

### A.    Detective Carusone's Motion for Summary Judgment

Mr. Carmon brings four claims against Detective Carusone: a section 1983 claim

for suppression of material that must be disclosed to the defense; a second section

1983 claim for fabrication of evidence; a claim of negligence; and a claim of negligent

infliction of emotional distress. Am. Compl. Counts One, Two, Seven, and Eight.

Detective Carusone moves for summary judgment, arguing that the claims asserted

against him are without merit, the claims sounding in state law are untimely, and that

Detective Carusone is entitled to qualified immunity. See Carusone Mem.; Carusone

Reply. Mr. Carmon opposes these arguments. See Opp'n.

#### 1.    Section 1983 Claims Against Detective Carusone

Mr. Carmon asserts two claims against Detective Carusone under section 1983.

See Am. Compl. Detective Carusone moves for summary judgment as to both claims,

arguing that there is no evidence upon which a reasonable jury could find Detective

Carusone liable. See Mem. at 4–6. Detective Carusone also asserts qualified

immunity. Id. at 10–11. Mr. Carmon opposes these arguments. Opp'n at 44–52.

16

a.    Suppression of Evidence

"When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under [section] 1983 for violating the disclosure requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)."  <u>Bellamy v. City of New York</u>, 914 F.3d 727, 751 (2d Cir. 2019) (cleaned up).  In order to bring a successful section 1983 claim on the basis of a <u>Brady</u> violation, a plaintiff must "show the materiality of the nondisclosed evidence."  <u>Id.</u> at 751.  This showing "does not depend on factual innocence."  <u>Poventud v. City of New York</u>, 750 F.3d 121, 134 (2d Cir. 2014).  Instead, a plaintiff's rights under <u>Brady</u> are "defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial."  <u>United States v. Coppa</u>, 267 F.3d 132, 140 (2d Cir. 2001).  That means in order to prevail on his claim against Detective Carusone, Mr. Carmon "must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  <u>Bellamy</u>, 914 F.3d at 751 (internal quotation marks omitted).

Detective Carusone argues that Mr. Carmon's <u>Brady</u> claim fails because Detective Carusone's involvement in the February 3 shooting was "very limited" and dealt primarily with providing Ms. Stanley with his support.  Carusone Mem. at 5.  Indeed, Detective Carusone argues that there is "no evidence" he withheld information of any kind.  <u>Id.</u>

Mr. Carmon responds that there is evidence Detective Carusone withheld evidence that could have impacted the outcome of his criminal trial.  Opp'n at 44–45.  Specifically, Mr. Carmon argues that Ms. Stanley was Detective Carusone's confidential informant, something that he failed to disclose to the State.  <u>Id.</u>  Detective Carusone

17

responds that the evidence overwhelmingly suggests Ms. Stanley was not a confidential informant. See Carusone Reply at 1–2.

Mr. Carmon asserts that Detective Carusone divulged to Attorney Glenn Conway ("Attorney Conway') that Ms. Stanley was a police informant. Opp'n at 44 (citing Pl.'s Ex. 18). Indeed, during a hearing on Mr. Carmon's Habeas Petition, Attorney Conway testified that Detective Carusone told Attorney Conway that Ms. Stanley was his confidential informant. Pl.'s Ex. 18 at 143:11–25. While Detective Carusone averred that Ms. Stanley was not a confidential informant, Carusone Ex. B at ¶ 10, a reasonable jury could find, on the basis of Attorney Conway's testimony, that Ms. Stanley was indeed a confidential informant who worked with Detective Carusone. In the event a reasonable jury found Ms. Stanley was a confidential informant, a reasonable jury could further find that Detective Carusone's failure to disclose this information had a material impact on the outcome of Mr. Carmon's criminal trial. See Banks v. Dretke, 540 U.S. 668, 703 (2004) (the suppression of a trial witness's status as a police informant called into question the reliability of the jury's verdict).

Accordingly, the court concludes that Detective Carusone has failed to show there is no material fact on which a reasonable jury could find for Mr. Carmon on his Count One.

b.    Fabrication of Evidence

Mr. Carmon brings a second section 1983 claim against Detective Carusone, among others, asserting Detective Carusone is liable for falsifying evidence. Am. Compl. at Count Two. Detective Carusone maintains that he was not in any position to fabricate evidence, given his limited involvement in the investigation and asserts that Mr. Carmon makes no claim Detective Carusone pressured Ms. Stanley to offer false

testimony.  Carusone Mem. at 6.  Detective Carusone further argues that he was not present at the courthouse when Ms. Stanley is alleged to have made a false statement. Carusone Reply at 2–3.

Mr. Carmon responds that Detective Carusone was present when Ms. Stanley identified him as the February 3 shooter and asserts that Detective Carusone failed to intervene to prevent falsified evidence from being used to deprive Mr. Carmon of his liberty.  Opp'n at 45.  Thus, Mr. Carmon argues that a jury could reasonably find Detective Carusone liable for the fabrication of evidence on a "failure-to-intervene theory" of liability.  Id. at 46.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); Garnett v. Undercover Officer C0039, 838 F.3d 265, 275 (2d Cir. 2016).

The court is aware of no evidence suggesting that Detective Carusone, himself, falsified evidence.  Indeed, Mr. Carmon's claim against Detective Carusone in Count Two of the Amended Complaint is that Detective Carusone failed to prevent another detective from falsifying evidence and failed to intervene when this evidence was presented at Mr. Carmon's criminal trial while Detective Carusone was present.

That Mr. Carmon has failed to adduce evidence Detective Carusone falsified evidence is not fatal to his claim.  The court considers Mr. Carmon to have pled failure to intervene as a separate theory of liability animating Count Two of his Amended

19

Complaint.  Mr. Carmon pled: "Detective Carusone . . . fabricated evidence . . . and/or failed to intervene to prevent the Plaintiff from being deprived of liberty on the basis of evidence they knew to be fabricated."  Am. Compl. at ¶ 374.  Having so pled, the court will consider whether Count Two of Mr. Carmon's Amended Complaint survives summary judgment under a theory of failure to intervene.  See Israel v. City of New York, No. 16 CIV. 6809 (PGG), 2018 WL 11219076, at *3 n. 5 (S.D.N.Y. Sept. 29, 2018) (viewing a complaint as having pled failure to intervene as an alternative theory of liability under section 1983); see also Henry v. Daytop Vill., Inc., 42 F.3d 89, 95 (2d Cir. 1994) ("The flexibility afforded by Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims.").

The falsification of evidence being a constitutional violation, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014) (internal quotation marks omitted).  A police officer "who fails to intercede in the [commission of a] constitutional violation is liable for the preventable harm caused by the actions of other officers."  Id.

Under this alternative theory of liability, Mr. Carmon has adduced evidence upon which a reasonable jury could conclude Detective Carusone failed to intervene.  Mr. Carmon asserts Detective Carusone was with Ms. Stanley during an identification procedure held while Mr. Carmon was being arranged at the New Haven Courthouse on February 22, 1994.  See Opp'n at 45; Plaintiff's Local Rule 56(a)(2)(ii) Statement of

Additional Material Facts ("Pl.'s 56(a)(2)(ii) Stmt.") (Doc. No. 132-7) at ¶¶ 159–68.[24]  Mr.

Carmon asserts further that a police report filed by Detective DiLullo contained

fabricated evidence falsely suggesting Mr. Carmon reacted in an incriminating manner

upon seeing Ms. Stanley.  Id. (citing Pl.'s 56(a)(2)(ii) Stmt. at ¶¶ 163–68).  According to

Mr. Carmon, he was unaware that Ms. Stanley was in the courthouse and neither saw

her nor reacted to her presence.  Id. (citing Pl.'s 56(a)(2)(ii) Stmt. at ¶ 168).  Mr. Carmon

has offered some evidence that Detective Carusone, having been present for the

identification procedure, knew that Ms. Stanley observed Mr. Carmon from afar when

identifying him.  Id. (citing Pl.'s 56(a)(2)(ii) Stmt. at ¶ 168).  Finally, Mr. Carmon asserts

that Detective Carusone, being aware the information in the police report was false, was

obligated to intervene upon learning that this information had been provided to state

prosecutors, but failed to do so.  Id. (citing Pl.'s 56(a)(2)(ii) Stmt. at ¶ 200; Carusone

56(a)(1) Stmt. at ¶¶ 7–8).  On the basis of the evidence adduced by Mr. Carmon, a

reasonable jury could find that Mr. Carmon's constitutional rights were violated.  Despite

knowing this was the case, Detective Carusone failed to intervene.

Because there is a material issue of fact as to whether Detective Carusone failed

to intervene to protect Mr. Carmon from a constitutional violation committed by another

police officer, the court denies Detective Carusone's Motion as to Count Two.

### c.    Qualified Immunity

Detective Carusone invokes qualified immunity with respect to "any of the claims

against him."  Mem. at 10 (cleaned up).  However, "qualified immunity protects an

---

[24] Mr. Carmon cites to paragraphs 163 to 638 in his 56(a)(2)(ii) Statement.  Opp'n at 45.  Because his 56(a)(2)(ii) Statement ends at paragraph 436, the court assumes Mr. Carmon intended to cite to paragraphs 163 to 168.  See Pl.'s 56(a)(2)(ii) Stmt.

official from liability under federal causes of action but is not generally understood to protect officials from claims based on state law." Jenkins v. City of New York, 478 F.3d 76, 86 (2d Cir. 2007).[25]

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). The qualified immunity analysis involves two steps, which the court may address in whatever order it decides is sensible; first, "a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009). Second, "the court must decide whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Id. A right is clearly established when "existing precedent has placed the statutory or constitutional question beyond debate." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up). The defendant bears the burden of showing he is entitled to qualified immunity. Bacon v. Phelps, 961 F.3d 533, 542 (2d Cir. 2020).

Detective Carusone's qualified immunity analysis amounts in essence to a few sentences in which he asserts that, to the extent Detective Carusone was obligated to become involved in the February 3 investigation, "defendant Carusone would claim qualified immunity." Carusone Mem. at 11. On the basis of Detective Carusone's threadbare argument, the court cannot conclude that he has met his burden of demonstrating that Mr. Carmon has failed to show a constitutional violation occurred or

---

[25] While "[a] similar doctrine exists under Connecticut common law," Marchand v. Simonson, 16 F. Supp. 3d 97, 118 (D. Conn. 2014), Detective Carusone does not invoke this state law doctrine, and the court will not address it.

that this constitutional violation was not clearly established at the time of the events in question.

Therefore, at least at this stage of the litigation, the court does not grant Detective Carusone qualified immunity as to the section 1983 claims brought against him.

2.    Negligence Claims Against Detective Carusone

Detective Carusone seeks summary judgment as to the negligence claims brought against him by Mr. Carmon.  Carusone Mem. at 7-10; see Carusone Reply.  He argues summary judgment should be granted because these claims are untimely and lack evidentiary support.  Carusone Mem. at 7-10.  Mr. Carmon opposes these arguments.  Opp'n at 44-52.

a.    Statute of Limitations and Period Repose

In Detective Carusone's view, Mr. Carmon's negligence claims are untimely because the Connecticut statute that governs such claims requires such actions to be brought within two years from the date the injury was either first sustained or first discovered.  Carusone Mem. at 9.  According to Detective Carusone, Mr. Carmon was, therefore, required to bring any negligence claim sometime in the mid-1990s when he would have been aware of the supposed negligent acts committed against him.  Id. at 10.  Mr. Carmon, however, brought his negligence claims in 2023, making them untimely according to Detective Carusone.  Id.

Mr. Carmon responds that Connecticut law incorporates the principles articulated in Heck, and, as a result, statutes of limitations for tort claims connected with investigatory misconduct do not run until the underlying criminal proceeding has been favorable terminated.  Opp'n at 48-49.  Mr. Carmon also argues that Detective

23

Carusone was engaged in a continuing course of negligent conduct and, thus, the

statute of limitations did not begin to run until after his wrongful conviction was cured.

Id. at 49-52.

> Section 52-584 of the General Statutes of Connecticut provides:
>
> [n]o action to recover damages for injury to the person . . . caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of[.]

Conn. Gen. Stat. Ann. § 52-584.  The two-year period refers to the statute of limitations

and the three-year period refers to the period of repose, the latter "specifies the time

beyond which an action is absolutely barred by Section 52-584."  See Birch v. Town of

New Milford, No. 3:20-CV-1790 (VAB), 2021 WL 4932405, at *20 (D. Conn. Sept. 24,

2021).  As a result of this period of repose, "an action may be timed barred even if no

injury is sustained during the three years following a defendant's act or omission."  Id.

This statutory provision applies to Mr. Carmon's negligence and NIED claims.  Id.

However, the statute of limitations and period of repose contained in section 52-

584 are not necessarily fatal to Mr. Carmon's negligence claims.  "According to

Connecticut state decisional law, if a prior action prevents enforcement of a remedy

sought in a later action, the pendency of the prior action can toll the statute of limitations

for a later filed action."  Birch, 2021 WL 4932405, at * 20 (collecting cases).  Mr.

Carmon's negligence claims could not have been brought until after his criminal

conviction was invalidated.  Taylor v. Wallace, 184 Conn. App. 43, 51 (2018) (abrogated

on other grounds), ("If success in a tort action would necessarily imply the invalidity of a

conviction, the action is to be dismissed unless the underlying conviction is

invalidated.").  This is because the Connecticut Supreme Court has adopted the

principles articulated in the Supreme Court decision <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994). <u>See</u> <u>Cooke v. Williams</u>, 349 Conn. 451, 468, (2024) ("[A] convicted criminal defendant turned civil plaintiff must prove that he or she has obtained either postconviction or appellate relief from his or her conviction before pursuing a criminal malpractice action[.]"). <u>Heck</u> provides that, "when a state prisoner seeks damages in a [section] 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint <u>must be dismissed</u> unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. <u>Heck</u>, 512 U.S. at 478 (emphasis added).

While <u>Cooke</u> involved a claim of malpractice, other courts in this District have applied the reasoning articulated in <u>Cooke</u> to claims of negligence, NIED, false arrest, and malicious prosecution. <u>Turner v. Boyle</u>, 116 F. Supp. 3d 58, 91 (D. Conn. 2015) (malicious prosecution claim governed by section 52-577 of the General Statutes of Connecticut accrues only once the underlying action is resolved in favor of the plaintiff); <u>Birch</u> 2021 WL 4932405, at * 21 ("[The plaintiff's] negligence claims did not accrue until his criminal conviction was overturned."); <u>Esposito v. Aldarondo</u>, No. 3:22-CV-00621-MPS, 2023 WL 2228412, at *7 (D. Conn. Feb. 24, 2023) (reaching the same conclusion as to a plaintiff's claims sounding in false arrest and malicious prosecution).

Accordingly, Mr. Carmon's negligence and NIED claims did not accrue under section 52-584 of the General Statutes of Connecticut until his Habeas Petition was granted on November 30, 2022. Because Mr. Carmon brought his negligence claims against Mr. Carusone on July 17, 2023, within two years of the grant of his Petition. <u>See</u> Complaint (Doc. No. 1), Mr. Carmon's negligence and NIED claims are timely.

25

b.    Sufficiency of Evidence

In his Amended Complaint, Mr. Carmon brings two claims sounding in negligence against Detective Carusone, among others.  The first claim asserts Detective Carusone was negligent in failing to exercise due care during the investigation into the February 3 shooting, failing to disclose exculpatory evidence, and failing to intervene to prevent other law enforcement officers from engaging in misconduct.  Am Compl, Count Seven.  Mr. Carmon also asserts that Detective Carusone is liable for negligent infliction of emotional distress, because Detective Carusone's allegedly negligent actions carried an unreasonable risk of causing emotional distress resulting in illness or bodily harm.  Am. Compl., Count Eight.

Detective Carusone seeks summary judgment as to both negligence claims brought against him.  He argues that there is no evidence that Detective Carusone was negligent or is liable for NIED because he was not involved in the February 3 investigation.  Carusone Mem. at 8; see also Carusone Reply.  Mr. Carmon opposes these arguments, asserting that there are issues of material fact that preclude summary judgment on the negligence claims asserted against Detective Carusone.  Opp'n at 44-46.

The court agrees with Mr. Carmon.  Detective Carusone makes the conclusory assertion that there is no evidence he was involved in the investigation, and he, thus, cannot be liable for negligence or NIED.  See Carusone Mem. at 8 ("Obviously, the evidence fails to present any factual basis for any of these allegations as Carusone was, simply, not involved in the investigation or gathering evidence.").  As the court has already decided, however, Mr. Carmon has come forward with evidence upon which a

reasonable jury could find that Detective Carusone was involved in the investigation into the February 3 shooting.  See, supra, part IV.A.1.

*         *         *

Having considered all of the arguments raised in Detective Carusone's Motion for Summary Judgment, the court concludes that summary judgment is not warrant as to the claims brought against him.  Accordingly, the court denies Detective Carusone's Motion for Summary Judgment.

B.    <u>Detective Stephenson's Motion for Summary Judgment</u>

In his Amended Complaint, Mr. Carmon brings three claims against Detective Stephenson: Count One, a section 1983 claim for suppression of evidence; Count Seven, a negligence claim for failing to disclose exculpatory evidence, failing to reasonably investigate the involvement of other suspects, and failing to intervene; and Count Eight, a NIED claim for Mr. Carmon's suffering caused as a result of certain actions taken by Detective Stephenson during the investigation.  Am. Compl. at Count One, Seven, Eight.  Detective Stephenson seeks summary judgment as to all of the claims brought against him by Mr. Carmon.  Stephenson Mem. at 22-50; Stephenson Reply 3-12.  Mr. Carmon opposes Detective Stephenson's Motion.  Opp'n at 28-44, 47-60.

1.    Section 1983 Claim Against Detective Stephenson

With respect to the section 1983 claim for withholding exculpatory evidence, Detective Stephenson argues that he is entitled to summary judgment as to this claim because Mr. Carmon did not timely file his section 1983 claim and failed to adduce evidence that Detective Stephenson withheld evidence, or possessed the requisite intent in so doing, in violation of <u>Brady</u>.  Stephenson Mem. at 22-27, 47-50; Stephenson

27

Reply at 3, 5-8. Detective Stephenson also claims witness, prosecutorial, and qualified immunity. Stephenson Mem. at 27-36; Stephenson Reply at 3-5. Mr. Carmon argues in response that his section 1983 claim is timely, there are material issues of fact about whether Detective Stephenson disclosed exculpatory evidence, and maintains that Detective Stephenson is not immune from the section 1983 claim brought against him. Opp'n at 28-44.

<blockquote>a.    Statute of Limitations</blockquote>

Detective Stephenson asserts that Mr. Carmon's section 1983 claim is untimely because, under section 52-577 of the General Statutes of Connecticut, Mr. Carmon could have brought his section 1983 claim in 1995, immediately after he was convicted of the crimes at issue. Stephenson Mem. at 47-50. Mr. Carmon asserts, in opposition, that, based on the Supreme Court's decision in Heck v. Humphrey, 512 U.S. 477 (1994), his section 1983 claim is timely because his section 1983 claim could not have been brought until his conviction was vacated. See Opp'n at 43.

The section 1983 claims brought against Detective Stephenson are timely. Pursuant to Heck, an individual "to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a section 1983 plaintiff must prove that the conviction or sentence has been . . . declared invalid by a state tribunal authorized to make such determination." Heck, 512 U.S. at 487-86. As a result, Mr. Carmon's section 1983 claim against Detective Stephenson could not have been brought his claim until after his criminal case was favorably disposed. Johnson v. New York City Police Dep't, 651 F. App'x 58, 60 (2d Cir. 2016) ("a Brady claim is not cognizable under [section] 1983 unless the challenged conviction has been

invalidated.").  Thus, it was not until Mr. Carmon's conviction was invalidated in 2021 that the statute of limitations period began to run.

The statute of limitations for a 1983 claim is three years.  Lyon v. Jones, 3:01–CV–521 (JCH), 260 F. Supp. 2d 507, 513 (D. Conn. 2003), aff'd, 91 F. App'x 196 (2d Cir. 2004).  Because Mr. Carmon filed his section 1983 claim against Detective Stephenson within two-years of the expiration of the Connecticut's applicable statute of limitations period, his claim is timely.

b.      Sufficiency of Evidence

i.      Withheld Evidence

Detective Stephenson asserts that he did not suppress any evidence in connection with Mr. Carmon's criminal conviction and, thus, summary judgment should be granted.  Stephenson Mem. at 23-25; Stephenson Reply at 5-7.  According to Detective Stephenson, he brought with him the entire contents of his work file when he met with Attorney Dearington and made this work file available to Attorney Dearington during those meetings.  Id. at 24-25.  This work file, Detective Stephenson asserts, contained typed reports, GRC database search results, a firearms worksheet containing his notes and drawings, photographs, and other notes.  Id. at 24.  During his meetings with Attorney Dearington, Detective Stephenson maintains, Attorney Dearington reviewed the entire contents of Detective Stephenson's work file.  Id.  Thus, in Detective Stephenson's view, Mr. Carmon's Brady claim cannot survive summary judgment.  Id.

Mr. Carmon responds that there are genuine issues of material fact as to whether Detective Stephenson did, in fact, bring the entire contents of his work file with him when he met with Attorney Dearington.  Opp'n at 29-31.  In support of this, Mr. Carmon asserts that the State's file on the February 3 shooting did not contain Detective

29

Stephenson's notes or GRC database search queries.  Id. at 29, citing Stephenson's 56(a)(2) at ¶ 50.  That the State did not have certain of Detective Stephenson's files suggests, to Mr. Carmon, that Detective Stephenson may have withheld this material from the work file he provided for Attorney Dearington's review.  Id. at 29.  Mr. Carmon asserts further that Detective Stephenson tested two screwdrivers that were seized by NHPD officers on the theory that they may have been used to alter the barrel of K1.  Id. at 30-31. However, Mr. Carmon asserts that Detective Stephenson did not include these screwdriver test results in his work file and that these results amounted to exculpatory evidence.  See id. at 31.

The court agrees with Mr. Carmon that genuine issues of material fact remain about whether Detective Stephenson provided his complete work file to State prosecutors.  First, a reasonable jury could find that the reason the State lacked certain files attributable to Detective Stephenson was because he did not include those files in the work file he brought to his meetings with Attorney Dearington.

Second, a reasonable jury could find that Detective Stephenson tested the screwdrivers at issue, concluded that they did not create the marks on the barrel of K1, and excluded these findings from his work file.  A jury would be reasonable in making this finding because Detective Stephenson testified during a deposition that he maintained a marble composition notebook, in which he listed all of the evidence he tested in connection with his firearm and toolmark examinations.  Pl.'s Ex. 102 at 197:1-198:10.[26]  A page from this notebook refers to a "6 inch regular screwdriver" and "3 inch

_____

[26] Detective Stephenson asserts in his Reply that Mr. Carmon did not include allegations about Detective Stephenson's marble notebook, what the parties call an "evidence log," or its possible significance, in Mr. Carmon's Complaint.  Stephenson Reply at 7-8.  Detective Stephenson fails to

Philips screwdriver." Pl.'s Ex. 103 199:22-200:9. Even though Detective Stephenson

stated during his deposition that he could not recall whether he tested the screwdrivers,

Pl.'s Ex. 102 at 200:15-18, a reasonable jury could find, in reliance on Detective

Stephenson's deposition testimony and marble notebook, that he tested both

screwdrivers listed in the notebook. Indeed, Detective Stephenson conceded that, while

he could not recall if he tested the screwdrivers, it would have been possible to perform

such tests. Pl.'s Ex. 102 at 200:15-202:5.

Assuming a jury found Detective Stephenson did test the screwdrivers, his work

file did not contain the results. See Stephenson Mem. at 8 (citing exhibits of documents

that would have comprised Detective Stephenson's work file, none of which contain

screwdriver test results).[27] Most importantly, information pertaining to the screwdrivers

could have been exculpatory, or used for purposes of impeachment.

### ii.    Intent to Withold Evidence

Detective Stephenson next argues that, even if he excluded the evidence in

violation of Brady, he did not exclude such evidence intentionally, and thus he cannot

be found liable under section 1983 for a Brady violation. Stephenson Mem. at 25-27.

Mr. Carmon responds that there is ample circumstantial evidence to suggest that

---

explain, however, why it is of any legal significance that Mr. Carmon did not include allegations about this
marble notebook in his Complaint.

Because the court is aware of no reason why Mr. Carmon should have been required to make
such an allegation, it will consider Mr. Carmon's arguments about the significance of the marble
notebook.

[27] Because Detective Stephenson makes no argument as to whether the withheld evidence was,
or was not, exculpatory, the court need not address it. See Stephenson Mem. at 22-25. The court notes,
however, that in order to prove his Brady claim at trial, Mr. Carmon must show that "had the withheld
information been disclosed prior to trial, he would have been acquitted based on reasonable doubt or
convicted on a lesser charge." Bellamy v. City of New York, 914 F.3d 727, 751 (2d Cir. 2019) (internal
quotation marks omitted).

Detective Stephenson acted with deliberate indifference, if not outright bad faith.  Opp'n at 32-35.

The Second Circuit has "suggested, though without so concluding, that a civil Brady claim requires a showing that the non-disclosure was intentional."  Bellamy v. City of New York, 914 F.3d 727, 751 n. 23 (2d Cir. 2019); see also Valentin v. City of Rochester, 783 F. App'x 97, 99 (2d Cir. 2019) (summary order).  Intent may be shown through circumstantial evidence that suggests the defendant intentionally withheld evidence.  Bellamy, 914 F.3d at 751 n. 23 (explaining that evidence a detective acted improperly during an investigation could be used to show his intent); see also Manganiello v. City of New York, 612 F.3d 149, 164 (2d Cir. 2010) (explaining that a jury could consider a police officer's actions throughout an investigation to conclude that the officer acted with the requisite state of mind).

Mr. Carmon has adduced evidence upon which a jury could find that Detective Stephenson intentionally withheld evidence connected with the screwdrivers.  See, supra, part IV.B.1.a.i.  Because Mr. Carmon has come forward with some evidence, albeit circumstantial, with which a jury could evaluate Detective Stephenson's state of mind, trial is especially indispensable.  See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984) ("where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable[.]"); Gelb v. Bd. of Elections of City of New York, 224 F.3d 149, 157 (2d Cir. 2000) ("summary judgment is generally inappropriate where questions of intent and state of mind are implicated.").

Detective Stephenson invokes Horn v. City of New Haven, No. 3:18-CV-1502(RNC), 2024 WL 1417605 (D. Conn. Apr. 2, 2024), in which another court from this District granted Detective Stephenson's summary judgment motion.  Stephenson Mem. at 25-26 (citing Horn, 2024 WL 1417605, at *11).  However, in Horn, the District Count concluded that Detective Stephenson, who was then a State firearms examiner, was entitled to qualified immunity because the record before that court showed Detective Stephenson was simply following standard protocols at the time of the investigation at issue.  Horn, 2024 WL 1417605 at *1, *11.  The qualified analysis, however, is distinct from the analysis required to determine whether a plaintiff has adduced evidence to support his claim.  Saucier v. Katz, 533 U.S. 194, 204-05 (2001) (a qualified immunity inquiry is distinct from an inquiry of the merits of the claim).  Further, in Horn, the court noted that it was "undisputed" that Detective Stephenson believed he was acting properly in declining to disclose certain materials.  Horn, 2024 WL 1417605 at *11.

Here, by contrast, the parties dispute whether Detective Stephenson would have been reasonable to believe he acted properly in withholding evidence of the screwdriver test results.  See, supra, part IV.B.1.a.i.  Accordingly, there is evidence upon which a reasonable jury could find that Detective Stephenson intentionally withheld evidence.

c.    Witness Immunity

In Detective Stephenson's view, he is entitled to absolute witness immunity because Mr. Carmon cannot prove his Brady claim without relying on testimony provided by Detective Stephenson during Mr. Carmon's criminal trial.  See Stephenson Mem. at 27-29.  Mr. Carmon responds that his claims against Detective Stephenson are not dependent on his criminal trial testimony and, thus, witness immunity does not apply to this case.  Opp'n at 40-42.

33

The Supreme Court has recognized that "Congress intended [section 1983] to be construed in the light of common-law principles that were well settled at the time of its enactment." Kalina v. Fletcher, 522 U.S. 118, 123 (1997). In keeping with these principles, the Court has explained that, because trial witnesses "enjoyed a limited form of absolute immunity" at common law, it is appropriate for trial witnesses to receive absolute immunity "with respect to any [section 1983] claim based on the witness' testimony." Rehberg v. Paulk, 566 U.S. 356, 367 (2012). Witness immunity applies also to a witness's "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony" in order to prevent the circumvention of this rule through artful pleading. See Rehberg, 566 U.S. at 370. Importantly, however, the Court made clear that its Ruling should not be understood to "suggest that absolute immunity extends to all activity that a witness conducts outside of the [court] room." Id. at 370 n. 1. The Court cited the fabrication of evidence as an example in which absolute witness immunity would not apply. Id.

Interpreting Rehberg, the Second Circuit has explained that, in evaluating an assertion of witness immunity, the court "should determine whether the plaintiff can make out the elements of his [section] 1983 claim without resorting to the [defendant's] testimony." Coggins v. Buonora, 776 F.3d 108, 112 (2d Cir. 2015). If the plaintiff's claim "exists independently of the . . . testimony, it is not 'based on' that testimony[,] and thus the claim is not barred by witness immunity. Id. at 112-13 (concluding that a police officer could not invoke witness immunity because the section 1983 claim against him was based on, inter alia, the officer's police reports and knowledge of the falsity of reports prepared by others).

34

Mr. Carmon's section 1983 claim against Detective Stephenson does not rely on Detective Stephenson's trial testimony or statements made to prosecutors approximating the testimony he planned to give at trial.  See, supra, part IV.B.1.a.i. Instead, the claim is based on Detective Stephenson's investigation into K1, and the contents of Detective Stephenson's work file.  Id.  This case is in contrast to Horn, which Detective Stephenson invokes in support of his assertion of witness immunity, Stephenson Mem. at 27-29.  There, the court concluded that the plaintiff in Horn intended to rely "primarily, if not solely" on Detective Stephenson's trial testimony to prove his malign intent.  Horn, 2024 WL 1417605, at *10.  Here, the court has no indication that Mr. Carmon intends to invoke Detective Stephenson's testimony to prove intent.  Accordingly, Detective Stephenson is not entitled to witness immunity.

> d.    Prosecutorial Immunity

Detective Stephenson next argues that he is shielded from liability under section 1983 by prosecutorial liability because he was simply complying with Attorney Dearington's directions by leaving the work file at issue in Attorney Dearington's office. Stephenson Mem. at 29-30.  Mr. Carmon opposes this assertion of immunity, arguing that the relevant conduct at issue is not whether Detective Stephenson left his work file in Attorney Dearington's office, but what was contained in the work file.  Opp'n at 42-43.

"Prosecutorial immunity from [section] 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate."  Hill v. City of New York, 45 F.3d 653, 661 (2d Cir. 1995).  This immunity extends to "employees who assist such [a prosecutor] and who act under that official's direction in performing functions closely tied to the judicial process."  Id. at 660. However, actions undertaken to acquire evidence, as opposed to organizing evidence

and marshalling it for trial, are not covered by prosecutorial immunity. <u>Barbera v. Smith</u>, 836 F.2d 96, 100 (2d Cir. 1987).

The court need not linger on Detective Stephenson's argument because it is based on a mischaracterization of Mr. Carmon's section 1983 claim. Mr. Carmon's theory of liability is not that Detective Stephenson improperly left his work file in Attorney Dearington's office. Instead, Mr. Carmon asserts that Detective Stephenson failed to disclose evidence that could have been exculpatory or used for purposes of impeachment. <u>See</u> Opp'n at 29-31. This theory of liability is squarely related to the evidence gathering process and is outside the scope of prosecutorial immunity. <u>See</u> <u>Barbera</u>, 836 F.2d at 100 ("actions that are of a police nature and are not entitled to absolute protection."). As the court has already discussed, <u>see</u>, <u>supra</u>, part IV.B.1.a.i, a jury could reasonably find that Detective Stephenson excluded certain evidence from his work file that he produced during his investigation into the February 3 shooting. On the basis of this excluded evidence, which derives from the investigation of the shooting, a jury could find Detective Stephenson liable under section 1983 for violating <u>Brady</u>. Detective Stephenson may not avail himself of prosecutorial immunity.

e.    Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). It is the defendant's burden to establish that he is entitled to qualified immunity. <u>Bacon</u>, 961 F.3d at 542. In determining whether the defense of qualified immunity applies, courts must undertake a two-prong inquiry, taking the prongs in the order court sees fit. <u>See</u> <u>Pearson</u>, 555 U.S.

36

at 236.  Under the first prong, "the court must decide whether the facts that a plaintiff has . . . shown (see Rules 50, 56) make out a violation of a constitutional right."  <u>Id.</u> at 232. [28]  Under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  <u>Id.</u>  A right is clearly established when "existing precedent has placed the statutory or constitutional question beyond debate."  <u>Reichle</u>, 566 U.S. at 664 (cleaned up).

The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage of litigation."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (collecting cases).  Nevertheless, "[i]f there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues[.]"  <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 162 (2d Cir. 2012).

Detective Stephenson argues that he is entitled to qualified immunity because his actions were in compliance with standard policies at the time of the events in question and were, therefore, objectively reasonable.  Stephenson Mem. at 30-32; Stephenson Reply at 3-5.  Detective Stephenson further argues that his actions did not violate clearly established law.  Stephenson Mem. at 33-36.  In opposition, Mr. Carmon argues that it is a question of fact as to whether Detective Stephenson acted in accordance with the standard policies in effect at the time and maintains that, by withholding evidence, Detective Stephenson violated Mr. Carmon's clearly established constitutional right.  Opp'n at 35-40.

---

[28] The court has already concluded that Mr. Carmon has adduced evidence upon which a reasonable jury could find he suffered a <u>Brady</u> violation.  <u>See</u> <u>supra</u>, part IV.A.1. Thus, the court need not consider the first prong of the qualified immunity inquiry.

Mr. Carmon has adduced evidence upon which a reasonable jury could find Detective Stephenson acted in a manner that violated Mr. Carmon's clearly established constitutional right.  Detective Stephenson mistakenly attempts to frame the question at issue as whether it was clearly established in 1994 that a firearms examiner was obligated to proactively make the prosecution aware of GRC database printouts and other research materials.  Stepheson Mem. at 34.  Detective Stephenson further argues, without citing caselaw, that it was not clearly established he was obligated to include certain observations, such as markings on bullets, in his work file materials.  Id. at 35.  As the court has already explained, see, supra, part IV.B.1.a.i, Mr. Carmon maintains that Detective Stephenson excluded exculpatory evidence from his work file, not only that he failed to proactively make the prosecution aware of certain aspects of that file or neglected to document the presence of certain markings.  Opp'n at 36.

The Second Circuit explained in Walker v. City of New York, 974 F.2d 293 (2nd Cir. 1992), that police officers have an obligation to disclose exculpatory evidence and that they satisfy this obligation when "they turn [such evidence] over to the prosecutors." Id. at 299.  Indeed, the Second Circuit later reasoned that "an analyst or technician fulfilling any of the roles associated with forensic analysis, in 1999 reasonably would have understood that he or she was required to turn over exculpatory information to the prosecutor." Horn v. Stephenson, 11 F.4th 163, 171 (2d Cir. 2021).[29]  This obligation not only extended to exculpatory evidence, "but also [to] evidence that may be used to impeach a government witness." United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987).  The court concludes, that, in 1994, it was clearly established that police officers

---

[29] While Horn dealt with events occurring in 1999, its reasoning was based on Walker, which was decided two years prior to the events at issue in the instant case.  See Horn, 11 F.4th at 171.

had an obligation to disclose to the prosecution evidence that could be exculpatory or used for impeachment.

Even if it was clearly established that Detective Stephenson was required to disclose certain evidence, he may be able to invoke qualified immunity if he can show that he acted in an objectively reasonable manner. To that end, Detective Stephenson argues that, at the time of the events in question, it was standard practice to disclose evidence by sharing the contents of the work file, and thus qualified immunity is appropriate because all officers in his position would have acted as he did. Stephenson Mem. at 30-32. Mr. Carmon responds that excluding exculpatory evidence from the work file would not have been considered objectively reasonable at the time of the events in question. Opp'n at 36-37.

On the record before the court, drawing all reasonable inferences in the non-movant's favor, Detective Stephenson has failed to show that he acted in an objectively reasonable manner. See Birch v. Town of New Milford, No. 3:20-CV-1790 (VAB), 2023 WL 4684720, at *39 (D. Conn. July 21, 2023), appeal dismissed, No. 23-1153, 2024 WL 3083385 (2d Cir. June 21, 2024) ("summary judgment on the basis of qualified immunity is precluded where disputed issues exist as to whether the conduct of the officer was proper." (cleaned up) (citing Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994)).

In further support of his invocation of qualified immunity, Detective Stephenson suggests the court should follow Horn and grant him qualified immunity. Stephenson Reply at 3-5 (citing Horn, 2024 WL 1417605, at *11). There, that court concluded that Detective Stephenson had brought the entity of his work file with him when meeting with prosecutors and considered whether it was objectively reasonable for Detective

Stephenson to think that he had satisfied his <u>Brady</u> obligations by making this work file available to prosecutors.  <u>See</u> <u>Horn</u>, 2024 WL 1417605, at *3, *11.  In the instant case, in contrast to <u>Horn</u>, the question is whether it would have been objectively reasonable for an officer to withhold evidence from the work file, thereby failing to provide prosecutors with the entirety of the work file.  <u>Compare</u>, <u>supra</u>, part IV.B.1.i.  Thus, <u>Horn</u> is not helpful in determining whether Detective Stephenson acted in an objectively reasonable manner in the instant case.

Accordingly, the court concludes that, on the basis of the record before it, Detective Stephenson cannot now successfully invoke the defense of qualified immunity.

### 2.     Negligence Claims Against Detective Stephenson

Mr. Carmon brings two common law claims against Detective Stephenson: negligence and NIED.  Am. Compl. Counts Seven, Eight.  Detective Stephenson asserts that Mr. Carmon's claims are untimely and maintains that he is immune from Mr. Carmon's common law claims through discretionary act immunity.  Stephenson Mem. at 36-46; Stephenson Reply at 3, 8-10.  Mr. Carmon opposes Detective Stephenson's arguments, asserting first, that his claims are timely; second, Detective Stephenson had a ministerial duty to disclose all exculpatory evidence to the prosecution; and third, discretionary act immunity does not apply where, as here, the acts at issue put an identifiable person in imminent harm.  Opp'n at 47-49, 52-56.

### a.     State Statute of Limitations

Detective Stephenson raises largely the same arguments as Mr. Carusone raised concerning the supposed tardiness of Mr. Carmon's common law claims. <u>Compare</u> Stephenson Mem. at 44-46 (asserting Mr. Carmon's negligence claims are

barred by section 52-584 of the General Statutes of Connecticut); with Carusone Mem. at 9 (making the same argument).  For the reasons the court has already explained, Mr. Carmon's negligence claims are timely because Connecticut applies the Heck doctrine to civil claims that risk undermining the validity of a criminal conviction.  See, supra, part IV.A.2.a.  Accordingly, the applicable statute of limitations was tolled until a Connecticut Superior Court favorably disposed of Mr. Carmon's criminal conviction.

b.    Discretionary Act Immunity

"Generally, a municipal employee is liable for the misperformance of ministerial acts, but has . . . immunity in the performance of governmental acts." Cotto v. Bd. of Educ. of City of New Haven, 294 Conn. 265, 272 (2009).[30]  Ministerial acts are those that, by a clear directive, "compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." Ventura v. Town of E. Haven, 330 Conn. 613, 631 (2019).  Discretionary acts are those "performed wholly for the direct benefit of the public and are supervisory or discretionary in nature." Gauvin v. New Haven, 187 Conn. 180, 184 (1982).  Discretionary act immunity is subject to certain exceptions, including "when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." Doe v. Petersen, 279 Conn. 607, 616 (2006).  This imminent harm exception has three requirements: first, the harm must be imminent; second, there must be an identifiable victim; and third, it must be apparent to the public official that his or her

---

[30] "[While] sometimes called 'qualified immunity[,]' [courts in this District] refer to it as 'discretionary act immunity,' as does the Connecticut Supreme Court, to avoid confusion with the doctrine of qualified immunity under 42 U.S.C. § 1983." Dipane-Saleem v. Gallagher, No. 3:15-CV-596 (MPS), 2016 WL 1060190, at *7 (D. Conn. Mar. 15, 2016).

conduct is likely to harm this victim.  Edgerton v. Town of Clinton, 311 Conn. 217, 230 (2014).

Detective Stephenson maintains that, in general, police officers act with discretion when performing their duties.  Stephenson Mem. at 39-40.  Mr. Carmon responds that section 54-86c(c) of the General Statutes of Connecticut directs police officers to disclose all exculpatory evidence, meaning that Detective Stephenson, in Mr. Carmon's view, was required to perform a ministerial act.  Opp'n at 52-53.  Section 54-86c(c) provides that police officers "shall disclose in writing any exculpatory information or material which he may have with respect to any criminal investigation to the prosecutorial official in charge of the case."  Conn. Gen. Stat. Ann. § 54-86c.

The court is aware of no case decided by a Connecticut state court that considers whether section 54-86c(c) is ministerial or discretionary.  The Connecticut Supreme Court has, however, explained that "[m]andatory statutory language is not sufficient to create a ministerial duty unless the statute itself limits discretion in the performance of the mandatory act."  Northrup v. Witkowski, 332 Conn. 158, 187 (2019). And according to one Connecticut Appellate Court, "[t]he mere fact that a statute uses the word 'shall' in prescribing the function of a government . . . officer should not be assumed to render the function necessarily obligatory[.]"  Mills v. The Sol., LLC, 138 Conn. App. 40, 51 (2012) (internal quotation marks omitted).  In interpreting this statute, the court is mindful that the Connecticut Supreme Court has explained, "as a general rule, police officers are protected by discretionary act immunity when they perform the typical functions of a police officer."  Ventura, 330 Conn. at 631.  Accordingly, the court concludes that section 54-86c(c) imposes a discretionary, rather than ministerial, duty

upon officers to disclose certain information.  In reaching this conclusion, this court joins

at least one other court in this District reaching the same view of the statute.  See Horn

v. City of New Haven, No. 3:18-CV-1502(RNC), 2024 WL 1342762, at *7 (D. Conn. Mar.

29, 2024) ("the duty imposed by the statute [section 54-86c(c)] is discretionary.").

Though section 54-86c(c) imposes a discretionary duty, Detective Stephenson

may still be liable under the imminent harm exception, which Mr. Carmon invokes.

Opp'n at 54-56.  According to Mr. Carmon, the applicability of the exception to

discretionary act immunity requires the determination of factual issues, suggesting that

resolution of discretionary act immunity is inappropriate on summary judgment.  See id.

Detective Stephenson responds that there is no evidence he could have reasonably

foreseen that his actions would put Mr. Carmon at risk of imminent harm.  Stephenson

Mem. at 40-43.  He asserts further that there is no evidence the harm at issue was

physical in nature which, Detective Stephenson argues, is a requirement for the

exception to apply.  Stephenson Reply at 8-10.

The court disagrees with Detective Stephenson that, for the imminent harm

exception to apply, the harm at issue must be physical.  Indeed, "the Connecticut

Supreme Court [in Evon v. Andrews, 1989] has explicitly entertained an identifiable

person-imminent harm claim involving what it called a 'nonphysical risk of harm.'"  Pines

v. Bailey, No. 3:10CV866 MRK, 2012 WL 2958213, at *6 (D. Conn. July 19, 2012), rev'd

on other grounds, 563 F. App'x 814 (2d Cir. 2014).  Further, other courts "have reached

divergent results" in deciding whether non-physical harms are contemplated by the

exception.  Horn v. City of New Haven, No. 3:18-CV-1502(RNC), 2024 WL 1342762, at

*7 (D. Conn. Mar. 29, 2024).  The court finds it instructive that the Connecticut Supreme

Court has not expressly precluded the invocation of non-physical harms as harms contemplated under the discretionary act immunity exception at issue.  See Doe v. Petersen, 279 Conn. 607, 618 n. 10 (2006) (considering how imminency should be determined in the context of a psychological harm asserted by the plaintiff).  Thus, for the purpose of deciding the present Motion, the court predicts that the Connecticut Supreme Court would conclude non-physical harms are contemplated under the discretionary act immunity exception now raised by Mr. Carmon.[31]

There are genuine issues of material fact that should be decided by the trier of fact before the court decides whether the imminent harm exception applies.  Drawing all reasonable inferences in Mr. Carmon's favor, a reasonable jury could find that Detective Stephenson was initially aware another individual, Arthur Brantley, was implicated in the February 3 shooting.  Indeed, on the basis of the evidence adduced by Mr. Carmon, a reasonable jury could infer that Detective Stephenson was aware Mr. Carmon became a suspect after the recovery of K1.  See Pl.'s Ex. 41 (Doc. No. 134-11) (explaining that Mr. Carmon owned K1 and gave it to Mr. Stevenson); Pl.'s Ex. 46 (Doc. No. 134-16) (documenting Detective Stephenson's tests of K1).  A reasonable jury could also infer that, after Detective Stephenson determined K1 had been altered, Pl.'s Ex. 46, police pressured Mr. Stevenson to suggest K1 had been scraped using a screwdriver.  See Pl.'s Ex. 47 (Doc. No. 134-17).  With these inferences in mind, a reasonable jury could find that Detective Stephenson elected to conceal the negative screwdriver test results to strengthen the State's case against Mr. Carmon.  See, supra, part IV.A.2.i.  Thus, on

---

[31] "To the extent that state law is uncertain or ambiguous, [the court] must carefully predict how the state's highest court would resolve the uncertainty or ambiguity."  Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 78 (2d Cir. 1999) (cleaned up).

the basis of the evidence adduced by Mr. Carmon, and drawing all reasonable inferences in his favor, a reasonable jury could find facts warranting the application of the imminent harm exception to discretionary act immunity.

In reaching this conclusion, this court joins other courts within this District that have declined to grant discretionary act immunity at the summary judgment stage under similar circumstances.  See Birch v. Town of New Milford, No. 3:20-CV-1790 (VAB), 2025 WL 1603217, at *5 (D. Conn. June 6, 2025) (charging the jury with determining whether the plaintiff had established facts warranting application of the imminent harm exception).  Indeed, this approach is in keeping with the Connecticut Supreme Court's acknowledgement that "unresolved factual issues material to the applicability of the [discretionary act immunity] defense" may require that the "resolution of those factual issues [be] properly left to the jury."  Haynes v. City of Middletown, 314 Conn. 303, 313 (2014).

The court concludes these are material issues of fact concerning Detective Stephenson's defense. Therefore, the court denies his Motion for Summary Judgement on this basis.

*               *               *

In conclusion, the court denies Detective Stephenson's Motion for Summary Judgment, having considered all of the arguments raised by him in his Motion, Memorandum of Law, and Reply.

C.    The City's Motion for Summary Judgment

Mr. Carmon brings three claims against the City: Count Six is a section 1983 claim on the basis of the City's alleged custom of misbehavior or deliberate indifference to misconduct committed by NHPD officers; Count Nine is a claim for indemnification to

the extent the individual defendants are found liable for the claims Mr. Carmon asserts against them; and Count 10 is a direct action for damages caused as a result of the City's employees.  Am. Compl., Counts Six, Nine, and Ten.

The City moves for summary judgment as to all of the claims brought against it. See City Mem; City Reply.  Mr. Carmon opposes summary judgment.  See Opp'n at 9-27, 47-60.

### 1. Monell Claim

In the City's view, the section 1983 claim brought against it fails because Mr. Carmon cannot adduce evidence that the City engaged in a pattern or practice of condoning unconstitutional investigative techniques, or that the City was deliberately indifferent to police officer misconduct.  City Mem. at 2-19; City Reply at 1-3.  Mr. Carmon responds that he has adduced sufficient evidence upon which a reasonable jury could find the City liable on a theory of custom, pattern, or practice, or deliberate indifference.  Opp'n at 10-27.

A municipality, such as the City, may be sued under section 1983 when the plaintiff is injured as a result of "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). "[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004).  Instead, among the ways a plaintiff can establish a municipality is liable for a constitutional tort is by showing "a local government [was] faced with a pattern of

46

misconduct and d[id] nothing, compelling the conclusion that the local government . . .

acquiesced in or tacitly authorities its subordinates' unlawful actions." Reynolds v.

Giuliani, 506 F.3d 183, 192 (2d Cir. 2007).  This pattern must be "sufficiently persistent

or widespread" such that it "acquires the force of law."  Id.  In the alternative, a plaintiff

can establish Monell liability by "showing that a municipal policy or custom existed as a

result of the municipality's deliberate indifference to the violation of constitutional rights,

either by inadequate training or supervision."  Russo v. City of Hartford, 341 F. Supp. 2d

85, 107 (D. Conn. 2004) (citing Vann v. City of New York, 72 F.3d 1040, 1049 (2d

Cir.1995).

Mr. Carmon asserts that the City is liable for fabricating evidence used in his

criminal conviction.[32]  He asserts that the City is liable because the NHPD engaged in a

pattern or practice of fabricating witness statements, or pressuring witnesses to give

false statements.  See Opp'n at 11-14.  Mr. Carmon cites multiple instances in which

NHPD officers, or supervisors, were accused of falsifying evidence, and Mr. Carmon

argues that the City took little, if any action, to correct these rampant constitutional

violations.  Id.  In connection to a 1988 murder investigation, for example, one witness

testified that NHPD Detective Joseph Greene ("Detective Greene"), had given her a

script to read into a tape recorder, and that the witness had not actually seen who

committed the murder.  56(a)(2)(ii) Stmt. at ¶ 224,399 (citing State v. Alvarez, 216

Conn. 301, 316 (1990)).  In 1991, the witnesses interviewed by Detective Greene in

---

[32] The City also claims that, to the extent the court concludes "an individual defendant has not committed a constitutional violation, the City is entitled to judgment in its favor as well[.]"  City Mem. at 19. Considering that only some of the individual defendants involved in the instant case have moved for summary judgment, the court could not now conclude, as a matter of law, that none of the individual defendants could be liable for a constitutional violation.

connection with a separate murder testified that Detective Greene "intimidated and bribed them into giving false statements."  Pl.'s Ex. 93 (Doc. No. 137-3) at 7.  During a separate 1991 homicide investigation, Detective Greene told a witness "what had to be said" and threatened another witness with a murder charge if he did not name a specific person as the suspect as the perpetrator of the homicide.  Pl.'s Ex. 92 (Doc. No. 137-2) at 3.  In connection with a third 1991 homicide investigation, defendant Michael Sweeney, who was a Sergeant Detective of the NHPD, witnessed his supervisee, Detective Vincent Raucci, threaten a witness that he would be charged with a homicide if the witness did not provide the desired statement.  See Pl.'s Ex. 73 (Doc. No. 136-3) at 17:12-19:24, 99:6-11, 106:4-7, 108:21-3.  Indeed, according to Detective Sweeney, Detective Raucci told the witness, "[j]ust tell us that these two men did it because I know they did it."  Id. at 114:3-13.

While Mr. Carmon offers several more examples like the ones already discussed, the court need not recount them.  See Opp'n at 11-14.  On the basis of the evidence adduced by Mr. Carmon, a reasonable jury could conclude that, at the time of the investigation into the February 3, 1994, shooting, that NHPD policymakers instituted a custom, pattern, or practice of falsifying evidence.  While the evidence reviewed by the court does not directly establish that officials at the highest level of the NHPD supported fabricating evidence, the evidence reviewed by the court suggests a "widespread pattern" of fabricating evidence, which would allow a jury to reasonably conclude policymakers constructively condoned such a practice.  See Lucente v. Cnty. of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020).

The City argues that Mr. Carmon has failed to establish the NHPD engaged in a pattern, practice, or custom of falsifying evidence. See Mem. at 8-16. According to the City, Mr. Carmon's assertion fails for several reasons.

First, the City notes that it had policies in place prohibiting such behavior. Id. at 9-11. However, "[w]here a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such [an] unconstitutional application might itself be considered municipal policy[.]" Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004). Accordingly, that the City had an official policy admonishing officers not to fabricate evidence does not invalidate Mr. Carmon's claim, supported by evidence, that the NHPD's custom was to fabricate evidence, especially in connection with homicide investigations.

The City next argues that Mr. Carmon cannot establish a pattern or practice of police misconduct because several decisions rendered by Connecticut State Courts have declined to either find the City liable for similar instances of police misconduct, or declined to grant criminal defendants' relief where similar police misconduct was at issue. See id. at 12-13. The court is unconvinced by this argument. Simply because the City has come forward with some evidence calling into question the evidence proffered by Mr. Carmon does not mean it would be unreasonable for a jury to conclude that the City engaged in a custom, pattern, or practice of sanctioning the fabrication of evidence. See Lucente, 980 F.3d at 301 (2d Cir. 2020) ("It is squarely within the province of the jury to decide, in determining municipal liability, what weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case."); see also Johnson

v. City of New Haven, et al., No. 3:17-cv-1479 (AVC), at 40 (D. Conn. Apr. 13, 2020)

(denying the City of New Haven's summary judgment motion as to the plaintiff's Monell

claim premised on the NHPD's investigatory misconduct).

The court concludes, therefore, that Mr. Carmon has adduced evidence upon

which a reasonable jury could find the City liable for violating Mr. Carmon's

constitutional rights on a theory that the City engaged in a custom, pattern, or practice

of falsifying evidence. Because Mr. Carmon has adduced such evidence, the court

need not consider his alternative theories of Monell liability. Accordingly, the court

denies the City's Motion for Summary Judgment as to Mr. Carmon's Monell claim.

### 2.    Common Law Claims

Mr. Carmon seeks indemnification from the City of the individual defendants

under section 7−456 of the General Statutes of Connecticut. Am. Compl., Count Nine.

He also brings a direct action claim against the City pursuant to section 52−557n of the

General Statutes of Connecticut. Am. Compl., Count Ten. According to the City, Mr.

Carmon's common law claims are untimely and substantively deficient. See City Mem.

at 19-39; City Reply at 3-10. Mr. Carmon urges, in opposition, that his common law

claims against the City are timely, supported by sufficient evidence, and not otherwise

infirmed. See Opp'n at 47-60.

### a.    Statute of Limitations

The City raises arguments similar to those the court has already addressed in

this Ruling on the Motions filed by Detectives Carusone and Stephenson. In the City's

view, the Supreme Court's decision in Heck does not apply to the common law claims at

issue here. City Mem. at 20-22. Instead, according to the City, sections 52-584 and 52-

557 bar Mr. Carmon's claims for indemnity and direct liability.  Id. at 22-24 37-39.  Mr.

Carmon opposes these arguments.

As the court has twice addressed, the City is incorrect to argue that Mr. Carmon's

common law claims are barred by the applicable statute of limitations.  See, supra, parts

IV.A.2.a, IV.B.2.  Pursuant to the principles articulated in Heck, adopted by the

Connecticut Supreme Court and applied by courts within the District, Heck tolled the

applicable statute of limitations until Mr. Carmon's criminal case was favorably

terminated.  See Heck, 2024 WL 1342762, at *3 ("claims seek damages for harm

resulting from the plaintiffs' allegedly wrongful convictions and imprisonment.  These

damages could not be recovered until the convictions were vacated.  Once that

occurred, the plaintiffs had at least two years to bring suit."); Birch, 2021 WL 4932405,

at *21 ("[the plaintiff's] negligence claims did not accrue until his criminal conviction was

overturned by the Supreme Court of Connecticut."); Esposito, 2023 WL 2228412, at *7

("the statute of limitations for [the plaintiff's section] 52-557n claim arising from the

individual defendants' allegedly negligent decisions to arrest and prosecute him was

tolled while the underlying criminal case was pending.").

Therefore, the court concludes that Mr. Carmon's common law claims brought

against the City are timely because he brought them against the City within two years of

the favorable disposition of his underlying criminal conviction.

b.    Section 7−465 Notice

The City next argues that Mr. Carmon's claim for indemnification is substantively

barred because he failed to timely provide the City with notice of suit, as required by

section 7-465(a) of the General Statutes of Connecticut.  City Mem. at 29-31; City Reply

at 7-10.  While Mr. Carmon concedes that he did not file such a notice, see Opp'n at 60,

he argues that notice is not required where, as here, the plaintiff seeks indemnification

for civil rights violations, in contract to physical injuries or property damage.  Opp'n at

59-60.

> Under section 7-465(a) of the General Statutes of Connecticut:
>
> No action for personal <u>physical injuries</u> or damages to real or personal property shall be maintained against such municipality and employee jointly unless such action is commenced within two years after the cause of action therefor arose and written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued.

Conn. Gen. Stat. Ann. § 7-465 (emphasis added).  By its plain language, the statute

requires notice when a plaintiff seeks indemnification on the basis of physical injury or

property damage.  <u>Id</u>.  The statute "clearly does not require notice for a civil rights action

or any action other than one for personal physical injury or property damages."

<u>Quezada v. City of Waterbury</u>, No. 3:22-CV-00077 (AWT), 2024 WL 3988666, at *4 (D.

Conn. Aug. 29, 2024); <u>see also</u> <u>Milardo v. City of Middletown</u>, No. 3:06CV01071(DJS),

2009 WL 801614, at *10 n. 8 (D. Conn. Mar. 25, 2009) (explaining that the notice

provision is not at issue for claims seeking indemnification on the basis of civil rights

violations); ("The statute . . . does not require notice for civil rights actions.").

Mr. Carmon's indemnification claim asserts that the individual defendants

"infringed on Plaintiff's civil rights and caused physical damages to his person and

property while performing their duties[.]"  Am. Compl. at ¶ 415.  Thus, to the extent Mr.

Carmon's indemnification claim seeks damages as a result of physical harms caused to

him by the individual defendants, any such claim is barred because he failed to notice

the City.  However, to the extent Mr. Carmon seeks damages arising from alleged

violations of his civil rights, he was not required to give notice to the City, and those claims survive.[33]

### c.     Common Law Claims and Willful Misconduct

According to the City, Mr. Carmon's indemnification claim fails because section 7-465 of the General Statutes of Connecticut statute does not require a municipality to indemnify employees who engage in willful or wanton misconduct.  City Mem. at 31-34. Thus, in the City's view, because Mr. Carmon alleges in parts of his Amended Complaint that individual defendants engaged in intentional misconduct, the City cannot be required to indemnify this behavior.  Id.  Mr. Carmon responds that he has pled theories of liability, which sound in willfulness or negligence, in the alternative.  Opp'n at 57-58.  He asserts further that, certain of his claims are pled on the basis of NHPD officers' failure to intervene, which he asserts requires no requisite mental state for liability to attach.  Id. at 58-59.  These claims included failure to intervene for the following: to prevent Brady violations, to prevent deprivation of liberty based on fabricated evidence, to prevent deprivation of liberty for malicious prosecution, and for Franks violations.  Id.

As he is permitted to do under the Federal Rules of Civil Procedure 8, Mr. Carmon pleads alternative theories of liability in his Amended Complaint.  Fed. R. Civ.

---

[33] In its Reply, the City invites the court to certify the question of section 7-465 notice requirement to the Connecticut Supreme Court.  City Reply at 9-10.  Because the court concludes the meaning of the statute is unambiguous, and is thus not subject to multiple reasonable interpretations, the court declines the City's invitation to certify the question of the statute's meaning to the Connecticut Supreme Court. Dorman v. Satti, 862 F.2d 432, 436 (2d Cir. 1988) ("certification [is appropriate] in cases where the state court could decide between two plausible interpretations of an ambiguous statute.").

Relatedly, the court need not consider the legislative history of section 7-465, as the City's urges in its Reply, because the plain meaning of the statute is clear.  State v. Moore, 352 Conn. 912, 919 (2025) ("The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. (internal quotation marks omitted.").
.

P. 8.  With respect to Mr. Carmon's section 1983 claims, he asserts that the defendants either acted willfully, with deliberate indifference, or failed to intervene.  <u>See</u> Am. Compl, Counts One to Six (First Cause of Action – Suppression of Brady Material; Second Cause of Action – Fabrication of Evidence; Third Cause of Action – Malicious Prosecution; Fourth Case of Action – <u>Franks/</u>False Warrant Affidavit; Fifth Cause of Action – Coerced Self-Incriminating Statement; Sixth Cause of Action – Municipal Liability).  With respect to Mr. Carmon's common law claims, he asserts the individual defendants acted negligently and maintains the City breached certain duties of care. <u>See</u> Am. Compl., Counts Seven to Ten (Seventh Cause of Action – Negligence; Eighth Cause of Action – Negligent Infliction of Emotional Distress; Ninth Cause of Action – Indemnification against the City of New Haven; Tenth Cause of Action – Direct Action Against City of New Haven).  By pleading in the alternative, Mr. Carmon has not somehow invalidated the common law claims brought against the City.  Indeed, section 1983 "has no precise counterpart in state law.  It is the purest coincidence when state statutes or the common law provide for equivalent remedies; any analogies to those causes of action are bound to be imperfect."  <u>Rehberg</u>, 566 U.S. at 366 (cleaned up).

The City is correct, however, that Mr. Carmon may not hold the City liable indirectly through section 7-465, or directly through section 52-557n, to the extent this liability stems from the willful actions of individual defendants.  <u>City of Hartford v. Edwards</u>, 946 F.3d 631, 634 (2d Cir. 2020) ("to maintain a claim under section 7-465, the plaintiff must . . . eventually prove that her injuries were not the result of the municipal employee's wilful or wanton act"); <u>Grasson v. Bd. of Educ. of Town of Orange</u>, No. CIV 3:09-CV-1584 (PCD), 2010 WL 1444570, at *3 (D. Conn. Apr. 12, 2010)

("[Section] 52–557(n)(a)(2)(A) bars [municipal] liability for the willful, wanton, intentional or reckless acts of its [employees].").  The common law claims brought against the City in Mr. Carmon's Amended Complaint make reference to all proceeding paragraphs, some of which allege individual defendants acted willfully.  See Am. Compl at ¶¶ 413, 419.  Consistent with Federal Rule of Civil Procedure 8(a), the court will construe Mr. Carmon's Amended Complaint to "do substantial justice," and thus declines to grant the City's Summary Judgment Motion on the basis of Mr. Carmon's seemingly inadvertent reference to intentional misconduct.  See Boains v. Lasar Mfg. Co., 330 F. Supp. 1134, 1137 (D. Conn. 1971) ("Mindful, . . . of the duty of the federal courts to construe pleadings generously to do substantial justice, and facilitate a proper decision on the merits, the court will view the pleadings already filed as sufficiently stating that narrow ground of . . . . liability." (cleaned up)).

d.     Section 52-557n and Immunity

Finally, the City argues that it is immune from Mr. Carmon's direct action claim, and that the imminent harm exception to discretionary act immunity does not apply. See City Mem. at 34-46.  In making this argument, the City suggests that Mr. Carmon's claim is premised on the City's decision not to "look into" Mr. Carmon's conviction.  See id. at 35-36.  Mr. Carmon responds that there are genuine issues of material fact that foreclose the availability of discretionary act immunity at this stage of the litigation. Opp'n at 52-56.  Mr. Carmon argues further that the City's analysis is unconvincing because it mischaracterizes his theories of liability.  Id. at 56.  Mr. Carmon (1) asserts a negligence theory in the alternative compelling indemnification; (2) alleges constitutional violations that do not require willful or wanton conduct; and (3) pleads constitutional claims on both bases of direct participation and failure to intervene.  Id. at 56-58.

55

For reasons the court has already explained, the court agrees with Mr. Carmon that issues of material fact remain that would bear directly on the City's ability to invoke discretionary act immunity. See, supra, part IV.B.2.b. Specifically, Mr. Carmon has adduced evidence upon which a reasonable jury could conclude that he was an identifiable victim in danger of imminent harm as a result of the NHPD's handling of the February 3 investigation. Id. Accordingly, the court declines to grant the City's Motion for Summary Judgment.

*            *            *

Therefore, the court denies the City's Motion Summary Judgment in part and grants the Motion in part. It is granted to the extent that Mr. Carmon seeks the City to indemnify individual defendants for their willful acts, or seeks indemnification on the basis of physical harms suffered by Mr. Carmon. The Motion is otherwise denied.

## V.    CONCLUSION

For the reasons stated above, the court denies Detective Carusone's Motion for Summary Judgment (Doc No. 119). The court also denies Detective Stephenson's Motion for Summary Judgment (Doc. No. 121). The court grants in part and denies in part the City's Motion for Summary Judgment (Doc. No. 122). The City's Motion is granted to the extent Mr. Carmon seeks the City to indemnify individual defendants for their willful acts or seeks indemnification on the basis of physical harms suffered by Mr. Carmon. The Motion is otherwise denied.

The parties are reminded that their Joint Pretrial Memorandum, in accordance with the court's Scheduling Order (Doc. No. 46), is due within 30 days of the entry of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 18th day of September 2025.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge